

| STATE OF NORTH CAROLINA FILED | ▶ FILE NO. **22-CVS-001507** |
|---|---|
| | In The General Court of Justice |
| New Hanover County    2022 NOV 30  A 9:52 | Superior Court Division |

NEW HANOVER CTY., G.S.C.

BY _____

Name of Plaintiff(s)
**EASTHAM,MARK**
**SPARK,PETER**

Name of Plaintiff's Attorney(s)
**BABEL,THOMAS,S**

[

**VERSUS**

[  **DISCOVERY SCHEDULING ORDER**

[  **(DSO)**

Local Rule 2.1(D)_____

Name of Defendant(s)
**PORT CITY CONTRACTING SERVICES INC**
**SHARPE,ROBERT,P**
**STONE BAY TACTICAL LLC**
**SRS SUPPLY LLC**

Name of Defendant's Attorney(s)
**JESSUP,ROBERT,HENRY,IV**
**PALANZA,ADDISON,TOMASKO**
**JESSUP,ROBERT,HENRY,IV**
**JESSUP,ROBERT,HENRY,IV**
**JESSUP,ROBERT,HENRY,IV**

**Discovery Scheduling Order and Order for Mediated Settlement Conference**
(unless the SRSCJ or presiding judge commissioned for the session allows an amended DSO, or the parties execute a Consent DSO):

1. Written discovery  -  60 days prior to trial                 **TRIAL DATE**
2. Expert witness  disclosure  -  60 days prior to trial          **05/29/2023**
3. Discovery depositions  -  30 days prior to trial
4. Completion of discovery (except *bene esse* depositions)  -  30 days prior to trial
5. Completion of mandatory mediated settlement conference *  -  30 days prior to trial
6. Dispositive motions  -  15 days prior to trial
7. Close of pleadings  -  15 days prior to trial

All calendared cases will be considered ready for trial whether or not counsel appear for the calendar call.
Counsel may determine the position of their case by contacting Valerie Jordan or Gwen Pruitt at (910) 772-6616.

11/29/2022
Date of Order                                 Phyllis M. Gorham
                                             Senior Resident Superior Court Judge

* The parties shall be required to pay the mediator's fee at the conclusion of the

settlement conference unless otherwise ordered by the Court.

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

MARK EASTHAM
And PETER SPARK,

     Plaintiffs,

vs.

PORT CITY CONTRACTING
SERVICES, INC., ROBERT P. SHARPE,
STONE BAY TACTICAL, LLC, and SRS
SUPPLY, LLC,

     Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 22-CVS-001507

2022 NOV 21  P  1: 14

NEW HANOVER COUNTY, C.S.C.

BY

ORDER

     THIS CAUSE came on for hearing before the undersigned Superior Court judge on the stipulation of all parties to the substitution of counsel for all Defendants.

     NOW THEREFORE, the Court, in its discretion, orders that the law firm of Howard, Stallings, From, Atkins, Angell & Davis and its attorneys, Robert H. Jessup and Ryan A. McCollum, shall be substituted as counsel for all Defendants, replacing the law firm of Reiss & Nutt, PLLC and its attorneys, W. Cory Reiss and Kyle J. Nutt, upon entry of this Order.

     This the 18 day of November 2022.

                             Superior Court Judge

STATE OF NORTH CAROLINA

FILED

New Hanover County

2022 DEC 30 ⊃ 2: 50

NEW HANOVER COUNTY, C.S.C.

BY _____

▶ File No. 22 CVS 1507

In the General Court of Justice
Superior Court Division

| | |
|---|---|
| *Name of Plaintiff(s)*<br>**Mark Eastman, et al** | |
| **VERSUS** | **ORDER TO**<br>**CLOSE FILE** |

*Name of Defendant(s)*
**Port City Contracting Services, Inc., et al**

---

It appearing to the undersigned Judge that this action is no longer an active lawsuit, that a trial of the case will probably not be necessary, and that the ends of justice will be best served by declaring the case inactive and removing it from the trial docket;

And the following circumstances support such conclusions:
**Notice of Bankruptcy  (see attached).**

**IT IS THEREFORE ORDERED** that this case file be closed and the action be removed from the trial docket, without prejudice to the rights of any party to move the court to re-open the file if further action becomes appropriate or necessary.

This the 30th day of December 2022.

Phyllis M. Gorham
Senior Resident Superior Court Judge

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

MARK EASTHAM and PETER SPARK,

  Plaintiffs,

v.

PORT CITY CONTRACTING SERVICES,
INC. and ROBERT P. SHARPE,

  Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CASE NO. 22 CVS 1507

**NOTICE OF BANKRUPTCY**

**COMES NOW**, Defendant Port City Contracting Services, Inc. (herein "Debtor"), by and through its undersigned counsel of record, and hereby states that it filed a Chapter 7 bankruptcy case in the United States Bankruptcy Court, Eastern District of North Carolina, Case No.: 22-02917-5-DMW on December 16, 2022. Thus, Debtor hereby requests that this action be stayed or otherwise discontinued as to Debtor.

  **DATED**: December 21, 2022.

         **HENDREN, REDWINE & MALONE, PLLC**

         By: _____
         Jason L. Hendren
         NC State Bar No. 26869
         Rebecca F. Redwine
         NC State Bar No. 37012
         Benjamin E.F.B. Waller
         NC State Bar No. 27680
         4600 Marriott Drive, Suite 150
         Raleigh, NC 27612
         Telephone: (919) 573-1422
         Facsimile: (919) 420-0475
         Email: jhendren@hendrenmalone.com
           rredwine@hendrenmalone.com
           bwaller@hendrenmalone.com
         *Attorneys for Defendant Port City Contracting*
         *Services, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing **NOTICE OF BANKRUPTCY** by depositing a copy thereof in an envelope bearing sufficient postage in the United States mail, addressed to the following person at the following address which is the last address known to me.

Thomas S. Babel
Davis Hartman Wright, LLP
P.O. Box 11320
Wilmington, NC 28404
*Counsel for Plaintiffs*

This the 21st day of December, 2022.

HENDREN, REDWINE & MALONE, PLLC

By: _____
Jason L. Hendren
NC State Bar No. 26869
Rebecca F. Redwine
NC State Bar No. 37012
Benjamin E.F.B. Waller
NC State Bar No. 27680
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: (919) 573-1422
Facsimile: (919) 420-0475
Email: jhendren@hendrenmalone.com
        rredwine@hendrenmalone.com
        bwaller@hendrenmalone.com
*Attorneys for Defendant Port City Contracting Services, Inc.*

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

F I L E D

2023 FEB -6  P 1: 54

NEW HANOVER CO., C.S.C.

BY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 22-CVS-001507

MARK EASTHAM and
PETER SPARK
                    Plaintiffs,

          v.

PORT CITY CONTRACTING
SERVICES, INC., ROBERT P.
SHARPE, STONE BAY TACTICAL,
LLC, and SRS SUPPLY, LLC,
                    Defendants.

)
)
)
)
)
)
)
)
)
)
)

NOTICE OF SUBSTITUTION

NOW COME PLAINTIFFS, through undersigned counsel and hereby provide notice of substitution of counsel, and states the following:

1. Thomas S. Babel is counsel for the Plaintiffs.
2. As of February 1, 2023, Thomas S. Babel became a member of the law firm of Equitas Law Partners, LLP.
3. Thomas S. Babel was formally an attorney at Davis Hartman Wright, LLP.
4. Plaintiffs desire to update the record to reflect that Thomas S. Babel is now a member of Equitas Law Partners, LLP and is to remain counsel for the Plaintiffs.
5. Plaintiffs respectfully request that the Court update the record to show Thomas S. Babel, Equitas Law Partners, LLP 330 Military Cutoff Road, Suite A2, Wilmington, NC 28405, (910) 900-8078 as counsel for the Plaintiffs.

RESPECTFULLY SUBMITTED, this the 6th day of February 2023.

Equitas Law Partners, LLP
330 Military Cutoff Road, Suite A-2
Wilmington, NC 28405
Telephone: (910) 900-8078

Thomas S. Babel
N.C. State Bar No. 35004
thomas@equitaslp.com
*Counsel for Counsel for Plaintiffs Mark Eastham and Peter Spark*

## CERTIFICATE OF SERVICE

      I hereby certify that I have this day served a copy of the foregoing **NOTICE OF SUBSTITUTION** by causing to be delivered to the party(ies) via electronic mail to the electronic mail address indicated below:

            **rmccollum@hsfh.com**

            **jhendren@hendrenmalone.com**

This the _____ day of February 2023.

                               _____

                               Thomas S. Babel
                               *Counsel for Plaintiffs Mark Eastham and*
                               *Peter Spark*

# Hendren, Redwine & Malone PLLC

ATTORNEYS AT LAW

J. MICHAEL MALONE
JASON L. HENDREN
REBECCA F. REDWINE
BENJAMIN E.F.B. WALLER

4600 MARRIOTT DRIVE, SUITE 150
RALEIGH, NORTH CAROLINA 27612
WWW.HENDRENMALONE.COM

LOCAL: 919-420-7867
TOLL FREE: 1-866-874-5253
FAX: 919-420-0475

Wednesday, December 21, 2022

**VIA FIRST CLASS MAIL**

New Hanover Clerk of Superior Court
P.O. Box 2023
Wilmington, NC 28402

> In re:  *Mark Eastham and Peter Spark v. Port City Contracting Services, Inc. and*
> *Robert P. Sharpe*
> *Case No. 22 CVS 1507*

Dear Clerk:

With respect to the above-referenced case, enclosed please find the original and two (2) copies of the Notice of Bankruptcy filed on behalf of Defendant Port City Contracting Services, Inc.

Please return a file-stamped copy to our office and one to counsel for the Plaintiffs in the self-addressed, postage prepaid envelopes provided.

If there are any issues with the enclosed filing, or if you have any questions, please call me at (919) 573-1426.

Sincerely,

**HENDREN, REDWINE & MALONE, PLLC**

Yazmeen O. Gadalla, NCCP
*Paralegal to Jason L. Hendren*

Encls.

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

FILED

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 22-CVS-001507

2023 JAN 12 P 12: 19

NEW HANOVER CO., C.S.C.

BY _____

MARK EASTHAM and
PETER SPARK

          Plaintiffs,

          v.

PORT CITY CONTRACTING
SERVICES, INC., ROBERT P.
SHARPE, STONE BAY TACTICAL,
LLC, and SRS SUPPLY, LLC,
          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

NOTICE OF HEARING

     PLEASE TAKE NOTICE that the undersigned will bring on for hearing the

Plaintiffs' Motion to Move Action from Inactive Status, at the January 24, 2023, Civil Session of

the New Hanover County Superior Court at 9:30 a.m. or as soon thereafter as the same may be

heard.

     RESPECTFULLY SUBMITTED, this the 12th day of January 2022.

                    Davis Hartman Wright LLP
                    P.O. Box 11320 (28404)
                    3819 Park Avenue, Suite B
                    Wilmington, NC 28403
                    Telephone and Facsimile: (910) 756-4070

By: _____
                    Thomas S. Babel
                    N.C. State Bar No. 35004
                    tsb@dhwlegal.com
                    *Counsel for Plaintiffs Mark Eastham*
                    *and Peter Spark*

NEW HANOVER COUNTY CLERK OF COURT

R166374 01/17/23 14:44:54

PAYOR: EASTHAM & SPARK
PAYEE: NOH/MOTN TO MOVE ACTION
CASE#: 22CVS001507 VCAP:Y
CITA#:

| | |
|---|---|
| 21450 MOTION FEE | 20.00 |
| TOTAL PAID | 20.00 |
| CO TENDERED | 20.00 |
| CHANGE | .00 |

9850 ID C64PMC

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing **NOTICE OF HEARING** by the following means:

☑ By causing to be delivered to the party(ies) via electronic mail to the electronic mail address indicated below:

rmccollum@hsfh.com
jhendren@hendrenmalone.com

This the 12th day of January 2022.

Thomas S. Babel
*Counsel for Plaintiffs Mark Eastham and Peter Spark*

FILED

STATE OF NORTH CAROLINA

2023 JAN 12 P 12: 20

COUNTY OF NEW HANOVER

NEW HANOVER CO., C.S.C.

BY _____

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 22-CVS-001507

MARK EASTHAM and
PETER SPARK
             Plaintiffs,

        v.

PORT CITY CONTRACTING
SERVICES, INC., ROBERT P.
SHARPE, STONE BAY TACTICAL,
LLC, and SRS SUPPLY, LLC,
             Defendants.

)
)
)
)
)
)
)
)
)
)
)

NOTICE OF HEARING

       PLEASE TAKE NOTICE that the undersigned will bring on for hearing the

Plaintiffs' Motion to Amend the Complaint, at the January 24, 2023, Civil Session of the New

Hanover County Superior Court at 9:30 a.m. or as soon thereafter as the same may be heard.

       RESPECTFULLY SUBMITTED, this the 12th day of January 2022.

                         Davis Hartman Wright LLP
                         P.O. Box 11320 (28404)
                         3819 Park Avenue, Suite B
                         Wilmington, NC 28403
                         Telephone and Facsimile: (910) 756-4070

By:

                         Thomas S. Babel
                         N.C. State Bar No. 35004
                         tsb@dhwlegal.com
                         *Counsel for Plaintiffs Mark Eastham*
                         *and Peter Spark*

NEW HANOVER COUNTY CLERK OF COURT

R166373 01/17/23 14:43:56

PAYOR: EASTHAM & SPARK
PAYEE: NOH/MOTN TO AMEND COMPLAINT
CASE#: 22CVS001507 VCAP:Y
CITA#:

| | |
|---|---|
| 21450 MOTION FEE | 20.00 |
| TOTAL PAID | 20.00 |
| CO TENDERED | 20.00 |
| CHANGE | .00 |

9850 ID C64PMC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the foregoing **NOTICE OF HEARING** by the following means:

       ☑ By causing to be delivered to the party(ies) via electronic mail to the electronic mail address indicated below:
           <u>rmccollum@hsfh.com</u>
           <u>jhendren@hendrenmalone.com</u>

This the 12th day of January 2022.

 

Thomas S. Babel
*Counsel for Plaintiffs Mark Eastham and Peter Spark*

STATE OF NORTH CAROLINA  F I L E D IN THE GENERAL COURT OF JUSTICE
                                                      SUPERIOR COURT DIVISION
COUNTY OF NEW HANOVER 22 DEC 12  A 11: 02  FILE NO.: 22-CVS-001507

MARK EASTHAM                NEW HANOVER CO., C.S.C.                                           V
and PETER SPARK,
                    Plaintiffs  BY

                                                )
                                                )
            v.                                  )         PLAINTIFFS' MOTION TO AMEND THE
                                                )                    COMPLAINT
PORT CITY CONTRACTING                           )
SERVICES, INC., ROBERT P.                       )
SHARPE, STONE BAY TACTICAL,                     )
LLC, and SRS SUPPLY, LLC,                       )
                    Defendants.                 )

 

        NOW COME Plaintiffs Mark Eastham and Peter Spark ("Plaintiffs"), by and through the

undersigned counsel and pursuant to Rule 15(a) of the North Carolina Rules of Civil Procedure,

bring their Motion to Amend the Complaint and state and aver in support as follows:

        1.      On or about June 22, 2022, Plaintiffs filed an Amended Complaint.

        2.      Plaintiffs, through counsel, provided Defendants with a draft copy of Plaintiffs'

Second Amended Complaint. A true and accurate copy of Defendants' Second Amended

Complaint is attached hereto and incorporated herein.

        3.      Defendants have consented to this Motion and the filing of the Second Amended

Complaint.

        4.      This Motion is brought in good faith and not for the delay and is further supported

by the doctrine of judicial economy.

        5.      Accordingly, Plaintiffs believe justice so requires the granting of this Motion.

        WHEREFORE, Plaintiffs request the Court grant its. Motion to Amend the Complaint.

RESPECTFULLY SUBMITTED, this the 9th day of December 2022.

Davis Hartman Wright LLP
P.O. Box 11320 (28404)
3819 Park Avenue, Suite B
Wilmington, NC 28403
Telephone and Facsimile: (910) 756-4070

By: _____

Thomas S. Babel
N.C. State Bar No. 35004
tsb@dhwlegal.com
*Counsel for Plaintiffs Mark Eastham
and Peter Spark*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing **Motion to Amend the Pleadings** by the following means:

    ☑ By causing to be delivered to the party(ies) via electronic mail to the electronic mail address indicated below:

        rmccollum@hsfh.com

This the 9th day of December 2022.

Thomas S. Babel
*Counsel for Plaintiffs Mark Eastham and Peter Spark*

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

FILE IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
2022 DEC 12 P 1:36 FILE NO.: 22-CVS-001507

NEW HANOVER CO., C.S.C.

BY _____

MARK EASTHAM and
PETER SPARK
        Plaintiffs,

v.

PORT CITY CONTRACTING
SERVICES, INC., ROBERT P.
SHARPE, STONE BAY TACTICAL,
LLC, and SRS SUPPLY, LLC,
        Defendants.

)
)
)
)
)
)
)
)
)
)

NOTICE OF HEARING

PLEASE TAKE NOTICE that the undersigned will bring on for hearing the

Plaintiffs' Motion to Amend the Complaint, at the January 4, 2023, Civil Session of the New

Hanover County Superior Court at 9:30 a.m. or as soon thereafter as the same may be heard.

RESPECTFULLY SUBMITTED, this the 12th day of December 2022.

Davis Hartman Wright LLP
P.O. Box 11320 (28404)
3819 Park Avenue, Suite B
Wilmington, NC 28403
Telephone and Facsimile: (910) 756-4070

By: _____

Thomas S. Babel
N.C. State Bar No. 35004
tsb@dhwlegal.com
*Counsel for Plaintiffs Mark Eastham
and Peter Spark*

NEW HANOVER COUNTY CLERK OF COURT

R165798 12/13/22 11:26:53

PAYOR: EASTHAM & SPARK
PAYEE: NOH/MOTN TO AMEND COMPLAINT
CASE#: 22CVS001507 VCAP:Y
CITA#:

| | |
|---|---|
| 21450 MOTION FEE | 20.00 |
| TOTAL PAID | 20.00 |
| CO TENDERED | 20.00 |
| CHANGE | .00 |

9699 ID C64PMC

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing **NOTICE OF HEARING** by the following means:

> ☑ By causing to be delivered to the party(ies) via electronic mail to the electronic mail address indicated below:
>
> rmccollum@hsfh.com

This the 12th day of December 2022.

Thomas S. Babel
*Counsel for Plaintiffs Mark Eastham and
Peter Spark*

STATE OF NORTH CAROLINA  FILED  IN THE GENERAL COURT OF JUSTICE
                                                  SUPERIOR COURT DIVISION
COUNTY OF NEW HANOVER 2022 NOV 22  ☐ 2: 11 FILE NO.: 22-CVS-001507

MARK EASTHAM                    NEW HANOVER CO., C.S.C.
And PETER SPARK,
                                BY _____
          Plaintiffs,                              )
                                                   )
vs.                                                )
                                                   )        CERTIFICATE OF SERVICE
PORT CITY CONTRACTING                              )
SERVICES, INC., ROBERT P. SHARPE,                  )
STONE BAY TACTICAL, LLC, and SRS                   )
SUPPLY, LLC,                                       )
                                                   )
          Defendants.                              )
                                                   )

        I, the undersigned attorney, hereby certify that the **ORDER** was duly served
on the following persons, pursuant to Rule 5 of the North Carolina Rules of Civil by
electronic mail:

        Thomas Babel
        Davis Hartman Wright, LLP
        P.O. Box 11320 (28404)
        Wilmington, NC 28403
        Fax: (910) 756-4080
        *Attorneys for Plaintiffs*

        Robert Jessup
        Ryan McCollum
        Howard, Stallings, From ,Atkins, Angell & Davis
        PO Box 12347
        Raleigh, NC 27605
        *Attorneys for Defendants*

-2-

This the 21st day of November 2022.

<div align="right">

REISS & NUTT, PLLC
*Attorneys for Defendants*

</div>

By:

W. Cory Reiss
N.C. State Bar No. 41549
Email: wcreiss@reissnutt.com
Kyle J. Nutt
N.C. State Bar No. 43469
Email: kjnutt@reissnutt.com
1221 Floral Parkway, Suite 104
Wilmington, NC 28403
Telephone: (910) 420-4674
Facsimile: (910) 420-4637

FILED

STATE OF NORTH CAROLINA        IN THE GENERAL COURT OF JUSTICE
                               SUPERIOR COURT DIVISION
COUNTY OF NEW HANOVER  2022 NOV 10  A 9: 23    FILE NO: 22-CVS-001507

NEW HANOVER CO., C.S.C.

BY _____

| | |
|---|---|
| MARK EASTHAM<br>And PETER SPARK,<br><br>    Plaintiffs,<br><br>vs.<br><br>PORT CITY CONTRACTING<br>SERVICES, INC., ROBERT P.<br>SHARPE, STONE BAY TACTICAL,<br>LLC, and SRS SUPPLY, LLC,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)   **CERTIFICATE OF SERVICE**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

    I hereby certify that I have this day served the foregoing **ORDER FOR EXTENSION OF TIME** on all parties to this action by electronic Mail:

        Thomas Babel
        Davis Hartman Wright, LLP
        P.O. Box 11320 (28404)
        Wilmington, NC 28403
        Fax: (910) 756-4080
        tsb@dhwlegal
        *Attorneys for Plaintiffs*

This the ___ day of November 2022

REISS & NUTT, PLLC
*Attorneys for Defendants*

By:

W. Cory Reiss
N.C. State Bar No. 41549
Email: wcreiss@reissnutt.com
1221 Floral Parkway, Suite 104
Wilmington, NC 28403
Telephone: (910) 420-4674
Facsimile: (910) 420-4637

FILED

STATE OF NORTH CAROLINA   IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
COUNTY OF NEW HANOVER 2022 NOV -7 P 2: 14 FILE NO.: 22-CVS-001507

NEW HANOVER CO., C.S.C.

BY_____

| | |
|---|---|
| MARK EASTHAM<br>And PETER SPARK,<br><br>        Plaintiffs,<br><br>vs.<br><br>PORT CITY CONTRACTING<br>SERVICES, INC., ROBERT P. SHARPE,<br>STONE BAY TACTICAL, LLC, and SRS<br>SUPPLY, LLC,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)     NOTICE OF FILING<br>)<br>)<br>)<br>)<br>)<br>) |

NOW COME Defendant Port City Contracting Services, Inc., and Robert P. Sharpe, by and through undersigned counsel of record, and duly gives Notice of Filing of the following documents in opposition to the Plaintiffs' Motion to Show Cause:

1. Affidavit of Robert P. Sharpe dated November 3, 2022; and

2. Affidavit of Michael Rudner dated November 1, 2022.

3. Response in Compliance with Order on Motion for Attachment.

Respectfully submitted this the 7th day of November 2022.

[SIGNATURE PAGE FOLLOWS]

REISS & NUTT, PLLC
1221 Floral Parkway, Suite 104 – Wilmington, North Carolina 28403

-2-

REISS & NUTT, PLLC
*Attorneys for Defendants*

By:

W. Cory Reiss
N.C. State Bar No. 41549
Email: wcreiss@reissnutt.com
Kyle J. Nutt
N.C. State Bar No. 43469
Email: kjnutt@reissnutt.com
1221 Floral Parkway, Suite 104
Wilmington, NC 28403
Telephone: (910) 420-4674
Facsimile: (910) 420-4637

## CERTIFICATE OF SERVICE

I, the undersigned attorney, hereby certify that the foregoing document was
duly served on the following persons, pursuant to Rule 5 of the North Carolina Rules
of Civil Procedure via electronic mail:

Thomas Babel
Davis Hartman Wright, LLP
P.O. Box 11320 (28404)
Wilmington, NC 28403
Fax: (910) 756-4080
Email: tsb@dhwlegal.com
*Attorneys for Plaintiffs*

This the 7th day of November 2022.

REISS & NUTT, PLLC
*Attorneys for Defendants*

By:

W. Cory Reiss

REISS & NUTT, PLLC
1221 Floral Parkway, Suite 104 - Wilmington, North Carolina 28403

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 22-CVS-001507

|  |  |
|---|---|
| MARK EASTHAM<br>And PETER SPARK,<br><br>           Plaintiffs,<br><br>vs.<br><br>PORT CITY CONTRACTING<br>SERVICES, INC., ROBERT P. SHARPE,<br>STONE BAY TACTICAL, LLC, and SRS<br>SUPPLY, LLC,<br><br>           Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AFFIDAVIT OF
ROBERT P. SHARPE**

I, Robert P. Sharpe, under oath, hereby state and affirm as follows:

1.      I am over the age of eighteen years, suffer from no legal disabilities, have personal knowledge of all matters herein asserted unless asserted upon information and belief, in which case I have a factual basis to believe them to be true, and am otherwise competent to testify to the contents of this Affidavit. I commonly go by the nickname "Trey."

2.      Following entry of a Temporary Restraining Order on May 4, 2022, PCC's counsel at the time, Addison T. Palanza, asked me to help gather certain information.  One of the documents he specifically requested was my pay stub for December of 2021, a request I then relayed to Michael Rudner, PCCS's president and the account administrator for our payroll vendor.  We produced that document to Addison, and others he requested.

-2-

3.     To the best of my recollection, I was not asked for all payroll records reflecting payment of my regular salary, which was known to all parties and was not a subject of any claims against me or the other Defendants.

4.     Had I thought those payroll records were at issue, I would have asked Michael for them.

5.     I understand that Michael was provided a report showing my income for the first three months of 2022 and has produced payroll statements for my salary paid in July and August but that due to actions taken by our former payroll vender following execution on PCCS's bank account, we lack direct access to that data for the first half of this year.

6.     My bank records reflect paycheck net deposits for April and May that are consistent with a decision at that time to cut payroll in half for those six weeks. A true and accurate copy of my screen showing bank paycheck deposits from the second quarter through present is attached as Exhibit A.

Further the Affiant sayeth not.

This the 3 day of October 2022.
November

ROBERT P. SHARPE

Sworn to and subscribed before me this the 3 day of October 2022.
November

NOTARY PUBLIC

My commission expires: 01-02-2027

REISS & NUTT, PLLC
1221 Floral Parkway, Suite 104 – Wilmington, North Carolina 28403



| Date ↑ | Description | Category | Amount |
|---|---|---|---|
| Apr 08, 2022 | Port City Contra Payroll | PAYCHECK | +$2,895.09 |
| Apr 21, 2022 | Port City Contra Payroll | Paycheck | +$2,895.07 |
| May 05, 2022 | Port City Contra Payroll | Paycheck | +$2,895.08 |



STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 22-CVS-001507

MARK EASTHAM
And PETER SPARK,

       Plaintiffs,

vs.

PORT CITY CONTRACTING
SERVICES, INC., ROBERT P. SHARPE,
STONE BAY TACTICAL, LLC, and SRS
SUPPLY, LLC,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF MICHAEL RUDNER**

NOW COMES Michael Rudner, Affiant, being first duly sworn, who deposes and states:

1.    I am above the age of eighteen years old, of sound mind, suffer from no legal disabilities, have personal knowledge of all matters herein asserted, or if stated upon information and belief I believe them to be true, and am otherwise competent to testify to the contents of this affidavit.

2.    I am President of Port City Contracting Services, Inc. ("PCCS"). I was appointed President on May 12, 2022, retroactively effective on April 8, 2022.

3.    Prior to April 8, 2022, Adrianne George was the administrator of our payroll account with MassPay, Inc.

4.    I was asked to assist in gathering documentation responsive to document demands in a Temporary Restraining Order entered on May 4, 2022. I

-2-

provided all documents that were requested of me and in the company's possession, custody, or control.

5.    Among the documents requested was a December 2021 pay stub for Trey Sharpe showing a $100,000 payment that was a focus of the lawsuit filed by the plaintiffs. That pay stub was produced.

6.    I was not informed that PCCS may have failed to comply with any document demands in the TRO until July of 2022 when I was asked for payroll information showing payments to Sharpe in 2022.

7.    I did not have access to the PCCS MassPay account at that time, however, and still have no access.

8.    In the first week of June, PCCS was notified that payroll run on June 3, could not be processed due to insufficient funds in its bank account.

9.    It is my understanding and belief that the cause of insufficient funds was that plaintiffs in another case, the DaVinci Company, LLC and DaVinci Aerospace, LLC, had obtained a default judgment against PCCS due to its attorney's failure to answer a Complaint, and that authorities had swept PCCS's bank account of all funds when executing on the judgment.

10.    Soon after that event, MassPay locked me out of the system.

11.    When I was asked in July for payroll data from the first half of the year, I had no access to it. Neither I nor anyone for PCCS to my knowledge had or has possession or control over data in the MassPay system. A true and accurate copy of an email I sent describing the issue on July 21, 2022 is attached hereto as Exhibit A.

-3-

12.     MassPay has since sent me a report showing the first quarter aggregated payroll amounts, taxes, and other data for January through March of 2022.[1] The report shows that Trey was paid gross wages in the amount of $38,078.05 for January through March.  A true and accurate but redacted copy of that page of the report, which is the only page directly responsive to the TRO demand, is attached hereto as Exhibit B.

13.     PCCS has no records, or access to records, showing payroll payments to Sharpe for April, May, or June.  However, PCCS shareholders and officers decided to cut payroll in half for April and the first two weeks of May.  Trey's salary of $15,000 would have resulted in a gross payment of approximately $7,500 in April and approximately $3,250 in May.  There was no payroll paid in the second half of May or in the month of June.

14.     I have seen bank deposit records for Sharpe that are consistent with that expectation.

15.     PCCS has since changed payroll processors to ADP.  Sharpe was paid his gross salary of $15,000 for July and August.  He was not paid for September.  True and accurate copies of Sharpe's earnings statements for July and August are attached as Exhibits B and C.

16.     The information contained herein and attached constitutes the only evidence of payroll payments to Sharpe in 2022 that is in PCCS's possession, custody, or control.

---

[1] The report sent to me has a date at the bottom of the pages showing 26-Apr-2022, but I have no knowledge of what that means.

-4-

This the 1 day of ~~October 2022.~~ MR   1ST NOVEMBER 2022

MICHAEL RUDNER

Sworn to and subscribed before me this
the 15th day of ~~October~~ November 2022.

NOTARY PUBLIC

My commission expires: 06 · 11 · 2025

Cintia Y Maybury
Notary Public
Pima County, Arizona
My Comm. Expires 06-11-25
Commission No. 608313

10/27/2022                                Reiss & Nutt, PLLC Mail - Attorney-Client Privilege



William Reiss <wcreiss@reissnutt.com>

## Attorney-Client Privilege

**michael rudner** <usmc4life1775@yahoo.com>                    Thu, Jul 21, 2022 at 2:48 PM
To: Cory Reiss <wcreiss@reissnutt.com>, Robert S <wilmingtondiver@gmail.com>
Cc: Holly Grange <holly.grange@pccsmedical.com>, Kyle Nutt <kjnutt@reissnutt.com>

Good Afternoon

I did have access to payroll but have been unable to log on for a while. I was locked out when this bank account was locked. My username and password are accepted but it will not allow me access to the site. The message i get is to contact our account administrator. I have reached out to them multiple times and get no return phone call or email. I am attempting to get hold of them now and will let you know as soon as I have gained access.

Sincere Thanks,
Michael Rudner
President
508-868-0449

[Quoted text hidden]



**Exhibit A**

NC DEPT. OF COMMERCE
DIVISION OF EMPLOYMENT SECURITY
P. O. BOX 26504
RALEIGH, NC 27611-6505

CONTINUATION SHEET FOR
REPORT OF EMPLOYEES WAGES

**PORT CITY CONTRACTING SERVICES INC**
EMPLOYER NAME

Page Number  1

ACCOUNT NUMBER



| | SOCIAL SECURITY NUMBER | INITIAL | INITIAL | LAST NAME | SEASONAL | WAGES PAID THIS QUARTER |
|---|---|---|---|---|---|---|
| **1/22** | ███ | | | | N | ███ |
| QUARTER-YEAR | ███ | | | | N | ███ |
| | ███ | | | | N | ███ |
| | ███ | | | | N | ███ |
| TYPE EMPLOYER NAME, ACCOUNT NUMBER, AND QUARTER-YEAR AS SHOWN ON FORM NCUI 101. | ███ | | | | N | ███ |
| | ███ | | | | N | ███ |
| | ███ | | | | N | ███ |
| | ███ | | | | N | ███ |
| | ███ | R | P | SHARPE | N | 38078.05 |
| RETURN THIS PAGE IF NEEDED TO COMPLETE REPORT | | | | | | |

14. PAGE TOTAL     133,962.71

NCUI 101-B

BH34|843|831  26-Apr-2022  10:52  24847149  1122

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| KC / 9YE 27473677 | 01/ | 5172669 | 1 of 1 |

Port City Contracting Services Inc
2017 Corporate Dr
Unit 4
WWilmington, NC 28405

## Earnings Statement



| Period Starling: | 07/01/2022 |
|---|---|
| Period Ending: | 07/31/2022 |
| Pay Date: | 08/22/2022 |

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 1 | Federal: |
| State: 1 | State: |
| Local: 0 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Robert Sharpe
245 Royal Fern Road
Wilmington, NC 28412

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | 15000.00 | 15000.00 |
| | | | | |
| Gross Pay | | | $15,000.00 | $15,000.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -2921.96 | 2921.96 |
| Social Security | -930.00 | 930.00 |
| Medicare | -217.50 | 217.50 |
| North Carolina State Income | -699.00 | 699.00 |
| | | |
| Net Pay | $10,231.54 | |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5372 | XXXXXXXXX | 10231.54 |

**Important Notes**

Basis of pay: Salaried

Your federal taxable wages this period are  $15,000.00

Port City Contracting Services Inc
2017 Corporate Dr
Unit 4
WWilmington, NC 28405

Pay Date:     08/22/2022

| Deposited to the account | account number | transit/ABA | amount |
|---|---|---|---|
| Checking DirectDeposit | XXXXXX5372 | XXXXXXXXX | 10231.54 |

THIS IS NOT A CHECK

Robert Sharpe
245 Royal Fern Road
Wilmington, NC 28412


Exhibit C

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| KC / 9YE 27473677 | 01/ | 5206204 | 1 of 1 |

Port City Contracting Services Inc
2017 Corporate Dr
Unit 4
WWilmington, NC 28405

# Earnings Statement

Period Starting:   08/01/2022
Period Ending:    08/31/2022
Pay Date:         09/02/2022

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal:    1 | Federal: |
| State:      1 | State: |
| Local:      0 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Robert Sharpe
245 Royal Fern Road
Wilmington, NC 28412

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 15000.00 | 30000.00 |
| **Gross Pay** | | | **$15,000.00** | **$30,000.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -2921.96 | 5843.92 |
| Social Security | -930.00 | 1860.00 |
| Medicare | -217.50 | 435.00 |
| North Carolina State Income | -699.00 | 1398.00 |
| **Net Pay** | **$10,231.54** | |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5372 | XXXXXXXXX | 10231.54 |

Important Notes

Basis of pay: Salaried

Your federal taxable wages this period are $15,000.00

Port City Contracting Services Inc
2017 Corporate Dr
Unit 4
WWilmington, NC 28405

Pay Date:        09/02/2022

| Deposited to the account | account number | transit/ABA | amount |
|---|---|---|---|
| Checking DirectDeposit | XXXXXX5372 | XXXXXXXXX | 10231.54 |

THIS IS NOT A CHECK

Robert Sharpe
245 Royal Fern Road
Wilmington, NC 28412



Exhibit D

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 22-CVS-001507

MARK EASTHAM
And PETER SPARK,

      Plaintiffs,

vs.

PORT CITY CONTRACTING
SERVICES, INC., ROBERT P. SHARPE,
STONE BAY TACTICAL, LLC, and SRS
SUPPLY, LLC,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

RESPONSE IN COMPLIANCE WITH
ORDER ON MOTION FOR
ATTACHMENT

Defendants Stone Bay Tactical, LLC and SRS Supply, LLC, by and through undersigned counsel, respond as follows to the Order Granting in Part and Denying in Part Motion for Prejudgment Attachment:

25.    Within ten (10) days of this Order, Stone Bay Tactical, LLC and SRS, LLC shall provide the identity of any banking or financial account, including the account number, in the name of Stone Bay Tactical, LLC or SRS Supply, LLC presently containing any funds that originated from PCCS to counsel for Plaintiffs, including the amount of such funds that are to be attached;

Response: None.

26.    Within ten (10) days of this Order, Stone Bay Tactical, LLC and SRS Supply, LLC shall provide the identity and location of any and all inventory and assets owned or held in their name that originated or were transferred from PCCS.

Response: None.

-2-

Respectfully submitted this the 27th day of ~~July~~ *October* 2022.

REISS & NUTT, PLLC
*Attorneys for Defendants*

By: _____

W. Cory Reiss
N.C. State Bar No. 41549
Email: wcreiss@reissnutt.com
Kyle J. Nutt
N.C. State Bar No. 43469
Email: kjnutt@reissnutt.com
1221 Floral Parkway, Suite 104
Wilmington, NC 28403
Telephone: (910) 420-4674
Facsimile: (910) 420-4637

## CERTIFICATE OF SERVICE

I, the undersigned attorney, hereby certify that the foregoing document was duly served on the following persons, pursuant to Rule 5 of the North Carolina Rules of Civil Procedure via electronic mail:

Thomas Babel
Davis Hartman Wright, LLP
P.O. Box 11320 (28404)
Wilmington, NC 28403
Fax: (910) 756-4080
Email: tsb@dhwlegal.com
*Attorneys for Plaintiffs*

This the 27th day of ~~July~~ *October* 2022.

REISS & NUTT, PLLC
*Attorneys for Defendants*

By: _____

W. Cory Reiss

REISS & NUTT, PLLC
1221 Floral Parkway, Suite 104 – Wilmington, North Carolina 28403



**HOWARD, STALLINGS,
FROM, ATKINS,
ANGELL & DAVIS, P.A.**

FILED

Telephone: 919.821.7700 | Facsimile: 919.821.7703 | PO Box 12347, Raleigh, NC 27605

ATTORNEYS at LAW

2022 NOV 10  P 12: 10

NEW HANOVER COUNTY, C.S.C.

BY _____

www.HowardStallings.com

I. Allan From
Joseph H. Stallings
Beth F. Atkins
James B. Angell
B. Joan Davis
Kenneth C. Haywood
Eugene W. Chianelli, Jr.
Brian E. Moore
Kathleen B. Coyle
Brooke L. Dalrymple
Linda Baugher Malone
Douglas D. Noreen
Robert H. Jessup
Rebecca Huffman Ugolick
Emily L. Langhenry
Anne M. Keyworth
Marianna M. Baggett
Brooke E. Webber
Wesley A. Stewart
Savannah E. Lavender

**Of Counsel**
E. Cader Howard

November 8, 2022

New Hanover County Clerk of Court
New Hanover County Courthouse
PO Box 2023
Wilmington, NC 28402

     Re:    22CVS001507  Mark Eastham and Peter Spark v. Port City Contracting Services, Inc. et al.

To the Clerk of Superior Court:

     Enclosed please find the original and one copy of a Notice of Appearance to be filed in the above captioned case. Please return the stamped 'Filed' copies to our office in the self-addressed stamped envelope provided.

     If you have any questions please do not hesitate to contact me.  Thank you for your assistance in this matter.

     Very truly yours,

     **HOWARD, STALLINGS, FROM &
     ATKINS, ANGELL & DAVIS, P.A.**

     Hallie Corbett

     Hallie S. Corbett
     Paralegal

STATE OF NORTH CAROLINA     FILED   IN THE GENERAL COURT OF JUSTICE
                                 SUPERIOR COURT DIVISION
COUNTY OF NEW HANOVER           FILE NO: 22-CVS-001507

2022 NOV -7 P 2: 15

NEW HANOVER CO., C.S.C.

BY_____ )____ CW_____

| | |
|---|---|
| MARK EASTHAM<br>And PETER SPARK, | )<br>) |
| Plaintiffs, | )<br>) |
| | )<br>) |
| vs. | )     **MOTION FOR EXTENSION OF TIME**<br>) |
| PORT CITY CONTRACTING<br>SERVICES, INC., ROBERT P.<br>SHARPE, STONE BAY TACTICAL,<br>LLC, and SRS SUPPLY, LLC, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

NOW COME the Defendants, PORT CITY CONTRACTING SERVICES, INC., ROBERT P. SHARPE, STONE BAY TACTICAL, LLC, and SRS SUPPLY, LLC, ("Defendants"), by and through undersigned counsel, and pursuant to Rule 6(b) of the North Carolina Rules of Civil Procedure, move the Court for the entry of an order extending the time within which they may respond to the Plaintiff's Second set of Requests for Production of Documents. In support hereof, Defendant's respectfully show the Court the following:

     1. That the Defendants were served with the Discovery Requests on October 19th, 2022.

     2. That the time for responding to the same has not expired.

3. That the Defendants are in need of an additional thirty (30) days to adequately prepare a response to the Discovery Requests.

**WHEREFORE,** Defendants pray the Court for an extension of an additional thirty (30) days to respond to the Discovery Requests, up to and including the 18th day of December 2022

This the 7th day of November 2022.

REISS & NUTT, PLLC
*Attorneys for Defendants*

By: _____
W. Cory Reiss
N.C. State Bar No. 41549
Email: wcreiss@reissnutt.com
1221 Floral Parkway, Suite 104
Wilmington, NC 28403
Telephone: (910) 420-4674
Facsimile: (910) 420-4637

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing *MOTION FOR EXTENSION OF TIME* on all parties to this action by electronic Mail:

Thomas Babel
Davis Hartman Wright, LLP
P.O. Box 11320 (28404)
Wilmington, NC 28403
Fax: (910) 756-4080
tsb@dhwlegal
*Attorneys for Plaintiffs*

This the 7 day of November 2022

REISS & NUTT, PLLC
*Attorneys for Defendants*

By: _____

W. Cory Reiss
N.C. State Bar No. 41549
Email: wcreiss@reissnutt.com
1221 Floral Parkway, Suite 104
Wilmington, NC 28403
Telephone: (910) 420-4674
Facsimile: (910) 420-4637

FILED

STATE OF NORTH CAROLINA    IN THE GENERAL COURT OF JUSTICE
                                                              SUPERIOR COURT DIVISION
COUNTY OF NEW HANOVER    2022 NOV -8  P 2:07    FILE NO: 22-CVS-001507

NEW HANOVER CO., C.S.C.

BY_____

| | |
|---|---|
| MARK EASTHAM<br>And PETER SPARK, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) |
| vs. | )    MOTION FOR EXTENSION OF TIME |
| | ) |
| PORT CITY CONTRACTING | ) |
| SERVICES, INC., ROBERT P. | ) |
| SHARPE, STONE BAY TACTICAL, | ) |
| LLC, and SRS SUPPLY, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

NOW COME the Defendants, PORT CITY CONTRACTING SERVICES, INC.,
ROBERT P. SHARPE, STONE BAY TACTICAL, LLC, and SRS SUPPLY, LLC,
("Defendants"), by and through undersigned counsel, and pursuant to Rule 6(b) of the
North Carolina Rules of Civil Procedure, move the Court for the entry of an order
extending the time within which they may respond to the Plaintiff's First Request for
Admissions. In support hereof, Defendant's respectfully show the Court the following:

1. That the Defendants were served with the Plaintiff's First Request for Admissions
on October 19th, 2022.

2. That the time for responding to the same has not expired.

3. That the Defendants are in need of an additional thirty (30) days to adequately
prepare a response to the Plaintiff's First Request for Admissions.

WHEREFORE, Defendants pray the Court for an extension of an additional thirty (30) days to respond to the Plaintiff's First Request for Admissions, up to and including the 18th day of December 2022

This the 8 day of November 2022.

REISS & NUTT, PLLC
*Attorneys for Defendants*

By:

W. Cory Reiss
N.C. State Bar No. 41549
Email: wcreiss@reissnutt.com
1221 Floral Parkway, Suite 104
Wilmington, NC 28403
Telephone: (910) 420-4674
Facsimile: (910) 420-4637

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing *MOTION FOR EXTENSION OF TIME* on all parties to this action by electronic Mail:

Thomas Babel
Davis Hartman Wright, LLP
P.O. Box 11320 (28404)
Wilmington, NC 28403
Fax: (910) 756-4080
tsb@dhwlegal
*Attorneys for Plaintiffs*

This the 6 day of November 2022

REISS & NUTT, PLLC
*Attorneys for Defendants*

By:

W. Cory Reiss
N.C. State Bar No. 41549
Email: wcreiss@reissnutt.com
1221 Floral Parkway, Suite 104
Wilmington, NC 28403
Telephone: (910) 420-4674
Facsimile: (910) 420-4637

STATE OF NORTH CAROLINA          FILED    IN THE GENERAL COURT OF JUSTICE
                                          SUPERIOR COURT DIVISION
COUNTY OF NEW HANOVER  2022 OCT - 5  A  9: 24 FILE NO.:  22-CVS-001507

MARK EASTHAM                          )
and PETER SPARK,                      )
                Plaintiffs            )
                                      )
                                      )
            v.                        )
                                      )          MOTION TO SHOW CAUSE
PORT CITY CONTRACTING                 )
SERVICES, INC., ROBERT P.             )
SHARPE, STONE BAY TACTICAL,           )
LLC, and SRS SUPPLY, LLC,             )
                Defendants.           )

NOW COME Plaintiffs Mark Eastham ("Eastham") and Peter Spark ("Spark") through

the undersigned counsel and move the Court to require Defendant Robert P. Sharpe ("Sharpe")

to appear and show cause why he should not be held in civil contempt for violating the

Preliminary Injunction Order entered on September 26, 2022 (attached hereto as Exhibit A).

## **MOTION TO SHOW CAUSE**

1.      Paragraph 134 of the Preliminary Injunction Order states "Sharpe is prohibited

from publishing defamatory statements about Eastham or Spark."

2.      On September 30, 2022, Sharpe violated the Preliminary Injunction Order by

publishing defamatory statements about Eastham and Spark on LinkedIn.

3.      On September 30, 2022, Sharpe published the LinkedIn profile of counsel for

Plaintiffs, and stated that counsel was representing "the men that abused and exploited" him and

encouraged a lawsuit to be filed related to the posting stating "do it."

4.      On or about October 1, 2022, Sharpe published defamatory statements about

Eastham and Spark on Facebook.

5.      On or about October 1, 2022, Sharpe again published the profile of counsel for Plaintiffs on Facebook stating that counsel represented Mr. Eastham and Mr. Spark and that they had "mentally abused and financially exploited me" and further stated that counsel of record should "bring it."

6.      On or about October 1, 2022, counsel for Plaintiffs sent a letter (attached hereto as Exhibit B) outlining the violations and requesting Sharpe remove the publications by the end of business on Monday, October 3, 2022.

7.      On or about October 1, 2022, counsel for Plaintiffs also left a voicemail with counsel for Sharpe concerning the violations and other matters published by Sharpe.

8.      As of October 3, 2022, Sharpe had not removed the publications.

9.      Sharpe continued to publish defamatory statements about Eastham and Spark on both LinkedIn and Facebook through October 4, 2022.

10.     Sharpe published on October 4, 2022, that he would not remove the publications stating that he "was threatened with a lawsuit if I didn't take down my claims of fraud and whistleblower retaliation. As a Marine, I earned my right to free speech. I will not be afraid to post the truth."

11.     Attached hereto and incorporated herein as Exhibit C is the affidavit of Mr. Spark that encloses and authenticates the screenshots of Sharpe's publications.

WHEREFORE, Plaintiffs pray the Court as follows:

1.      That Defendant Sharpe be Ordered to appear and show cause, if any, why he should not be held in civil contempt for his failure to comply with the Court's Preliminary Injunction Order;

    2.       That Sharpe be ordered to remove the publications, and to publish a

retraction;

    3.       That Sharpe be ordered to pay Plaintiffs' reasonable attorneys' fees;

    4.       That Sharpe be ordered to submit a cash bond to be used to secure any

additional damages caused by violations of the Preliminary Injunction; and

    5.       For such other relief this Court deems justified and necessary.


RESPECTFULLY SUBMITTED, this the 4th day of October 2022.


                    Davis Hartman Wright LLP
                    P.O. Box 11320 (28404)
                    3819 Park Avenue, Suite B
                    Wilmington, NC 28403
                    Telephone and Facsimile: (910) 756-4070

By:

                    Thomas S. Babel
                    N.C. State Bar No. 35004
                    tsb@dhwlegal.com
                    *Counsel for Plaintiffs Mark Eastham*
                    *and Peter Spark*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing **Motion to Show Cause** by the following means:

☑ By causing to be delivered to the party(ies) via electronic mail to the electronic mail address indicated below:
wcreiss@reissnutt.com

This the 4th day of October 2022.

Thomas S. Babel
*Counsel for Plaintiffs Mark Eastham and Peter Spark*

**Exhibit A**

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 22-CVS-001507

FILED

2022 SEP 26  A 9 22

NEW HANOVER CTY., C.S.C.

BY _____

MARK EASTHAM
and PETER SPARK

Plaintiff

v.

PORT CITY CONTRACTING
SERVICES, INC., ROBERT P.
SHARPE, STONE BAY TACTICAL,
LLC, and SRS SUPPLY, LLC,
                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

PRELIMINARY RESTRAINING ORDER

THIS MATTER came before this Court on September 8, 2022, on Plaintiffs' Motion for
Preliminary Restraining Order. Based on the Verified Amended Complaint, the Affidavits,
Deposition transcripts, the Court's record, and other materials provided to the Court, and the
arguments of counsel, the Court FINDS AND ORDERS THE FOLLOWING:

## FINDINGS OF FACT

1.    Mark Eastham is an adult individual and citizen and resident of Minnesota.

2.    Peter Spark is an individual and is a citizen and resident of New Hanover County,
North Carolina.

3.    Defendant Port City Contracting Services, Inc. ("PCCS") is a North Carolina
corporation with its registered agent and principal offices in New Hanover County, North
Carolina.

4.    Defendant Robert P. Sharpe ("Sharpe") was the Chief Executive Officer ("CEO")
of Defendant PCCS and is a citizen and resident of New Hanover County, North Carolina.

5.   Defendant PCCS is in the business of supplying diabetes testing strips and whose primary customer is the United States Department of Veterans Association.

6.   Defendant PCCS is a service-disabled veteran owned business.

7.   Plaintiffs are shareholders and former officers of Defendant PCCS. Together, the Plaintiffs are the owners of 40% of Class B shares of Defendant PCCS.   Eastham owns 25% of Class B shares and Spark owns 15% of Class B shares of Defendant PCCS.

8.   Sharpe is a shareholder of Defendant PCCS and is the owner of 100% of Class A shares of Defendant PCCS, and the owner of approximately 40% of Class B shares of Defendant PCCS.

9.   Pursuant to the Statement of Shareholder of Defendant PCCS only Class A shareholders have the right to vote during shareholder meetings, and effectively hold all of the power to run Defendant PCCS.

10.   Sharpe is the majority owner of shares of Defendant PCCS, and as such owes a fiduciary duty to the minority shareholders of Defendant PCCS, which includes Plaintiffs.

11.   PCCS was originally formed as a North Carolina limited liability company.

12.   Eastham was an owner of membership interest in PCCS when it was a limited liability company.

13.   On June 30, 2020, PCCS was converted from a North Carolina limited liability company to a North Carolina corporation.

14.   As a former owner of membership interests in PCCS, Eastham recognized personal income, which was recognized on a K-1 issued by the company.

15.   In December 2021, PCCS paid the tax liability for the income recognized by Eastham when PCCS converted from a limited liability company to a corporation.

16. At the same time, Defendant Sharpe's similar tax liability was also paid by PCCS.

17. Throughout Eastham's employment with Defendant PCCS, Eastham served as Chief Operating Office and President.

18. Throughout Spark's employment with Defendant PCCS, Spark served as Chief Financial Officer and Secretary of the Board of Directors.

19. Because Defendant PCCS was a startup company, it could not afford to pay the agreed upon salaries of key employees until its revenues grew.

20. As a result, certain key employees, including Plaintiffs Eastham and Spark, agreed to defer receipt of their full wages until Defendant PCCS had sufficient financial means to pay their deferred compensation.

21. Plaintiffs Eastham's and Spark's accrued deferred compensation was tracked and recorded on the books and records of PCCS starting in August 2020.

22. Sharpe was aware of PCCS' obligation to pay deferred compensation to Plaintiffs Eastham and Spark has been on the books and records of PCCS since August 2020.

23. In January 2021, Eastham left the employ of PCCS. At the time, Eastham owned 3,194 shares of PCCS.

24. On June 7, 2021, PCCS and Eastham entered into a Stock Redemption and Release Agreement ("Release Agreement") wherein PCCS agreed to purchase and redeem 1,916 of Eastham shares in PCCS in exchange for $60,000.00.

25. The payments under the Release Agreement were triggered by the sale of diabetic test strips. As of September 16, 2021, PCCS had sold sufficient diabetic test strips to pay Eastham $23,830.00 under the Release Agreement. PCCS failed to pay Eastham.

26.     As of December 2021, PCCS had approximately $600,000.00 in its bank accounts.  At this time, PCCS had sufficient funds to pay Eastham under the Release Agreement but failed to make any payment under the Release Agreement.

27.     PCCS had sufficient funds from January 2022-April 2022, to pay Eastham under the Release Agreement but failed to make any payment.

28.     Later in 2021, Eastham returned to PCCS as an employee to serve as the COO.

29.     Defendant PCCS experienced significant revenue and profit growth in 2020 and 2021.

30.     On or about December 10, 2021, Plaintiff Eastham, Defendant Sharpe, Jay Graves, Ryan Albert, and Adrianne George, who was the president of PCCS, held a meeting to discuss compensation ("December Meeting").

31.     At the time of the December Meeting, Eastham, Spark, and Sharpe were three Directors for Defendant PCCS and members of its compensation committee.

32.     At the December Meeting, Sharpe announced that he was unilaterally giving himself a significant increase in salary and an annual $100,000.00 bonus.  Sharpe admitted that the bonus was based on the fact that he was owed deferred compensation in the amount of $170,000.00 from PCCS.

33.     Sharpe also used Defendant PCCS funds to lease a car for his own personal use over the objection of the other key employees and members of the compensation committee.

34.     Eastham objected to Sharpe's plan to dramatically increase his pay and to issue himself a bonus, given that Defendant PCCS had promised to pay the deferred compensation to key employees when it was financially able.

35.   At the time of the December 10, 2021, PCCS owed $357,500.00 in deferred compensation to it key employees.

36.   Eastham informed Sharpe that Defendant PCCS needed to pay the deferred compensation as it had promised its key employees.  Sharpe did not object to Eastham's position but stated that he didn't know that PCCS had such a large amount of deferred compensation on its books and records.

37.   Following the December Meeting, Eastham, on behalf of the other minority shareholders, sent an email to Sharpe stating that the deferred compensation should be paid before Defendant PCCS paid additional salary and bonuses to Sharpe.

38.   After the December Meeting, and after the email from Eastham, Defendant Sharpe held a telephone call with Plaintiffs Eastham and Spark, and Adrianne George.  During this call, the deferred compensation was discussed, and Sharpe admitted that maybe he was wrong as to the deferred compensation issue.

39.   At no time during the December Meeting, or after, did Sharpe state that Plaintiffs Eastham or Spark were not owed deferred compensation because they were issued equity in PCCS equal to the amount of deferred compensation that was reflected on the books and records of PCCS.

40.   On or about December 14, 2021, Sharpe informed both Eastham and Spark that they were being terminated from employment and removed as officers and directors of Defendant PCCS.

41.   Following Eastham's termination, Sharpe threatened that, if Eastham took action against Defendant PCCS, then Sharpe would "file a criminal complaint" that "will be federal" against Eastham.

42.   Following Spark's, who is a UK national, termination, Sharpe threatened to have him deported.

43.   Sharpe also attempted to have Spark arrested for stealing Defendant PCCS property. After investigating the complaint, the local authorities decided that there was no support for any criminal actions against Spark and dropped the matter.

44.   Sharpe exercises complete control over Defendant PCCS as its only voting shareholder.

45.   In the fall of 2021, Sharpe unilaterally decided that he wanted to start a new company to sell weapons to military veterans. The stated business of selling weapons was different than PCCS' business.

46.   Initially, this company was called Stone Bay Tactical and was a DBA of PCCS. A Federal Firearms License was issued to PCCS but listed the business name of Stone Bay Tactical.

47.   Ultimately, Stone Bay Tactical, LLC was formed with all of the membership interests being owned by Sharpe.

48.   Stone Bay Tactical, LLC's principal place of business is the same address of PCCS.

49.   Sharpe used funds of Defendant PCCS to capitalize and purchase inventory for Stone Bay Tactical, LLC.

50.   This included a cache of weapons with a stated value of $120,400.00 ("Stone Bay Weapons"). A list of the Stone Bay weapons is attached hereto as Exhibit A.

51.    Sharpe also used the warehouse owned by Defendant PCCS to store the Stone

Bay Weapons, inventory, and other materials of Stone Bay Tactical, LLC and used the

employees of Defendant PCCS to do work for Stone Bay Tactical, LLC.

52.    For instance, Sharpe hired David Danel to be the president of Stone Bay Tactical,

LLC. However, David Danel's salary was paid by PCCS.

53.    As part of his responsibilities, David Danel was to open a bank account in the

name of Stone Bay Tactical, LLC and to obtain a federal firearms license. Mr. Danel was unable

to do either because of the poor financial condition of Sharpe, who was the owner of Stone Bay

Tactical, LLC.

54.    Sharpe traveled to Las Vegas on behalf of Stone Bay Tactical, LLC to attend a

military trade show. Sharpe used PCCS funds to pay for the trip and for other expenses during

the show.

55.    The military show had nothing to do with the business of PCCS.

56.    The PCCS funds used by Stone Bay Tactical, LLC were never paid back to PCCS

and there is no intercompany agreement between the entities recognizing that Stone Bay

Tactical, LLC owes a debt to PCCS.

57.    Sharpe also used PCCS funds to purchase inventory for SRS Supply, LLC.

58.    SRS Supply, LLC was a company formed by Sharpe and which he owned all of

the membership interests.

59.    SRS Supply, LLC's principal place of business is the same address as PCCS.

60.    SRS Supply, LLC was formed in order to sell PPE materials on Ebay.

61.    Sharpe used PCCS funds to purchase inventory for SRS Supply, LLC.

62.    Sharpe used PCCS employees to do work for SRS Supply, LLC.

63. Sharpe also used Defendant PCCS' warehouse to store inventory and other materials of SRS Supply, LLC.

64. The PCCS funds used by SRS Supply, LLC were never paid back to PCCS and there is no intercompany agreement between the entities recognizing that SRS Supply, LLC owes a debt to PCCS.

65. Sharpe, Stone Bay Tactical, LLC or SRS Supply, LLC have converted the assets of Defendant PCCS.

66. Sometime in March 2022, Sharpe left the United States and traveled to the Ukraine.

67. Initially, Sharpe represented that he was going to the Ukraine to sell body armor to the Ukraine government, which had nothing to do with the business of PCCS.

68. However, while in the Ukraine, Sharpe represented to various military officers at the U.S. Embassy in Poland that he was resigning his position as CEO of PCCS and was going to work as a foreign agent.

69. Sharpe also represented to the General Court of Justice, Superior Court Division, Guilford County, North Carolina that he traveled to the Ukraine to provide humanitarian aid to the refugees fleeing Ukraine due to the military advancements of the Russian army.

70. Ultimately, on March 20, 2022, Sharpe, in email, which was published to a number of third-parties, resigned his position as the CEO of PCCS and represented that he was going to fight for the Ukrainian military in their defense of the invasion by Russia.

71. In the March 20, 2022 email, Sharpe published to third-parties that Plaintiffs Eastham and Sharpe had defrauded PCCS, intended to "steal company business", and had embezzled from the company.

72.    On April 3, 2022, Sharpe sent a text to Mark Eastham wherein Sharpe apologized to Mr. Eastham for "anything I did to hurt you" and further stated that he was "serving in Ukraine. I am going to enlist and try and find some peace through service."

73.    Sharpe used the funds of Defendant PCCS to pay for his travel and other costs while in the Ukraine.

74.    Sharpe has not reimbursed PCCS for the funds he used while in the Ukraine and there is no agreement with PCCS for the repayment of these amounts.

75.    When Sharpe was in the Ukraine, he also used funds of Defendant PCCS to purchase weapons and other military supplies that he intended to sell or give to the Ukrainian military.

76.    The weapons that Sharpe purchased with Defendant PCCS funds are currently being stored in a warehouse owned or leased by Defendant PCCS.

77.    The weapons purchased by Sharpe with Defendant PCCS funds have no relationship to the business of Defendant PCCS.

78.    Despite his written recognition as the CEO of Defendant PCCS, Sharpe continued to be a signatory on the bank accounts for the company and continued to control debits and withdraws from the company bank account.

79.    In addition, Sharpe, while still in the Ukraine, and after he resigned as CEO, terminated the employment of the president of PCCS, Adrianne George.  Sharpe did not provide any justification for the termination.

80.    As a result, on March 25, 2022, Ryan Albert, who is a license pharmacist, and was the pharmacist for PCCS, resigned from PCCS.

81.   In March 2022, there were few individuals that worked at Defendant PCCS, and, consequently, there was little to no supervision of Sharpe's activities as they relate to Defendant PCCS.

82.   Currently, there are only two officers of PCCS, Holly Grange, CEO, and Michael Rudner, President.

83.   On February 4, 2022, Plaintiffs, through counsel, made demand on PCCS for payment of their deferred compensation, payment under the Release Agreement, and for PCCS to investigate the actions of Sharpe.

84.   PCCS never responded to the February 4, 2022, letter.

85.   Defendants have failed to pay Plaintiffs the deferred compensation.

86.   On February 28, 2022, by and through counsel, Eastham made a written demand on Defendant PCCS pursuant to N.C. Gen. Stat. §55-16-02 for the inspection of corporate books and records.

87.   Defendant PCCS did not respond to the February 28, 2022, demand for inspection of the corporate records.

88.   On July 13, 2022, after the filing of this action, PCCS responded to the February 28, 2022, demand but failed to provide all of the requested and required information.

89.   Sharpe, as the majority shareholder, and while he was the CEO of PCCS, failed to follow the By-Laws and other corporate governing documents for the corporation.

90.   On May 4, 2022, the Plaintiffs filed a Verified Complaint bringing claims against PCCS and Sharpe.

91.   On May 4, 2022, the Court entered a Temporary Restraining Order and ordered expedited discovery.

92.    As part of the expedited discovery order, PCCS was to provide the location of any and all bank accounts in the name of PCCS, to produce corresponding bank statements from December 10, 2021, to the present, and to identify and provide the location of all assets of PCCS.

93.    After the filing of this action, Sharpe sent a text message to David Danel wherein Sharpe accused David Danel of trying to harm Sharpe and PCCS. Sharpe further stated that he "was planning to let your betrayals go and move on. Not anymore." During the deposition of Sharpe, he stated that part of the alleged betrayals referenced in the text message was that he alleged that David Danel was trying to steal certain business from PCCS. Sharpe later admitted that he had offered to sell David Danel the same business he accused Mr. Danel of trying to steal, and that he also intended to offer to sell the business to the Plaintiffs, if Mr. Danel would not purchase the business.

94.    On May 4, 2022, Plaintiffs, through counsel, sent a demand letter to PCCS pursuant to N.C. Gen. Stat. §55-7-42 and demanded that the company investigate the claims against Sharpe.

95.    On May 17, 2022, PCCS responded to the May 4, 2022, demand letter and refused to bring claims against Sharpe.

96.    On May 17, 2022, PCCS produced certain records in response of the expedited discovery order. The records produced included bank statements from First National Bank.

97.    The First National Bank statements showed that in December 2021, PCCS had approximately $600,000.00 in its bank accounts but by May 2022 the bank accounts had zero or deficient amounts.

98.    On May 31, 2022, a mediation was conducted in this action. The mediation was requested by Defendants.

108. On July 27, 2022, the Court entered an order of prejudgment attachment against Stone Bay Tactical, LLC and SRS Supply, LLC. As part of the Order, the Court found that Plaintiffs are creditors of Defendants and that there are insufficient funds to satisfy their debt.

109. On July 20, 2022, Defendants produced additional documents to Plaintiffs. As part of this production, it was disclosed that the $172,608.00 payment from the U.S. Government was deposited on June 23, 2022, into an account in the name of Grange Council, LLC.

110. July 26, 2022, PCCS and Sharpe were deposed.

111. During the deposition, Defendants disclosed that Sharpe directed the U.S. Government to deposit the $172,608.00 into the account of Grange Council, LLC, that there was no relationship between PCCS and Grange Council, LLC, and there was no agreement related to the PCCS funds between PCCS and Grange Council, LLC.

112. During the deposition, and based on additional records produced, it was disclosed that the PCCS account at First Citizen's Bank as of July 2022 had a negative balance.

113. As of July 2022, all of the bank accounts in the name of PCCS had either a zero balance or a negative balance.

114. Sharpe has ignored the corporate formalities of PCCS, has conducted PCCS as if he is the sole owner, and has used PCCS assets as if they were his own personal property.

115. During the deposition, Defendants further testified that PCCS was still in business and that it was making bids and receiving awards from the U.S. Government.

116. In August 2022, PCCS was paid approximately $500,000.00 from the U.S. Government. PCCS was not able to account for these funds.

117. Sharpe has represented to third-parties that neither he nor PCCS will ever pay Plaintiffs Eastham or Spark any amount owed to them for their deferred compensation, the Release Agreement, or as shareholders of PCCS.

## CONCLUSION OF LAW

118. This Court has subject matter jurisdiction over this action pursuant to N.C. Gen. Stat. §7A-243 and other applicable bases for jurisdiction.

119. This Court has personal jurisdiction over the Defendants pursuant to N.C. Gen. Stat. §1-75.4 and other applicable bases for jurisdiction.

120. Venue is proper in this Court pursuant to N.C. Gen. Stat. §§1-79, 1-82, and N.C. Gen. Stat. §55-14-31, and other applicable bases for venue.

121. Preliminary relief may be issued by the Court: "(1) if a plaintiff is able to show likelihood of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation." *Redlee/SCS, Inc. v. Pieper*, 153 N.C. App. 421, 423, 571 S.E.2d 8, 11 (2002) (quoting *A.E.P. Industries v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759-60 (1983); *SED Holdings, LLC v. 3 Star Properties, LLC*, 246 N.C. App. 632 (2016); *see also* Rule 65(b) of the North Carolina Rules of Civil Procedure.

122. Plaintiffs have established through the verified pleadings, and attached and incorporated exhibits, the affidavits, the deposition transcripts, the Court's record, and other materials provided during the hearing, that they have a likelihood of success on the merits of its claims brought against Defendants.

123. Plaintiffs have established through the verified pleadings, and the attached and incorporated exhibits, the affidavits, the deposition transcripts, the Court's record, and the other

materials provided during the hearing, that they will suffer irreparable harm if the temporary
injunction is not granted by this Court.

124. Plaintiffs have established through the verified pleadings, and the attached and
incorporated exhibits, the affidavits, the deposition transcripts, the Court's record, and other
materials provided during the hearing, that a temporary injunction in this action is necessary for
the protection of Plaintiffs' rights and to maintain the status quo until the conclusion of this
action.

125. This Court concludes that "findings of fact made during a preliminary
injunction proceeding are not binding upon a court at a trial on the merits." *Lohrmann v. Iredell
Mem'l Hosp., Inc.*, 174 N.C. App. 63, 75, 620 S.E.2d 258, 265 (2005).

126. This Court has considered the necessity of a bond under Rule 65 of the North
Carolina Rules of Civil Procedure and finds, as further set forth below, that a nominal bond will
suffice to protect Defendants.

BASED ON THE FINDINGS OF FACT AND CONCLUSIONS OF LAW, the
arguments of counsel, the Court hereby grants Plaintiffs' Motion and ORDERS as follows:

127. Other than for business reasons, the bank accounts of Defendant PCCS will be
frozen, and Sharpe will not have access to any account of Defendant PCCS;

128. Defendants shall disclose to Plaintiffs within ten (10) days from opening, the
identity, with account number, of any new bank account opened in the name of PCCS, Stone Bay
Tactical, LLC, or SRS Supply, LLC;

129. The other physical assets of Defendant PCCS will be frozen and will not be
disposed of, other than for ordinary business reasons;

130. Any funds generated by the operation of PCCS or by the sale of any assets of PCCS shall be deposited only in a bank or other financial account in the name of PCCS;

131. Sharpe will not have access or control over any asset of Defendant PCCS;

132. The Stone Bay Weapons will be held at the PCCS warehouse;

133. PCCS can only sell or dispose the Stone Bay Weapons for U.S. currency with the proceeds of any sale or disposition to be deposited into a trust account or escrow account identified by Plaintiffs. PCCS shall not donate or exchange the Stone Bay Weapons for any other type of consideration, in kind or otherwise, and also may not gift the Stone Bay Weapons. Both Plaintiffs and Defendants shall have access to the account only to monitor deposits and the current balance. The cost of the escrow agent or any costs related to maintaining the trust or escrow account may be withdrawn from the proceeds held in the account. Any costs of the escrow agent or by maintaining the trust account not covered by the proceeds shall by paid by Defendants. The proceeds will not be released from said trust or escrow account until so ordered by the Court and shall serve as additional bond pursuant to Rule 65 of the North Carolina Rules of Civil Procedure;

134. Sharpe is prohibited from publishing defamatory statements about Eastham or Spark;

135. The Five Hundred and No/100 Dollars ($500.00) Plaintiffs deposited with the New Hanover County Clerk of Court as part of the Temporary Restraining Order shall serve as an additional bond and held by the Clerk of Court until further order of this Court;

136.    This Preliminary Injunction Order may be shared with any financial institution or other third-party necessary to effectuate the restrictions set forth herein; and

SO ORDERED, this the 21 day of September 2022.

The Honorable Phyllis M. Gorham
Superior Court Judge Presiding

**Exhibit B**

# DAVIS HARTMAN WRIGHT LLP

### ATTORNEYS AT LAW

<table>
<tr><td>ASHEVILLE*</td><td>NEW BERN</td><td>RALEIGH*</td><td>WILMINGTON</td></tr>
</table>

MICHAEL SCOTT DAVIS
MARK SPENCE HARTMAN
I. CLARK WRIGHT, JR.
JOHN C. BIRCHER III
THOMAS S. BABEL
EDWIN J. TISDALE
GREGORY M. KATZMAN
SAMUEL B. POTTER
MARK K. YORK
JAIMEE BULLOCK MOSLEY
MARY BOYD BAREFOOT
RACHEL M. BENGE
JOHN A.J. WARD *(RETIRED)*

P.O. BOX 11320 (28404)
3819 PARK AVE. (28403)
WILMINGTON, N.C.

PHONE 252-514-2828
DIRECT 910-756-4070
CELL 910-508-0359
FAX 910-756-4070

EMAIL TSB@DHWLEGAL.COM
*\* BY APPOINTMENT ONLY*

October 1, 2022

Via Email

Cory Reiss
Reiss & Nutt
1221 Floral Parkway, Suite 104
Wilmington, NC 28403

Dear Cory:

Attached hereto are LinkedIn posts that were posted by Mr. Sharpe on September 30, 2022. These posts are in violation of the Preliminary Injunction Order dated September 26, 2022. Mr. Sharpe also posted information about me and my office. Please have these posts removed by the end of business on Monday, October 3, 2022. If these posts are not removed by the time-period requested herein, we will seek the Court's intervention via a Motion to Show Cause.

Sincerely,

Thomas S. Babel

Saturday, October 1, 2022 at 10:10:15 Eastern Daylight Time

| | |
|---|---|
| **Subject:** | (none) |
| **Date:** | Saturday, October 1, 2022 at 10:09:49 AM Eastern Daylight Time |
| **From:** | thomas babel |
| **To:** | Thomas Babel |

**Attachments:** Screenshot 2022-09-30 at 3.14.07 PM.JPEG

3:14 ✔                          .ıl 🤶 ■

                          · · ·

 **Trey Sharpe · 1st**
Founder, PCCS Medical / Stone
Bay Tactical
1h · Edited · ⓢ

Mark Eastham and Peter Spark mentally
abused me and financially exploited me as
a disabled veteran. They did this while
being a part of a device disabled business
program. I'm tired of being ashamed. I'm
tired of not being allowed to call out my
abuser.

They were supposed to mentor and help
me. They abused me, stole, and when I
attempted to get away, they only
increased the abuse and harrassment.
#help #veteran

| ᗡ | ♡ | ↱ | ✔ |
|---|---|---|---|
| Like | Comment | Share | Send |



⤴ Leave your                          @
thoughts here...


🏠        📑        🖼        🔔        ☰
Home    My Network    Post    Notifications

Sent from my iPhone

**Subject:** (none)

**Date:** Saturday, October 1, 2022 at 10:09:05 AM Eastern Daylight Time

**From:** thomas babel

**To:** Thomas Babel

**Attachments:** Screenshot 2022-09-30 at 2.38.51 PM.jpeg



←                                                                    ...

**Trey Sharpe · 1st**
Founder, PCCS Medical / Stone
Bay Tactical
26m · Edited · ⦵

Mark Eastham mentally abused me and
financially exploited me as a disabled
veteran. He did this while being a part of a
device disabled business program. I'm
tired of being ashamed. I'm tired of not
being allowed to call out my abuser.

He was supposed to mentor and help me.
He abused me, stole, and when I
attempted to get away, he only increased
the abuse and harrassment. #help
#veteran

| Like | Comment | Share | Send |
|------|---------|-------|------|



Be the first to comment

Leave your                                      @
thoughts here...

    
Home      My Network      Post      Notifications      Jobs

Sent from my iPhone

Saturday, October 1, 2022 at 10:10:23 Eastern Daylight Time

**Subject:** (none)

**Date:** Saturday, October 1, 2022 at 10:10:06 AM Eastern Daylight Time

**From:** thomas babel

**To:** Thomas Babel

**Attachments:** IMG_4354.PNG



Sent from my iPhone

**Exhibit C**

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 22-CVS-001507

MARK EASTHAM                          )
and PETER SPARK                       )
                   Plaintiffs         )
                                      )
                                      )
              v.                      )         **AFFIDAVIT OF PETER SPARK**
                                      )
PORT CITY CONTRACTING                 )
SERVICES, INC., ROBERT P.             )
SHARPE, STONE BAY TACTICAL,           )
LLC, and SRS SUPPLY, LLC              )
                   Defendants.        )


NOW COMES PETER SPARK, having first been duly sworn, and testifies as follows:

1.      I am over the age of eighteen, I have personal knowledge of the information
contained in this affidavit, and the statements are true to the best of my knowledge.


2.      Attached hereto as Exhibit A are true and accurate copies of publications posted
by Robert P. Spark to LinkedIn and Facebook.
            Sharpe

3.      The posts were published between September 30th and October 4th, 2022.


Further Affiant sayeth not.

This the 4th day of October 2022.


                                                        _____
                                                        Peter Spark

STATE OF NORTH CAROLINA
COUNTY OF NEW HANOVER

    I certify that Peter Spark personally appeared before me this day, acknowledging to me under oath that he signed the attached Affidavit.

    This the 4 day of October 2022.


SWORN TO AND SUBSCRIBED

Notary Public _Patricia L Babel_

Patricia L. Babel
Printed/typed name of Notary Public

My commission expires: 02·03·2027
    (Seal)

**Exhibit A**



**Trey Sharpe** · 2nd                                    + Follow    ···
Founder, PCCS Medical / Stone Bay Tactical
2h · Edited · 🌐

Mark Eastham and Peter Spark mentally abused me and financially exploited me as a disabled veteran. They did this while being a part of a device disabled business program. I'm tired of being ashamed. I'm tired of not being allowed to call out my abuser.

They were supposed to mentor and help me. They abused me, stole, and when I attempted to get away, they only increased the abuse and harrassment. #help #veteran

👍 Like          💬 Comment          ↱ Share          ✈ Send

Add a comment...                                    ☺    🖼

1:4

← Articles, posts & more...

**All activity** | Articles | Posts | Documents | Ir

I had abusive people steal my life's work. No one ...see more

👍 Like    💬 Comment    ↪ Share    ✈ Send



**Trey Sharpe** · 2nd                                    + Follow    · · ·
Founder, PCCS Medical
22h · Edited · 🌐

Mark Eastham and Peter Spark mentally abused me and financially exploited me as a disabled veteran. They did this while being a part of a device disabled business program. I'm tired of being ashamed. I'm tired of not being allowed to call out my abuser.

They were supposed to mentor and help me. They abused me, stole, and when I attempted to get away, they only increased the abuse and harassment. #help #veteran

👍 1

👍 Like    💬 Comment    ↪ Share    ✈ Send



**Trey Sharpe** · 2nd                                    + Follow    · · ·
Founder, PCCS Medical
1d · 🌐

This is hard, but I am trying to reach out and get help. I am a disabled veteran being mentally abused and financially exploited within a VA program by someone that was paid to help me #veteran #help . I need help. The VA doesn't have a system to help. I am not sure I will make it through this.

It is national suicide prevention month and I have been begging for help getting away from abuse. If anyone can help me, please.

👍 2                                                              4 shares

👍 Like    💬 Comment    ↪ Share    ✈ Send



🏠 Home    👥 My Network    ➕ Post    🔔② Notifications    💼 Jobs

9:L

←                                                                    • • •

  **Trey Sharpe** · 2nd                          ＋ Follow
Founder, PCCS Medical / Stone Bay Tactical
3m · Edited · Ⓢ

This is the attorney representing the men that abused and
exploited a disabled veteran. He just viewed my profile. His
name is Thomas Babel and he will likely file a lawsuit about
this post.

Do it. I'm done being silent. I'm done letting people take
advantage of veterans. Everything you do from this point
forward will be public.



9:43 ⏀                                    ‖ ⏀ ▬

←   ⚲ Thomas Babel

**Thomas Babel** · 2nd
Partner at DAVIS HARTMAN
WRIGHT LLP

Davis Hartman Wright LLP · The Ohio
State University Moritz College of Law
Wilmington, North Carolina, United States

450 connections

🌐 1 mutual connection: Will Oden

**🔗 Connect**      ⏀ Message      ⋯

**About**

My practice experience encompasses
various areas of the law.  I have pretrial,
trial, and appellate experience in
trademark, trade secret, patent, ...see more

**Activity**

 Leave your thoughts here...            @ Post

        ➕         18       
Home    My Network    Post    Notifications    Jobs



1:08

**Robert Sharpe**
3h · ⚬⚬

My former partners, Mark Eastham and Peter Spark
mentally abused and financially exploited me in a
program for disabled veterans. I can't describe the
betrayal of have non-veterans steal from a disabled
veteran. This is their attorney. He will try and sue me
for this post. Bring it. I'm done being ashamed and
quiet. Everything from now on will be public.

9:55

← 🔍 Thomas Babel



# Thomas Babel · 2nd
Partner at DAVIS HARTMAN
WRIGHT LLP

Davis Hartman Wright LLP · The Ohio
State University Moritz College of Law
Wilmington, North Carolina, United States

450 connections

🌐 1 mutual connection: Will Oden





About

The Wilmington Progressive Coalition is an alliance of progressive activist and organizations meant to share resources with each other and to support one another with events, recruitment, and issues. In and of itself the coalition does not do its own events but is there as a mutual aid society for the progressive community of Wilmington. we also have an ongoing calender of events of interest to the the progressive community. https://calendar.google. com/calendar/embed?src=v4qf1i7u6m5usqur2m7s0 dimss%40group.calendar.google.com&ctz=America %2FNew_York



Write something...                                    Photo

Robert Sharpe shared a post.                          •••
19 hrs

Please share. These people were paid hundreds of thousands of dollars to help a disabled veteran work in a program for disabled veterans. I can't afford to fight them in court, but I can tell the truth.



9:55

←   🔍 Thomas Babel





9:35 

←  ...

**Trey Sharpe** · 2nd
Founder, PCCS Medical
39m · 

+ Follow

Whistleblower protection for subcontractors has broken down at the U.S. Department of Veterans Affairs. The SDVOSB program was supposed to help me. I am being financially exploited by a non-veteran. He took the benefits we earned. Then he helped another company commit fraud and destroyed our company.

After I reported serious fraud on a contract, the prime contractor hired this disgruntled partner. They literally sued me under the solicitation number I reported for fraud. Together they worked to get a default judgement since the disgruntled partner was registered agent for MY company. They embezzled money and made themselves the highest paid. The list of harms is long. The overwhelming nature of the offense makes it hard to wrap your head around. But we deserve someone to hear us and talk.

They wanted our money. They took it.

These people worked together to destroy our company and cost multiple veterans their jobs. Families have been hurt. Disabled veterans should have to beg to be protected in a program for disabled veterans. With billions of dollars in contracts, there are people taking advantage of us. We need help. Please.

#veterans #help #jobs #dav #nvsbc

 Like      Comment      Share      Send



 Leave your thoughts here...      Post


Home     
My Network     
Post     
Notifications     
Jobs

6:33 

 **Trey Sharpe** · Following
Founder, PCCS Medical
8m · 🌐

I was threatened with a lawsuit if I didn't take down my claims of fraud and whistleblower retaliation. As a Marine, I earned my right to free speech. I will not be afraid to post the truth.

 1

 Like         Comment         Repost         Send

Reactions





## Be the first to comment

Comment

 Leave your thoughts here...                Post

|||        ◯        ‹

Done          **14 of 14**

Replies to **Paul Natinsky**'s comment on this **post**

 **Paul Natinsky** · 3rd+                    2h  ···
Content Creator - Storyteller - Multimedia Man...

About what?

   Like      Reply  ·  1 reply

 **Trey Sharpe** Author            1h  ···
Founder, PCCS Medical

I reported a company for fraud. It was a
serious issue that affected patient
safety. They lost their VA contract. Then
they started suing me. The company also
hired two disgruntled former partners
from my company who were previously
fired for embezzlement and fraud. They
don't want the truth to come out, so they
are trying to bully me in court.

   Like     Reply

 Leave your thoughts here...       

                  

108. On July 27, 2022, the Court entered an order of prejudgment attachment against Stone Bay Tactical, LLC and SRS Supply, LLC. As part of the Order, the Court found that Plaintiffs are creditors of Defendants and that there are insufficient funds to satisfy their debt.

109. On July 20, 2022, Defendants produced additional documents to Plaintiffs. As part of this production, it was disclosed that the $172,608.00 payment from the U.S. Government was deposited on June 23, 2022, into an account in the name of Grange Council, LLC.

110. July 26, 2022, PCCS and Sharpe were deposed.

111. During the deposition, Defendants disclosed that Sharpe directed the U.S. Government to deposit the $172,608.00 into the account of Grange Council, LLC, that there was no relationship between PCCS and Grange Council, LLC, and there was no agreement related to the PCCS funds between PCCS and Grange Council, LLC.

112. During the deposition, and based on additional records produced, it was disclosed that the PCCS account at First Citizen's Bank as of July 2022 had a negative balance.

113. As of July 2022, all of the bank accounts in the name of PCCS had either a zero balance or a negative balance.

114. Sharpe has ignored the corporate formalities of PCCS, has conducted PCCS as if he is the sole owner, and has used PCCS assets as if they were his own personal property.

115. During the deposition, Defendants further testified that PCCS was still in business and that it was making bids and receiving awards from the U.S. Government.

116. In August 2022, PCCS was paid approximately $500,000.00 from the U.S. Government. PCCS was not able to account for these funds.

117. Sharpe has represented to third-parties that neither he nor PCCS will ever pay Plaintiffs Eastham or Spark any amount owed to them for their deferred compensation, the Release Agreement, or as shareholders of PCCS.

## CONCLUSION OF LAW

118. This Court has subject matter jurisdiction over this action pursuant to N.C. Gen. Stat. §7A-243 and other applicable bases for jurisdiction.

119. This Court has personal jurisdiction over the Defendants pursuant to N.C. Gen. Stat. §1-75.4 and other applicable bases for jurisdiction.

120. Venue is proper in this Court pursuant to N.C. Gen. Stat. §§1-79, 1-82, and N.C. Gen. Stat. §55-14-31, and other applicable bases for venue.

121. Preliminary relief may be issued by the Court: "(1) if a plaintiff is able to show likelihood of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation." *Redlee/SCS, Inc. v. Pieper*, 153 N.C. App. 421, 423, 571 S.E.2d 8, 11 (2002) (quoting *A.E.P. Industries v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759-60 (1983); *SED Holdings, LLC v. 3 Star Properties, LLC*, 246 N.C. App. 632 (2016); *see also* Rule 65(b) of the North Carolina Rules of Civil Procedure.

122. Plaintiffs have established through the verified pleadings, and attached and incorporated exhibits, the affidavits, the deposition transcripts, the Court's record, and other materials provided during the hearing, that they have a likelihood of success on the merits of its claims brought against Defendants.

123. Plaintiffs have established through the verified pleadings, and the attached and incorporated exhibits, the affidavits, the deposition transcripts, the Court's record, and the other

materials provided during the hearing, that they will suffer irreparable harm if the temporary injunction is not granted by this Court.

124. Plaintiffs have established through the verified pleadings, and the attached and incorporated exhibits, the affidavits, the deposition transcripts, the Court's record, and other materials provided during the hearing, that a temporary injunction in this action is necessary for the protection of Plaintiffs' rights and to maintain the status quo until the conclusion of this action.

125. This Court concludes that "findings of fact made during a preliminary injunction proceeding are not binding upon a court at a trial on the merits." *Lohrmann v. Iredell Mem'l Hosp., Inc.*, 174 N.C. App. 63, 75, 620 S.E.2d 258, 265 (2005).

126. This Court has considered the necessity of a bond under Rule 65 of the North Carolina Rules of Civil Procedure and finds, as further set forth below, that a nominal bond will suffice to protect Defendants.

BASED ON THE FINDINGS OF FACT AND CONCLUSIONS OF LAW, the arguments of counsel, the Court hereby grants Plaintiffs' Motion and ORDERS as follows:

127. Other than for business reasons, the bank accounts of Defendant PCCS will be frozen, and Sharpe will not have access to any account of Defendant PCCS;

128. Defendants shall disclose to Plaintiffs within ten (10) days from opening, the identity, with account number, of any new bank account opened in the name of PCCS, Stone Bay Tactical, LLC, or SRS Supply, LLC;

129. The other physical assets of Defendant PCCS will be frozen and will not be disposed of, other than for ordinary business reasons;

130. Any funds generated by the operation of PCCS or by the sale of any assets of PCCS shall be deposited only in a bank or other financial account in the name of PCCS;

131. Sharpe will not have access or control over any asset of Defendant PCCS;

132. The Stone Bay Weapons will be held at the PCCS warehouse;

133. PCCS can only sell or dispose the Stone Bay Weapons for U.S. currency with the proceeds of any sale or disposition to be deposited into a trust account or escrow account identified by Plaintiffs. PCCS shall not donate or exchange the Stone Bay Weapons for any other type of consideration, in kind or otherwise, and also may not gift the Stone Bay Weapons. Both Plaintiffs and Defendants shall have access to the account only to monitor deposits and the current balance. The cost of the escrow agent or any costs related to maintaining the trust or escrow account may be withdrawn from the proceeds held in the account. Any costs of the escrow agent or by maintaining the trust account not covered by the proceeds shall by paid by Defendants. The proceeds will not be released from said trust or escrow account until so ordered by the Court and shall serve as additional bond pursuant to Rule 65 of the North Carolina Rules of Civil Procedure;

134. Sharpe is prohibited from publishing defamatory statements about Eastham or Spark;

135. The Five Hundred and No/100 Dollars ($500.00) Plaintiffs deposited with the New Hanover County Clerk of Court as part of the Temporary Restraining Order shall serve as an additional bond and held by the Clerk of Court until further order of this Court;

136.     This Preliminary Injunction Order may be shared with any financial institution or

other third-party necessary to effectuate the restrictions set forth herein; and

SO ORDERED, this the **21** day of September 2022.

The Honorable Phyllis M. Gorham
Superior Court Judge Presiding

## Exhibit B

# DAVIS HARTMAN WRIGHT LLP

### ATTORNEYS AT LAW

ASHEVILLE*        NEW BERN        RALEIGH*        WILMINGTON

MICHAEL SCOTT DAVIS
MARK SPENCE HARTMAN
I. CLARK WRIGHT, JR.
JOHN C. BIRCHER III
THOMAS S. BABEL
EDWIN J. TISDALE
GREGORY M. KATZMAN
SAMUEL B. POTTER
MARK K. YORK
JAIMEE BULLOCK MOSLEY
MARY BOYD BAREFOOT
RACHEL M. BENGE
JOHN A J. WARD (RETIRED)

P.O. BOX 11320 (28404)
3819 PARK AVE. (28403)
WILMINGTON, N.C.

PHONE 252-514-2828
DIRECT 910-756-4070
CELL 910-508-0359
FAX 910-756-4070

EMAIL TSB@DHWLEGAL.COM
* BY APPOINTMENT ONLY

October 1, 2022

Via Email

Cory Reiss
Reiss & Nutt
1221 Floral Parkway, Suite 104
Wilmington, NC 28403

Dear Cory:

Attached hereto are LinkedIn posts that were posted by Mr. Sharpe on September 30, 2022. These posts are in violation of the Preliminary Injunction Order dated September 26, 2022. Mr. Sharpe also posted information about me and my office. Please have these posts removed by the end of business on Monday, October 3, 2022. If these posts are not removed by the time-period requested herein, we will seek the Court's intervention via a Motion to Show Cause.

Sincerely,

Thomas S. Babel

**Saturday, October 1, 2022 at 10:10:15 Eastern Daylight Time**

**Subject:** (none)

**Date:** Saturday, October 1, 2022 at 10:09:49 AM Eastern Daylight Time

**From:** thomas babel

**To:** Thomas Babel

**Attachments:** Screenshot 2022-09-30 at 3.14.07 PM.JPEG

3:14 ✔                    .ıl 중 ■

←                              ...

 **Trey Sharpe · 1st**
Founder, PCCS Medical / Stone
Bay Tactical
1h · Edited · ⑤

Mark Eastham and Peter Spark mentally
abused me and financially exploited me as
a disabled veteran. They did this while
being a part of a device disabled business
program. I'm tired of being ashamed. I'm
tired of not being allowed to call out my
abuser

They were supposed to mentor and help
me. They abused me, stole, and when I
attempted to get away, they only
increased the abuse and harrassment.
#help #veteran

| 👍 | 💬 | ↪ | ✈ |
| Like | Comment | Share | Send |



 Leave your                    @
thoughts here...

    
Home    My Textbook    Post    Notifications    .com

Sent from my iPhone

**Subject:** (none)

**Date:** Saturday, October 1, 2022 at 10:09:05 AM Eastern Daylight Time

**From:** thomas babel

**To:** Thomas Babel

**Attachments:** Screenshot 2022-09-30 at 2.38.51 PM.jpeg

.ıl 🗢 ■

←                                              ...

**Trey Sharpe · 1st**
Founder, PCCS Medical / Stone
Bay Tactical
26m · Edited · ⓢ

Mark Eastham mentally abused me and
financially exploited me as a disabled
veteran. He did this while being a part of a
device disabled business program. I'm
tired of being ashamed. I'm tired of not
being allowed to call out my abuser.

He was supposed to mentor and help me.
He abused me, stole, and when I
attempted to get away, he only increased
the abuse and harrassment. #help
#veteran

| 👍 | ⚪ | ↪ | ⇗ |
|---|---|---|---|
| Like | Comment | Share | Send |



Be the first to comment


Leave your                                    @
thoughts here...

    
Home

Sent from my iPhone

**Subject:** (none)

**Date:** Saturday, October 1, 2022 at 10:10:06 AM Eastern Daylight Time

**From:** thomas babel

**To:** Thomas Babel

**Attachments:** IMG_4354.PNG



Sent from my iPhone

# Exhibit C

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 22-CVS-001507

MARK EASTHAM                              )
and PETER SPARK                           )
                   Plaintiffs             )
                                          )
                                          )
        v.                                )        **AFFIDAVIT OF PETER SPARK**
                                          )
PORT CITY CONTRACTING                     )
SERVICES, INC., ROBERT P.                 )
SHARPE, STONE BAY TACTICAL,               )
LLC, and SRS SUPPLY, LLC                  )
                   Defendants.

NOW COMES PETER SPARK, having first been duly sworn, and testifies as follows:

1.      I am over the age of eighteen, I have personal knowledge of the information
contained in this affidavit, and the statements are true to the best of my knowledge.

2.      Attached hereto as Exhibit A are true and accurate copies of publications posted
by Robert P. Spark to LinkedIn and Facebook.
           Sharpe

3.      The posts were published between September 30th and October 4th, 2022.

Further Affiant sayeth not.

This the 4th day of October 2022.

_____
Peter Spark

STATE OF NORTH CAROLINA
COUNTY OF NEW HANOVER

  I certify that Peter Spark personally appeared before me this day, acknowledging to me under oath that he signed the attached Affidavit.

  This the ___4___ day of October 2022.

SWORN TO AND SUBSCRIBED

Notary Public _Patricia J Babel_

_Patricia L. Babel_
Printed/typed name of Notary Public

My commission expires: _02·03·2027_
   (Seal)

**Exhibit A**



dln    ×    +

urn 34-...    **a** Applications | Amaz...    **R** Remote Accountin...    Job Hunting    Custom S

Home    My Network    Jobs    Messagin

**Trey Sharpe** · 2nd      **+ Follow**    •••
Founder, PCCS Medical / Stone Bay Tactical
2h · Edited · 🌐

Mark Eastham and Peter Spark mentally abused me and financially exploited me as a disabled veteran. They did this while being a part of a device disabled business program. I'm tired of being ashamed. I'm tired of not being allowed to call out my abuser.

They were supposed to mentor and help me. They abused me, stole, and when I attempted to get away, they only increased the abuse and harrassment. #help #veteran

👍 Like      💬 Comment      ↗ Share      ✈ Send

Add a comment...      😊 🖼

1:4

## Articles, posts & more...

**All activity**   Articles   Posts   Documents   In

~~I had abusive people steal my life's work. No one~~ ...see more

👍 Like    💬 Comment    ↪ Share    ✈ Send

**Trey Sharpe** · 2nd                    + Follow    ...
Founder, PCCS Medical
22h · Edited · 🌐

Mark Eastham and Peter Spark mentally abused me and financially exploited me as a disabled veteran. They did this while being a part of a device disabled business program. I'm tired of being ashamed. I'm tired of not being allowed to call out my abuser.

They were supposed to mentor and help me. They abused me, stole, and when I attempted to get away, they only increased the abuse and harrassment. #help #veteran

👍 1

👍 Like    💬 Comment    ↪ Share    ✈ Send

**Trey Sharpe** · 2nd                    + Follow    ...
Founder, PCCS Medical
1d · 🌐

This is hard, but I am trying to reach out and get help. I am a disabled veteran being mentally abused and financially exploited within a VA program by someone that was paid to help me #veteran #help . I need help. The VA doesn't have a system to help. I am not sure I will make it through this.

It is national suicide prevention month and I have been begging for help getting away from abuse. If anyone can help me, please.

👥 2                                    4 shares

👍 Like    💬 Comment    ↪ Share    ✈ Send

🏠 Home    👥 My Network    ➕ Post    🔔 Notifications ②    💼 Jobs

9:5

←                                                                    • • •

 **Trey Sharpe** · 2nd                          + Follow
Founder, PCCS Medical / Stone Bay Tactical
3m · Edited · ⊚

This is the attorney representing the men that abused and
exploited a disabled veteran. He just viewed my profile. His
name is Thomas Babel and he will likely file a lawsuit about
this post.

Do it. I'm done being silent. I'm done letting people take
advantage of veterans. Everything you do from this point
forward will be public.



9:43 ⌁                                      .� 🡒 ▬

←   ⚲ Thomas Babel

**Thomas Babel** · 2nd
Partner at DAVIS HARTMAN
WRIGHT LLP

Davis Hartman Wright LLP · The Ohio
State University Moritz College of Law
Wilmington, North Carolina, United States

450 connections

🝏 1 mutual connection: Will Oden

**▸ Connect**    ◁ Message    ⋯

### About

My practice experience encompasses
various areas of the law.  I have pretrial,
trial, and appellate experience in
trademark, trade secret, patent, ...see more

### Activity

 Leave your thoughts here...         Post

                                
Home      My Network      Post      Notifications      Jobs

1:08 ◁



**Robert Sharpe**
3h · ⚏

··· ✕

My former partners, Mark Eastham and Peter Spark mentally abused and financially exploited me in a program for disabled veterans. I can't describe the betrayal of have non-veterans steal from a disabled veteran. This is their attorney. He will try and sue me for this post. Bring it. I'm done being ashamed and quiet. Everything from now on will be public.

9:55 ◁



← Ｑ Thomas Babel



## Thomas Babel · 2nd
Partner at DAVIS HARTMAN
WRIGHT LLP

Davis Hartman Wright LLP · The Ohio
State University Moritz College of Law
Wilmington, North Carolina, United States

450 connections

◐ 1 mutual connection: Will Oden





10:24

🔒 m.facebook.com

About

The Wilmington Progressive Coalition is an alliance of progressive activist and organizations meant to share resources with each other and to support one another with events, recruitment, and issues. In and of itself the coalition does not do its own events but is there as a mutual aid society for the progressive community of Wilmington. we also have an ongoing calender of events of interest to the the progressive community. https://calendar.google.com/calendar/embed?src=v4qf1i7u6m5usqur2m7s0dimss%40group.calendar.google.com&ctz=America%2FNew_York



Write something...                                    Photo

**Robert Sharpe** shared a **post**.
19 hrs

Please share. These people were paid hundreds of thousands of dollars to help a disabled veteran work in a program for disabled veterans. I can't afford to fight them in court, but I can tell the truth.



9:55

← 🔍 Thomas Babel





9:35

←                                                      •••

 **Trey Sharpe** · 2nd                    + Follow
Founder, PCCS Medical
39m · ⑨

Whistleblower protection for subcontractors has broken down at the U.S. Department of Veterans Affairs. The SDVOSB program was supposed to help me. I am being financially exploited by a non-veteran. He took the benefits we earned. Then he helped another company commit fraud and destroyed our company.

After I reported serious fraud on a contract, the prime contractor hired this disgruntled partner. They literally sued me under the solicitation number I reported for fraud. Together they worked to get a default judgement since the disgruntled partner was registered agent for MY company. They embezzled money and made themselves the highest paid. The list of harms is long. The overwhelming nature of the offense makes it hard to wrap your head around. But we deserve someone to hear us and talk.

They wanted our money. They took it.

These people worked together to destroy our company and cost multiple veterans their jobs. Families have been hurt. Disabled veterans should have to beg to be protected in a program for disabled veterans. With billions of dollars in contracts, there are people taking advantage of us. We need help. Please.

#veterans #help #jobs #dav #nvsbc

                    →              ⍈
Like              Comment          Share          Send



 Leave your thoughts here...           Post

                                        
Home          My Network          Post          Notifications          Jobs

6:33

← ⋮



**Trey Sharpe** · Following
Founder, PCCS Medical
8m ·

I was threatened with a lawsuit if I didn't take down my claims of fraud and whistleblower retaliation. As a Marine, I earned my right to free speech. I will not be afraid to post the truth.

 1


Like


Comment


Repost


Send

Reactions





## Be the first to comment

( Comment )

 Leave your thoughts here...

@ Post

||| ○ ‹

10:37 ✓                                    •••• LTE 🔋

Done                    **14 of 14**

Replies to **Paul Natinsky**'s comment on this **post**

 **Paul Natinsky** · 3rd+                    2h  •••
Content Creator - Storyteller - Multimedia Man...

About what?

Like      Reply   ·  1 reply

 **Trey Sharpe** `Author`                    1h  •••
Founder, PCCS Medical

I reported a company for fraud. It was a
serious issue that affected patient
safety. They lost their VA contract. Then
they started suing me. The company also
hired two disgruntled former partners
from my company who were previously
fired for embezzlement and fraud. They
don't want the truth to come out, so they
are trying to bully me in court.

Like     Reply

 Leave your thoughts here...          @ 

                              

FILED

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
                                              SUPERIOR COURT DIVISION
COUNTY OF NEW HANOVER       2022 AUG -2  P  FILE NO.: 22-CVS-001507

NEW HANOVER CO., C.S.C.

MARK EASTHAM                        )
And PETER SPARK,                    )
                           BY_____)  OR
          Plaintiffs,               )
                                    )
vs.                                 )
                                    )
PORT CITY CONTRACTING               )          NOTICE OF FILING
SERVICES, INC., ROBERT P. SHARPE,   )
STONE BAY TACTICAL, LLC, and SRS    )
SUPPLY, LLC,                        )
                                    )
          Defendants.               )
_____)

        Please take notice that the undersigned counsel for Defendants has filed the

following documents in opposition to the Plaintiffs' Motion for Preliminary

Injunction:

    1. Affidavit of Robert P. Sharpe with the following exhibits:

        A. 2019 Schedule K-1s

        B. Articles of Incorporation Including Articles of Conversion

        C. PCCS Minutes Meeting of Board of Directors

        D. Written Consent of the Sole Class A Stockholder

        E. Written Consent of the Board of Directors of PCCS

        F. Articles of Amendment PCCS

        G. Stock Redemption and Release Agreement

        H. Sept. 18, 2021 Email Exchange Re Payment to Eastham

        I. PCCS Federal Firearms Licenses

REISS & NUTT, PLLC
1221 Floral Parkway, Suite 104 – Wilmington, North Carolina 28403

-2-

  J. Draft Independent Contractor Agreement

  K. Dec. 10, 2021 Email Re Commission and "Back-Pay"

  L. Transcript From Recorded Call on December 13, 2021

  M. Sept. 30, 2021 Chat Between Spark, Eastham, and Graves

  N. Oct. 21, 2021 Chat Between Eastham and Graves

  O. June 23, 2021 Chat Between Spark and Graves

  P. Nov. 1, 2021 Email Re Setting Up Stone Bay Tactical, LLC

  Q. Dept. of Veterans Affairs "Verification Assistance Brief"

  R. Verizon Records

  S. Nov. 30, 2021 Email Re Desired Buyout or Taking Business

  T. Feb. 4, 2022 No-Contact Order Against Spark

  U. Certificates to Sharpe by Armed Forces of Ukraine

  V. FNB Statement Ending 03/31/2022

  W. May 12, 2022 Written Consent of Board of Directors

  X. June 28, 2022 Demand by DaVinci Company

  Y. July 8, 2022 Eastham Text to Mary Puncochar

  Z. Stone Bay Tactical DBA

2. Affidavit of Kimberly Q. Swintosky with the following exhibit:

  A. November 2020 Email Exchanges Re Treatment of Unpaid Work

3.   Transcript of Rule 30(b)(6) Deposition of Port City Contracting, Inc., Robert P. Sharpe as designee, Vols. I and II.

-3-

Respectfully submitted this the 2nd day of August 2022.

REISS & NUTT, PLLC
*Attorneys for Defendants*

By: _____

W. Cory Reiss
N.C. State Bar No. 41549
Email: wcreiss@reissnutt.com
Kyle J. Nutt
N.C. State Bar No. 43469
Email: kjnutt@reissnutt.com
1221 Floral Parkway, Suite 104
Wilmington, NC 28403
Telephone: (910) 420-4674
Facsimile: (910) 420-4637

## CERTIFICATE OF SERVICE

I, the undersigned attorney, hereby certify that the foregoing document was duly served on the following persons, pursuant to Rule 5 of the North Carolina Rules of Civil Procedure via electronic mail:

Thomas Babel
Davis Hartman Wright, LLP
P.O. Box 11320 (28404)
Wilmington, NC 28403
Fax: (910) 756-4080
Email: tsb@dhwlegal.com
*Attorneys for Plaintiffs*

This the 2nd day of August 2022.

REISS & NUTT, PLLC
*Attorneys for Defendants*

By: _____

W. Cory Reiss

REISS & NUTT, PLLC
1221 Floral Parkway, Suite 104 – Wilmington, North Carolina 28403

CONFIDENTIAL

PCCS 364

651119

| | Final K-1 | | Amended K-1 | OMB No. 1545-0123 |
|---|---|---|---|---|

**Schedule K-1**
**(Form 1065)**

Department of the Treasury
Internal Revenue Service

**2019**

For calendar year 2019, or tax year

beginning _____ ending _____

**Partner's Share of Income, Deductions, Credits, etc.** ▶ See page 2 and separate instructions.

| Part I | Information About the Partnership |
|---|---|

**A** Partnership's employer identification number

**B** Partnership's name, address, city, state, and ZIP code

PORT CITY CONTRACTING SERVICES, LLC
1608 QUEEN STREET
Wilmington, NC 28401

**C** IRS Center where partnership filed return ▶ KANSAS CITY, MO 64999

**D** ☐ Check if this is a publicly traded partnership (PTP)

| Part II | Information About the Partner |
|---|---|

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See instructions.)

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.

Robert P. Sharpe
245 Royal Fern Rd
Wilmington, NC 28412

**G** ☒ General partner or LLC member-manager   ☐ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner
**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____

**I1** What type of entity is this partner? INDIVIDUAL
**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 51.0000 % | 51.0000 % |
| Loss | 51.0000 % | 51.0000 % |
| Capital | 100.0000 % | 51.0000 % |

Check if decrease is due to sale or exchange of partnership interest . . ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse . . . . . . . . . . $ | | $ |
| Qualified nonrecourse financing . $ | | $ |
| Recourse . . . . . . . . . $ | | $ |

☐ Check this box if Item K includes liability amounts from lower tier partnerships.

**L** Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account . . . . . $ | |
| Capital contributed during the year . . $ | 10,400. |
| Current year net income (loss) . . . . $ | 32,183. |
| Other increase (decrease) (attach explanation) . $ | |
| Withdrawals & distributions . . . . $ ( | ) |
| Ending capital account . . . . . . $ | 42,583. |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . . . . . . . . $
Ending . . . . . . . . . . . . $

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) ★ | 33,268. | 15 Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | | 16 Foreign transactions |
| 4a | Guaranteed payments for services | | |
| 4b | Guaranteed payments for capital | | |
| 4c | Total guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 6c | Dividend equivalents | | 17 Alternative minimum tax (AMT) items |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | | 18 Tax-exempt income and nondeductible expenses |
| 9b | Collectibles (28%) gain (loss) | | C   576. |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | | 19 Distributions |
| 11 | Other income (loss) | | |
| 12 | Section 179 deduction | | 20 Other information Z★   STMT |
| 13 | Other deductions A   510. | | |
| 14 | Self-employment earnings (loss) A   33,268. C   80,626. | | |
| 21 | More than one activity for at-risk purposes* | | |
| 22 | More than one activity for passive activity purposes* | | |

*See attached statement for additional information.

For IRS Use Only

Exhibit A

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Schedule K-1 (Form 1065) 2019

UYA

02/01/2020 04:12:51 PM

CONFIDENTIAL

PCCS 368

651119

| **Schedule K-1 (Form 1065)** | **2019** | |
|---|---|---|

Department of the Treasury
Internal Revenue Service

For calendar year 2019, or tax year

beginning _____ ending _____

**Partner's Share of Income, Deductions, Credits, etc.** ▶ See page 2 and separate instructions.

| Final K-1 | ☐ | Amended K-1 | OMB No. 1545-0123 |
|---|---|---|---|

| **Part III** | **Partner's Share of Current Year Income, Deductions, Credits, and Other Items** |

| Part | | Part III |
|---|---|---|
| **Part I** Information About the Partnership | | |

**A** Partnership's employer identification number

[blacked out]

**B** Partnership's name, address, city, state, and ZIP code

PORT CITY CONTRACTING SERVICES, LLC
1608 QUEEN STREET
Wilmington, NC 28401

**C** IRS Center where partnership filed return ▶ KANSAS CITY, MO   64999

**D** ☐ Check if this is a publicly traded partnership (PTP)

**Part II   Information About the Partner**

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See instructions.)

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.

Nicholas Becton
224 Royal Fern Rd
Wilmington, NC 28412

**G** ☒ General partner or LLC member-manager   ☐ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____

**I1** What type of entity is this partner?   INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 29.0000 % | 29.0000 % |
| Loss | 29.0000 % | 29.0000 % |
| Capital | 29.0000 % | 29.0000 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ | $ |
| Qualified nonrecourse financing | $ | $ |
| Recourse | $ | $ |

☐ Check this box if Item K includes liability amounts from lower tier partnerships.

**L**   **Partner's Capital Account Analysis:**

| | |
|---|---|
| Beginning capital account | $ |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ 18,300. |
| Other increase (decrease) (attach explanation) | $ |
| Withdrawals & distributions | $ ( ) |
| Ending capital account | $ 18,300. |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☐ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning _____ $
Ending _____ $

| # | Item | Value |
|---|---|---|
| 1 | Ordinary business income (loss) ★ | 18,917. |
| 2 | Net rental real estate income (loss) | |
| 3 | Other net rental income (loss) | |
| 4a | Guaranteed payments for services | |
| 4b | Guaranteed payments for capital | |
| 4c | Total guaranteed payments | |
| 5 | Interest income | |
| 6a | Ordinary dividends | |
| 6b | Qualified dividends | |
| 6c | Dividend equivalents | |
| 7 | Royalties | |
| 8 | Net short-term capital gain (loss) | |
| 9a | Net long-term capital gain (loss) | |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | |
| 11 | Other income (loss) | |
| 12 | Section 179 deduction | |
| 13 | Other deductions  A | 290. |
| 14 | Self-employment earnings (loss)  A | 18,917. |
| | C | 45,847. |

| # | Item | Value |
|---|---|---|
| 15 | Credits | |
| 16 | Foreign transactions | |
| 17 | Alternative minimum tax (AMT) items | |
| 18 | Tax-exempt income and nondeductible expenses  C | 327. |
| 19 | Distributions | |
| 20 | Other information  Z* | STMT |
| 21 | More than one activity for at-risk purposes* | |
| 22 | More than one activity for passive activity purposes* | |

*See attached statement for additional information.

For IRS Use Only

02/01/2020 04:12:52PM

CONFIDENTIAL

PCCS 372

651119

| Final K-1 | | Amended K-1 | OMB No. 1545-0123 |

## Schedule K-1 (Form 1065)

**2019**

Department of the Treasury
Internal Revenue Service

For calendar year 2019, or tax year

beginning _____ ending _____

**Partner's Share of Income, Deductions, Credits, etc.**    ▶ See page 2 and separate instructions.

### Part I    Information About the Partnership

**A** Partnership's employer identification number

**B** Partnership's name, address, city, state, and ZIP code

PORT CITY CONTRACTING SERVICES, LLC
1608 QUEEN STREET
Wilmington, NC 28401

**C** IRS Center where partnership filed return ▶ KANSAS CITY, MO  64999

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II    Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See instructions.)

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.

Mark Eastham
261 Wyndham Cir W
New Brighton, MN 55112

**G** ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member

**H1** ☒ Domestic partner    ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:

TIN _____ Name _____

**I1** What type of entity is this partner? INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 20.0000 % | 20.0000 % |
| Loss | 20.0000 % | 20.0000 % |
| Capital | 20.0000 % | 20.0000 % |

☐ Check if decrease is due to sale or exchange of partnership interest

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ | $ |
| Qualified nonrecourse financing | $ | $ |
| Recourse | $ | $ |

☐ Check this box if Item K includes liability amounts from lower tier partnerships.

**L** Partner's Capital Account Analysis:

| | |
|---|---|
| Beginning capital account | $ |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ 12,620. |
| Other increase (decrease) (attach explanation) | $ |
| Withdrawals & distributions | $ ( ) |
| Ending capital account | $ 12,620. |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes  ☐ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning _____ $
Ending _____ $

### Part III    Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| # | Description | | # | Description |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) ★ 13,047. | | 15 | Credits |
| 2 | Net rental real estate income (loss) | | | |
| 3 | Other net rental income (loss) | | 16 | Foreign transactions |
| 4a | Guaranteed payments for services | | | |
| 4b | Guaranteed payments for capital | | | |
| 4c | Total guaranteed payments | | | |
| 5 | Interest income | | | |
| 6a | Ordinary dividends | | | |
| 6b | Qualified dividends | | | |
| 6c | Dividend equivalents | | 17 | Alternative minimum tax (AMT) items |
| 7 | Royalties | | | |
| 8 | Net short-term capital gain (loss) | | | |
| 9a | Net long-term capital gain (loss) | | 18 | Tax-exempt income and nondeductible expenses |
| 9b | Collectibles (28%) gain (loss) | | C | 226. |
| 9c | Unrecaptured section 1250 gain | | | |
| 10 | Net section 1231 gain (loss) | | 19 | Distributions |
| 11 | Other income (loss) | | | |
| 12 | Section 179 deduction | | 20 | Other information Z★ STMT |
| 13 | Other deductions A 200. | | | |
| 14 | Self-employment earnings (loss) A 13,047. C 31,618. | | | |
| 21 | More than one activity for at-risk purposes* | | | |
| 22 | More than one activity for passive activity purposes* | | | |

*See attached statement for additional information.

For IRS Use Only

02/01/2020 04:12:52PM

PCCS 16

SOSID: 1801626
Date Filed: 6/30/2020 8:24:00 AM
Elaine F. Marshall
North Carolina Secretary of State

C2020 181 01776

### State of North Carolina
### Department of the Secretary of State

## ARTICLES OF INCORPORATION
## INCLUDING ARTICLES OF CONVERSION

Pursuant to §55-2-02 and § 55-11A-03 of the General Statutes of North Carolina, the undersigned converting business entity does hereby submit these Articles of Incorporation Including Articles of Conversion for the purpose of forming a business corporation.

1.      The name of the resulting corporation is Port City Contracting Services, Inc.

        The corporation is being formed pursuant to a conversion of another business entity.

2.      The name of the converting business entity is Port City Contracting Services, LLC

        and the organization and internal affairs of the converting business entity are governed by the laws of the state of North Carolina.  A plan of conversion has been approved by the converting business entity as required by law.

3.      The converting business entity is a domestic limited liability company.

4.      The number of shares the corporation is authorized to issue is:  10,000

        These shares shall be: *(check either a or b)*

        a.  ☐  all of one class, designated as common stock; or

        b.  ☒  divided into classes or series within a class as provided in the attached schedule,  with the information required by N.C.G.S. Section 55-6-01.

5.      The name of the initial registered agent is:   ___Peter Spark___

6.      The street address and county of the initial registered agent office of the limited liability company is:

        Number and Street:  _237 Royal Fern Road_____

        City: _Wilmington_  State: _North Carolina_    Zip Code: _28412_  County: _New Hanover_

7.      The mailing address, if different from the street address, of the initial registered agent office is:

        Number and Street: _____

        City: _____  State: _____    Zip Code: _____  County: _____



PCCS 16

PCCS 17

8. **Principal office information: (Select either a or b.)**

   a. ☒   The limited liability company has a principal office.

   The principal office telephone number: _____ 910-500-7724 _____

   The **street address** and county of the principal office of the limited liability company is:

   Number and Street: _1608 Queen Street_____

   City: _Wilmington_ State: _North Carolina_  Zip Code: 28401  County: New Hanover

   The **mailing address**, if different from the street address, of the principal office of the company is:

   Number and Street: _____

   City: _____ State: _____  Zip Code: _____ County: _____

   b. ☐   The limited liability company does not have a principal office.

9. **Any other provisions which the corporation elects to include (e.g., the purpose of the entity) are attached.**

10. **The name and address of each incorporator is as follows:**

| <u>Name:</u> | <u>Address:</u> | <u>Capacity:</u> |
|---|---|---|
| Cindy York | 2030 Eastwood Road, Ste. 7<br>Wilmington, NC  28403 | Incorporator |

11. **(Optional): Please provide a business e-mail addres** <span>Privacy Redaction</span>
    The Secretary of State's Office will e-mail the business automatically
    document is filed.  The e-mail provided will not be viewable on the website.  For more information on why this service is
    offered, please see the instructions for this document.

12. **These articles will be effective upon filing, unless a future date is specified:  These articles will be effective upon filing, unless a future date is specified: _____**

This is the 29th day of June, 2020.

_____
Cindy York, Incorporator

PCCS 18

**Attachment to Articles of Incorporation**
**Port City Contracting Services, Inc.**

<u>**4.b. Schedule:  Division of 10,000 Shares of Common Stock**</u>

The corporation is authorized to issue the 10,000 shares of common stock as follows:

10 shares of Class A Common Stock – Pursuant to N.C.G.S. Section 55-6-01, Class A shares shall have unlimited voting rights, with one vote per share.

9,990 shares of Class B Common Stock – Class B shares shall have no voting rights.

Pursuant to N.C.G.S. Section 55-6-01(c)(2), Class A and Class B common stock shareholders together shall be entitled to receive the net assets of the corporation upon dissolution, prorated by number of shares held.

PCCS 24

# PORT CITY CONTRACTING SERVICES, INC.

## MINUTES MEETING OF BOARD OF DIRECTORS

### August 17, 2020

A meeting of the Board of Directors (the "**Board**") of Port City Contracting Services, Inc. (the "**Company**") was held virtually on August 17, 2020 at 2:00 p.m. EDT. Directors present at the Board meeting were Trey Sharpe (Chairman and CEO), Mark Eastham (COO and President) and Peter Spark (CFO and Secretary).

Trey Sharpe, Chief Executive Officer of the Company and Chairman of the Board, presided and Peter Spark served as Secretary of the meeting. A quorum having been established, Trey Sharpe called the meeting to order and reviewed the meeting agenda.

## AGENDA ITEM 1 - Compensation

Trey Sharpe made opening remarks and summarized recent events, including progress made towards getting a warehouse. He noted that working capital continues to be an issue due to the seasonality of the sales. Having a warehouse would promote growth, but is a big commitment and presents certain risks in these time of uncertainty. If the Company is going to commit to getting the warehouse, a contingency plan may be required to ensure that the Company has sufficient cash to pay for it. Considering the Company's largest (non-COGS) expense is payroll, compensation reductions may be necessary to facilitate the acquisition of a warehouse.

Further discussion was had regarding compensation:

The Company is a startup that was deliberately structured to have low overhead and minimal debt, but access to sufficient working capital has been a struggle. There are a number of individuals that have gone un- or under paid for a portion of their work so far. Those doing so, were willing to do so based upon a promise future payment or ownership in the Company. The PPP loan obtained by the Company helped to compensate the team in early 2020, but there are still a number of individuals that have not been fully compensated for past work performed.

In addition to going unpaid, some employees have put personal assets up as collateral to facilitate the Company's ability to accept contracts and take on business for which it did not have sufficient working capital. Such individuals include owners of the Company as well as non-owners, and the commitment of each person needs to be documented and appropriately rewarded.

While the Company has started generating revenues, the timing of such revenues remains inconsistent on a month to month basis. Accordingly, the Company needs to determine how to best compensate its employees in a way that will not only retain them, but incentivize them to help grow the Company's business and ensure the



consistency of revenues, while limiting the risk of not being able to pay a salary payroll due to lack of cash during any given pay period.

The Board determined it to be in the best interests of the Company to develop a comprehensive Compensation Plan designed to maximize employee retention and incentivize team work and achieving the Company's business goals, which Plan may include changes to current compensation, equity issuances, and/or bonus plans to all employees or classes of employees. It was noted that any equity issuances would require 1) a determination of value and 2) additional equity issuances to Trey Sharpe so that retains ownership of at least 51%.

**RESOLVED**, the Board hereby establishes a Compensation Committee to carry out the responsibilities delegated by the Board relating to the review and determination of executive and staff compensation. The Compensation Committee shall have no fewer than two members, and the initial members shall be the CEO, COO, and CFO.

**RESOLVED**, the Compensation Committed is hereby charged with the task of:

      (i)     Evaluating the Company's options for compensating its employees in a manner that makes them feel valued and incentivizes them to do their best on behalf of the Company,

      (ii)    Evaluating the Company's options for compensating employees for past work, to include consideration of equity grants in lieu of cash compensation,

      (iii)   Evaluating the Company's options for compensating employees for personal guarantees made on behalf of the Company;

      (iv)   Working with the Company's CFO to evaluate the Company's current and expected cash flow and its ability to compensate employees with cash on a regular basis, and

      (v)    Proposing a comprehensive Compensation Plan to the Board addressing all of the above.

### AGENDA ITEM 2 - Working Capital

Peter Spark led a discussion regarding the Company's financial status and need for additional working capital. The Company's previous attempts to obtain a working capital line of credit from Banks have been unsuccessful due to a lack of regular revenues. The Company has depended upon the willingness of owners and other to personally guarantee lease, vendor and financing agreements. Dependence upon personal guarantees limits the Company's ability to grow.

Multiple options for obtaining additional working capital were discussed, including the possibility of bringing in an investor. The Board concluded that bringing in an investor would likely be the most expensive option and would prefer that to be an option of last resort. While the Company's revenues are still irregular on a month to month basis, the additional history of the Company obtaining and fulfilling contracts may now allow it to obtain a SBA or other bank loan.

## PCCS 26

**RESOLVED**, the CFO is hereby charged with the task of exploring the possibility of obtaining a bank loan to address the Company's working capital needs.

### AGENDA ITEM 3 – Power Contingency Plan

Power outages present significant risks to the Company's ability to ensure business continuity. During hurricane season, power outages may last for significant periods of time. The Board discussed steps it may take to provide back-up power to critical business components, including the home of the CFO, currently servicing as the Company's primary business office and from which all accounting and most administrative services are performed, and warehouse in which items sensitive to temperature and humidity are expected to be stored. The warehouse will not have this ability as a result of insufficient space for a fixed external generator as well as not having hook-up for natural gas.

**RESOLVED**, the officers of the Company shall explore options and pricing for purchasing and installing a natural gas generator at the home of the Company's CFO.

**RESOLVED**, the officers of the Company shall explore options for providing a back-up power supply to the warehouse.

There being no further business to be brought before the Board, the meeting was adjourned by the approval of all Directors present.

Respectfully submitted,

Peter Spark

PCCS 30

## PORT CITY CONTRACTING SERVICES, INC.

## WRITTEN CONSENT OF THE SOLE CLASS A STOCKHOLDER

### December 10, 2020

The undersigned, being the sole holder of all of the issued and outstanding shares of Class Common Stock of Port City Contracting Services, Inc., a North Carolina corporation (the "**Company**"), which Class A shares are all of the issued and outstanding voting shares of the Company, does hereby adopt the following resolutions in accordance with the North Carolina Business Corporation Act (the "NCBCA") by signing his written consent hereto, which action by written consent shall be effective as of the date first set forth above:

### AMENDMENT OF
### ARTICLES OF INCORPORATION

**WHEREAS**, the Board of Directors of the Company (the "**Board**") deems it to be in the best interests of the Company and its voting stockholders to amend the Articles of Incorporation of the Company by filing the Articles of Incorporation attached hereto and incorporated herein by reference as **Exhibit A** (the "**Amendment**") in order to increase the number of authorized shares of Class B Common Stock; and

**WHEREAS,** the Board has recommended the Amendment to the stockholders of the Company for approval;

**NOW, THEREFORE, BE IT RESOLVED,** that the Amendment recommended by the Board to the stockholders for approval be, and it hereby is, approved by the undersigned stockholder, who is the holder of all of the Class A Common Stock, in all respects; and

**RESOLVED FURTHER,** that, notwithstanding the foregoing resolution, the Board may, at any time prior to the filing of the Amendment with the Secretary of State of the State of North Carolina, abandon the proposed Amendment without further action by the stockholders.

**IN WITNESS WHEREOF,** the undersigned, being sole holder of all of the Company's Class A Common Stock has executed this consent to be effective as of the date first written above.

_____
Robert P. Sharpe

### ALL OF THE CLASS A STOCKHOLDERS

Exhibit
D

PCCS 31

**EXHIBIT A**

**Articles of Amendment**

(Attached)

PCCS 27

## WRITTEN CONSENT OF THE BOARD OF DIRECTORS
## OF
## PORT CITY CONTRACTING SERVICES, INC.

The undersigned, being all of the members of the Board of Directors (the "**Board**") of Port City Contracting Services, Inc., a North Carolina corporation (the "**Company**"), and desiring to take action without a meeting by written consent as authorized by the North Carolina General Statutes, do hereby adopt the following resolutions and consent to the actions contemplated therein effective as of December ___, 2020:

### AMENDMENT TO
### ARTICLES OF INCORPORATION

**WHEREAS**, the Board deems it to be advisable to amend the Company's Articles of Incorporation, as set forth in the Amended and Restated Articles of Incorporation attached hereto as **Exhibit A** (the "**Amendment**"), in order to increase the number of authorized shares of Class B Common Stock authorized thereunder from Nine Thousand Nine Hundred Ninety (9,990) shares to Nine Hundred Ninety-Nine Thousand Nine Hundred Ninety (999,990) shares of Class B Common Stock.

**NOW, THEREFORE, BE IT RESOLVED**, that the Amendment be, and it hereby is, adopted by the Board;

**RESOLVED FURTHER**, that the officers of the Company are hereby authorized and directed to seek stockholder approval of the foregoing action; and

**RESOLVED FURTHER**, that, upon approval of the Amendment by the requisite stockholders of the Company, the proper officers of the Company be, and they hereby are, severally authorized and directed to execute, acknowledge, deliver and file the Charter Amendment at the office of the North Carolina Secretary of State, in the form attached hereto.

### ENABLING RESOLUTIONS

**RESOLVED FURTHER**, that the proper officers of the Company be, and they hereby are, severally authorized and directed to execute and deliver on behalf of the Company such other documents, certificates, instruments and agreements, and to take such further action by and on behalf of the Company as shall be either necessary or appropriate to further the purposes of the foregoing resolutions, the necessity or propriety of such actions to be conclusively evidenced by the taking of such actions by said officers; and

**RESOLVED FURTHER**, that all corporate actions taken on or prior to the date hereof by the officers or the Directors of the Company in connection with the foregoing resolutions or the transactions contemplated thereby be, and the same hereby are, approved, adopted, and ratified in all respects as the actions of the Company effective as of the date such actions were taken.



Exhibit E

PCCS 28

The Directors of the Company may execute this Unanimous Written Consent of the Board of Directors in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall constitute one and the same instrument, effective as of the date first above written.

**IN WITNESS WHEREOF**, the undersigned, being all of the Directors of the Company, have executed this consent to be effective as of the date first written above.

_____
Robert P. Sharpe

_____
Mark Eastham

_____
Peter Spark

**ALL OF THE DIRECTORS**

PCCS 29

# EXHIBIT A

## Articles of Amendment

(Attached)

PCCS 32

SOSID: 0801626
Date Filed: 12/11/2020 7:25:00 AM
Elaine F. Marshall
North Carolina Secretary of State
C2020 345 01175

## ARTICLES OF AMENDMENT
## PORT CITY CONTRACTING SERVICES, INC.

Pursuant to §55-10-06 of the General Statutes of North Carolina, Port City Contracting Services, Inc. (the "**Corporation**"), hereby submits the following Articles of Amendment for the purpose of amending its Articles of Incorporation.

1. That the name of the corporation is Port City Contracting Services, Inc.

2. The text of the amendment adopted is as follows:

    The Attachment to Articles of Incorporation shall be replaced in its totality so that it reads as follows:

    **4.b. Schedule: Division of 1,000,000 Shares of Common Stock**

    The corporation is authorized to issue 1,000,000 shares of common stock as follows:

    10 shares of Class A Common Stock – Pursuant to N.C.G.S. Section 5-6-01, Class A Shares shall have unlimited voting rights, with one vote per share.

    999,990 shares of Class B Common Stock – Class B shares shall have no voting rights.

    Pursuant to N.C.G.S. Section 55-6-01(c)(2), Class A and B common stock shareholders together shall be entitled to receive the net assets of the corporation upon dissolution, prorated by number of shares held.

3. The date of adoption of the amendment was _12/11/2020_

4. That the amendment was approved by shareholder action, and such shareholder approval was obtained as required by Chapter 55 of the North Carolina General Statutes.

5. These Articles will be effective upon filing.

This the _10th_ day of December, 2020.

PORT CITY CONTRACTING SERVICES, INC.

By: _____
    Robert P. Sharpe, CEO

Exhibit
F

## STOCK REDEMPTION AND RELEASE AGREEMENT

This Stock Redemption and Release Agreement ("Agreement") is dated as of June 7, 2021, and is by and among Port City Contracting Services, Inc., a North Carolina corporation, whose principal place of business is Port City Contracting Services, Inc., 2017 Corporate Drive, Unit 4, Wilmington, North Carolina 28405, and which was formerly Port City Contracting Services, LLC (the "Company") and Mark Eastham, an individual with an address of 261 Wyndham Cir W, New Brighton, MN 55112 ("Eastham"). The Company and Eastham are sometimes referred to herein individually as a "Party" and together as the "Parties."

### RECITALS

**WHEREAS**, Eastham owns 3,194 shares of Class B common stock in the Company (the "Shares");

**WHEREAS**, Eastham has stepped down from his position as President and terminated his employment relationship with the Company, but plans to continue to serve on the Company's Board of Directors and provide consulting services to the Company on an independent contractor basis;

**WHEREAS**, Eastham wishes to sell to the Company, and the Company wishes to purchase and redeem from Eastham, 1,916 of the shares owned by Eastham (the "Shares"), as more fully described and subject to the terms and conditions set forth herein;

**NOW THEREFORE**, in consideration of the premises, and the representations, warranties and mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each Party, the Parties hereto do hereby agree as follows:

### AGREEMENT

1.    **Redemption.** Eastham hereby sells, transfers, and assigns to the Company, and the Company hereby redeems and purchases from Eastham, all of Eastham's right, title, and interest in and to the Shares (the "Redemption"), free and clear of any pledge, lien, charge, security interest, mortgage, claim, or other encumbrance (each, an "Encumbrance").

2.    **Redemption Price. Following receipt of an executed Stock Assignment Separate from Certificate in the form attached hereto as Schedule 1, the Company shall pay to Eastham Sixty thousand and no/100 Dollars ($60,000.00) for the Shares (the "Redemption Price"). The Redemption Price shall be paid as the Company receives payments for the sale of diabetic test strips at a rate of $1 per box sold and for which payment is received. On or before the [5th] of each month, beginning in [July] 2021, the Company shall determine the number of boxes of test strips for which it received payment during the prior month and pay to Eastham an amount equal to $1 per box until the Redemption Price has been paid in full. The Company shall pay such amounts by [check mailed to the address/wire transfer to the bank account] indicated on Schedule 2, or as Eastham may otherwise direct in writing.**

3.    **Effective Date.** The effective date of the Redemption shall be [the date of this Agreement].

**Expiration Date.** The expiration date will be one year from the Effective Date. If the Redemption Price has not been paid in full Eastham will retain the difference of shares not purchased and redeemed by Company. If both parties agree then a new stock redemption and release agreement may be negotiated for the remaining balance from this agreement.

**Exhibit G**

4.     **Further Assurances**. Each Party hereto shall take all further actions and sign and deliver any additional instruments on or after the Closing as a Party hereto deems reasonably necessary to consummate or evidence the transactions contemplated by this Agreement.

5.     **Representations and Warranties**.

(a)     Each Party represents and warrants to the other Party that: (i) such Party has full capacity, power, and authority to enter into this Agreement and the Transaction Documents to which it is a party and to carry out the transactions contemplated under this Agreement and the Transaction Documents to which it is a party; (ii) this Agreement and the Transaction Documents to which it is a party are binding upon such Party and are enforceable against such Party in accordance with their terms; (iii) no consents or approvals are required from any other person or entity for such Party to enter into this Agreement or the Transaction Documents to which it is a party or consummate the transactions contemplated hereby or thereby; and (iv) the execution, delivery and performance by such Party of this Agreement and the other Transaction Documents to which it is a party do not and will not violate any law, rule, regulation, judgment, injunction, order, contract, agreement, or other instrument, arrangement, commitment, obligation, understanding, or restriction of any kind to which such Party is a party.

(b)     Eastham represents and warrants to the Company as follows:

(i)     None of the Shares are pledged, placed in escrow, encumbered, subject to any lien or to any matured, unmatured, or contingent claim.  Except for the rights of the Company under this Agreement, there are no options, agreements, contracts, security interests, or other rights in existence to purchase or acquire the Shares, now or in the future.

(ii)     All of the Shares redeemed by the Company pursuant to this Agreement have been validly issued and are outstanding, fully paid and nonassessable, and are not subject to any liens, restrictions, charges, or other Encumbrances, or to any preemptive rights or rights of first refusal or first offer in favor of any other person.

(iii)     Eastham agrees to waive any and all rights he may have pursuant to the Bylaws or otherwise which concern the purchase and sale of the Shares.

6.     **Survival of Representations and Warranties**.  Each of the Company and Eastham shall be entitled to rely only upon the warranties and representations set forth in this Agreement and all representations, warranties, covenants, and agreements made by the parties in this Agreement shall survive the Closing.   Each of the Company and Eastham expressly warrants and represents that, except for the representations and statements set forth herein, neither Party is relying upon any statement or representation of the other Party to this Agreement or any other person. Each Party is relying on that Party's own judgment and acknowledges that each has been represented and advised by the Party's own attorney in connection with this Agreement.

7.     **Assignment**.  The stock of the Company is not marketable and this Agreement is unique and personal to the Parties hereto.  This Agreement shall not be assigned by any Party without the express prior consent of the other Party, and may be enforced by a suit in equity for specific performance by either of the Parties.

8.     **Entire Agreement**.  This Agreement represents the entire agreement between the Parties with respect to its subject matter and supersedes all prior oral and written representations, agreements, and other communications relating to the subject matter of this Agreement.  This Agreement may be amended, modified, supplemented, superseded, or canceled, and any of the terms, covenants, representations,

warranties, or conditions hereof may be waived, only by a written instrument executed by both of the Parties hereto or, in the case of a waiver, by or on behalf of the Party waiving compliance.

9.    **Governing Law**.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of North Carolina.

10.    **Binding Effect**.  The rights and duties of the Parties hereunder will inure to the benefit of and be binding upon their respective successors and permitted assigns.

11.    **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which will be an original and all of which together will constitute one and the same instrument.  Any signature page delivered electronically will be binding to the same extent as an original signature page.


IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

PORT CITY CONTRACTING SERVICES, INC.

By: _____  06/07/21
Name:    Robert P. Sharpe
Title:    CEO


_____

**MARK EASTHAM**

**SCHEDULE 1**

**STOCK ASSIGNMENT SEPARATE FROM CERTIFICATE**

FOR VALUE RECEIVED, the undersigned (the "Transferor"), hereby sells, assigns, and transfers unto Port City Contracting Services, Inc., a North Carolina corporation (the "Company") all of such Transferor's right, title, and interest in and to _____ shares of Class B common stock of the Company standing in the name of Transferor on the books of the Company and such Transferor does hereby irrevocably constitute and appoint an authorized officer of the Company as his attorney-in-fact to transfer such stock on the books of the Company with full power of substitution in the premises.

Dated: June 10 _____, 2021

_____
Mark Eastham

## SCHEDULE 2

Wiring Instructions for Bank Account Designated by Eastham for Payments

Account Name:                        Mark Eastham
Bank:
Bank Address (if needed):
ABA#:
Account Name to Credit:
Account Number to Credit:
Account Address (if needed):

**Subject:** Re: STOCK REDEMPTION AND RELEASE AGREEMENT between Robert Sharpe and Mark Eastham is Signed and Filed!

**Date:** Thursday, September 16, 2021 at 10:09:15 PM Eastern Daylight Time

**From:** Trey Sharpe

**To:** Peter Spark, Mark Eastham

**Attachments:** image001.png, image002.jpg

Sounds good to me. Also, Mark and I need to put an agreement on paper about future compensation for the work he is performing.

Trey Sharpe
CEO, PCCS Medical
Mobile 910.540.8157
www.pccsmedical.com

**From:** Peter Spark <peter@pccsmedical.com>
**Sent:** Thursday, September 16, 2021 8:15:41 PM
**To:** Trey Sharpe <trey@pccsmedical.com>; Mark Eastham <mark.eastham@pccsmedical.com>
**Subject:** FW: STOCK REDEMPTION AND RELEASE AGREEMENT between Robert Sharpe and Mark Eastham is Signed and Filed!

As an update (numbers are rounded)

We received payment for the two orders since July 1st

This totals 8,076 boxes (258 shares which is 2.02%), this equates to 13,512 count equivalent boxes (431 shares which is 3.38%)

We just invoiced for 4000 50 count boxes yesterday (127 shares / 0.99%).

With these that is a total of 17,512 50 count boxes (559 shares / 4.38%) that we have invoiced or received payment for (report attached)

Today we were awarded 2,340 100 count and 1,656 50 count (Equates to 6,336 50 count boxes / 202 shares and 1.58%)

That is a total of 761 shares / $23,830.90 / 39.72% of the agreed buyback.

Please let me know if you want to go ahead and
- do the transfer this month at the amounts stated above
- round to say 50% for convenience

Have a think / discussion and let me know when I return from vacation

thank you

Peter Spark
CFO, PCCS Medical
Mobile 910.620.2691
www.pccsmedical.com



**Page 1 of 3**

 

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** Trey Sharpe <robert@pccsmedical.com>
**Sent:** Thursday, June 10, 2021 10:02 AM
**To:** Peter Spark <peter@pccsmedical.com>
**Subject:** FW: STOCK REDEMPTION AND RELEASE AGREEMENT between Robert Sharpe and Mark Eastham is Signed and Filed!

**From:** Adobe Sign <adobesign@adobesign.com>
**Date:** Thursday, June 10, 2021 at 9:11 AM
**To:** Trey Sharpe <robert@pccsmedical.com>, Mark Eastham <mark.eastham@pccsmedical.com>
**Subject:** STOCK REDEMPTION AND RELEASE AGREEMENT between Robert Sharpe and Mark Eastham is Signed and Filed!



## STOCK REDEMPTION AND RELEASE AGREEMENT between Robert Sharpe and Mark Eastham is Signed and Filed!

**To:** Robert Sharpe and Mark Eastham

Attached is a final copy of **STOCK REDEMPTION AND RELEASE AGREEMENT**.

Copies have been automatically sent to all parties to the agreement.

You can view **the document** in your Adobe Sign account.

Page 2 of 3



**Why use Adobe Sign:**

- Exchange, Sign, and File Any Document. In Seconds!
- Set–up Reminders. Instantly Share Copies with Others.
- See All of Your Documents, Anytime, Anywhere.

To ensure that you continue receiving our emails, please add adobesign@adobesign.com to your address book or safe list.

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Federal Firearms License
## (18 U.S.C. Chapter 44)

In accordance with the provisions of Title I, Gun Control Act of 1968, and the regulations issued thereunder (27 CFR Part 478), you are licensed to engage in the business specified in this license, within the limitations of Chapter 44, Title 18, United States Code, and the regulations issued thereunder, until the expiration date shown. **THIS LICENSE IS NOT TRANSFERABLE UNDER 27 CFR 478.51.** See "WARNINGS" and "NOTICES" on reverse.

| | | | |
|---|---|---|---|
| Direct ATF Correspondence To | ATF - Chief, FFLC FFLC@atf.gov 1-866-662-2750 | License Number | **1-56-129-08-4J-15713** |
| Chief, Federal Firearms Licensing Center (FFLC) *Tracy Robertson* | | Expiration Date | **September 1, 2024** |

Name
**STONE BAY TACTICAL**

**Premises Address** (Changes? Notify the FFLC at least 30 days before the move.)
**2017 CORPORATE DRIVE, UNIT 4**
**WILMINGTON, NC 28405-**

Type of License

**08-IMPORTER OF FIREARMS OTHER THAN DESTRUCTIVE DEVICES**

**Purchasing Certification Statement**

The licensee named above shall use a copy of this license to assist a transferor of firearms to verify the identity and the licensed status of the licensee as provided by 27 CFR Part 478. The signature on each copy must be an original signature. A faxed, scanned or e-mailed copy of the license with a signature intended to be an original signature is acceptable. The signature must be that of the Federal Firearms Licensee (FFL) or a responsible person of the FFL. I certify that this is a true copy of a license issued to the licensee named above to engage in the business specified above under "Type of License."

Mailing Address (Changes? Notify the FFLC of any changes.)

PORT CITY CONTRACTING SERVICES, INC
STONE BAY TACTICAL
2017 CORPORATE DRIVE, UNIT 4
WILMINGTON, NC 28405-

**Exhibit I**

_____
Licensee/Responsible Person Signature

CFO
Position/Title

Peter J. Spark
Printed Name

10-5-2021
Date

Previous Edition is Obsolete    PORT CITY CONTRACTING SERVICES, INC;2017 CORPORATE DRIVE, UNIT 4 28405;1-56-129-08-4J-15713;September 1, 2024;08-IMPORTER OF FIREARMS OTHER THAN DESTRUCTIVE DEVICES    ATF Form 8 (5310.11) Revised October 2011

### Federal Firearms License (FFL) Customer Service Information

Federal Firearms Licensing Center (FFLC)
244 Needy Road
Martinsburg, WV 25405-9431

Toll-free Telephone Number: (866) 662-2750
Toll-free Fax Number: (866) 257-2749
E-mail: FFLC@atf.gov

ATF Homepage: www.atf.gov
FFL eZ Check: www.atfonline.gov/fflezcheck

**Change of Address** *(27 CFR 478.52)*. Licensees may during the term of their current license remove their business or activity to a new location at which they intend regularly to carry on such business or activity by filing an Application for an Amended Federal Firearms License, ATF Form 5300.38, in duplicate, not less than 30 days prior to such removal with the Chief, Federal Firearms Licensing Center. The application must be executed under the penalties of perjury and penalties imposed by 18 U.S.C. 924. The application shall be accompanied by the licensee's original license. The license will be valid for the remainder of the term of the original license. (The Chief, FFLC, shall, if the applicant is not qualified, refer the application for amended license to the Director of Industry Operations for denial in accordance with § 478.71.)

**Right of Succession** *(27 CFR 478.56)*. (a) Certain persons other than the licensee may secure the right to carry on the same firearms or ammunition business at the same address shown on, and for the remainder of the term of, a current license. Such persons are: (1) The surviving spouse or child, or executor, administrator, or other legal representative of a deceased licensee; and (2) A receiver or trustee in bankruptcy, or an assignee for benefit of creditors. (b) In order to secure the right provided by this section, the person or persons continuing the business shall furnish the license for that business for endorsement of such succession to the Chief, FFLC, within 30 days from the date on which the successor begins to carry on the business.

*(Continued on reverse side)*

Cut Here ✂ -----------------------------------------

**Federal Firearms License (FFL) Information Card**

License Name: **PORT CITY CONTRACTING SERVICES, INC**

Business Name: **STONE BAY TACTICAL**

License Number: **1-56-129-08-4J-15713**

License Type: **08-IMPORTER OF FIREARMS OTHER THAN DESTRUCTIVE DEVICES**

Expiration: **September 1, 2024**

Please Note: Not Valid for the Sale or Other Disposition of Firearms.

FFL Newsletter - Electronic Version Available

Sign-Up Today!

FFLs interested in receiving the electronic version of the FFL Newsletter, along with occasional additional information, should submit name, FFL number, and e-mail address to: FIPB@atf.gov.

The electronic FFL Newsletter will enable ATF to communicate information to licensees on a periodic basis.

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Federal Firearms License**
*(18 U.S.C. Chapter 44)*

In accordance with the provisions of Title I, Gun Control Act of 1968, and the regulations issued thereunder (27 CFR Part 478), you are licensed to engage in the business specified in this license, within the limitations of Chapter 44, Title 18, United States Code, and the regulations issued thereunder, until the expiration date shown. **THIS LICENSE IS NOT TRANSFERABLE UNDER 27 CFR 478.51.** See "WARNINGS" and "NOTICES" on reverse.

| | | | |
|---|---|---|---|
| Direct ATF Correspondence To | ATF - Chief, FFLC FFLC@atf.gov 1-866-662-2750 | License Number | **1-56-129-07-4J-15712** |

Chief, Federal Firearms Licensing Center (FFLC)

*Tracy Robertson*

Expiration Date: **September 1, 2024**

Name
STONE BAY TACTICAL

Premises Address (Changes? Notify the FFLC at least 30 days before the move.)
**2017 CORPORATE DRIVE, UNIT 4**
**WILMINGTON, NC 28405-**

Type of License

07-MANUFACTURER OF FIREARMS OTHER THAN DESTRUCTIVE DEVICES

Purchasing Certification Statement
The licensee named above shall use a copy of this license to assist a transferor of firearms to verify the identity and the licensed status of the licensee as provided by 27 CFR Part 478. The signature on each copy must be an original signature. A faxed, scanned or e-mailed copy of the license with a signature intended to be an original signature is acceptable. The signature must be that of the Federal Firearms Licensee (FFL) or a responsible person of the FFL. I certify that this is a true copy of a license issued to the licensee named above to engage in the business specified above under "Type of License."

Mailing Address (Changes? Notify the FFLC of any changes.)

PORT CITY CONTRACTING SERVICES, INC
STONE BAY TACTICAL
2017 CORPORATE DRIVE, UNIT 4
WILMINGTON, NC 28405-

Licensee/Responsible Person Signature — Position/Title: CFO

Peter J. Spark — Date: 10-5-2021
Printed Name

ATF Form 8 (5310-11)
Revised October 2011
PORT CITY CONTRACTING SERVICES, INC:2017 CORPORATE DRIVE, UNIT 1:2845:1-56-129-07-4J-15712:September 1, 2024:07-MANUFACTURER OF FIREARMS OTHER THAN DESTRUCTIVE DEVICES

Previous Edition is Obsolete

### Federal Firearms License (FFL) Customer Service Information

Federal Firearms Licensing Center (FFLC)
244 Needy Road
Martinsburg, WV 25405-9431

Toll-free Telephone Number: (866) 662-2750
Toll-free Fax Number: (866) 257-2749
E-mail: FFLC@atf.gov

ATF Homepage: www.atf.gov
FFL eZ Check: www.atfonline.gov/fflezcheck

**Change of Address** *(27 CFR 478.52)*. Licensees may during the term of their current license remove their business or activity to a new location at which they intend regularly to carry on such business or activity by filing an Application for an Amended Federal Firearms License, ATF Form 5300.38, in duplicate, not less than 30 days prior to such removal with the Chief, Federal Firearms Licensing Center. The application must be executed under the penalties of perjury and penalties imposed by 18 U.S.C. 924. The application shall be accompanied by the licensee's original license. The license will be valid for the remainder of the term of the original license. (The Chief, FFLC, shall, if the applicant is not qualified, refer the application for amended license to the Director of Industry Operations for denial in accordance with § 478.71.)

**Right of Succession** *(27 CFR 478.56)*. (a) Certain persons other than the licensee may secure the right to carry on the same firearms or ammunition business at the same address shown on, and for the remainder of the term of, a current license. Such persons are: (1) The surviving spouse or child, or executor, administrator, or other legal representative of a deceased licensee; and (2) A receiver or trustee in bankruptcy, or an assignee for benefit of creditors. (b) In order to secure the right provided by this section, the person or persons continuing the business shall furnish the license for that business for endorsement of such succession to the Chief, FFLC, within 30 days from the date on which the successor begins to carry on the business.

*(Continued on reverse side)*

Cut Here ✂

| Federal Firearms License (FFL) Information Card |
|---|
| License Name: **PORT CITY CONTRACTING SERVICES, INC** |
| Business Name: **STONE BAY TACTICAL** |
| License Number: **1-56-129-07-4J-15712** |
| License Type: **07-MANUFACTURER OF FIREARMS OTHER THAN DESTRUCTIVE DEVICES** |
| Expiration: **September 1, 2024** |
| Please Note: Not Valid for the Sale or Other Disposition of Firearms. |

FFL Newsletter - Electronic Version Available

Sign-Up Today!

FFLs interested in receiving the electronic version of the FFL Newsletter, along with occasional additional information, should submit name, FFL number, and e-mail address to: FIPB@atf.gov.

The electronic FFL Newsletter will enable ATF to communicate information to licensees on a periodic basis.

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

## 2022 Special Tax Stamp

OMB No. 1140-0090 (05/31/2017)

| Name and Principal Business Address | Tax Statement | |
|---|---|---|
| | (Annual Tax Rate) 2000.00<br>Initial Tax $ | **TAX** |
| PORT CITY CONTRACTING SERVICES, INC<br>STONE BAY TACTICAL<br>2017 CORPORATE DRIVE, UNIT 4<br>WILMINGTON, NC 28405 | 2000.00<br>Additions, . . $ .00<br>2000.00<br>Total Tax PAID $ | **2022**<br>**YEAR** |
| | THIS IS NOT A BILL.<br>DO NOT PAY THE AMOUNT NOTED. | |

| Actual Physical Business Address (See Number 2 below)<br>PORT CITY CONTRACTING SERVICES, INC<br>STONE BAY TACTICAL<br>2017 CORPORATE DRIVE, UNIT 4<br>WILMINGTON, NC 28405 | Type of Operation Conducted<br>(62) NFA FIREARMS MFGR |
|---|---|
| 0002 | |
| This is a receipt of payment of Special (Occupational) Tax (SOT) under the<br>National Firearms Act. (27 CFR 479.36) | Number of Locations<br>2 OF 2 |

If You Have Any Questions, Refer To The Information Below

| Date of This Receipt<br>**SEPTEMBER 29, 2021** | Dates of Special Tax Period<br>**07/01/2021 TO 06/30/2022** |
|---|---|
| Employer Identification Number<br>**85-1908103** | Control Number<br>**2021264-N50-001** |

If you have any questions, you may contact the Bureau of Alcohol, Tobacco, Firearms and Explosives as follows:

CALL: (304) 616-4500      OR      WRITE: National Firearms Act Division, Bureau of ATF
FAX:  (304) 616-4501                          244 Needy Road
                                                              Suite 1120
                                                              Martinsburg, WV 25405

1. If you write, include in the letter your employer identification number, control number from above, your telephone number, and the best time for us to call if we need more information.

2. If you filed ATF Form 5630.7, Special Tax Registration and Return (NFA Firearms), for the first time, or have renewed your special tax stamp on ATF Form 5630.5R, Special Tax "Renewal" Registration and Return, and ATF Form 5630.5RC, Special Tax Location Registration Listing(s), showing multiple locations, you should have received a stamp for each location. Each stamp is printed with your principal business address and the actual physical address of the business location for which the stamp was issued. Forward the stamp to that location. Be sure that each location keeps the stamp on its business premises so that it is available for inspection. Photocopies are not acceptable evidence of tax payment.

3. If any of the preprinted information is incorrect, please write to the above address listing the correct information and return this Special Tax Stamp with your letter.

4. If there is a change in ownership of your business or business structure, such as a sole owner incorporating, the new owner is required to file ATF Form 5630.7, Special Tax Registration and Return (NFA Firearms), and obtain a new Special Tax Stamp (except as provided in 27 CFR 194.166 - 194.169 or 27 CFR 179.42 - 179.45) before engaging in the business.

5. If you have a change in control, contact ATF. You must notify the Bureau of Alcohol, Tobacco, Firearms and Explosives of any change of address, location, or trade name and receive approval before the change is made, by filing ATF Form 5630.7. If a Federal firearms licensee discontinues business and retains NFA firearms, the retention may be in violation of law. The licensee should check with State and local authorities.

6. This is a Special Tax Stamp and Receipt for Payment of Federal Tax. This does not authorize anyone to begin or continue a business contrary to Federal, State or local laws, nor does it exempt anyone from penalties or punishment for violating such laws.

7. THIS RECEIPT IS NOT TRANSFERABLE.

ATF Form 5630.6A

PORT CITY CONTRACTING SERVICES, INC  85-1908103

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and E.., .osives

**2022 Special Tax Stamp**

OMB No. 1140-0090 (05/31/2017)

| Name and Principal Business Address | Tax Statement (Annual Tax Rate) | 2000.00 | **TAX 2022 YEAR** |
|---|---|---|---|

PORT CITY CONTRACTING SERVICES, INC
STONE BAY TACTICAL
2017 CORPORATE DRIVE, UNIT 4
WILMINGTON, NC 28405

Initial Tax . . . . . $ 2000.00
Additions $ .00
Total Tax PAID $ 2000.00

THIS IS NOT A BILL.
DO NOT PAY THE AMOUNT NOTED.

Actual Physical Business Address (See Number 2 below)
PORT CITY CONTRACTING SERVICES, INC
STONE BAY TACTICAL
2017 CORPORATE DRIVE, UNIT 4
WILMINGTON, NC 28405

0001

Type of Operation Conducted
(61) NFA FIREARMS IMPORTER

Number of Locations
1 OF 2

This is a receipt of payment of Special (Occupational) Tax (SOT) under the National Firearms Act. (27 CFR 479.36)

**If You Have Any Questions, Refer To The Information Below**

Date of This Receipt
**SEPTEMBER 29, 2021**

Dates of Special Tax Period
**07/01/2021 TO 06/30/2022**

Employer Identification Number
**85-1908103**

Control Number
**2021264-N50-001**

If you have any questions, you may contact the Bureau of Alcohol, Tobacco, Firearms and Explosives as follows:

CALL: (304) 616-4500   OR   WRITE: National Firearms Act Division, Bureau of ATF
FAX: (304) 616-4501
244 Needy Road
Suite 1120
Martinsburg, WV 25405

1. If you write, include in the letter your employer identification number, control number from above, your telephone number, and the best time for us to call if we need more information.

2. If you filed ATF Form 5630.7, Special Tax Registration and Return (NFA Firearms), for the first time, or have renewed your special tax stamp on ATF Form 5630.5R, Special Tax "Renewal" Registration and Return, and ATF Form 5630.5RC, Special Tax Location Registration Listing(s), showing multiple locations, you should have received a stamp for each location. Each stamp is printed with your principal business address and the actual physical address of the business location for which the stamp was issued. Forward the stamp to that location. Be sure that each location keeps the stamp on its business premises so that it is available for inspection. Photocopies are not acceptable evidence of tax payment.

3. If any of the preprinted information is incorrect, please write to the above address listing the correct information and return this Special Tax Stamp with your letter.

4. If there is a change in ownership of your business or business structure, such as a sole owner incorporating, the new owner is required to file ATF Form 5630.7, Special Tax Registration and Return (NFA Firearms), and obtain a new Special Tax Stamp (except as provided in 27 CFR 194.166 - 194.169 or 27 CFR 179.42 - 179.45) before engaging in the business.

5. If you have a change in control, contact ATF. You must notify the Bureau of Alcohol, Tobacco, Firearms and Explosives of any change of address, location, or trade name and receive approval before the change is made, by filing ATF Form 5630.7. If a Federal firearms licensee discontinues business and retains NFA firearms, the retention may be in violation of law. The licensee should check with State and local authorities.

6. This is a Special Tax Stamp and Receipt for Payment of Federal Tax. This does not authorize anyone to begin or continue a business contrary to Federal, State or local laws, nor does it exempt anyone from penalties or punishment for violating such laws.

7. THIS RECEIPT IS NOT TRANSFERABLE.

ATF Form 5630.6A

## INDEPENDENT CONTRACTOR AGREEMENT

This INDEPENDENT CONTRACTOR AGREEMENT (this "Agreement") is entered into as of March 1st, 2021 (the "Effective Date"), by and between Port City Contracting Services, Inc. ("PCCS") and Mark Eastham ("Contractor"). For purposes of this Agreement, PCCS and Contractor may be referred to individually as a "Party" and collectively as the "Parties."

PCCS is a nationwide wholesale distributor of medical and surgical supplies, medical equipment and pharmaceuticals, and Contractor has specialized expertise [**in pharmaceutical distribution**].

Contractor desires to provide certain services to PCCS as an independent contractor, and PCCS wishes to retain Contractor to provide such services. The Parties desire for the provision of such services to be governed by the terms and conditions of this Agreement.

Therefore, in consideration of the above and the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Description of Services. Contractor agrees to provide such consulting services as PCCS may require from time to time relating to Contractor's experience and expertise and as agreed to by Contractor. A list of expected services is attached hereto as Exhibit A (the "Services"). Contractor will use Contractor's own equipment, including, without limitation, any computers, telephones, and any other equipment or materials needed to perform the Services under this Agreement.

2.      Compensation. Contractor shall be compensated for the Services as provided in Exhibit B.

3.      Term and Termination. The term of this Agreement shall be for a period of Twenty four (24 ) months commencing on the date first written above (the "Term"); provided, however, this Agreement may be terminated earlier: (a) by either Party for any reason or no reason upon five 60 (605) calendar days' written notice to the other Party; and, (b) by either Party immediately in the event of a breach by the other Party of the terms of this Agreement, which breach is not cured, if curable, within three (3) calendar days' written notice to the other Party of such breach.

3. 4.      Renewal. This Agreement shall auto-renew for an additional twenty four (24) months unless either party gives written notice to the other of it's intent to terminate prior to the natural expiration date.

# Eastham Indep Contractor Agreement (Unsigned) Docs9942566_1 Docx



4.5.    Relationship of Parties – Independent Contractor Status.    The Parties hereby acknowledge and agree that Contractor's services for PCCS shall be provided strictly as an independent contractor. Nothing in this Agreement shall be construed to render Contractor an employee, co-venturer, agent, or other representative of PCCS.    Contractor understands that Contractor must comply with all tax laws applicable to a self-employed individual, including the filing of any necessary tax returns and the payment of all income and self-employment taxes. PCCS shall not be required to withhold from any compensation paid to Contractor under this Agreement any state or federal income taxes or to make payments for any Social Security, Medicare, unemployment insurance, or any other payroll taxes. PCCS shall not be responsible for, and shall not obtain, worker's compensation insurance, disability benefits insurance, or unemployment security insurance coverage for Contractor.    Contractor is not eligible for, nor entitled to, and shall not participate in, any of PCCS's pension, health, or other benefit plans, if any such plans exist. Consistent with the duties and obligations under this Agreement, Contractor shall, at all times, maintain sole and exclusive control over the manner and method by which Contractor performs the Services.    Contractor shall have the right to perform work for others as long as Contractor fulfills Contractor's obligations hereunder and the performance of services for others does not create a conflict of interest with PCCS.

5.6.    Warranties by Contractor.    Contractor represents and warrants as follows:

(a)    Contractor has the knowledge and skills required to perform the Services under this Agreement and Contractor will perform the Services in compliance with all rules and regulations of PCCS, including those relating to personal conduct.

(b)    Contractor's performance of Services under this Agreement will not result in a breach of any duty owed by Contractor to another, under contract or otherwise, or violate any confidence of another.

6.7.    Confidential Information.    In light of Contractor's access to PCCS's Confidential Information, as defined below, Contractor agrees that, during the Term of this Agreement and thereafter, Contractor will hold in strictest confidence and will not disclose or use any Confidential Information, except as such disclosure or use may be required in connection with Contractor's work for PCCS, or unless and to the extent PCCS expressly authorizes such in writing. Contractor will obtain PCCS's written approval before publishing or submitting for publication any material (written, verbal, or otherwise, including without limitation presentations, abstracts or posters) that relates to Contractor's work at PCCS, relates to PCCS's business, and/or incorporates any Confidential Information.    Contractor agrees to assign and hereby assigns to PCCS any rights Contractor may have or acquire in any knowledge, data or information that is made, authored, conceived, developed or reduced to practice by Contractor during Contractor's engagement by PCCS, and that (but for Contractor's rights therein) would constitute Confidential Information, and Contractor recognizes that all Confidential Information shall be and is the sole and exclusive property of PCCS.

(a)    Confidential Information. The term "Confidential Information" shall mean any and all knowledge, data or information owned or controlled by PCCS, whether learned or received by Contractor before or following the Effective Date of this Agreement. By way of

illustration but not limitation, "Confidential Information" includes: (i) trade secrets, inventions, ideas, processes, formulas, algorithms, software, source and object code, data, results, programs, works of authorship, know-how, improvements, discoveries, developments, designs and techniques, (ii) information regarding research, development, new products, services, marketing, selling, business plans, budgets, unpublished financial statements, licenses, contracts, prices, costs, suppliers, collaborators and customers, or plans with respect to any of the foregoing, (iii) information regarding the skills and compensation of other employees, independent contractors or other service providers of PCCS and (iv) the existence of any business discussions, negotiations or agreements between PCCS and any third party.

(b)    Subpoena or Court Order. If Contractor is required to disclose Confidential Information pursuant to a court order, subpoena or other government process or such disclosure is necessary to comply with applicable law or defend against claims, Contractor agrees that Contractor shall:  (i) notify PCCS promptly before any such disclosure is made; (ii) at PCCS's request and expense take all reasonably necessary steps to defend against such disclosure, including defending against the enforcement of the court order, other government process or claims; and (iii) permit PCCS to participate with counsel of its choice in any proceeding relating to any such court order, subpoena, other government process or claims.

(c)    Notice of Certain Rights.  Notwithstanding the foregoing or any other provision in this Agreement, PCCS agrees that if Contractor files a lawsuit for retaliation by PCCS for the reporting of a suspected violation of law, Contractor may disclose any trade secret to Contractor's attorney and use the trade secret information in that court proceeding, if Contractor: (i) files any document containing such trade secret under seal and (ii) does not disclose any such trade secret, except pursuant to court order. PCCS also hereby notifies Contractor that Contractor may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (i) in confidence, directly or indirectly, to a federal, state, or local government official, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

7.8.    Ownership of Work Product.  All right, title, and interest in and to any and all inventions (and all proprietary rights with respect thereto), trade secrets, confidential and proprietary information, software programs, discoveries, conceptions, preparations and developments, whether or not eligible for or covered by patent, copyright, or trade secret protection, and whether or not any of the foregoing constitute works for hire or would otherwise belong to PCCS by operation of law, developed for PCCS as part of the Services, and arising out of and/or related to the Services, and/or related to PCCS's business as currently conducted and as contemplated to be conducted pursuant to its business plan or otherwise whether developed pursuant to this Agreement or prior to this Agreement, including all improvements to PCCS's existing products and/or services (collectively, the "Work Product"), shall belong exclusively to PCCS. Contractor shall, and hereby does, assign to PCCS all of its right, title, and interest in such Work Product. Upon request of PCCS and at PCCS's expense, Contractor shall take such further actions, including execution and delivery of instruments of conveyance necessary to obtain legal protection in the United States and foreign countries for such Work Product and for the purpose of vesting title thereto in PCCS, or its nominee, as may be appropriate to give full and proper effect

to such assignment and to vest in PCCS complete title and ownership to such Work Product, including, but not limited to, executing an assignment agreement.

~~8.~~9.    Indemnification.  Contractor will defend, indemnify and hold harmless PCCS and its officers, directors, employees, agents, successors and assigns from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind (including reasonable attorneys' fees) arising out of or resulting from: (a) damage to real or tangible, personal property resulting from Contractor's acts or omissions; and (b) Contractor's breach of any representation, warranty, covenant or obligation under this Agreement.

**~~9.~~10.    [Non-solicitation.  Contractor agrees that during the Term of this Agreement and for twelve (12) months following the termination or expiration of this Agreement Contractor will not, other than through general advertisements for employment not specifically directed at PCCS employees, solicit for employment any employee or other person who had been employed or retained by PCCS during the last six (6) months of Contractor's relationship with PCCS and with whom Contractor had material contacts during the course of Contractor's relationship with PCCS to terminate his or her employment or independent contractor relationship with PCCS.]**

~~10.~~11. Waiver.  No waiver of any right or remedy with respect to any occurrence or event shall be deemed a waiver of such right or remedy with respect to such occurrence or event in the future. No waiver of any of Contractor's obligations under this Agreement shall be effective unless in writing and signed by PCCS.

~~11.~~12. Assignment.  The terms, provisions, covenants and agreements contained in this Agreement shall apply to, be binding upon and inure to the benefit of PCCS's successors and assigns. For clarity and the avoidance of doubt, PCCS, at its discretion, may assign this Agreement to any affiliate or successor.  Because this Agreement is personal to Contractor, Contractor may not assign this Agreement.

~~12.~~13. Severability.  In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, Contractor agrees and acknowledges that such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

~~13.~~14. Governing Law and Consent to Jurisdiction.  This Agreement shall be construed, interpreted, and governed in accordance with and by North Carolina law. Any and all claims, controversies, and causes of action arising out of or relating to this Agreement, whether sounding in contract, tort, or statute, shall be governed by the laws of the state of North Carolina, including its statutes of limitations, without giving effect to any conflict-of-laws rule that would result in the application of the laws of a different jurisdiction.  Contractor agrees with PCCS: (a) that service of process may be effected upon Contractor by registered mail sent to the address for notices described in this Agreement, and (b) to the uncontested enforcement of a final judgment from a court with competent jurisdiction over Contractor.

~~14.~~15. Entire Agreement; Amendment.  This Agreement embodies the entire agreement between PCCS and Contractor relating to the subject matter hereof.  No changes, modifications or amendments of any term hereof shall be valid unless agreed upon by the Parties in writing.

~~15.~~16. Tax Consequences.  Contractor acknowledges that neither PCCS nor any employee or agent of PCCS has advised Contractor with respect to any tax consequences related to this Agreement nor potential tax consequences with respect to the consideration payable under this Agreement, whether cash, property or other value.  Contractor assumes full responsibility for all such tax consequences and the filing of all tax returns and elections Contractor may be required to or find desirable to file in connection with this Agreement.

~~16.~~17. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall be taken together and deemed to be one instrument.

*[Signatures on Following Page]*

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first above written.


**INDEPENDENT CONTRACTOR:**


_____
Mark Eastham


**PORT CITY CONTRACTING SERVICES, INC.**


By:    _____
       Name: Robert P. Sharpe
       Title: CEO

**EXHIBIT A**

**SERVICES TO BE PROVIDED BY CONTRACTOR**

Pursuant to the terms of this Agreement, Contractor has agreed to undertake the Services as set forth below:

- *Establish relationships related to pharmaceuticals which can include but not be limited to manufacturers, GPO's, buying groups, distributors[TO BE PROVIDED]*; and

- Such other consulting services to and for PCCS as requested from time to time by PCCS and agreed upon by Contractor.

# EXHIBIT B

## FEE SCHEDULE FOR CONTRACTOR

Compensation to Contractor for the Services provided pursuant to the terms of this Agreement shall be paid according to the following rates and terms.

All pharmaceutical and/or OTC sales made by PCCS to any entity via any sales channels shall be reimbursed at 25% of gross profit. Gross profit is defined as: *Revenue minus COGS minus shipping charges if applicable. Payment to contractor will be made no more than five days after PCCS has received payment.* PCCS shall provide backup detailing the payments. For purposes of this agreement diabetic test strips are expressly excluded.

Any other services requested by PCCS shall be reimbursed at an hourly rate of $200.00/hour for work performed. Weekly hours shall be submitted to PCCS. Contractor shall be notified within 24 hours of any disputes arising from submitted hours. Payment for other services shall be made monthly no later than the fifth of the following month.

**Formatted:** Font: Italic

**Formatted:** Font: Not Italic

**From:** **Mark Eastham** mark.eastham@pccsmedical.com  📎
**Subject:** Follow Up
**Date:** December 10, 2021 at 2:01 PM
**To:** Trey Sharpe trey@pccsmedical.com



Trey,

Thank you for sharing with us your compensation plan going forward. I'm sorry on behalf of the Partners if some of us were taken off guard. I hope that you were not upset. We are very appreciative of what you have done and for your generosity to all of us. You have worked very hard and deserve to be compensated how you feel is appropriate.

Based on our conversation it makes sense that everyone be made whole. I have copied below these amounts that are on the books. These figures were ones that you came up with by looking at everyone's time with the company without pay based on current salaries at that time. These numbers were included in last years financials.

We would like to propose that everyone get their full back pay by the end of the year. It would be $170K for you and you can see the others below. Your new compensation plan of 25% new business profit in 2022 makes sense to all of us now that we had time to digest.

If you're in agreement we can get this information to Adrianne.

Again I hope that you understand how appreciative we all are of your efforts.

Thanks

Mark

| Salaries Payable (A/P) | |
|---|---|
| Salaries Payable - Jay | 8,500.00 |
| Salaries Payable - Mark | 72,500.00 |
| Salaries Payable - Peter | 92,500.00 |
| Salaries Payable - Robert | 170,000.00 |
| Salaries Payable - Ryan | 22,500.00 |

**Exhibit K**

Mark Eastham, R.Ph.
Partner

Partner
PCCS Medical
(651) 788-3396
https://pccsmedicalcorp.com/

 

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

---

## RECORDED TELEPHONE CONVERSATION

---

---

### Patricia B. Kinlaw
### Court Reporter

Wyatt Legal Services, LLC
3936 Elizabeth Glen Way
Jamestown, NC 27282
(336) 510-8515



Exhibit
L

**Page 2**

## ATTORNEY NOTES

| PAGE | LINE | SUBJECT MATTER | RELATES TO | ACTION |
|------|------|----------------|------------|--------|
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |
| _____ | | _____ | | |

**COPY**

Wyatt Legal Services, LLC, 3936 Elizabeth Glen Way, Jamestown, NC 27282 (336) 510-8515

**Page 3**

## I N D E X

CONVERSATION BEGINS                                    4

CONVERSATION ENDS                                     16

REPORTER CERTIFICATE                                  17

---

**PARTICIPANTS**

Robert Sharpe

Mark Eastman

Peter Spark

Adrianne

NOTE:  The court reporter was not physically present during this meeting and did not personally record the conversation.

COPY

```
 1          WHEREUPON,

 2          the recorded telephone conversation begins:

 3               MR. SPARK:  Morning, guys.

 4               MR. SHARPE:  Hey, Pete.

 5               MS. ADRIANNE:  Morning.

 6               MR. SHARPE:  All right.  So the point of

 7    this call is to figure out how $366,000 in debt

 8    got added to the books and it wasn't discussed.  I

 9    know we discussed it in concept when negotiating

10    with Nick, but it was never told to me it was

11    going to actually be placed on the books.

12               And Pete, we just had a big company

13    meeting where we went over finances and we talked

14    about the loans that were outstanding and all the

15    debt and the assets.  And again, $366,000 in back

16    pay debt wasn't even discussed.  And I'm curious

17    how it got there and -- and -- and -- and why it

18    hasn't been discussed.

19               MR. SPARK:  So we had a compensation

20    committee meeting where the exact calculation was

21    given by you, how we should put it on there.  We

22    then had a board meeting reviewing that,

23    conferring it was on there.  As part of the

24    valuation, it was put into the books.  So I don't

25    understand why you're saying you never knew about
```

COPY

```
 1    it.  And okay, when --
 2              MR. SHARPE:  So let's stop right there
 3    --
 4              MR. SPARK:  -- we had that --
 5              MR. SHARPE:  -- real quick.
 6              MR. SPARK:  -- most recent meeting,
 7    fine, we didn't necessarily --
 8              MR. SHARPE:  Let's --
 9              MR. SPARK:  -- raise that particular
10    topic, but --
11              MR. SHARPE:  Hey, Pete.  Let's stop real
12    quick.  Adrianne, were you aware that there was
13    $366,000 on the books?
14              MS. ADRIANNE:  Oh, I think it was the
15    first heard for me over the last few days, so
16    yeah.
17              MR. SHARPE:  I mean, Pete, this wasn't
18    --
19              MR. EASTMAN:  Well, was it our
20    responsibility to ensure that executives of the
21    company don't know how to look at QuickBooks and
22    read the financials?
23              MR. SHARPE:  Yes, it is.
24              MR. EASTMAN:  Okay.  Well, it's not.
25    It's been on there for -- I don't -- over a year
```

**COPY**

1    now.  It's all documented in emails, Trey, that

2    you were copied on.

3              MR. SHARPE:  Right.

4              MR. EASTMAN:  It's documented in emails

5    to the attorney.  I mean, I don't know how -- what

6    else could've been done.  So --

7              MR. SHARPE:  So let me ask Pete.  Pete,

8    why wasn't this discussed at the meeting?

9              MR. SPARK:  Because that -- that's

10   always been debt on the books that's amongst the

11   partners.  It's -- it's not like there's an

12   external loan.  There's no reason I've hidden it

13   from you or anything like that.  It's not being

14   hidden.  It just -- it was always there when we

15   talked about it.  It would probably be something

16   that we wrapped up when we sold the company.

17             MR. SHARPE:  But don't you think we

18   should've talked about it at the financial

19   briefing?

20             MR. SPARK:  Not particularly.

21             MR. EASTMAN:  No, I don't either.  It's

22   -- it's been sitting on the balance sheet over a

23   year.  So I'm -- I'm just still unclear on --

24             MR. SHARPE:  Okay.

25             MR. EASTMAN:  -- why this is being

COPY

```
 1   discussed right now.

 2           MR. SHARPE:  Because -- one, because I

 3   didn't know it was on the books and, you know, as

 4   the CEO of the company, I should know that that

 5   would be the largest debt that we owe to anyone,

 6   and it -- and -- and it -- and it came as an

 7   absolute surprise.  I absolutely do not know how

 8   to read financial statements.  That's why I have

 9   Pete.  I -- I -- I -- you know, I -- I can see how

10   it could've possibly been a miscommunication.

11   What I'm going to need is just a copy of

12   everything that -- that's -- you know, all the

13   emails and stuff that y'all mentioned, I would

14   just like to see them myself, if that's possible.

15           MR. EASTMAN:  Of course, because you're

16   on all of them.  All you have to do is go back to

17   your inbox and find them, Trey.

18           MR. SHARPE:  Sure.  Well, right.  I just

19   --

20           MR. EASTMAN:  But we'll send it.  We'll

21   send them to you.  Don't worry.  We'll send --

22           MR. SHARPE:  Okay.

23           MR. EASTMAN:  -- them to you.

24           MR. SHARPE:  Other than --

25           MR. SPARK:  I don't know if you
```

Wyatt Legal Services, LLC, 3936 Elizabeth Glen Way, Jamestown, NC 27282 (336) 510-8515

```
 1    remember, but also, when we were going through it
 2    with Kim, she actually came back and had suggested
 3    revisions for that board meeting, for the minutes
 4    of that meeting, which we all had to review and
 5    approve.  So again, it was in there as well.
 6           MR. SHARPE:  Yeah.  And -- and I'm just
 7    going to be clear.  My understanding was that it
 8    was a negotiating tactic and something that we
 9    would do if Nick decided to fight us, but he
10    didn't.  And again, it just -- it -- it really --
11    you can imagine my level of stress whenever I'm
12    trying to move things forward and all of a sudden
13    I realize we have $366,000 in debt that I didn't
14    know about.  We -- and we can argue about, you
15    know, why I didn't know about it, but at the end
16    of the day, it -- it -- it absolutely came as a
17    huge surprise that it was literally being carried
18    on the books.
19           MR. SPARK:  So just to be clear, when we
20    were doing that valuation, that's why it got put
21    on the books.  And if I was under any impression
22    that this was deliberated, devalue the company and
23    defraud someone else, the value of their shares, I
24    would not have put my name behind any of that.
25           MR. SHARPE:  Okay.  Well, I -- that was
```

Wyatt Legal Services, LLC, 3936 Elizabeth Glen Way, Jamestown, NC 27282 (336) 510-8515

1    not my intent.  We were talking about -- I

2    remember the negotiating being Nick was discussing

3    what he was putting in the company and wanting

4    more money for his time and that's -- you know,

5    and then we're like, well, we haven't even put our

6    time on -- you know, so -- so it -- it is what it

7    is.  I just want to look at the paperwork and see

8    how to go forward.

9           The -- the second thing I -- I -- I want

10   to talk about is, when I mentioned I wanted to be

11   paid a bonus in it, I -- I got the feeling that

12   everybody felt that a hundred thousand dollars was

13   too much.  Why would it then make sense to try to

14   pay out $366,000 by the end of the year?

15          MR. EASTMAN:  We felt like, Trey, it was

16   a way just to get that off the books.  I mean, and

17   -- and you had made a comment on the phone call

18   that you knew there was stuff on the books.  I

19   mean, you referenced this on the call --

20          MR. SHARPE:  Yeah, we --

21          MR. EASTMAN:  -- Friday.

22          MR. SHARPE:  -- we moved cash over that

23   was due --

24          MR. EASTMAN:  So --

25          MR. SHARPE:  -- to be paid to you and I

COPY

```
 1    from the LLC to the C-corp.  That, I knew about,

 2    because we got a tax payment to cover the tax

 3    portion of it.  But you and I both put cash

 4    directly into PCCS, the corporation.  And so --

 5              MR. EASTMAN:  Well, me moving this was

 6    to -- you know, my -- I took that as you were

 7    referring to the partners back pay?

 8              MR. SHARPE:  No.

 9              MR. EASTMAN:  Because again, all of us

10    knew it was on there, except for you, for some

11    reason.  So it made sense just, well, if you're

12    going to pay, let's just pay all this out.  You

13    know, if there's another way you want to do it,

14    that's fine, but --

15              MR. SHARPE:  Well, does anybody hear

16    feel they're owed back pay?

17              MR. EASTMAN:  Well, yeah.  It's sitting

18    on the books.  Been on the books over a year.  Did

19    -- did we put it on there just -- why -- why is it

20    on there then if -- if nobody -- if we're not owed

21    the back pay?

22              MR. SHARPE:  Well, that's my question.

23              MR. EASTMAN:  Okay.  Well, it's a

24    misrepresentation then of -- of the company.

25              MR. SHARPE:  Well, no.  I never intended
```

Wyatt Legal Services, LLC, 3936 Elizabeth Glen Way, Jamestown, NC 27282 (336) 510-8515

```
1    that.  I -- I -- I didn't know it was put on the

2    books.  I thought it was just something we are

3    discussing with attorneys, but --

4              MR. EASTMAN:  Well, Trey --

5              MR. SHARPE:  And I could be wrong.  I --

6    I'm --

7              MR. EASTMAN:  Right.

8              MR. SHARPE:  -- I'm just asking simple

9    --

10             MR. EASTMAN:  That's neither --

11             MR. SHARPE:  -- questions.

12             MR. EASTMAN:  -- here nor there.

13             MR. SHARPE:  Yeah, I'm just --

14             MR. EASTMAN:  Okay.

15             MR. SHARPE:  But does anybody -- I mean,

16   because where I'm coming from -- and -- and I'm

17   not trying to be a dick.  But I spent, like on the

18   pharma side, hundreds of thousands of dollars in

19   salaries and we have not recaptured any of that.

20   So the idea that I owe hundreds of thousands of

21   additional money and salaries is scary.

22             MR. EASTMAN:  And I can't -- I'm not

23   going to explain business anymore to you, Trey.

24   Okay?  I don't know how many times we've been

25   through this.  You hired me to come on.  We did
```

COPY

1    pharma maybe two months and then COVID hit.

2              MR. SHARPE:  Yes.

3              MR. EASTMAN:  We, as a company, made a

4    decision to change the strategy and go after PPE.

5    We did that for a year.  I then left the company.

6              MR. SHARPE:  Uh-huh.

7              MR. EASTMAN:  I have been back in the

8    company since October of this year.  And so, you

9    know, this initiative, in reality, has been worked

10   on maybe four months.  So stop saying it's been

11   over two years and you haven't done anything,

12   because it's not an accurate statement, and you

13   know it's not.

14             MR. SHARPE:  Okay.

15             MR. EASTMAN:  So I -- I -- we need -- I

16   -- I'm just -- I'm trying to -- you know, this

17   takes time.  All right?  I -- I know that you

18   don't understand time, but it takes time.  Even

19   when we spoke to your guy, Troy, the biggest thing

20   he told me is you need to tell Trey he has got to

21   be patient, it takes time.  So, you know, and it

22   hasn't been two years.  It's been about four

23   months.  So I'd like to kind of get off that point

24   of I've paid hundreds of thousands of dollars and

25   I don't have anything.  If you don't want to do

COPY

Page 13

```
 1      the initiative anymore, that's your decision.

 2                  MR. SHARPE:  Okay.

 3                  MR. EASTMAN:  But just stop.

 4                  MR. SHARPE:  Okay.

 5                  MR. EASTMAN:  That's fine with me.

 6      Let's just stop it.  Okay?

 7                  MR. SHARPE:  All right.  Well, I -- I

 8      just need to think about things and figure out

 9      what makes the most sense for us all.  I'm not

10      trying to be hotheaded.  I just -- you know, all I

11      know is from my end if -- if I'd have been just a

12      diabetic test strip company, my house would be

13      paid for.  And I'm not saying that to be rude.

14      But I don't think people appreciate how hard I

15      work, what I've brought in.  You know, I'll be

16      really blunt.  Everybody getting upset whenever I

17      ask for a commission, that's not even the full

18      commission that I -- that I've offered you, and to

19      get that -- that negative, it -- it tells me that

20      nobody really appreciates what I bring to the

21      table.  Because I don't understand how it's okay

22      for the veteran in charge or -- or it's not okay

23      for the veteran in charge of a veteran-owned

24      company to collect the same commission that other

25      team members are allowed to collect.
```

COPY

```
 1              MR. EASTMAN:  Okay.  Trey, I -- if you
 2      want to go through these point by point, we can.
 3              MR. SHARPE:  Okay.
 4              MR. EASTMAN:  I don't -- I don't know if
 5      that -- that makes a lot of sense.  But if that's
 6      what you want to do, we can.  I've never worked in
 7      a company where the CEO has to keep reminding his
 8      employees how hard he works.  All right?
 9              MR. SHARPE:  I shouldn't have to.
10              MR. EASTMAN:  It's -- it's crazy
11      leadership.  I mean, it just doesn't make any
12      sense at all.  But you're constantly justifying
13      how hard you're working, which we feel like, then,
14      we're not working.  And that's okay.  I mean, you
15      know, you -- if that's what you feel you need to
16      do, that's fine.
17              The second point is, you know, we had a
18      conversation last week.  I mean, there's a way you
19      could get a lot of money right now.  But, you
20      know, you have some unrealistic number in your
21      head.  You know, if you want to, you know, pay
22      your house off, then, you know, pay your house
23      off, Trey.  There's nothing stopping you.
24              MR. SHARPE:  Sure.
25              MR. EASTMAN:  You do whatever you want
```

Wyatt Legal Services, LLC, 3936 Elizabeth Glen Way, Jamestown, NC 27282 (336) 510-8515

```
 1    to do.  All right?  Since I've come back to the

 2    company, there's no more teamwork.  You know, when

 3    I left the company, you know, we were working

 4    together, we were doing things, you know.  Now,

 5    it's you.  You are basically telling us what to

 6    do.  Okay?  We don't have time to even think

 7    outside the box for ourselves because you've got

 8    us doing what you want to do.  And now, you know,

 9    you're funding your gun company with PCCS.  And I

10    just don't like it.  I mean, I'm just, you know,

11    being honest and transparent with you.  I -- I

12    just -- I don't think it's right, what's

13    happening, and that's just why I'm, you know, kind

14    of at a point where, where is PCCS headed?

15              MR. SHARPE:  Okay.  All right.  Well, I

16    appreciate the call.  Let me digest everything and

17    -- and we'll -- Adrianne, do you have anything?

18              MS. ADRIANNE:  No thanks.

19              MR. SHARPE:  All right.

20              MR. EASTMAN:  So we'll get you that

21    information.  You'll have it this morning.

22              MR. SHARPE:  Okay, cool.

23              MR. EASTMAN:  And then, if you have

24    questions about it, you know, you can certainly --

25    please schedule another call.
```

COPY

1            MR. SHARPE:  All right.  I appreciate

2       it.

3            MR. EASTMAN:  All right.  Thanks.  Bye.

4            (WHEREUPON, the conversation ended.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COPY

## CERTIFICATION

I, Patricia B. Kinlaw, Notary Public in and for the County of Onslow, State of North Carolina at Large, do hereby certify:

That the recorded telephone call was reduced to typewriting under my direct supervision, and the foregoing consecutively numbered pages are a complete and accurate record of the conversations;

That the undersigned is not of kin, nor in anywise associated with any of the parties to said cause of action, nor their counsel, and that I am not interested in the event(s) thereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this the 15th day of July, 2022.

_____

PATRICIA B. KINLAW
NOTARY NO: 19982650110

**COPY**

Jay Graves

**Jay Graves**   9/30/21 12:35 PM

where the fuck is trey

is he out playing with the general?

he said something about his kids bachelor party

dude is obsessed with the guy

maybe its because i was an officer but jesus...

9/30/21 12:36 PM

No idea - he's probably upset or pissed that I told him I'm sick of always having to adapt to his emotional needs and working with an attorney to dilute me to nothing

**Jay Graves**   9/30/21 12:37 PM

speaking of which...does pccs make money off stonebay?

i am always so confused

9/30/21 12:37 PM

Stone Bay isn't a separate entity. It is just another DBA like PCCS Medical is to Port City Contracting Services.

**Jay Graves**   9/30/21 12:38 PM

ok so technically we would get payouts on its profit?

9/30/21 12:38 PM

yeah assuming he doesn't shoot that out the barrel of his fully auto sig down the range

Type a new message



**Exhibit M**

Go to m

nnels >    From >    Date >    [ ] @mentions me    [ ] Has attachment    [ ] Hide apps & bots

**Peter Spark in group chat**    10/21/21 12:51 PM

You, Jay and Mark

No it references Stone Bay as a **DBA** of Port City

**Jay Graves in group chat**    10/21/21 12:51 PM

You, Jay and Mark

but will it be a **DBA** if he separates it for shares?

**Jay Graves in group chat**    10/21/21 12:51 PM

You, Jay and Mark

can still do a **DBA** I guess but..that fucks up shares

**Jay Graves in chat**    6/23/21 12:51 PM

In conversation with you

I need to fill out a **dba** form. Much easier than starting a company. Lol.

**Peter Spark**

In conversation with Jay Graves

**Jay Graves**    9/30/21 12:37 PM

i am always so confused



**Peter Spark in chat**    9/30/21 12:37 PM

Exhibit N



5/16
Sivaramakrishna: scha....

10/22
o idea and yes it's ano...



Q Search

○ Jay, ○ Mark    Chat   Files   +

Jay Graves   10/21/21 12:51 PM
can still do a DBA I guess but..that fucks up shares

That's sig issue

Jay Graves   10/21/21 12:51 PM
but will it be a DBA if he separates it for shares?

10/21/21 12:51 PM
No it references Stone Bay as a DBA of

Mark Eastham   10/21/21 12:52 PM
where does it reference PCCS?

In the sig agreement

10/21/21 12:52 PM
and we have that registered.
This is where I was saying we either need them to rename new Co so we can keep it or we lose

10/21/21 12:54 PM
no on the FFL and SOT

although PCCS are on the credit application for the Sig account (along with 2 years tax returns we had submit)

Type a new message

ves

June 23, 2021

6/23/21 12:33 PM
So it looks like we're getting FFL. Landlord is ok with it

Do you know if we can add a second domain to microsoft?

6/23/21 12:51 PM
no - just another DBA - he finaly listened

**Jay Graves** 6/23/21 12:50 PM
Hmmm. I don't know. I was actually looking at that a few days ago.

Will this be a new company?

**Jay Graves** 6/23/21 12:51 PM
Thank goodness.

I need to fill out a dba form. Much easier than starting a company. Lol.

6/23/21 12:51 PM
I really thought the landlord would say no but he was like yeah, we're zoned where that is ok, it's pretty cool

i was in two minds whether to tell Trey but then figured he'd run it out of his garage where there would be no control

Type a new message



**Exhibit O**

**From:** Mark Eastham <mark.eastham@pccsmedical.com>
**Subject: RE: Set Up LLC [SMITHLAW-RDU.FID582403]**
**Date:** November 3, 2021 at 7:22:22 AM EDT
**To:** Peter Spark <peter@pccsmedical.com>, Trey Sharpe <trey@pccsmedical.com>

Pete,

All good points and information. I suggest we need an action plan to make sure everything is covered below.

Trey?

Mark Eastham, R.Ph.
Partner
PCCS Medical
(651) 788-3396
www.pccsmedical.com

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** Peter Spark <peter@pccsmedical.com>
**Sent:** Tuesday, November 2, 2021 5:07 PM
**To:** Trey Sharpe <trey@pccsmedical.com>; Mark Eastham <mark.eastham@pccsmedical.com>
**Subject:** RE: Set Up LLC [SMITHLAW-RDU.FID582403]

Also, just a couple of other thoughts so we make sure we have everything aligned

SDVOSB certification



- As there is a business registered at this address that could be challenging, we had the same issue with MyCyberExec which was overcome but if there is now a third that could be challenging
- Our Lease doesn't allow sub-letting without prior approval from the landlord and a $1,000 admin fee
- With Rudner being based almost as far from Wilmington as possible what is the risk to SDVOSB status is he's that far away, might there be a concern about leading the company

Licensing and Special Tax

- As mentioned, Stone Bay Tactical name is already registered and linked to the PCCS licensing
- There was prior mention of storing the guns at the Osprey facility. We would need FFLs to cover both locations. The FFLs also require the landlord approval/lease which we got for Stone Bay as a PCCS company. With NewCo we would need landlord approval, sub-lease agreement and something similar with Osprey

Capital Contribution

- Some aren't contributing so need clear guidance on that piece
- Those that are contributing should be detailed as to when they contribute
- Document will need addresses of economic and member interest parties I beleive

Peter Spark
CFO, PCCS Medical
Mobile 910.620.2691
www.pccsmedical.com

 

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** Peter Spark
**Sent:** Tuesday, November 2, 2021 5:00 PM
**To:** Trey Sharpe <trey@pccsmedical.com>; Mark Eastham <mark.eastham@pccsmedical.com>
**Subject:** RE: Set Up LLC [SMITHLAW-RDU.FID582403]

Don't forget there is still the issues that Stone Bay Tactical is a registered DBA of Port City Contracting Services. It is also listed on the Tax Stamp and FFL. As it's a DBA of PCCS it's also registered at the same address.

I still think this name thing could be an issue so Kim needs to be aware of that as I'd hate to rush the processing with NC just for it to be rejected because the company name already exists.

Peter Spark
CFO, PCCS Medical
Mobile 910.620.2691
www.pccsmedical.com

 

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** Trey Sharpe <trey@pccsmedical.com>
**Sent:** Tuesday, November 2, 2021 3:33 PM
**To:** Mark Eastham <mark.eastham@pccsmedical.com>; Kim Swintosky <kswintosky@smithlaw.com>
**Cc:** Peter Spark <peter@pccsmedical.com>; Holly Grange <hgrange@ospreyglobalsolutions.com>; Michael Rudner <Michael.Rudner@pccsmedical.com>; David Danel <david.c.danel@gmail.com>
**Subject:** Re: Set Up LLC [SMITHLAW-RDU.FID582403]

Kim,

This is the template used with PCCS when first formed as an LLC. We wanted to setup with half shares economic interest only. The other half members.

The two memeber are myself and Holly Grange. She has an LLC setup as Grange Counsel, LLC. Are there issues setting her half the membership shares through her LLC?

Our breakdown of membership/ economic interest is:

Membership (50% of total economic interest) will be evenly split between myself and Holly Grange (Grange Counsel, LLC)

Economic interest only:

5% - John Brex (bought for $25k)
5% - Bob Eschino ($25k)

5% - Chris Dunn ($25k...may hold on his issue of shares and simply take a loan from him for 25k with shares as collateral. He is about to go through a high conflict divorce.)
5% Michael Rudner (CEO)
5% David Danel (President)
5% Peter Spark
5% Adrianne George

We have other shares to issue but those can be done after formation.

15% reserved for issue for future capital/employee/talent recruitment.

HQ and address will be 2017 Corporate Drive Wilmington NC 28412

We do plan on certifying as an SDVOSB, so Michael Rudner will need to be senior officer of Stone Bay. Both Holly and I are both senior officers of our own SDVOSB.

Trey Sharpe
CEO, PCCS Medical
Mobile 910.540.8157
www.pccsmedical.com

**From:** Mark Eastham <mark.eastham@pccsmedical.com>
**Sent:** Tuesday, November 2, 2021 11:53:13 AM
**To:** Kim Swintosky <kswintosky@smithlaw.com>
**Cc:** Trey Sharpe <trey@pccsmedical.com>; Peter Spark <peter@pccsmedical.com>
**Subject:** RE: Set Up LLC [SMITHLAW-RDU.FID582403]

Kim,
Thx for the prompt response. As soon as I get all the information requested below from Trey will get back to you.

Hope your well.

Mark Eastham, R.Ph.
Partner
PCCS Medical
(651) 788-3396
www.pccsmedical.com

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** Kim Swintosky <kswintosky@smithlaw.com>
**Sent:** Monday, November 1, 2021 11:12 PM
**To:** Mark Eastham <mark.eastham@pccsmedical.com>
**Cc:** Trey Sharpe <trey@pccsmedical.com>; Peter Spark <peter@pccsmedical.com>
**Subject:** RE: Set Up LLC [SMITHLAW-RDU.FID582403]

Getting the Articles filed and the Company created doesn't take much time and can be done pretty quickly.  It is the drafting the Operating Agreement that is usually custom drafted, which is the wildcard for estimating fees.  The OA you sent looks like a standard real estate holding co LLC OA based off of the CY Johnson NC LLC forms manual (which is the same forms manual that we and most other NC attorneys use for NC LLC OAs).  If you want an OA that is substantially similar to the one you sent, that can be done pretty quickly, but if the arrangement is different, it would be helpful to know how it is different.  How many members?  Who will be managers?  Everything to be pro rata or any differences in ownership interests, etc.?  What do you like/dislike about the OA you sent to me?

Re: timing, if you tell me the name of the LLC, name and address of registered agent and principal office address, if any, I can get the Articles drafted and filed tomorrow – SOS fee is $125  and with $100 expedite fee to SOS, you can get 24 hour service to make sure that the Articles are effective this week – otherwise it could take a while for them to be processed.  I cannot promise to turn around an OA this week as my to do list already runneth over.

Kim


**KIMBERLY Q. SWINTOSKY | PARTNER**
kswintosky@smithlaw.com | bio
919.821.6736 | vcard | smithlaw.com | map


**SMITH ANDERSON**
*expectexcellence®*
Sign up to receive legal updates
Best Places to Work Award Winner! *Triangle Business Journal*



**From:** Mark Eastham [mailto:mark.eastham@pccsmedical.com]
**Sent:** Monday, November 1, 2021 4:31 PM
**To:** Kim Swintosky <kswintosky@smithlaw.com>
**Cc:** Trey Sharpe <trey@pccsmedical.com>; Peter Spark <peter@pccsmedical.com>
**Subject:** Set Up LLC

Kim,

It's been a while since we last spoke. I'm working with Trey on a new company (LLC) set up. I was hoping to get an estimate for the set up and timing. We need to get this done quickly due to tight windows.

I have attached the original PCCS Operating agreement as a guide.

Once I get confirmation on pricing and timing I will provide the relevant company information.

Thanks

Mark Eastham, R.Ph.
Partner
PCCS Medical
(651) 788-3396
www.pccsmedical.com

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

IMPORTANT: This e-mail message is intended solely for the individual or individuals to whom it is addressed. It may contain confidential attorney-client privileged information and attorney work product. If the reader of this message is not the intended recipient, you are requested not to read, copy or distribute it or any of the information it contains. Please delete it immediately and notify us by return e-mail or by telephone (919) 821-1220.

U.S. Department
of Veterans Affairs

# Verification Assistance Brief

# Proving Veteran is Highest Compensated Employee

## Issue:

This brief explains the verification requirement that a Veteran or Service-Disabled Veteran must be compensated in an amount equal to or higher than any non-Veteran director, officer, or employee of the business. If a Veteran is not the highest compensated, the applicant must explain how the Veteran taking lower compensation benefits the concern.

(For purposes of this brief, the regulations when referring to Service-Disabled Veterans applies equally to Veterans; applicant refers to the business entity applying for verification; and participant refers to a business entity that has already been verified.)

## The Regulations:

**13 CFR § 125.11** provides:

*Veteran owned small business concern* means a small business concern:

(1) Not less than 51 percent of which is owned by one or more veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans; and

(2) The management and daily business operations of which are controlled by one or more veterans. All of the provisions of subpart B of this part apply for purposes of determining ownership and control.

**13 CFR § 125.13(i)(2)** provides that "[n]on-service-disabled veteran individuals or entities may not control the firm. There is a rebuttable presumption that non-service-disabled veteran individuals or entities control or have the power to control a firm...[if] one or more non-service-

disabled veterans receive compensation from the firm in any form as directors, officers or employees, including dividends, that exceeds the compensation to be received by the highest-ranking officer (usually CEO or President). The highest-ranking officer may elect to take a lower amount than the total compensation and distribution of profits that are received by a non-veteran only upon demonstrating that it helps the concern."

## What This Means:

- Subpart B as referred to in 13 CFR § 125.11 is saying that anywhere in the regulations where the term Service-Disabled Veteran is used, it is equally applicable to Veterans for purposes of determining eligibility.

- While receiving less compensation than non-Veterans may be found as a bar to establishing control of an applicant or participant, Center for Verification and Evaluation (CVE) may find that the requirement of 13 CFR § 125.13(i)(2) has been satisfied where the concern demonstrates that the Veteran receives total compensation in an amount more than the total compensation and distribution of profits received by the non-Veteran employee, director or owner. If the Veteran does not, CVE may find that this requirement is satisfied if the concern has provided a written statement explaining that the Veteran has elected to take less compensation and why doing so benefits the concern. This requirement may be satisfied where the applicant's business documentation shows that the Veteran receives compensation at least equal to that of the non-Veteran directors, employees, and owners. Importantly, salary



Exhibit

Q

is not the only factor in determining compensation. Total compensation including distribution of profits must be considered to determine whether the requirements of 13 CFR § 125.13(i)(2) have been met. For example, if a Veteran CEO is paid $70,000 in salary and receives $10,000 in dividends annually, and the non-Veteran president of the company is paid $60,000 in salary and $25,000 dividends annually, the requirement will not be met.  The combined compensation of the Veteran does not equal or exceed that of the non-Veteran employee.

- If the Veteran provides an explanation that he or she elected to receive lower compensation, it is important to show how the concern benefits (rather than how the Veteran benefits personally). Explanations solely demonstrating personal benefits are insufficient to satisfy the verification requirement.

- Examples of adequate explanations can be: (1) that the Veteran will be able to retain highly skilled employees by electing to compensate those employees rather than taking a higher salary; (2) the current business and economic situations are such that revenue is not sufficient to compensate the Veteran and operational costs are more critical; and (3) the applicant is a start-up company and the Veteran must use resources for start-up costs to ensure the company's success. This list of examples is not all-inclusive. CVE will assess the totality of the circumstances of every applicant when making a determination of eligibility.

**FOR INFORMATIONAL PURPOSES ONLY**
This information has been provided by the U.S. Department of Veterans Affairs (VA) Office of Small and Disadvantaged Business Utilization (OSDBU) for general informational purposes and should not be construed as legal advice. You should contact your attorney to obtain

advice with respect to any particular issue or problem. In addition, VA OSDBU makes no representation as to whether the information above is accurate or current. All applicants and participants must read the applicable regulations and determine how best to meet these requirements. This Verification Assistance Brief does not constitute legal notice or replace governing regulations.

For more information about VA Small and Veteran Business Programs, visit http://www.va.gov/osdbu.

**VA Office of Small and Disadvantaged Business Utilization**
1–866–584–2344
Monday–Friday | 8 a.m. to 6 p.m. (Eastern)

Status Update:
verificationfollowup@va.gov
Profile Questions: vip@va.gov

File  Edit  View  History  Bookmarks  Develop  Window  Help

Dikiana - CSX - ITS Conglobal

mb.verizonwireless.com

Manage Account    Support

✓ My Business

Add new

# Company users

Search by user id or user name  🔍

View columns

| User ID ⬍ | User Name ⬍ | Role ⬍ | Email Address ⬍ | Phone Number ⬍ | Actions |
|---|---|---|---|---|---|
| PCCSTREY | Robert sharpe | Primary Contact | Robert@pccsmedical.... | 9105408157 | Edit  Reset Password |
| SPARKPJ1980 | Peter Spark | Administrator | Peter@PCCSMedical.... | 9106202691 | Edit  Delete  Reset Passw |

| About Verizon | Subscribe | Store Locator |
|---|---|---|
| About Us | Sign Up | Store Location |
| Our Company | | |
| Corporate Responsibility | | |
| Careers | | |

⇧ ❄ Chat with us

Business Account/Sign In
rizon for Business App
t a Rep.
Internet

📎 **Promo Central** | **Location code:** P161901 | **Sales rep:** E29Z6 | **ECPD:** 5335522



...

**Dec 14, 2021,**
**11:28:42 AM PST**

CENAMY

Contact Name: SPARK, PETER MDN 910-200-1601:NAME:PETER
SPARKMDN:9102001601/9106202691/9106746888/9105082655/9104090 940ACCOUNT VERIFIED:YECiPD:
YISSUE:CX WANT TO TRANSFER 5 LINES ON THE BUSINESS ACCOUNT TO HIS PERSONAL ACCOUNT//CX
DO NOT HAVE PERSONAL ACCOUNT YET//CREATED PERSONAL ACCOUNT//SUCCESSFULLY
TRANSFERRED THE FIVE LINES ON THE PERSONAL ACCOUNT//RESOLUTION PROVIDED:CREATED
PERSONAL ACCOUNT FOR THE 5 LINES TO BE TRANSFERRED//TRANSFER THE LINES//CALL OUTCOME:
RESOLVEDREASON FOR UNRESOLVED: NAPROMOTER QUESTION: YSSO: YRECAP: YPOSSIBLE CALL
BACK:N

**Dec 14, 2021,**
**11:21:07 AM PST**

CENAMY

MTN: 9105082655 FREE VZW MSG-DO NOT REPLY: Peter I cannot hear anything from you. I'm done with the
process of transferring the lines to your personal account

**Dec 14, 2021,**
**11:19:23 AM PST**

Exhibit
R

| Invoice Number | Account Number | Date Due | Page |
|---|---|---|---|
| 9893252833 | 342321351-00001 | 12/12/21 | 4 of 37 |

910-200-1601

## Monthly Charges

| | | | |
|---|---|---|---|
| Business Unlimited Smartphone | | 11/21 – 12/20 | 45.00 |
| | | | **$45.00** |

### Equipment Charges

| | |
|---|---|
| Device Payment Agreement 1313959369 – Payment 23 of 24 | 45.83 |
| Paid 1008.33 | |
| Past Due .00 | |
| Balance (after this month's current payment) 45.83 | |
| | **$45.83** |

## Usage and Purchase Charges

| Voice | | Allowance | Used | Billable | Cost |
|---|---|---|---|---|---|
| Calling Plan | minutes | unlimited | 690 | --- | --- |
| Total Voice | | | | | $.00 |

| Messaging | | Allowance | Used | Billable | Cost |
|---|---|---|---|---|---|
| Text | messages | unlimited | 200 | --- | --- |
| Unlimited M2M Text | messages | unlimited | 7 | --- | --- |
| Picture & Video – Sent | messages | unlimited | 4 | --- | --- |
| Picture & Video – Rcv'd | messages | unlimited | 6 | --- | --- |
| Total Messaging | | | | | $.00 |

| Data | | Allowance | Used | Billable | Cost |
|---|---|---|---|---|---|
| Gigabyte Usage | gigabytes | unlimited | 5.235 | --- | --- |
| Total Data | | | | | $.00 |
| Total Usage and Purchase Charges | | | | | $.00 |

| Surcharges | |
|---|---|
| Fed Universal Service Charge | .44 |
| Regulatory Charge | .16 |
| Administrative Charge | 1.95 |
| | $2.55 |







verizon
Invoice Number Account Number Date Due Page
Summary for Peter Spark: 910-620-2691
Your Plan
Business Unlimited Smartphone
Unlimited monthly minutes
UNL Text Messaging
Unlimited M2M Text
Unlimited Text Message
Email & Web Unlimited
UNL Picture/Video MSG
Unlimited monthly Picture & Video
Have more questions about your charges?
Get details for usage charges at
b2b.verizonwireless.com
Monthly Charges
Business Unlimited Smartphone
Equipment Charges
Paid 1054.16
Past Due .00
Balance (after this month's current payment) .00
Usage and Purchase Charges
Voice Allowance Used Billable Cost
Calling Plan minutes unlimited 564
Total Voice
Messaging Allowance Used Billable Cost
Text messages unlimited 129
Unlimited M2M Text messages unlimited 15
Picture & Video - Sent messages unlimited 7
Picture & Video - Rcv'd messages unlimited 1
Total Messaging
Data Allowance Used Billable Cost
Total Data
Total Usage and Purchase Charges
Surcharges
Fed Universal Service Charge
Regulatory Charge
Administrative Charge
Taxes, Governmental Surcharges and Fees
NC State 911 Fee
NC State Telecom Sales Tax
NC State Sales Tax
58.2%
.5
1×
2
VIDEO
PHOTO
PORTRAIT

Monday, May 23, 2022 14:52:02 Eastern Daylight Time

**Subject:** Re: There was a purchase on your Employee Card that may need a second look

**Date:** Tuesday, November 30, 2021 at 2:46:57 PM Eastern Standard Time

**From:** Peter Spark

**To:** Mark Eastham

**Attachments:** image001.png, image002.png, image003.jpg, ~WRD0002.jpg, image004.png, image005.jpg

I guessed as much re the knifes.

I also think a buy out given the brand would be better as it's not a brand associated with guns. We can come to a deal regarding a percentage of test strip sales over a period of time. Maybe even in perpetuity

Peter Spark
CFO, PCCS Medical
Mobile 910.620.2691
www.pccsmedical.com

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

Get Outlook for iOS

**From:** Mark Eastham <mark.eastham@pccsmedical.com>
**Sent:** Tuesday, November 30, 2021 2:43:18 PM
**To:** Peter Spark <peter@pccsmedical.com>
**Subject:** FW: There was a purchase on your Employee Card that may need a second look

These are knives he's getting for all the stone bay peeps to commemorate the new company. He told Rudner that he was going to write a check when I told him we couldn't complete the credit app without the NC tax number……………….hahahahahaha

Adrianne is too scared to have the expense conversation with him. She's asked me three times how to go about it…………….

On the call Thursday regardless of what he does with PCCS I'm going to review all this with the Partners and suggest any further spending using PCCS money must be approved by Partners in which he will go ape shit. He promised investors which is probably BS. I do have their email address b/c a message was sent out in the Stone Bay email announcing the Articles of Incorporation. Should I just ping them individually and ask?

We need to tread carefully b/c he holds all the cards at this point. I'm hoping he does want to shut down Rx so it's his idea then we have a better shot at just picking it up with Pathfinder. Another way is to try and buy him out of PCCS b/c we have spend considerable time building the brand to an extent.

Mark Eastham, R.Ph.
Partner
PCCS Medical
(651) 788-3396



https://pccsmedicalcorp.com/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** Peter Spark <peter@pccsmedical.com>
**Sent:** Tuesday, November 30, 2021 1:23 PM
**To:** Mark Eastham <mark.eastham@pccsmedical.com>; Adrianne George <Adrianne.George@pccsmedical.com>
**Subject:** FW: There was a purchase on your Employee Card that may need a second look





## Spartan Blades (Pineland Cutlery Inc.)

| Website | Directions | Save | Call |

5.0 ★ ★ ★ ★ ★ 10 Google reviews

Knife manufacturing in Southern Pines, North Carolina

**Address:** 625 SE Service Rd, Southern Pines, NC 28387

**Hours:** Open · Closes 5PM ▾

**Phone:** (910) 757-0035

Suggest an edit · Own this business?

**Know this place?** Share the latest info

Peter Spark
CFO, PCCS Medical
Mobile 910.620.2691
www.pccsmedical.com

 

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** American Express <AmericanExpress@welcome.aexp.com>
**Sent:** Tuesday, November 30, 2021 2:21 PM
**To:** Peter Spark <peter@pccsmedical.com>
**Subject:** There was a purchase on your Employee Card that may need a second look



# AMERICAN EXPRESS

ACCOUNT ENDING: 51000

## Hi PETER J SPARK,

There was a purchase on your Employee Card that may need a second look

This transaction doesn't fall under the approved merchant types you've specified in your account settings. You can review the details below:

| | |
|---|---|
| **ROBERT P SHARPE's Card ending:** | **51018** |
| **PINELAND CUTLERY:** | **$997.95*** |
| **Date:** | **Tue, Nov 30, 2021** |
| **Location:** | **SOUTHERN PINES** |

*This amount may not match the final charge because some merchants issue a pre-authorization charge.*

**Manage Alert Settings**

**Freeze Spending**

Sincerely,

**American Express**

**DON'T do business WITHOUT IT‑**



**Alerts**

Alerts are emails we send to help you stay on top of your account activity. You can customize or turn them off at any time by logging into your account and updating your preferences. Manage Alerts

PRIVACY STATEMENT | UPDATE YOUR EMAIL

Your account information is included above to help you recognize this as a customer care email from American Express. To learn more about email security or report a suspicious email, please visit us at americanexpress.com/phishing. We kindly ask you not to reply to this email but instead contact us via Customer Care.

© 2021 American Express. All rights reserved.

ALEENALEECE0115

2 2 C V  0 0 0 1 2 5

| STATE OF NORTH CAROLINA | File No. |
|---|---|

NEW HANOVER COUNTY

NEW HANOVER _____ County

In The General Court Of Justice
District Court Division

Name And Address Of Plaintiff

ROBERT SHARPE
245 ROYAL FERN RD
WILMINGTON NC 28412

FEB 04 23

11 16 am 9 m

CLERK OF SUPERIOR COURT

**NO-CONTACT ORDER
FOR STALKING OR
NONCONSENSUAL SEXUAL CONDUCT**

**VERSUS**

Name And Address Of Defendant

PETER SPARK
237 ROYAL FERN RD
WILMINGTON NC 28412

G.S. 50C-7

## FINDINGS

This matter was heard by the undersigned district court judge, the court has jurisdiction over the parties and subject matter, and the defendant has been provided notice of the hearing.

The Court hereby finds that:

☐ 1. *(If this block is checked, skip to the Order portion of the Order.)* This Order is entered by default for the remedy sought in the complaint because the defendant failed to ☐ file an answer ☐ appear at this hearing  and the allegations in the complaint are sufficient to justify a no-contact order for stalking or nonconsensual sexual conduct.

☑ 2. Present at the hearing were: ☑ the plaintiff, represented by _____
☑ the defendant, represented by _____

☑ 3. The plaintiff has suffered unlawful conduct by the defendant in that:

THREAT OF HARM SEVERAL TIMES

☐ 4. Other:

## CONCLUSIONS

☑ 1. The defendant committed acts of unlawful conduct against the plaintiff.
☐ 2. The plaintiff has failed to prove grounds for issuance of a no-contact order.

## ORDER

It is ORDERED that:

☑ 1. The defendant shall not visit, assault, molest, or otherwise interfere with the plaintiff.
☑ 2. The defendant cease stalking the plaintiff.
☑ 3. The defendant cease harassment of the plaintiff.
☑ 4. The defendant not abuse or injure the plaintiff.
☑ 5. The defendant not contact the plaintiff by telephone, written communication, or electronic means.
☑ 6. The defendant not enter or remain present at the plaintiff's residence, school, place of employment, and other places listed below at times when the plaintiff is present.

List Other Places Where Defendant Ordered Not To Be

A TRUE COPY
CLERK OF SUPERIOR COURT
NEW HANOVER COUNTY
BY: *Miranda McCarter*
Deputy Clerk of Superior Court

*(Over)*

AOC-CV-524, Rev. 4/17
© 2017 Administrative Office of the Courts

**Exhibit
T**

☐ 7. Other: *(specify)*

☒ 8. The terms of this Order shall be effective until ☒ one (1) year from the date of this Order.
☐ *(specify date and time if less than one year)* ____________

☐ 9. The Order is denied and the case is dismissed.

| | |
|---|---|
| Date: 2.4.22 | Name Of District Court Judge (type or print): Hugstin |
| Time: ☐ AM ☐ PM | Signature Of District Court Judge |

**NOTICE TO DEFENDANT:** ***A KNOWING VIOLATION OF A CIVIL NO-CONTACT ORDER SHALL BE PUNISHABLE AS CONTEMPT OF COURT, WHICH MAY RESULT IN A FINE OR IMPRISONMENT. THE COURT MAY FIND YOU IN CIVIL OR CRIMINAL CONTEMPT.***

## CERTIFICATION

I certify this Order is a true copy.

| | | |
|---|---|---|
| Date | Signature Of Clerk | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court |

**NOTE TO CLERK:** *G.S. 50C-9 provides: "The clerk of court shall deliver on the same day that a civil no-contact order is issued, a certified copy of that order to the sheriff." The statute also provides that a copy of the order shall be issued promptly to the police department of the municipality of the victim's residence, or the sheriff and any county police department if the victim does not live within a municipality with a police department.*

## RETURN/CERTIFICATE OF SERVICE WHEN DEFENDANT NOT PRESENT AT HEARING

I certify that this No-Contact Order For Stalking Or Nonconsensual Sexual Conduct was received and served as follows:

| | | |
|---|---|---|
| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |

☐ By delivering to the defendant named above a copy of this Order.

☐ By leaving a copy of this Order at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

*Name And Address Of Person With Whom Copies Left*

☐ By mailing a copy of this Order to the defendant by
☐ registered mail. ☐ certified mail (return receipt). ☐ designated delivery service.

☐ Defendant WAS NOT served for the following reason.

| | |
|---|---|
| Date Received | Signature Of Deputy Sheriff Making Return |
| Date Of Return | Name Of Sheriff (type or print) |
| Date Mailed | County Of Sheriff |
| | Signature Of Clerk ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court |

**NOTE TO CLERK:** *G.S. 50C-9(b) provides: "If the [defendant] was not present in court when the order was issued, the [defendant] may be served in the manner provided for service of process in civil proceedings in accordance with Rule 4(j) of the Rules of Civil Procedure."*

© 2017 Administrative Office of the Courts

МІНІСТЕРСТВО ОБОРОНИ
УКРАЇНИ
ВІЙСЬКОВА ЧАСТИНА
А7062
Код ЄДРПОУ 26623081

Всім, кого це стосується.

To whom it may concern

"15" березня 20 22 р.

№ 154
45240, с. Липляни, вул. Санаторна, 8

## Довідка

Ми призначаємо **Роберта Пола Шарпа** (нар. 11.09.1974 р.; громадянин США; паспорт № 540540317) представником із постачання в/ч А7062 Збройних Сил України.

Командир військової частини А7062

підполковник                                                      О. Адамович

## Certificate

To whom it may concern: We hereby appoint **Robert Paul Sharpe** (born 9/11/1974; US citizen; passport #540540317) as an cpresentative of the military supply unit of the A7062 Armed Forces of Ukraine.

Commander of the A7062 Armed Forces of Ukraine

Lieutenant Colonel                                               O. Adamovych



Exhibit
11

МІНІСТЕРСТВО ОБОРОНИ
**УКРАЇНИ**
**ВІЙСЬКОВА ЧАСТИНА**
**А7062**
Код ЄДРПОУ 26623081

" _30_ " _березня_ 2022 р.

№ _237_
_____

45240, Волинська обл., с.Линпляни

## ДОВІДКА

Видана громадянину США Sharpe Robert Paul про те, що він
інструктором (позаштатним) з тактичної підготовки в/ч А 7062 з 30
року, а громадянка України   Тетяна Поудел є перекладачем, та
пересуватись на автомобілі KIA Sorento номерний знак АС 8679 СМ.

До довідки додається фотографія даної   особи, завірена
печаткою в/ч А7062.

Командир військової частини А7062
підполковник                                      Олександр АДАМО

# First National Bank

4140 E. State Street
Hermitage, PA 16148

**ADDRESS SERVICE REQUESTED**

PORT CITY CONTRACTING SERVICES INC
OPERATING ACCOUNT
2017 CORPORATE DR UNIT 4
UNIT 4
WILMINGTON NC 28405-7472

## Statement Ending 03/31/2022

PORT CITY CONTRACTING                      Page 1 of 4
Primary Account Number: XXX7282

### Managing Your Accounts

 Online        www.fnb-online.com

 By Phone      1 800-555-5455

By Mail       4140 E. State Street
              Hermitage, PA 16148

## Summary of Accounts

| Account Type | Account Number | Balance This Statement |
|---|---|---|
| BUSINESS ANALYSIS CHECKING | 7282 | $114,797.33 |

## BUSINESS ANALYSIS CHECKING - 7282

### Account Summary

| Date | Description | Amount | | |
|---|---|---|---|---|
| 03/01/2022 | Balance Last Statement | $256,834.35 | Minimum Balance | $114,797.33 |
| | 4 Credit(s) This Period | $92,022.12 | Average Ledger Balance | $194,486.02 |
| | 41 Debit(s) This Period | $234,059.14 | Average Available Balance | $194,486.02 |
| 03/31/2022 | Balance This Statement | $114,797.33 | | |

### Other Credits

| Date | Description | Amount |
|---|---|---|
| 03/02/2022 | 36 TREAS 310 MISC PAY 851908103360012 | $80,910.00 |
| 03/10/2022 | BANKCARD MTOT DEP 510159200102069 | $88.12 |
| 03/14/2022 | INTUIT 59781965 DEPOSIT 524771997340940 | $1,024.00 |
| 03/16/2022 | BROADSWORD DEFEN ACH Pmt XXXXXX3778 | $10,000.00 |

### Electronic Debits

| Date | Description | Amount |
|---|---|---|
| 03/01/2022 | PORT CITY CONTRA C#2565615 XXXXX1053 | $16,159.09 |
| 03/01/2022 | PORT CITY CONTRA PCCS/SB XXXXX1053 | $3,765.60 |
| 03/01/2022 | GFL ENV. FIRSTECH FTWEB49191902 | $265.92 |
| 03/01/2022 | 18004INTUIT QuickBooks 5234144 | $50.00 |
| 03/02/2022 | CAPE FEAR TAX & SALE | $500.00 |
| 03/02/2022 | LEASE DIRECT WEB PAY 75409364 | $88.21 |
| 03/02/2022 | BANKCARD MTOT DISC 510159200102069 | $20.00 |
| 03/03/2022 | PORT CITY CONTRA 1600922377 XXXXX1053 | $52,920.00 |
| 03/03/2022 | PORT CITY CONTRA Bill # PSI XXXXX1053 | $323.14 |
| 03/03/2022 | PORT CITY CONTRA C#2565615 XXXXX1053 | $148.16 |
| 03/04/2022 | PORT CITY CONTRA PCCS/Forte XXXXX1053 | $12,080.00 |
| 03/04/2022 | PORT CITY CONTRA C#2565615 XXXXX1053 | $1,801.40 |
| 03/04/2022 | Spectrum Cable Bill 1999861 | $117.97 |
| 03/07/2022 | PORT CITY CONTRA Center Car XXXXX1053 | $5,000.00 |
| 03/10/2022 | PORT CITY CONTRA Payroll | $35,884.62 |
| 03/11/2022 | 18004INTUIT QuickBooks 0593441 | $180.00 |
| 03/14/2022 | PORT CITY CONTRA Center Car XXXXX1053 | $5,000.00 |
| 03/14/2022 | FID BKG SVC LLC ACH XXXXX9462 L6WJQ | $496.16 |
| 03/14/2022 | PORT CITY CONTRA Inv# 20221 XXXXX1053 | $417.31 |



To learn more about FNB's deposit account practices such as our posting order, what is an available balance, and how p...eauthorized point-of-sale
debit card transactions affect your account, please visit the following websites:
• For consumer accounts, click on the Managing Your Checking Account video at www.fnb-online.com/learn
• For business accounts, click on https://www.fnb-online.com/business-overdrafts

**First National Bank**

**Statement Ending 03/31/2022**

4140 E. State Street
Hermitage, PA 16148

PORT CITY CONTRACTING          Page 3 of 4
Primary Account Number: ▮▮7282

## BUSINESS ANALYSIS CHECKING - ▮7282 (continued)

### Electronic Debits (continued)

| Date | Description | Amount |
|---|---|---|
| 03/14/2022 | INTUIT 19839595 TRAN FEE 524771997340940 | $29.95 |
| 03/15/2022 | ALLY ALLY PAYMT 228077284972 | $4,434.52 |
| 03/15/2022 | THE HARTFORD NWTBCLSCIC 16004106 | $76.87 |
| 03/16/2022 | PORT CITY CONTRA Rent XXXXX1053 | $1,926.64 |
| 03/17/2022 | PORT CITY CONTRA Piton Gill XXXXX1053 | $10,000.00 |
| 03/17/2022 | PORT CITY CONTRA Center Car XXXXX1053 | $5,000.00 |
| 03/18/2022 | PORT CITY CONTRA Rudner Exp XXXXX1053 | $5,780.00 |
| 03/18/2022 | PORT CITY CONTRA Julie Nayl XXXXX1053 | $256.67 |
| 03/21/2022 | PORT CITY CONTRA Med Items XXXXX1053 | $10,000.00 |
| 03/21/2022 | THE HARTFORD NWTBCLSCIC 16231881 | $735.00 |
| 03/22/2022 | DUKEENERGY BILL PAY 910084646784 | $109.17 |
| 03/24/2022 | PORT CITY CONTRA Payroll | $38,108.99 |
| 03/24/2022 | PORT CITY CONTRA Inv#203284 XXXXX1053 | $804.85 |
| 03/28/2022 | PORT CITY CONTRA Invoice 19 XXXXX1053 | $12,080.00 |
| 03/28/2022 | FID BKG SVC LLC ACH XXXXX9462 L6Y0X | $496.16 |
| 03/29/2022 | GFL ENV. FIRSTECH FTWEB50435341 | $110.06 |
| 03/29/2022 | 18004INTUIT QuickBooks 6654234 | $50.00 |
| 03/30/2022 | C & H PRECISION SALE | $3,578.65 |

### Other Debits

| Date | Description | Amount |
|---|---|---|
| 03/04/2022 | Analysis Charges February 2022 | $88.28 |

### Checks Cleared

| Check Nbr | Date | Amount | Check Nbr | Date | Amount | Check Nbr | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 995003 | 03/31/2022 | $1,652.50 | 995004 | 03/31/2022 | $2,823.25 | 995006* | 03/08/2022 | $700.00 |

* Indicates skipped check number

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 03/01/2022 | $236,593.74 | 03/11/2022 | $207,740.08 | 03/22/2022 | $174,501.79 |
| 03/02/2022 | $316,895.53 | 03/14/2022 | $202,820.66 | 03/24/2022 | $135,587.95 |
| 03/03/2022 | $263,504.23 | 03/15/2022 | $198,309.27 | 03/28/2022 | $123,011.79 |
| 03/04/2022 | $249,416.58 | 03/16/2022 | $206,382.63 | 03/29/2022 | $122,851.73 |
| 03/07/2022 | $244,416.58 | 03/17/2022 | $191,382.63 | 03/30/2022 | $119,273.08 |
| 03/08/2022 | $243,716.58 | 03/18/2022 | $185,345.96 | 03/31/2022 | $114,797.33 |
| 03/10/2022 | $207,920.08 | 03/21/2022 | $174,610.96 | | |

PCCS 42

## WRITTEN CONSENT OF THE BOARD OF DIRECTORS
## OF
## PORT CITY CONTRACTING SERVICES, INC.

### May 12, 2022

The undersigned, being all of the members of the Board of Directors (the **"Board"**) of Port City Contracting Services, Inc., a North Carolina corporation (the **"Company"**), and desiring to take action without a meeting by written consent as authorized by the North Carolina General Statutes, do hereby adopt the following resolutions and consent to the actions contemplated therein effective retroactively as set out below:

### APPOINTMENT OF EXECUTIVE OFFICERS

**WHEREAS,** Robert Sharpe has resigned as Chief Executive Officer of the Company;

**WHEREAS,** the Board wishes to appoint Michael Rudner as President of the Company;

**WHEREAS,** the Board further wishes to appoint Holly Grange as Chief Executive Officer of the Company;

**WHEREAS,** the Board further wishes to appoint David Swintowski as Chief Financial Officer of the Company;

**WHEREAS,** the Board further wishes to appoint Robert Sharpe as Head of Strategy and Business Development of the Company;

**WHEREAS,** the Board further wishes to appoint Andrew Layton as General Manager of the Company for the Stone Bay Tactical division.

**NOW, THEREFORE, BE IT RESOLVED,** that the resignation of Robert Sharpe as Chief Executive Officer is accepted, with retroactive effect as of April 1, 2022, and Mr. Sharpe is given a full discharge of liability with respect to his tenure in office;

**BE IT FURTHER RESOLVED,** that:

- Michael Rudner is appointed as President of the Company, effective retroactively as of April 8, 2022;

- Holly Grange is appointed as Chief Executive Officer of the Company, effective retroactively as of April 1, 2022;

- David Swintowski is appointed as Chief Financial Officer of the Company, effective as of the date hereof;

- Robert Sharpe is appointed as Head of Strategy and Business Development of the



PCCS 43

Company, as of the date hereof; and

- Andrew Layton is appointed as General Manager of the Company for the Stone Bay
Tactical division, effective retroactively as of April 8, 2022.


### ENABLING RESOLUTIONS

**RESOLVED FURTHER,** that the proper officers of the Company be, and they hereby
are, severally authorized and directed to execute and deliver on behalf of the Company such other
documents, certificates, instruments and agreements, and to take such further action by and on
behalf of the Company as shall be either necessary or appropriate to further the purposes of the
foregoing resolutions, the necessity or propriety of such actions to be conclusively evidenced by
the taking of such actions by said officers; and

**RESOLVED FURTHER,** that all corporate actions taken on or prior to the date hereof by
the officers or the Directors of the Company in connection with the foregoing resolutions or the
transactions contemplated thereby be, and the same hereby are, approved, adopted, and ratified in
all respects as the actions of the Company effective as of the date such actions were taken.

The Directors of the Company may execute this Unanimous Written Consent of the Board of
Directors in one or more counterparts, each of which shall be deemed to be an original and all of
which, when taken together, shall constitute one and the same instrument, effective as of the date first
above written.

**IN WITNESS WHEREOF,** the undersigned, being all of the Directors of the Company,
have executed this consent to be effective as of the date first written above.


_____
Robert P. Sharpe

_____
Holly Grange, Chairman


### ALL OF THE DIRECTORS

PCCS 44

## PORT CITY CONTRACTING SERVICES, INC.

### WRITTEN CONSENT OF THE SOLE CLASS A STOCKHOLDER

### May 12, 2022

The undersigned, being the sole holder of all of the issued and outstanding shares of Class Common Stock of Port City Contracting Services, Inc., a North Carolina corporation (the "**Company**"), which Class A shares are all of the issued and outstanding voting shares of the Company, does hereby adopt the following resolutions in accordance with the North Carolina Business Corporation Act (the "NCBCA") by signing his written consent hereto, which action by written consent shall be effective as of the date first set forth above:

### REMOVAL AND APPOINTMENT OF DIRECTORS

**WHEREAS,** the Sole Class A Shareholder deems it prudent to remove from their offices as directors Mark Eastham and Peter Sparks;

**WHEREAS,** the Sole Class A Shareholder wishes to maintain in office Robert Sharpe as a board member and to appoint Holly Grange as Chairman of the Board;

**NOW, THEREFORE, BE IT RESOLVED,** that Mark Eastham and Peter Sparks are removed from office with immediate effect;

**RESOLVED FURTHER,** that Holly Grange is appointed to the board as Chairman of the Board.

**IN WITNESS WHEREOF,** the undersigned, being sole holder of all of the Company's Class A Common Stock has executed this consent to be effective as of the date first written above.

_____
Robert P. Sharpe

**ALL OF THE CLASS A STOCKHOLDERS**

**Executive Summary:**

Situation Overview:

1. A judgment of fraud has been entered against PCCS, which will culminate in PCCS losing its federal contracts, and may result in Trey's debarment as well.   We are confident that the judgment will stand.
2. Trey is being sued by Mark and Peter, and they are likely to win this case as well, as the evidence speaks for itself. Their claims carry double damages and attorneys' fees, so the total judgment is likely to be substantial.
3. We have proof that PCCS's cash and other assets were  used by Trey  for personal endeavors and to fund other business ventures without the proper accounting or tax treatment.  We will be going after Trey's accounting to find out where he spent money and on what. Assuming no tax evasion or fraud here, our offer will stand.
4. We know the Federal Fire Arms License is in PCCS's name – if Trey accepts this offer we will not go after Stone Bay or the fire arms.
5. We know based on his own admission that PCCS has had several CEO changes etc. Its questionable if he can obtain an SDVOSB certification at this point.
6. We know based on his own admission that PCCS is considering Bankruptcy, this offer is intended to help Trey and PCCS avoid these inevitably bad outcomes and preserve some value for Trey

**Offer:**

- Dan Shoaf personally acquires 100% of the voting shares. -This stays in compliance with the SBA SDVOSB designation.  Per the SBA determination of ownership for SDVOSBs; ownership by another corporation, LLC or partnership (even one owned by an SDVOSB) does not fulfill the requirement.  It must be personally held by a service-disabled veteran.  Regardless of acquiring Class B stock we would have to make sure that 51% of the total stock outstanding remains owned by a service-disabled veteran.  Trey cannot sell without prior-written consent of Mr. Shoaf.  Trey will execute a non-compete/NDA.   No shareholder derivative suits after Shoaf takes over without consent of at least one additional shareholder. Shareholder derivative suits are subject to binding arbitration.

    **DaVinci Agrees to:**
    - Remove the levy on PCCS's account to allow for business operations.
    - Set aside collection of the remainder of the $284k due.
    - Set aside the judgement against PCCS.
    - Dismiss the personal suit against Trey.
    - Negotiate outstanding litigation with Mark Eastham & Peter Spark and handle this lawsuit for PCCS and Trey.

    **Trey Gets:**

    - Continued up-side of ownership of Class B Stock
    - Removal of personal suit by DaVinci
    - No more lawyer fees etc to negotiate with Mark Eastham and Peter Spark
    - Clean "no fraud judgement" record



- o Retains ownership of questionably purchased assets for his other companies
  - o FFL belongs to PCCS not Stone Bay Tactical therefore the guns would have to belong to PCCS – we will ignore this and allow the continued growth of Stone Bay.
- o Doesn't have to file bankruptcy

**Caveat:**

- We would need a due diligence period, attestations of no further outstanding/pending litigation, other normal acquisition stuff before finalizing.



+1 (651) 788-3396 ›

Hi Mary – it's been a long time. We both have been through change. I was hoping you would be willing to get me an intro to Ascensia. Understand if your not comfortable with it. Either way we should catch up. Maybe grab coffee again. Mark Eastham

Today 2:34 PM

Mary since I texted you yesterday I have learned that you are working with Trey. I'm so embarrassed and never would have reached out to you. On a personal note I do think you need to understand why Trey has no business partners anymore, PCCS is no longer a registered SDVOSB, PCCS and Trey were found guilty of fraud and have a 275k judgment against them



iMessage

  

      

+1 (651) 788-3396 ›

Mary since I texted you yesterday I have learned that you are working with Trey. I'm so embarrassed and never would have reached out to you. On a personal note I do think you need to understand why Trey has no business partners anymore, PCCS is no longer a registered SDVOSB, PCCS and Trey were found guilty of fraud and have a 275k judgment against them where Trey misrepresented Ascensia products to another company, his bank accounts were levied, he lied to the court, failing to declare assets of PCCS, PCCS is broke, plus myself and another partner have a lawsuit where Trey defrauded us on wages and a stock sale agreement. I could go on but want to make sure you have facts when working with Trey.

iMessage

BK: RB 6482
PG: 2380-2381
RECORDED:
08-19-2021
02:30:01 PM
BY: KELLIE GILES
DEPUTY

2021040757
NEW HANOVER COUNTY, NC
TAMMY THEUSCH PIVER
REGISTER OF DEEDS

NC FEE $26.00

## ASSUMED BUSINESS NAME CERTIFICATE (NCGS §66-71.5)
*Please print legibly.*

1. The assumed business name is:
   Stone Bay Tactical

   (You may include no more than five (5) assumed business names on this form.)

2. The real name of the person or entity engaging in business under the assumed business name is:
   Port City Contracting Services, Inc.   SOSID -1801626

   (Corporations, LLC's, limited partnerships must provide the exact name registered with the NC Secretary of State's office and the SOSID number assigned at the time of formation. Go to www.sosnc.gov/br/search to look up your information.)

3. The nature/type of the business is: e-commerce

4. The street address of the principal place of business is: (PO Boxes are not acceptable)
   2017 Corporate Dr, Unit 4, Wilmington NC 28405

5. The mailing address, if different from the street address, is:

6. The counties where the assumed business name will be used to engage in business are:
   ■ All 100 North Carolina counties

This certificate is signed by the owner/legal representative of the person or entity named above, this  19th  day of  August , 2021 .

Signature:

Printed/Typed Name: Robert Sharpe

Title: CEO

   (See instructions for who must sign for various business entity types.)

Assumed Business Name Certificate

Exhibit Z

10.03.17

STATE OF NORTH CAROLINA    IN THE GENERAL COURT OF JUSTICE
                                        SUPERIOR COURT DIVISION
      COUNTY OF NEW HANOVER        FILE NO.:  22-CVS-001507


MARK EASTHAM and PETER SPARK. )
                Plaintiffs,   )
                              )
v.                            )
                              )
PORT CITY CONTRACTING         )
SERVICES, INC., ROBERT P.     )
SHARPE, STONE BAY TACTICAL,   )
LLC, and SRS SUPPLY, LLC,     )
                Defendants.   )


           30(b)(6) DEPOSITION OF ROBERT P. SHARPE

                        (VOLUME 1)



               July 19, 2022 @ 10:00 a.m.



                 HELD AT THE OFFICES OF
                   REISS & NUTT, PLLC
             1221 FLORAL PARKWAY, SUITE 104
              WILMINGTON, NORTH CAROLINA


                 PAGES 1 THROUGH 83



                    REPORTED BY:
            CAPE FEAR COURT REPORTING, INC.
               POST OFFICE BOX 10112

        WILMINGTON, NORTH CAROLINA  28404-0112

                  (910) 616-8458

          E-MAIL @ Jennifercvr@aol.COM

          www.capefearcourtreporting.com

Robert P. Sharpe (vol 1) ~ 7/19/2022

**2**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:
THOMAS S. BABEL, ESQ.
DAVIS HARTMAN WRIGHT, PLLC
3819 PARK AVENUE, SUITE B
WILMINGTON, NC  28403
910-756-4070
tsb@dhwlegal.com

ON BEHALF OF THE DEFENDANTS:
W. CORY REISS, ESQ.
REISS & NUTT, PLLC
1221 FLORAL PARKWAY, SUITE 104
WILMINGTON, NC  28403
910-420-4674
wcreiss@reissnutt.com

ALSO PRESENT:
HOLLY GRANGE

Robert Sharpe                    July 19, 2022

**3**

T A B L E   O F   C O N T E N T S

| WITNESS: | EXAMINATION | PAGE |
|---|---|---|
| ROBERT P. SHARPE | | |
| BY MR. BABEL | DIRECT | 5 |

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| 1 | PLAINTIFFS' AMENDED NOTICE OF DEPOSITION OF CORPORATE REPRESENTATIVE OF PORT CITY | 6 |
| 2 | FIRST CITIZENS STATEMENT ENDING 6/30/22 PCCS 534 | 18 |
| 3 | KEVIN RUST AFFIDAVIT | 20 |
| 4 | FIRST NATIONAL BANK STATEMENTS ENDING 1/31/22 THROUGH 4/29/22 | 23 |
| 5 | FIRST NATIONAL BANK STATEMENTS ENDING 5/31/22 THROUGH 6/30/22 - PCCS 543-548 | 23 |
| 6 | FIRST NATIONAL BANK STATEMENTS ENDING 5/31/22 THROUGH 6/30/22 - PCCS 526-532 | 49 |
| 7 | CONSOLIDATED INVOICES PCCS 473-525 | 51 |
| 8 | PCCS ASSETS: FIREARMS AND RELATED EQUIPMENT | 71 |
| 9 | PCCS MEDICAL INC CHART OF ACCOUNTS | 73 |
| 10 | ROBERT SHARPE PAY STUB 12/31/21 | 76 |
| 11 | STOCK REDEMPTION AND RELEASE AGREEMENT | 77 |
| 12 | COMPENSATION COMMITTEE MEETING MINUTES | 79 |

Robert Sharpe                    July 19, 2022

**4**

S T I P U L A T I O N S

PRIOR TO EXAMINATION OF THE WITNESS,
COUNSEL FOR THE PARTIES STIPULATED
AND AGREED AS FOLLOWS:

1.  SAID DEPOSITION SHALL BE TAKEN PURSUANT TO
N.C. RULES FOR CIVIL PROCEDURE;

2.  ANY OBJECTIONS OF ANY PARTY HERETO AS TO
NOTICE OF THE TAKING OF SAID DEPOSITION, OR AS TO
THE TIME AND PLACE THEREOF, OR AS TO THE COMPETENCY
OF THE PERSON BEFORE WHOM THE SAME SHALL BE TAKEN,
ARE HEREBY WAIVED;

3.  OBJECTIONS TO QUESTIONS AND MOTIONS TO
STRIKE ANSWERS NEED NOT BE MADE DURING THE TAKING OF
THIS DEPOSITION; BUT MAY BE MADE FOR THE FIRST TIME
DURING THE PROGRESS OF THE TRIAL OF THIS CASE, OR
ANY PRETRIAL HEARING HELD BEFORE THE JUDGE FOR THE
PURPOSE OF RULING THEREON, OR AT ANY OTHER HEARING
OF SAID CASE AT WHICH SAID DEPOSITION MIGHT BE USED;
EXCEPT AN OBJECTION AS TO THE FORM OF A QUESTION
MUST BE MADE AT THE TIME SUCH QUESTION IS ASKED OR
OBJECTION IS WAIVED AS TO THE FORM OF THE QUESTION;

4.  THAT THE SIGNATURE OF THE WITNESS TO THE
TRANSCRIPT OF HIS TESTIMONY IS WAIVED.

Robert Sharpe        July 19, 2022

**5**

1        P R O C E E D I N G S 10:00 a.m.
2            (WHEREUPON,
3            ROBERT P. SHARPE
4    WAS CALLED AS A WITNESS, DULY SWORN AND TESTIFIED AS
5    FOLLOWS:)
6        DIRECT EXAMINATION
7    BY MR. BABEL:
8        Q.  Sir, can you state your name for the
9    record?
10       A.  Robert Paul Sharpe.
11       Q.  And what's your current home address?
12       A.  245 Royal Fern Road, Wilmington, North
13   Carolina, 28412.
14       Q.  All right. Mr. Sharpe, it is my
15   understanding that you are here as a corporate
16   representative of Port City Contracting Services,
17   Inc. Is that correct?
18       A.  Yes.
19       Q.  Okay. I'm going to show you --
20           MR. BABEL: Cory, is it okay if we just do
21   consecutive instead of doing Plaintiff's and
22   Defendant's --
23           MR. REISS: Yeah.
24           MR. BABEL: -- exhibits? Okay.
25           MR. REISS: Yeah. Before -- is that the

Robert Sharpe        July 19, 2022

**Cape Fear Court Reporting, Inc.**

6

1  notice of deposition?
2      MR. BABEL: Yes.
3      MR. REISS: He has not seen that because I
4  didn't know -- realize until yesterday that you had
5  added an exhibit list, because initially, you
6  referred us to the order. So, just so you know, he
7  hasn't see that.
8      MR. BABEL: Well --
9      MR. REISS: We have prepared according to
10 the order, just so you know.
11     MR. BABEL: Okay.
12     (DEPOSITION EXHIBIT NO. 1 MARKED FOR THE
13 RECORD.)
14     Q. (Mr. Babel) All right. I'm going to show
15 you what we've marked as Exhibit 1. I think I know
16 the answer to this question after what your lawyer
17 just said, but have you seen this exhibit before?
18     A. No.
19     Q. Okay. Well, take a look at Exhibit A.
20 And I'm not going to read them out loud, but why
21 don't you take a minute and look at those five
22 topics, and tell me if you're prepared to testify as
23 to those five topics. If there's one that you're
24 not, just let me know.
25     A. I prefer to testify, but like when it
        Robert Sharpe          July 19, 2022

7

1  comes to balance, I might know the exact amount, but
2  I can get close.
3      Q. Okay. Well, we're going to go through
4  some documents that might help.
5      A. Okay. I'm ready when you are.
6      Q. If -- what would be the answer to the
7  question? I'm sorry.
8      A. Which one?
9      Q. The question was, looking at Exhibit A to
10 -- Exhibit A to Exhibit No. 1, are you prepared to
11 testify as to those five topics?
12     A. I am.
13     Q. Okay. And I'm sorry, we should've done a
14 little background. Have you ever had your
15 deposition taken before?
16     A. Nope.
17     Q. Okay. I'm sure your lawyer has told you
18 what sort of the rules are, how these things
19 transpire, but I'll just briefly tell you. I'm just
20 going to ask you a number of questions. The thing I
21 would ask you to do is, for the purposes of the
22 court reporter, making her job a little easier, if
23 you'd let me finish my question and then you answer
24 it, it just makes her job a lot easier, plus it'll
25 give your lawyer an opportunity to object. I will
        Robert Sharpe          July 19, 2022

8

1  try to do the best I can. I -- I violate that rule
2  myself, but if we can both try to just do our best
3  not to talk over each other, that will make her job
4  much easier. Okay?
5      A. Roger that.
6      Q. And if I ask you a question you don't
7  understand, just stop me, tell me why you don't
8  understand it, because I want you to understand my
9  questions so we can get the facts on the record.
10 Okay?
11     A. Sure.
12     Q. All right.
13     MR. BABEL: Is that me? (Phone
14 vibration.) Sorry.
15     Q. (Mr. Babel) What is your current -- and
16 for Port City Contracting Services, is it okay? I'm
17 going to refer to it as PCCS. Is that all right?
18     A. Uh-huh.
19     Q. Okay. What's your current position at
20 PCCS?
21     A. Right now, business development.
22     Q. And have you had any other roles at PCCS?
23     A. Yes.
24     Q. And what were those?
25     A. CEO.
        Robert Sharpe          July 19, 2022

9

1      Q. And when were you the CEO of PCCS?
2      A. From inception in February of 2019 until I
3  resigned in, on or about, I think, March 20th, in
4  that time. While I was in the Ukraine, I resigned.
5      Q. Would that be March 2022?
6      A. Yes.
7      Q. All right. When did you -- so am I fair
8  to assume, since March of 2022 to today, you took
9  the position of business development?
10     A. Uh-huh.
11     Q. And who is the current CEO of PCCS?
12     A. Holly Grange.
13     Q. And when did Ms. Grange become the CEO of
14 PCCS?
15     A. April 1st.
16     Q. Are there any other officers of PCCS?
17     A. Michael Rudner.
18     Q. And Michael's position is what?
19     A. President.
20     Q. And when did Michael become the president
21 of PCCS?
22     A. April 1st.
23     Q. Okay. Other than Ms. Grange and Mr.
24 Rudner, any other officers of PCCS?
25     A. No.
        Robert Sharpe          July 19, 2022

3 (Pages 6 to 9)

Robert P. Sharpe (vol 1) ~ 7/19/2022

10

1    Q.  And you attended UNCW, correct?
2    A.  Yes.
3    Q.  And did you obtain a degree from UNCW?
4    A.  Yes.
5    Q.  When was that?
6    A.  2009 was graduation.
7    Q.  And what was your degree in?
8    A.  English, minor.  Major was political
9  science.
10   Q.  And you are a veteran of the Marine Corps,
11  correct?
12   A.  Yes.
13   Q.  And when did you -- when were you
14  discharged from the Marine Corps?
15   A.  Active duty, '97; reserves, 2000.
16   Q.  Honorable discharge?
17   A.  Yes.
18   Q.  What was your rank when you were -- what
19  was your rank in '97 and what was your rank in 2000?
20   A.  Corporal in '97, same in 2000.  My reserve
21  time was inactive, so I didn't drill but once.
22   Q.  All right.  Did you use to live at 1521
23  Cadfel Court, Unit 2- -- 204, Wilmington, North
24  Carolina?
25   A.  Yes.

Robert Sharpe          July 19, 2022

11

1    Q.  And did you live at 164 Durwood Evans
2  Road, Beulaville, North Carolina?
3    A.  Yes.
4    Q.  And did you live at 147 Harris Creek Road,
5  Jacksonville, North Carolina?
6    A.  Yes.
7    Q.  Have you ever been convicted of a felony?
8    A.  No.
9    Q.  All right.  So I pulled up some criminal
10  charges, at least it looked like it was against you.
11  So I'm going to ask you some questions just so I
12  have a better understanding of what these charges
13  related to and what the ultimate outcome was.
14       MR. REISS:  Tom, I'm going to object to
15  this.  This is not the subject of a 30(b)(6) that
16  the Court required us to sit for.
17       MR. BABEL:  Well, he's required to sit for
18  a deposition as an individual.
19       MR. REISS:  Yeah, but he's -- the -- as I
20  said before, he's not testifying currently as an
21  individual.
22       MR. BABEL:  Well, I'm asking him as an
23  individual.
24       MR. REISS:  Tom, I want you to ask the
25  questions that the Court had us come here for and

Robert Sharpe          July 19, 2022

12

1  keep it tight.  I want you to ask all of them.  But
2  this is not a general deposition for purposes of
3  this lawsuit.  This is for specifically to comply
4  with the Court's temporary restraining order, and
5  those are narrowly prescribed topics that I believe
6  you drafted.
7       THE WITNESS:  Can I have two minutes with
8  you outside?
9       MR. REISS:  That's up to Tom, really.
10      MR. BABEL:  When we get a -- finish this
11  and then figure out if we're going to ask the
12  question, have an answer.  So Cory, I hear what
13  you're saying.  I don't believe that's what the
14  order says.  The order says that he sits for a
15  deposition, and as a 30(b)(6) deposition, as well as
16  -- I'm not required to get a court order for a
17  deposition.  You know that.  That's where we're
18  starting at.  So if -- and I believe Rule 30 says --
19  I got your objection.  I don't know if there's such
20  a thing.  What you're required to do is file a
21  motion.  If you think this deposition needs to be
22  limited for some purpose --
23      MR. REISS:  And then we'll do it.
24      MR. BABEL:  But --
25      MR. REISS:  But -- so let's -- but I want

Robert Sharpe          July 19, 2022

13

1  you to have the opportunity to ask the questions
2  that the Court wants you to ask --
3       MR. BABEL:  I would rather --
4       MR. REISS:  -- before we do that.
5       MR. BABEL:  I'd rather we ask the
6  questions, get the answers, and then we can argue
7  whether any of that testimony is admissible during
8  the preliminary injunction hearing.
9       MR. REISS:  No.  Because he is entitled to
10  have preparatory sessions with his attorney about
11  the expected topics to be discussed at this
12  deposition, and he hasn't.
13      MR. BABEL:  Okay.
14      MR. REISS:  He's prepared to talk about
15  the following, which is from the order:  Defendants,
16  plural, shall sit for a deposition wherein
17  information related to the interrogatory answers and
18  documents produced will be elicited, and information
19  related to bank statements in the name of Defendant
20  PCCS from December 10, 2021 to the present, all
21  assets of Defendant PCCS from December 10th, 2021 to
22  the present, the location of any and all assets,
23  tangible or intangible, of Defendant PCCS, an
24  accounting or financial records of any and all
25  amounts paid to or withdrawn by Sharpe since

Robert Sharpe          July 19, 2022

4  (Pages 10 to 13)

14

1  December 10, 2021 will be elicited. That's it. So
2  we're not getting into this. If we need to make a
3  motion, we're going to do it.
4       MR. BABEL: Okay.
5       MR. REISS: But that means we're going to
6  put a pin in this deposition so that we could be
7  heard on that subject. I would rather that you ask
8  all the questions that the Court wants you to ask in
9  this order.
10      MR. BABEL: I'm going to ask the
11 questions. If you want to instruct him not to
12 answer it, then go ahead and do it, but I'm going to
13 ask the questions.
14      MR. REISS: Go ahead.
15      MR. BABEL: Okay.
16      Q. (Mr. Babel) All right. So, according to
17 your -- the background check I did on you, Mr.
18 Sharpe, it looks like you were charged in 2008. I
19 believe it was August 15th, in 2008, in Onslow
20 County. Does that sound correct?
21      MR. REISS: Objection. Don't answer that
22 pending the determination by a court that you need
23 to answer it as a 30(b)(6) deponent or otherwise.
24      THE WITNESS: Can I tell you something in
25 your ear? Is that okay?
   Robert Sharpe          July 19, 2022

15

1       MR. REISS: No.
2       THE WITNESS: Okay. All right.
3       MR. BABEL: I mean, if you need to take a
4  break. So there's not a question pending, so if you
5  want to take a break and talk to your lawyer, I
6  don't have a problem with that.
7       MR. REISS: Okay. Let's --
8       THE WITNESS: It's real quick.
9       (Recess, 10:09 a.m. - 10:10 a.m.)
10      Q. (Mr. Babel) All right. We took a break,
11 you conferred with your counselor. Do you need to
12 change the answers to any of your questions?
13      A. (Witness shakes head negatively.)
14      Q. Okay. All right. So going back to that
15 2008 case, were you charged with embezzlement and a
16 misdemeanor larceny?
17      MR. REISS: Objection. Don't answer that.
18      Q. Were you convicted of embezzlement or
19 misdemeanor larceny?
20      MR. REISS: Objection. Don't answer that
21 pending the decision of a judge on our motion for a
22 protective order.
23      Q. Were you -- I've also found a case in New
24 Hanover County. Were you charged with a crime in
25 April of 2009?
   Robert Sharpe          July 19, 2022

16

1       MR. REISS: Objection. This is not a
2  question for the corporation, which is the subject
3  of this 30(b)(6) deposition.
4       Q. Were you convicted of a crime based on
5  that charge in April 1st of 2009?
6       MR. REISS: Objection. Beyond the scope
7  of a 30(b)(6) deposition.
8       Q. Mr. Sharpe, were you charged with a crime
9  in October 25th, 2010 in Onslow County?
10      MR. REISS: Same objection.
11      Q. Based on the charge of October 25th, 2010
12 in Onslow County, were you convicted of a crime?
13      MR. REISS: Same objection.
14      Q. Mr. Sharpe, were you charged with a crime
15 on May 23rd, 2012 in Onslow County?
16      MR. REISS: Same objection.
17      Q. Mr. Sharpe, were you convicted of a crime
18 based on the charge dated May 23rd, 2012 in Onslow
19 County?
20      MR. REISS: Same objection.
21      Q. Mr. Sharpe, were you convicted of a crime
22 in Brunswick County in July 15th, 2016?
23      MR. REISS: Same objection.
24      Q. Mr. Sharpe, were you convicted of a crime
25 based on the charge dated July 15th, 2016 in
   Robert Sharpe          July 19, 2022

17

1  Brunswick County?
2       MR. REISS: Same objection.
3       Q. Mr. Sharpe, were you charged with a crime
4  in New Hanover County on March 5th, 2018?
5       MR. REISS: Same objection.
6       Q. Mr. Sharpe, were you convicted of a crime
7  based on the charge in New Hanover County on March
8  5th, 2018?
9       MR. REISS: Same objection.
10      Q. All right. We're done with those. Mr.
11 Sharpe, have you petitioned for bankruptcy
12 protection?
13      A. Before in my life?
14      Q. Yes, sir.
15      MR. REISS: Objection.
16      THE WITNESS: Yes.
17      MR. REISS: Is that for the company or for
18 him individually?
19      MR. BABEL: For him individually.
20      MR. REISS: He's not answering questions
21 individually. He's answering for the company.
22      MR. BABEL: Well, he's here as an
23 individual and as a company representative.
24      MR. REISS: As I made clear before this
25 deposition started, because of this type of issue, I
   Robert Sharpe          July 19, 2022

5 (Pages 14 to 17)

18

```
 1  want the deposition of the company taken first, and
 2  if there's questions you need to ask him within the
 3  scope of the TRO individually afterwards because
 4  there's something different, then that's fine.  But
 5  this is a deposition of the company.
 6       MR. BABEL:  Okay.  So I need to finish the
 7  30(b)(6) and then ask him individual questions?
 8  That's how you want to do this?
 9       MR. REISS:  Yes.
10       MR. BABEL:  That seems to be totally
11  inefficient.
12       MR. REISS:  I'm sorry, but that's --
13  that's the reason.  I'm not having a corporation
14  tied to these questions.
15       MR. BABEL:  Why don't he just tell me if
16  he's testifying on his behalf.  I mean, my question
17  was, have you petitioned for bankruptcy --
18       MR. REISS:  Okay.
19       MR. BABEL:  -- not you, PCCS.
20       MR. REISS:  Let's just keep this clean.
21  PCCS questions, please.
22       (DEPOSITION EXHIBIT NO. 2 MARKED FOR THE
23  RECORD.)
24    Q.  (Mr. Babel)  Mr. Sharpe, I'm handing you
25  an exhibit that's been marked Exhibit No. 2.  Can
```
Robert Sharpe          July 19, 2022

19

```
 1  you tell me what I'm looking at here?
 2    A.  A bank account.
 3    Q.  All right.  This is the bank account for
 4  PCCS, correct?
 5    A.  It's what it says.
 6    Q.  When was this account opened?
 7    A.  I do not know.
 8    Q.  Was it opened in June of 2022?
 9    A.  Sounds about right.
10    Q.  Okay.  And prior to -- was this the first
11  account that PCCS had with First Citizens Bank?
12    A.  Yes.
13    Q.  Do you know, sitting here, July 19th, what
14  the current balance is in this bank account at First
15  Citizens Bank?
16    A.  What was the question?
17    Q.  Yes.  Sitting here today, which is July
18  19th, do you currently know, approximately, what the
19  balance is for the PCC account at First Citizens
20  Bank?
21    A.  Negative.
22    Q.  It's negative?
23    A.  Yep.
24    Q.  So it's been overdrawn?
25    A.  Yep.
```
Robert Sharpe          July 19, 2022

20

```
 1    Q.  All right.  I'm going to show you what I'm
 2  going to mark as Exhibit 3.
 3       (DEPOSITION EXHIBIT NO. 3 MARKED FOR THE
 4  RECORD.)
 5    Q.  Let me ask you this.  Is there any other
 6  bank accounts at First Citizens in the name of PCCS?
 7    A.  No.
 8    Q.  All right.  Mr. Sharpe, I'm showing you
 9  what I've marked as Exhibit 3, which is an avada- --
10  affidavit, excuse me, of Kevin Rust.  And I'll just
11  represent to you, Mr. Rust represents a company by
12  the name of DaVinci Company, LLC, and DaVinci
13  Aerospace, LLC.  Are you familiar with those two
14  companies?
15    A.  Yes.
16    Q.  All right.  And if you'd look, I think
17  it's the third page of Exhibit 3.
18    A.  Uh-huh.
19    Q.  There is a copy of a default judgment.
20  Let me back up.  Are you aware that there is a
21  lawsuit that has been filed by DaVinci Company, LLC
22  and DaVinci Aerospace, LLC versus PCCS and yourself
23  as an individual?
24    A.  Yes.
25    Q.  Okay.  And if you'd look at that Exhibit A
```
Robert Sharpe          July 19, 2022

21

```
 1  to Mr. Rust's affidavit, is that a -- do you -- have
 2  you seen that judgment before?
 3    A.  I have.
 4    Q.  Okay.  And would you agree with me that it
 5  was entered on April 26, 2022?
 6    A.  That's the date that shows on the paper.
 7    Q.  Okay.  All right.  Now, I want you to look
 8  at Exhibit B.
 9    A.  Uh-huh.
10    Q.  All right.  Is this a form that you filled
11  out?
12    A.  Yes.
13    Q.  And if you go to the -- I think it's the
14  second page of Exhibit B.  Is that the -- is that
15  the same account we were just looking at, the First
16  Citizens account that was Exhibit 2?
17    A.  Yep.  Well, it -- yeah.
18    Q.  And if you go and you look -- I'm -- I'm
19  sorry, there's not page numbers here, but it's under
20  Section 3 of this Exhibit B that's attached to
21  Exhibit 3 for this deposition.  All right.  So that
22  Section 3, it says -- it -- you have to list a
23  description of any and all vehicles, boats,
24  trailers, equipment and real po- -- property, excuse
25  me, with or without liens that is owned by the
```
Robert Sharpe          July 19, 2022

6  (Pages 18 to 21)

Robert P. Sharpe (vol 1) ~ 7/19/2022

22

1  defendant.  Did I read that correctly?
2      A.  Yep.
3      Q.  And that section is blank, correct?
4      A.  Yep.
5      Q.  All right.  When you filled out this
6  Exhibit B, is there any other employees at PCCS that
7  assisted you in doing this?
8      A.  Define assist.
9      Q.  Anyone else at the company that provided
10 you information or you went and asked them
11 questions, anything like that.
12     A.  Yes.
13     Q.  Who was that?
14     A.  Holly Grange.
15     Q.  And what information did Ms. Holly Grange,
16 Ms. Grange, give you?
17     A.  I asked about that question, is there
18 anything that she felt that we needed to include.
19     Q.  That question being, that's No. 3 that
20 we're talking about?
21     A.  Yeah, any vehicles, boats, trailers,
22 equipment or real property.
23     Q.  And I assume it's blank, Ms. Grange's
24 answer was no, she didn't believe anything needed to
25 be listed there.
Robert Sharpe          July 19, 2022

23

1      A.  Correct.
2          (DEPOSITION EXHIBIT NO. 4 MARKED FOR THE
3  RECORD.)
4      Q.  I'm going to show you what I've marked as
5  Exhibit 4.  All right.  Have you seen this document
6  before?
7      A.  Yes.
8      Q.  Okay.  So, as part of this proceeding,
9  your counsel has produced some bank statements from
10 First National Bank.
11     A.  Uh-huh.
12     Q.  And from my reading, it looks as if PCCS
13 has four different accounts at -- in its name at
14 First National Bank.  Is that correct?
15     A.  I thought it was three, but I could be
16 wrong.
17     Q.  We'll look at another document.  Let's see
18 if I got that.
19     A.  I think there was one that was in the name
20 of Stone Bay, and there's one that was in the name
21 of Sage, which is unrelated.
22     Q.  All right.
23         (DEPOSITION EXHIBIT NO. 5 MARKED FOR THE
24 RECORD.)
25     Q.  All right.  I'm going to show you what
Robert Sharpe          July 19, 2022

24

1  we've marked as Exhibit 5.  Again, this is a
2  document that was produced yesterday to us by your
3  counsel, and it looks to be a consolidated statement
4  from First National Bank for the accounts, my
5  assumption was, in the name of PCCS.  And when I
6  look down, it says, "Accounts included in the
7  family: Relationship accounts summary."  There's four
8  accounts there.  Do you know whether those four
9  accounts are in the name of PCCS or if one or two of
10 them are in -- in the name of a different company?
11     A.  I'd have to check on that.  I do know that
12 there is at least three in the name of PCCS.  I know
13 7282 is our operating account.
14     Q.  Okay.  What about the one above that, 978?
15 Do you know what -- what name that account is in or
16 the purpose of that account?
17     A.  That was set up by Peter, and that is in
18 the name of PCCS.
19     Q.  All right.  What about the account -- and
20 we're using the last three numbers, correct?
21     A.  And I'm -- I -- I can't say for sure which
22 one of these is in -- 5978 may or may not be PCCS.
23 I -- well, I would have to look.
24     Q.  All right.  What about 0474?
25     A.  Same for all three of them.  I -- I know,
Robert Sharpe          July 19, 2022

25

1  by memory, 7282 is PCCS.
2      Q.  Okay.  Well, if you go back and look at
3  Exhibit 4, that looks to be an account statement in
4  47282.
5      A.  Right.
6      Q.  Okay.  So this account is definitely in
7  the name of --
8      A.  If that's --
9      Q.  -- Port City Contracting Services.
10     A.  Yeah, this is the main account.
11     Q.  Okay.  And I was going to ask you a
12 question, but I think you already answered.  So this
13 account, the last four numbers 7282, is the
14 operating account for PCCS, correct?
15     A.  Correct.
16     Q.  Let's assume there's three accounts in the
17 name of PCCS at First National Bank.  What are the
18 other two accounts?  What were they designed to do?
19     A.  You'd have to ask Peter.
20     Q.  Okay.  And you say Peter, you mean Peter
21 Sparks [sic].
22     A.  Yes.
23     Q.  Okay.  All right.  So looking at Exhibit
24 4, I'm going to go down.  If you look under the
25 section, electronic debits.
Robert Sharpe          July 19, 2022

Robert P. Sharpe (vol 1) ~ 7/19/2022

---

26

1    A.  Uh-huh.
2    Q.  And what we're going to do is I'm going to
3  ask you some questions about some of the entries
4  that are on here.  All right?  And I'm going to
5  direct you to the first one, which is dated January
6  12th, 2022, and it says, "Port City Contra Expense
7  Re," and then it's got some Xs and then 1053.  Do
8  you see that?
9    A.  Uh-huh.
10    Q.  And it's in the amount of $8,459.31.
11    A.  Okay.
12    Q.  Do you know what that -- one, do you know
13  who that expense reimbursement was going to?
14    A.  I believe that that was expenses of mine
15  that had been on the books from the previous
16  quarter.
17    Q.  Okay.  Do you recall what those expenses
18  were, in a generality sense?
19    A.  I mean, just, you know, flights, hotels.
20    Q.  So fair for me to assume you put those
21  charges on a personal credit card or used your
22  personal funds and you were reimbursed by the
23  company?
24    A.  (Witness nods head affirmatively.)
25    Q.  Would there be, in the books and records
   Robert Sharpe          July 19, 2022

---

27

1  for PCCS, some back-up, like an expense report that
2  you submitted to justify that reimbursement?
3    A.  Uh-huh.
4    Q.  Would that -- would that --
5    MR. REISS:  Hold on, Tom.  Can you use
6  words --
7    MR. BABEL:  Yeah.
8    MR. REISS:  -- to answer, just so that the
9  record is clear?
10    THE WITNESS:  Yes.
11    Q.  (Mr. Babel)  Would those records go back
12  as far as January of 2020 -- 2022?
13    A.  Yes.
14    Q.  Okay.  All right.  Going down two more,
15  there's another one.  It -- it looks like same date,
16  another expense reimbursement in the amount of
17  $2,517.98.  You see that one?
18    A.  Yep.
19    Q.  Do you recall who that expense
20  reimbursement went to?
21    A.  Not off the top of my head, no.
22    Q.  All right.  We're going to go to the
23  second page.  And the one on the top there, there's
24  an entry for January 21st, 2022 [sic].  It says it
25  was a payment to Salesforce in the amount of
   Robert Sharpe          July 19, 2022

---

28

1  $17,423.25.  Do you see that?
2    A.  Yeah.
3    Q.  Do you know whether that was for Port City
4  Contracting or for some other company?
5    A.  Port City Contracting.
6    Q.  And what does Port City Contracting use
7  Salesforce for?
8    A.  We have a -- we had an agreement with a
9  company called ORS Nasco.  They have 600
10  manufacturers that they represent, lots of products
11  that we can put into the government.  So at that
12  time -- in fact, Mark was involved in this program.
13  We were trying to develop a catalog that contracting
14  officers can purchase things from; everything from
15  filters for HVAC systems to even some medical
16  supplies.
17    Q.  And then what did -- I'm a little
18  confused.  What did Salesforce do for the company to
19  assist in what you just described?
20    A.  It's a B2B sales platform, so that you can
21  create individual portals.  So if you're a -- a
22  contracting officer for a hospital, I can put maybe,
23  you know, your top 30 things.  It -- it tracks, you
24  know, CSM.  So, you know, customer -- or CRM,
25  customer relation management.  It helps with, you
   Robert Sharpe          July 19, 2022

---

29

1  know, sales history.  It -- it -- it's a sales
2  platform.
3    Q.  All right.  Going down, same page, there's
4  an entry on July -- or excuse me, January 25th,
5  2022.  It says -- it looks like a payment to Sig
6  Sauer --
7    A.  Yep.
8    Q.  -- for $2,968.66.  Fair to assume that was
9  a purchase of a gun or guns?
10    A.  Could be optics, but something from Sig
11  Sauer.
12    Q.  And then going down to the next one,
13  another entry on January 25th, 2022.  It's E-n-g-e-
14  n-s-e Inc.  What is that?
15    A.  For $646?
16    Q.  I believe that's correct, yes.
17    A.  I am not sure.  Be happy to find out for
18  you.
19    Q.  All right.  We're going to go -- turn the
20  page.  Now, this looks to be a statement from
21  February 28, 2022 for that same operating account of
22  7282, correct?
23    A.  Uh-huh.
24    Q.  All right.  Going back down to the debits.
25  If you go to February 4, 2022, it -- there's a
   Robert Sharpe          July 19, 2022

---

8 (Pages 26 to 29)

Robert P. Sharpe (vol 1) ~ 7/19/2022

---

30

1  payment there to Stone Bay. When I see Stone Bay,
2  is that Stone Bay Tactical, LLC?
3      A.  No.
4      Q.  Okay.  What is it?
5      A.  That is a payment that is made for
6  inventory on behalf of Stone -- or on behalf of
7  PCCS.  DBA is Stone Bay.
8      Q.  Okay.  But it's being -- according to this
9  record, it's being paid to Stone Bay.
10     A.  It is not being paid to Stone Bay.
11     Q.  Okay.  Who is it being paid to?
12     A.  Most likely, on that one, Sig Sauer.
13     Q.  Why does it -- do you know why the banking
14  record doesn't show Sig Sauer; it shows Stone Bay?
15     A.  I'm assuming it's with how they -- because
16  QuickBooks and the bank account are all connected.
17  I did go back through these and -- there -- there's
18  been no payments to Stone Bay, LLC, in this manner.
19  So these are all inventory purchases for PCCS, but
20  they're items under the DBA of Stone Bay, because we
21  tried to keep everything compartmentalized.
22     Q.  Okay.  Let's -- let me ask you this.  What
23  is the business of PCCS?
24     A.  Government contracting.
25     Q.  Okay.  When you say government

Robert Sharpe          July 19, 2022

---

31

1  contracting, what do you mean?
2      A.  It means that we search for, solicit and
3  try to compete, make money off of contracts with the
4  government; everything from supplies to services.
5      Q.  Okay.  What services does PCCS provide to
6  the government?
7      A.  It could be everything from warehouse
8  management, inventory support, potentially security
9  services.  I mean, the government buys just about
10  everything you can think of, both on a supply side
11  and a service side.
12     Q.  All right.  What does Stone Bay Tactical,
13  LLC do?
14     A.  Nothing right now.
15     Q.  Okay.  What was it formed to do?
16     A.  It was eventually going to be a spinoff of
17  the DBA from PCCS.
18     Q.  Okay.  I guess -- well, we're talking
19  about the DBA.  The Stone Bay Tactical, was
20  designed to be a gun dealer.  Is that correct?
21     A.  Uh-huh.
22     Q.  All right.  And what -- when I say gun
23  dealer, was there a specific customer base design
24  that you were going to focus on to sell those
25  weapons?

Robert Sharpe          July 19, 2022

---

32

1      A.  Yeah, there's -- so there's two aspects to
2  that.  There's the end user aspect, which PCCS had
3  an agreement with the military exchange system, so
4  that would be the retail segment.  That was what was
5  intended to be spun off into Stone Bay, LLC, the
6  retail part, and then you have the government
7  contracting side.  So, for instance, Sig Sauer just
8  got the next generation squad weapon contract as an
9  SDVOSV.  They are going to -- they always have add-
10  on subcontracting, so what we call furniture on a
11  gun.  So sights, optics, mounts, stocks, triggers,
12  spare parts, repair parts and all of that.  Sig
13  Sauer signed up PCCS as one of their two, in the
14  whole country, SDVOSV distributors.
15     Q.  Okay.  So what I believe you just told me,
16  you tell me if I got this right or wrong.  So at
17  some point, Stone Bay Tactical, LLC, the separate
18  entity, was going to be the gun dealer on the retail
19  side.
20     A.  Uh-huh.
21     Q.  PCCS would be maintained --
22     A.  The government contractor.
23     Q.  But were they -- was it going to sell
24  weapons to the government or just the --
25     A.  Both.

Robert Sharpe          July 19, 2022

---

33

1      Q.  -- I'm going to call it accessories that
2  go with the weapons?
3      A.  Both.
4      Q.  Okay.  Why -- when you said Stone Bay
5  Tactical, LLC is not operating, why is that -- why
6  is that the case?
7      A.  Because of these lawsuits, it scared away
8  our investors.
9      Q.  Okay.  All right.  So let's -- we're going
10  to -- we'll get to some of that later.  But let's go
11  back to what we're looking at here, this exhibit.
12  So the next entry -- well, let -- let me back up.
13  You said you investigated these charges.  Did you --
14  do you have -- what -- what kind of records did you
15  find?
16     A.  QuickBooks.
17     Q.  Okay.  Well, what did QuickBooks tell you?
18     A.  It shows the invoices.  And QuickBooks,
19  it's broken down by the individual invoices.  So you
20  might have 10 invoices of various amounts, and then
21  you have the aggravate amount, where the payment was
22  sent out, and these were where the payment was sent
23  out.
24     Q.  Okay.  All right.  Well, let's go to the
25  next one, which is February 8, 2022, and it's

Robert Sharpe          July 19, 2022

---

**Cape Fear Court Reporting, Inc.**

Robert P. Sharpe (vol 1) ~ 7/19/2022

34

```
 1   another entry.  It says, "Stone Bay" --
 2       A.  Uh-huh.
 3       Q.  -- for $14,319.19.  What was that payment?
 4       A.  Same answer.
 5       Q.  Who -- wait, let me ask the question.  Who
 6   did the payment go to?
 7       A.  If it -- if it has Stone Bay on there, it
 8   was some sort of inventory that's applicable to the
 9   Stone Bay side of PCCS business.  It could've been
10   Daniel Defense.  It could've been Sig Sauer.  It
11   could've -- you know, there's about 10 different
12   vendors that we work with.  So it could've been any
13   of them.  I would have to check per charge, you know
14   -- you know, is this specifically invoices for
15   Daniel Defense, Sig Sauer, I can't tell you.  But I
16   can tell you that these are all inventory payments
17   for PCCS.
18       Q.  Okay.  So -- so the record's clear, we're
19   specifically looking at this one for the February
20   8th.  What did you do to confirm that that entry for
21   $14,000, using round numbers, didn't go to Stone Bay
22   Tactical, LLC?
23       A.  Well, one, I've seen the bank account for
24   Stone Bay, LLC, Tactical, and it's only received one
25   payment ever, and this is not it.
```
Robert Sharpe           July 19, 2022

35

```
 1       Q.  Okay.  What -- do you know -- so when I
 2   look at those two entries, the one on the 4th and
 3   the one that gave -- you know, we've got these Xs
 4   and then there's a number, 1053.  What the 1053 is
 5   in reference to?
 6       A.  No.
 7       Q.  Okay.  All right.  Let's go back down to
 8   -- there's another entry on February 8, 2020 to
 9   Center Car.  What is Center Car?
10       A.  Center Car is a company credit card.
11   Everybody has them.  And then it's a prepay.  So we
12   fund it, and then, when you're on trips or whatnot,
13   put stuff on your CenterCard.
14       Q.  And can the company -- is there a set
15   amount it has to be prepay every month or they can
16   -- you can send in however much money you want?
17       A.  As needed.  Peter set it up.  So he'd be
18   very familiar with that.
19       Q.  All right.  Let's go down.  There's a
20   charge on February 14th, 2022.
21       A.  Okay.
22       Q.  It's a -- for a hundred thousand dollars.
23   You know what that entry is for?
24       A.  Yes.
25       Q.  All right.  What is it?
```
Robert Sharpe           July 19, 2022

36

```
 1       A.  It was for ACH payments to Ascensia.
 2       Q.  And how do you know that from looking at
 3   that entry?
 4       A.  Because the maximum that we could ACH to
 5   them is a hundred thousand dollars per day, and we
 6   would typically, sometimes have bills that could be
 7   over a million dollars, and if the bill isn't due
 8   for another 10 days, we can do the ACHs for free
 9   instead of paying a wiring fee.
10       Q.  All right.  Is there -- are you testifying
11   -- is your testimony based simply on the fact that
12   the figure is a hundred thousand dollars, or did you
13   do something, look at some records or something at
14   the company to confirm that that hundred thousand
15   dollars was going to -- what's the name of it?
16       A.  I looked at the records, but also just
17   remembering the conversations within the company of
18   we can only do a hundred thousand dollars at a time.
19   So if you look, almost every day or -- or, you know,
20   in a series of days, once one hits, we do the other
21   one, and that's how we would pay Ascensia some of
22   the times.
23       Q.  All right.  Let's go to the next page.
24       A.  Okay.
25       Q.  There's another entry on the 14th of
```
Robert Sharpe           July 19, 2022

37

```
 1   February, 2022 for another hundred thousand dollars.
 2   Where did that payment go?
 3       A.  Most likely Ascensia.
 4       Q.  If --
 5       A.  That -- that's the only -- that's -- and
 6   I'm just saying that, 99 percent sure.  I mean, you
 7   know, there are a few of them.  I -- I can't
 8   remember everything.  But Ascensia -- every hundred
 9   thousand dollar payment I remember seeing was for
10   Ascensia.
11       Q.  Okay.  Would there be -- what -- what
12   records would be at the company to confirm that the
13   hundred thousand --
14       A.  QuickBooks.
15       Q.  Let -- let me just finish --
16       A.  Okay.
17       Q.  -- there.  -- that the hundred thousand
18   dollars that was paid on February 14th, 2022 went to
19   Ascensia?
20       A.  QuickBooks.
21       Q.  All right.  Let's go down.  There's
22   another entry on February 17th, 2022.  It's another
23   hundred thousand dollar payment.  Do you know where
24   that payment went to?
25       A.  Ascensia.
```
Robert Sharpe           July 19, 2022

10  (Pages 34 to 37)

Robert P. Sharpe (vol 1) ~ 7/19/2022

---

38

1     Q.  Same question I asked you before. What
2  records at the company would confirm that that
3  hundred thousand dollar payment on February 17th,
4  2022 went to Ascensia?
5     A.  QuickBooks.
6     Q.  Okay. All right. Next entry. There's an
7  entry on -- another entry on the 17th for $13,482.90
8  and it went to Go2 Weapon.
9     A.  Yep.
10    Q.  What is Go2 Weapon?
11    A.  It's an arms dealer.
12    Q.  All right. And do you know what was being
13  -- why -- why that PCCS was paying Go2 Weapon?
14    A.  Yeah, we had purchased short barreled
15  rifles.
16    Q.  And that would be for what reason? Why is
17  PCCS buying short barreled rifles?
18    A.  Both for R&D and also for potential
19  government sales. These are Class 3 weapons. So
20  that would mean the government contracting side,
21  because civilians can't buy these.
22    Q.  All right. And then go down to the next
23  entry. February 17th, 2022, there's an entry, the
24  payment for 18 -- one thousand eight hundred and six
25  thousand eighty-three cents to UNC Pembroke. What
   Robert Sharpe          July 19, 2022

---

39

1  is that for?
2     A.  We had a -- we had a -- Peter actually
3  started it. We were helping Cheryl, who had been
4  our admin, obtain -- she was taking college classes
5  and so we agreed to help her with those costs.
6     Q.  All right. Next entry on February 18th,
7  2022, there's a payment of $10,000 to Piton Gill?
8     A.  Gill, it's short for Gillespie. That's
9  for legal services.
10    Q.  Okay. All right. Then we've got another
11  entry on the twenty -- two entries on the -- well,
12  two entries on the 22nd; one for a hundred thousand
13  dollars. Do you know where the hundred thousand
14  dollars went?
15    A.  Ascensia.
16    Q.  And again, we could confirm that through
17  the QuickBooks --
18    A.  Yep.
19    Q.  -- entry at the company?
20    A.  Yep.
21    Q.  All right. Next one. There's another
22  payment on that same day for $77,338.40. Do you
23  know where that went?
24    A.  I'm -- my assumption would be the -- the
25  remainder of that specific Ascensia bill, just
   Robert Sharpe          July 19, 2022

---

40

1  because typically, these huge -- well, for me
2  anyway, huge sums are almost always going to be
3  Ascensia.
4     Q.  And again, we would confirm that through
5  the QuickBooks and the company?
6     A.  Yes, sir.
7     Q.  All right. Next entry. There's an entry
8  on the -- another entry on the twenty -- 22nd,
9  excuse me, for $38,125. Do you see that?
10    A.  Yep.
11    Q.  Do you know where that went to?
12    A.  Nope.
13    Q.  Could we figure that out by looking at the
14  QuickBooks entry?
15    A.  Yes, sir.
16    Q.  All right. Similar question. There's
17  another entry on the 22nd for $10,942.05. Do we
18  know where that went?
19    A.  Not off the top of my head, no.
20    Q.  But we can confirm that through the
21  QuickBooks?
22    A.  Yes, sir.
23    Q.  All right. And then we've got, on that
24  same day, anther payment to Center Car. That's that
25  prepaid credit card for $5,000. Is that correct?
   Robert Sharpe          July 19, 2022

---

41

1     A.  Yes, sir.
2     Q.  All right. Go down to February 28, 2022.
3     A.  Uh-huh.
4     Q.  There's an entry, it says "Stone Bay," for
5  $25,325.16.
6     A.  Correct.
7     Q.  Where did that money go to?
8     A.  Supply. So items that we purchased for
9  Stone Bay DBA.
10    Q.  Okay. And did you do anything to confirm
11  that payment was for Stone Bay DBA and not Stone Bay
12  Tactical, LLC?
13    A.  Yes.
14    Q.  What did you do?
15    A.  I looked at QuickBooks.
16    Q.  All right. Then we've got another payment
17  on the 28th, $5,000, for Center Car. Again, that's
18  that prepaid card?
19    A.  Yes.
20    Q.  All right. You can turn the page.
21    A.  Yep.
22    Q.  All right. Now we're looking on the
23  statement from March of 2022 for that same operating
24  account, 7282, correct?
25    A.  Correct.
   Robert Sharpe          July 19, 2022

---

Robert P. Sharpe (vol 1) ~ 7/19/2022

42

```
 1      Q.  All right.  All right.  First one, if you
 2   look at the charge on March 1st, 2022 for
 3   $16,159.09, do you know what that --
 4      A.  Not --
 5      Q.  -- payment was for?
 6      A.  Not without looking at QuickBooks.
 7      Q.  Okay.  Do you know who it went to?
 8      A.  Not without looking at QuickBooks.
 9      Q.  All right.  Go down to -- there's an entry
10   on March 3rd, 2022 for $52,920.  Do you know who
11   that was paid to?
12      A.  I believe that was to Ascensia, but it --
13   if it was not, it would be for some other type of
14   inventory for PCCS.
15      Q.  And we would confirm that through the
16   QuickBooks entry?
17      A.  Yes, sir.
18      Q.  All right.  Go down.  There's another
19   entry on March 3rd; it's for $12,000.80.  Do you see
20   that?
21      A.  It's on the 4th?
22      Q.  Oh, yeah.  You're right.  I'm sorry.  Do
23   you know who -- what company that went to or who it
24   went to?
25      A.  Forte.
```
Robert Sharpe          July 19, 2022

43

```
 1      Q.  What is Forte?
 2      A.  They were helping load all the data in
 3   products from the ORS Nasco supply chain into the
 4   Salesforce platform.
 5      Q.  So fair to call them like a software
 6   consultant?
 7      A.  Yeah.  Sure.
 8      Q.  All right.  Go down to March 7, 2022.  It
 9   says, "Center Car."  Again, that's that prepaid --
10   prepaid credit card?
11      A.  Yes.
12      Q.  Go down to March 14th.  There's another
13   payment of $5,000 to Center Car.  Again, that's that
14   prepaid credit card?
15      A.  Yes.
16      Q.  All right.  You can turn to the next page.
17   If you look, there's an entry for March 15th, 2022.
18   It says, "Olly Olly (ph) payment."  What is Olly
19   Olly?
20      A.  Ally.
21      Q.  Okay.  What's Ally?
22      A.  That's for the company car.
23      Q.  The company car?
24      A.  Right.
25      Q.  Okay.  So the company, PCCS, owns a car?
```
Robert Sharpe          July 19, 2022

44

```
 1      A.  Well, they don't own it.  It's a lease.
 2      Q.  Okay.  Is it -- is the lease in the name
 3   of PCC -- PCCS?
 4      A.  Yes.
 5      Q.  All right.  If you go down to March 17th,
 6   2022, another entry for $5,000 to Center Car.
 7   Again, that's that prepaid credit card?
 8      A.  Yes.
 9      Q.  The next entry is March 18th, 2022.  It
10   says, "Rudner expense."  It's an expense payment to
11   Mr. Rudner?
12      A.  Yes.
13      Q.  All right.
14      A.  And I just want you to note, if you see in
15   the descriptions, that's why sometimes you'll see
16   Stone Bay, because the QuickBooks changes what it
17   says on here.  So just because it says Stone Bay
18   doesn't mean it's a payment to Stone Bay; that's
19   just an internal audit.
20      Q.  All right.  What -- take a look at the
21   entry on the -- March 21st --
22      A.  Uh-huh.
23      Q.  -- for $10,000.  It says, "Med items."
24   What -- what does -- who did that payment go to?
25      A.  I'd have to look at QuickBooks.  Oh, no,
```
Robert Sharpe          July 19, 2022

45

```
 1   no.  I know exactly what that one was for.  So there
 2   -- if you'll notice, there is a deposit in that
 3   month for $10,000 from Broadsword Defense.
 4      Q.  Uh-huh.
 5      A.  Right.  That money was meant for me to use
 6   from Broadsword Defense, but because of the security
 7   situation in Ukraine, there was no way to directly
 8   transfer that to me, and so it went to the company
 9   and then to me.  Because I could get payments from
10   the company, but I had no way of receiving direct
11   payments from a third party.
12      Q.  Okay.  All right.  Go down.  There's an
13   entry on March 28th for twelve thousand dollars and
14   eighty -- twelve thousand eighty.
15      A.  Okay.
16      Q.  It just says, "Invoice 19."  Do you know
17   what that was for?
18      A.  Not off the top of my head.
19      Q.  All right.  And go down to March 30th.
20      A.  Okay.
21      Q.  There's an entry for C&H Precision sales.
22   What is C&H Precision sale?
23      A.  Without looking at QuickBooks, I'd have to
24   check.  But most likely, some sort of inventory.
25      Q.  Do you know what kind of inventory?
```
Robert Sharpe          July 19, 2022

12 (Pages 42 to 45)

Robert P. Sharpe (vol 1) ~ 7/19/2022

46

1    A.  Not without looking at QuickBooks.
2    Q.  All right.  We're going to turn the page
3  and we're going to go to the statement for April
4  29th for that same operating account of seventy --
5  7282.
6    A.  Okay.
7    Q.  All right.  First one, April 1st, 2022.
8  There's an -- it just says, "Invoice 220471."
9    A.  Uh-huh.
10    Q.  Do you know who that invoice came from?
11    A.  Nope.
12    Q.  But we could look at QuickBooks and it
13  would tell us?
14    A.  Yes, sir.
15    Q.  All right.
16    A.  There's only two things that it could be;
17  it's either inventory or a service.  And the only
18  services we had in that amount would either be
19  Salesforce or Forte, at least at this time.  So --
20    Q.  All right.  And go down.  It looks like
21  there's three entries on the 4th to Broadsword
22  Defense.  You see that?
23    A.  Yep.
24    Q.  Well, actually, it's three.  Excuse me.
25  Who is Broadsword Defense?
Robert Sharpe          July 19, 2022

47

1    A.  David Danel.
2    Q.  All right.  And why is PCCS paying
3  Broadsword Defense?
4    A.  Because David -- number one, David ran
5  those sales through.  And I know y'all are talking
6  to him, so that would be a good source for that
7  information.  But also, he had purchased things for
8  the company out of his credit card and then that was
9  him paying himself back.
10    Q.  All right.  Do you know what he paid on
11  his credit card on behalf of PCCS?
12    A.  I know he had bought some suppressors for
13  -- for our sale and use and then a kiosk for the
14  shop, a sales platform where, you know, if we have a
15  client come in, they can actually order, do their
16  fingerprints and -- so it's an automated system to
17  -- to get NFA items approved for individuals.
18    Q.  And that would be for the DBA, not for
19  Stone Bay Tactical, LLC?
20    A.  Correct.
21    Q.  Both of those things, the suppressors and
22  the kiosk?
23    A.  Right.  Yeah.  Just might make things
24  simpler for you.  Stone Bay, LLC does not have an
25  FFL license.  They could not legally buy, you know,
Robert Sharpe          July 19, 2022

48

1  most of this inventory.
2    Q.  Okay.  All right.  Go down to April 4,
3  2022.  It says, "Bank card MTOT disc" for
4  $24,848.94.  You know what that payment was for?
5    A.  Well, that payment was $20.73.  The twenty
6  four eight forty-eight was for --
7    Q.  Oh, you're right.
8    A.  -- payroll.
9    Q.  Sorry.  You can just strike that one.  All
10  right.  Turn to the next page.
11    A.  Uh-huh.
12    Q.  And on the 11th of April, there was two
13  withdrawals; one for 15,000 and one for $5,000.  Do
14  you know who took those withdrawals from the PCCS
15  account?
16    A.  Which page are we on right now?
17    Q.  I think it's the last page of the exhibit.
18    A.  3 of 4?
19    Q.  Yes, sir.
20    A.  Okay.  And what was the question again?
21    Q.  There's two withdrawals on April 11th; one
22  for --
23    A.  Oh.
24    Q.  -- 15,000 and one for five.  Do you know
25  who took those withdrawals from the PCCS account?
Robert Sharpe          July 19, 2022

49

1    A.  The one on 4/11 was for legal services,
2  and then the one below that was also for legal
3  services.  The 5,000 went to James Gillespie and the
4  15,000 went to Atlantic Coast Law.
5    Q.  All right.  And how do you know that to be
6  true sitting here?
7    A.  Because I remember what the bill was.
8    Q.  Okay.  But it's a -- I'm a little confused
9  that the bank statements is a -- it's a withdraw,
10  which makes me believe that someone took cash out of
11  the account, not --
12    A.  Cashier's check.
13    Q.  Okay.
14    A.  And I -- there will be a copy of that.  We
15  can get you that if you need it.
16      (DEPOSITION EXHIBIT NO. 6 MARKED FOR THE
17  RECORD.)
18    Q.  I'm going to show you what we've marked as
19  Exhibit 6.  All right.  And this is a May -- there's
20  some other dates in here, but this -- the first page
21  is the May 2022 statement for that same operating
22  account, 7282, correct?
23    A.  Yes.
24    Q.  All right.  Going down, if you look,
25  there's an entry on May 9th to Center Car.
Robert Sharpe          July 19, 2022

13  (Pages 46 to 49)

Robert P. Sharpe (vol 1) ~ 7/19/2022

50

```
1    A.  Uh-huh.
2    Q.  Again, that's that prepaid credit card?
3    A.  It is.
4    Q.  All right.  And on the 12th, there's
5  another entry to Center Car.  That's the prepaid
6  credit card?
7    A.  It is.
8    Q.  Another entry on the 17th to Center Car.
9  That's the prepaid credit card?
10    A.  It is.
11    Q.  All right.  Go to, I think it's the third
12  page of that exhibit.  It says, "Other debits."
13  There's another withdrawal for $7500.  Do you know
14  what that was for?
15    A.  Yeah, that was to James Gillespie.
16    Q.  And how do you know that?
17    A.  I remember that bill.  We didn't have a
18  whole lot going out at that time and he was owed
19  $7500.
20    Q.  Okay.  If you go, keep turning the page to
21  -- to the statement for June.
22    A.  Okay.
23    Q.  All right.  If you look on June 6, there's
24  two entries.  It says, "Miscellaneous debit"; one
25  for $200 and one for $68,585.50.  Do you know what
```
Robert Sharpe          July 19, 2022

51

```
1  those -- where that money went to?
2    A.  Yeah, to the sheriff's department and --
3  where they levied our account in the DaVinci matter.
4    Q.  Okay.
5    (DEPOSITION EXHIBIT NO. 7 MARKED FOR THE
6  RECORD.)
7    Q.  All right.  Mr. Sharpe, I've shown you
8  what we marked as Exhibit 7.  Can you tell me what
9  Exhibit 7 is?
10    A.  It's the billing invoices for CenterCard.
11    Q.  Okay.  So again, that's that prepaid
12  credit card, right?
13    A.  Correct.
14    Q.  Okay.  So tell me if I get this right.
15  You prepaid the credit card and then, at the end of
16  the month, like a normal credit card, you would get
17  a statement from -- from Center Car showing
18  basically all the charges on that credit card.
19    A.  I believe -- again, Peter Spark set this
20  up.  So he'd be the best person to be able to answer
21  that question.
22    Q.  Okay.  Bear with me.  All right.  If you
23  look sort of in the middle top there, there's -- it
24  says, "PCCS 4-" -- there's a number.  It says -- the
25  first page is 473?
```
Robert Sharpe          July 19, 2022

52

```
1    A.  Yeah.
2    Q.  Okay.  I'm going to reference those
3  numbers.  All right?
4    A.  Okay.
5    Q.  So turn to page 479.
6    A.  Page 479?
7    Q.  Actually, it might be 480.
8    A.  Oh, okay.  I get what you're saying now.
9    Q.  All right.  Looking at 480, which, if I'm
10  reading this document correct, if you go back to 478
11  --
12    A.  Uh-huh.
13    Q.  -- I believe 480 is part of the records
14  that were sent by Center Car for the month of March.
15    A.  Sure.
16    Q.  Okay.  All right.  So there's an entry on
17  page 480.  It looks like it was for February 14th,
18  and it says the merchant was Frontpoint Security.
19  What is Frontpoint Security?
20    A.  Our security system.
21    Q.  All right.  Security system for PCCS?
22    A.  The warehouse, yeah.
23    Q.  All right.  So every time I see Frontpoint
24  Security, that would be an -- a payment to the
25  security system for PCCS.  Is that correct?
```
Robert Sharpe          July 19, 2022

53

```
1    A.  Correct.
2    Q.  All right.  Go to four -- page 482.  Okay.
3  There's a -- there's a payment to Academy Sports.
4  Is that Academy Sports here in Wilmington?
5    A.  Yes.
6    Q.  Do you know what was purchased at Academy
7  Sports on behalf of PCCS?
8    A.  Either ammunition or targets.
9    Q.  All right.  What about -- if you go down
10  to the next one, there's an entry on February 25th
11  to Sportsman Warehouse.
12    A.  Same answer.
13    Q.  All right.  Go to page 484.  And there's
14  an entry on February 14th to Keepersecurity.com.
15  You know what that is?
16    A.  Let me see who made that charge.  That was
17  something that Adrianne George did.  So you'd have
18  to ask her.
19    Q.  And how do you know Adrianne did it?
20  Through the employee number?
21    A.  Yeah.  So when you look, it has Adrianne
22  George is -- coming, you know, down, it lists all of
23  her charges.
24    Q.  Got it.
25    A.  Now, just to -- you know, Adrianne was in
```
Robert Sharpe          July 19, 2022

**Cape Fear Court Reporting, Inc.**

Robert P. Sharpe (vol 1) ~ 7/19/2022

---

54

1  charge of all of our computers and security and
2  stuff. She comes from a cyber security background.
3  So I would assume it was something in that lane.
4      Q.  Well, if you go back, if you look at page
5  479, help me understand how to read this. So if you
6  look at four -- page 479. If I see, like, Cheryl
7  Mihalik? I don't know if I'm pronouncing that
8  right.
9      A.  Mihalik.
10     Q.  Okay. Are her charges below her name, or
11 are the charges that she charged on the -- on the
12 credit card above her name?
13     A.  Below her name.
14     Q.  Okay. So if I look at that page, the
15 bottom name is David Daniel [sic], right?
16     A.  Which page?
17     Q.  Same page, 479.
18     A.  Okay.
19     Q.  If you go on the bottom.
20     A.  Oh, yep.
21     Q.  So then, if I go to the next page, 480,
22 was David the one that made the payment to
23 Frontpoint Security?
24     A.  Yes. Well, it was made on his card. That
25 -- that -- I don't know if that's a reoccurring
   Robert Sharpe            July 19, 2022

---

55

1  charge or what. But yeah. Yeah, David was
2  responsible for that.
3      Q.  And David was an employee of PCCS,
4  correct?
5      A.  Correct.
6      Q.  Okay. And it looks like David also was
7  the one that made those charges that are on page 482
8  to Academy Sports and Sportsman Warehouse. Is that
9  correct?
10     A.  Let me double check just to make sure.
11 Employee No. P2G4. One second. Where's David
12 Danel? Yep. That's how I'm reading it.
13     Q.  Okay.
14     A.  Hold on real quick. Which -- which line
15 were you talking about on 484?
16     Q.  No, it wasn't on -- I was -- I think I was
17 on page 482.
18     A.  Okay.
19     Q.  Yeah, I think we've confirmed that the
20 charge to Keeper Security was made by Adrianne
21 George.
22     A.  Okay.
23     Q.  What is -- if you look on page 485, what's
24 Aromas of Peru?
25     A.  Hum. I'd have to look. Let's see if --
   Robert Sharpe            July 19, 2022

---

56

1  who did that one.
2      Q.  It was Ms. George.
3      A.  Okay. I -- I'd have to check with her.
4      Q.  All right. Go to page 486.
5      A.  Okay.
6      Q.  All right. Now, we're going to go down to
7  the bottom of the page and it looks like charges
8  made by you.
9      A.  Correct.
10     Q.  So if I -- if I'm reading this right, if I
11 see -- I'm going to use the last four identifiers.
12 D7E9, that would be you.
13     A.  Correct.
14     Q.  I'm looking at the employee number.
15     A.  Yes, sir.
16     Q.  All right. So it looks like on February
17 9th, you made a charge at Harris Teeter.
18     A.  Yep.
19     Q.  Was that for PCCS?
20     A.  Yep.
21     Q.  All right. And what were you buying at
22 Harris Teeter for PCCS?
23     A.  I can't remember off the top of my head.
24 But it could've been water, drinks, stuff for the
25 office, coffee.
   Robert Sharpe            July 19, 2022

---

57

1      Q.  All right. And then on the 15th of
2  February, there's a charge to Circa 922 for
3  $1,241.10.
4      A.  Yep.
5      Q.  What was that for?
6      A.  That was for a large dinner where we had
7  Sig Sauer come in.
8      Q.  All right. And go to the next page.
9      A.  Okay.
10     Q.  All right. Let me -- I'm going to -- I'm
11 going to ask you some specific questions, but let's
12 just say generally, if there's a charge on this that
13 you made, is it your testimony it was made on behalf
14 of PCCS?
15     A.  There's been times where I've charged
16 something that I thought would be a writeoff but it
17 turns out it wasn't. So our policy was if -- if I'm
18 ever wrong, then it just gets billed to me
19 personally and taken out of my pay. But -- so you
20 could potentially find a charge that is incorrect.
21 But other than that, typically yes, it's always for
22 -- supposed to be for PCCS.
23     Q.  Do you know what Sweet D is?
24     A.  Yeah, that's pastries.
25     Q.  Okay. All right. Go to page 495.
   Robert Sharpe            July 19, 2022

---

15  (Pages 54 to 57)

58

1     MR. REISS: Aren't you glad I Bate stamped
2  these?
3     MR. BABEL: You always try to help me.
4     MR. REISS: Yeah.
5     THE WITNESS: All right.
6     Q. (Mr. Babel) All right. I believe there's
7  a charge there on March 1st, and it was made by Mr.
8  Daniel to Tactical Distributors. Do you know what
9  he bought on behalf of the company from Tactical
10 Distributors?
11    A. Not off the top of my head. Most likely
12 something for either inventory or testing.
13    Q. What -- what was the procedure at PCCS as
14 related to this credit card? Like if Mr. Daniel
15 went and used the credit card, did he submit like an
16 expense report or some type of report in the company
17 to ensure that those --
18    A. Yeah.
19    Q. -- amounts were made --
20    A. So --
21    Q. -- on behalf of the company?
22    A. There's an app that everybody has on their
23 phone, and then your charges, at the end of the
24 month, you're supposed to reconcile them, and if you
25 have a receipt, turn it in. Of course receipts get
   Robert Sharpe        July 19, 2022

59

1  lost. Or if you lose a receipt, you have to say
2  that this was a business expense and you put what it
3  was for. So there is an internal.
4     Q. And would -- so just using the March 1st
5  charge here as an example. Would the records at
6  PCCS -- what would it show as related to that charge
7  that Mr. Daniel made?
8     A. You'd have to ask Peter. He set this
9  account up, so he knows the ins and outs very well.
10 So I -- I can't testify to those, because I've never
11 personally paid this bill or done the reconcile. I
12 -- I stay out of the books for --
13    Q. Okay. But going back to the app you're
14 talking about. Like would Mr. Daniel, like, take a
15 photo with his phone of the -- of the receipt and
16 that would be uploaded in --
17    A. That's one of the ways to do it, yeah.
18    Q. And does that all get uploaded to
19 QuickBooks?
20    A. I believe so.
21    Q. All right. If you go to page 496.
22    A. Okay.
23    Q. There's a charge to Delta that Mr. Daniel
24 made for $607.60. Do you know what that ticket was
25 for?
   Robert Sharpe        July 19, 2022

60

1     A. A flight. Where to, I -- I do not know
2  off the top of my head.
3     Q. Did Mr. -- it -- it's true that Mr. Daniel
4  went to the Ukraine with you, correct?
5     A. Yeah. Well, he was there part of the time
6  that I was there. That wasn't for Ukraine.
7     Q. All right. Well, go to 497.
8     A. Well, you know what? Potentially it
9  could've been, if he bought the tickets in -- no, he
10 -- he -- the -- the tickets from Ukraine were not
11 paid on CenterCard. I know that for a fact.
12    Q. All right. Well, let's go to the next
13 page, 497.
14    A. Okay.
15    Q. And there's an entry on March 21st,
16 another one to Delta for $882.20. Do you know what
17 that flight, where it was going?
18    A. You'd have to ask David.
19    Q. Okay. All right. Why don't you go to
20 page 504. And if -- if it helps you, if you go to
21 -- start on page 501.
22    A. Let me make sure that this is -- this is
23 me, correct?
24    Q. Yeah. That's why it's going to help you,
25 so you're comfortable.
   Robert Sharpe        July 19, 2022

61

1     A. Okay. Yeah.
2     Q. So 501 shows your name, and again, it
3  shows your employee number, D7E9, correct?
4     A. Correct.
5     Q. All right. First of all, let's go down.
6  There's a charge on that page of 501 to American on
7  March 3rd, 2022. Do you know what that charge was
8  for?
9     A. That was for flying to Washington D.C., I
10 believe. I believe that was the D.C. trip.
11    Q. Okay. Well -- and then if you go to page
12 502, there's another charge to American for $281.60.
13 Do you know what that flight was for?
14    A. I believe that was a return. I --
15 something to do with travel. I -- I can't tell you
16 what that specific charge was for, but it was to
17 American Airlines. And I know right -- I took
18 multiple trips to prepare for Ukraine right before.
19 So I -- I'd have to double check.
20    Q. Why -- and why did you go to the Ukraine?
21    A. Multiple reasons.
22    Q. All right. Can you tell them to me?
23    A. Well, for the company, you know, we're a
24 government contracting company that has an extensive
25 supply chain of medical supplies and guns, and in a
   Robert Sharpe        July 19, 2022

16 (Pages 58 to 61)

Robert P. Sharpe (vol 1) ~ 7/19/2022

62

1  new war, they have a massive need for medical
2  supplies and guns.
3      Q.  Okay.  Is that one reason?
4      A.  Uh-huh.
5      Q.  Okay.  What are the other reasons?
6      A.  I thought that the Russian invasion of
7  Ukraine was immoral and as an American, it's my duty
8  to support and protect democracy.
9      Q.  Okay.  Any other reasons?
10     A.  I mean, that's the basis of -- I mean,
11  that's pretty much it.
12     Q.  Okay.
13     A.  Business and personal drive.
14     Q.  All right.  Look at -- look at page 504.
15     A.  Uh-huh.
16     Q.  And we can go through these line by line
17  or we can try to do it as a group.  But it looks
18  like starting on -- well, do you know when you got
19  to the Ukraine?
20     A.  I believe the 10th.  But with the -- I
21  know I left on the 10th.  I might've arrived on the
22  11th.  I --
23     Q.  But that would be the 10th of March.
24     A.  Yeah.
25     Q.  Did you fly -- where did you fly to,
Robert Sharpe          July 19, 2022

63

1  initially?
2      A.  Oh, shit.  I -- bear in mind, I fly so
3  much, it gets confusing.  I believe we flew out of
4  New York.
5      Q.  That was a bad question.  Did you fly
6  directly to the Ukraine or do you fly to a different
7  country --
8      A.  No.
9      Q.  -- first?
10     A.  You -- you know, you have one or two.  We
11  didn't fly into Ukraine period.  Our first location
12  -- not Slovakia.  It's one of the former Bosnia
13  countries.  I'm trying to remember the name of --
14  where's Zagreb?
15         MS. GRANGE:  Croatia.
16         THE WITNESS:  Yeah.  Croatia was our first
17  destination.
18         MR. BABEL:  Okay.
19         MR. REISS:  Got to let him answer.
20         MR. BABEL:  I knew the answer, but --
21         MR. REISS:  Even he doesn't --
22         MR. BABEL:  -- I thought we're on
23  Jeopardy.
24     Q.  (Mr. Babel)  All right.  So let's look at
25  504.  It looks like, starting on the 13th, there's a
Robert Sharpe          July 19, 2022

64

1  number of charges made in countries that are in
2  Eastern Europe.
3      A.  Yep.
4      Q.  Okay.  So the first one that we're
5  looking, there on the 13th, it says, "CN."  I think
6  that's Croatia.  Does that sound right to you?
7      A.  It does.
8      Q.  Okay.  And then there's another one.  Then
9  the next one down is to Goric.
10     A.  Yep.
11     Q.  Then another one to Chelm, CN, which I
12  think is Croatia.
13     A.  Okay.
14     Q.  Warszawa, CN, which again I think is
15  Croatia.  Does that sound right to you?
16     A.  Yeah.
17     Q.  All right.  Another one on the 15th to
18  Dublin, CN.  Which again, I think CN is the country
19  code for Croatia.
20     A.  Sounds about right.
21     Q.  So let's just do it this way.  If you look
22  at that first charge on 504, and then if you go all
23  the way to page 510, it looks to me, and you can
24  correct me if I'm wrong, that all of those charges
25  were made while you were -- and we're going to say
Robert Sharpe          July 19, 2022

65

1  while you were, quote, in the Ukraine, but you
2  might've been in Croatia or Poland or one of the
3  other countries in the -- Eastern Europe.
4      A.  Yeah.  I hit like five countries, but
5  yeah.  Now, there -- there could be a recurring
6  charge on here.  Some of our recurrings we put on
7  here as well.  But I don't see any right now.  Hotel
8  Bristol.  Yeah.  Yeah.  What page did you want me to
9  go to?
10     Q.  510.
11     A.  McDonald's.  McDonald.  Ate a lot of
12  McDonald's, it seems.  So, of course the Global
13  Underwriters is not a charge for Croatia.
14     Q.  All right.  I want you -- I want you to
15  tell me where that --
16     A.  That is --
17     Q.  Okay.  On page --
18     A.  -- 509.
19     Q.  Okay.  And that's the charge on March
20  21st?
21     A.  Uh-huh.
22     Q.  And what's Global Underwriters?
23     A.  That is insurance.  And I could be wrong.
24  David and I both had travel insurance.  David wanted
25  extra insurance for Ukraine.  I can't remember if I
Robert Sharpe          July 19, 2022

Robert P. Sharpe (vol 1) ~ 7/19/2022

---

**66**

1 was under that umbrella or not. But just travel
2 insurance.
3    Q. Okay. But it was travel insurance related
4 to your travels to the -- what we're referring as
5 the Ukraine?
6    A. Right.
7    Q. All right. Do you see anything else on
8 those pages, 504 to 510, that you thought might not
9 be related to your travels to the Ukraine?
10    A. Not -- not that I saw.
11    Q. Okay.
12    A. I can go through them again if you'd like.
13    Q. It's up to you.
14    A. Yeah, I don't see anything. But -- yeah.
15 (Witness reviews document.) Yeah. It's what they
16 all look like.
17    Q. Okay. Why don't you go to page 516.
18    A. Okay.
19    Q. And I believe -- and again, if you go back
20 to 515 to just confirm for yourself. We're going to
21 look at page 516, but I think those are going to be
22 charges of Mr. Daniel.
23    A. Danel.
24    Q. Danel. All right. If you go -- now, if
25 you turn to 516, there's a charge for Mr. Danel to

Robert Sharpe        July 19, 2022

---

**67**

1 Delta on April 6, 2022. Do you know where he was
2 flying to or from?
3    A. That may not be a valid charge, because
4 that's around the time I fired him, and that was for
5 him to fly back home. I don't know if that would be
6 a valid charge or not.
7    Q. Fly back home from where?
8    A. From here to Texas.
9    Q. All right. And why -- why was Mr. Danel
10 fired?
11    A. Theft.
12    Q. Okay. Well, what did he steal?
13       THE WITNESS: Should I go into detail on
14 that?
15       MR. REISS: Well, answer -- you can answer
16 the question.
17       THE WITNESS: Okay. He had received some
18 items to his home address from the FFL that he was
19 not supposed to, and then he also tried to remove or
20 steal some of our vendors. For instance, I got a
21 call after I got back from Ukraine from ORS Nasco,
22 so that account with Salesforce and Forte and all of
23 that. He tried to take that account and move it to
24 his company, Broadsword Defense.
25    Q. (Mr. Babel) Okay. What -- when you say

Robert Sharpe        July 19, 2022

---

**68**

1 he received materials from the FF -- FFL, that's the
2 federal firearms -- firearms license?
3    A. Yeah, he had a gun shipped to his house
4 from the manufacturer without telling me.
5    Q. Okay. Was it a gun owned by PCCS?
6    A. It was.
7    Q. Okay. What -- do you know the make of the
8 gun?
9    A. Go2 Weapons. And we've since recovered
10 that gun. There still are some items in his
11 possession that are stolen, that we have been unable
12 to recover.
13    Q. And what are those?
14    A. I know there's one set of optics that's
15 about $1600 and multiple sets of ballistic armor.
16    Q. All right. Going back to the exhibit,
17 look at page 517.
18    A. Okay.
19    Q. And it looks like, down on the bottom
20 there, it starts charges by you?
21    A. Okay.
22    Q. All right. And it looks like the first
23 one on April 2nd, you're still in the Ukraine. Is
24 that right?
25    A. Well, that's Lublin. So that would be

Robert Sharpe        July 19, 2022

---

**69**

1 Poland.
2    Q. Okay. Yeah. When I say Ukraine, I'm
3 using the generic term when you were in Eastern
4 Europe on --
5    A. Yeah.
6    Q. -- on behalf of your interest in the
7 Ukraine.
8    A. And just to let you know, CN is not --
9 because that Warszawa, that's Warsaw, Poland. So CN
10 might be some kind of European or -- I don't know
11 what CN means. But that's Warsaw.
12    Q. Okay. Well, if you'll look at -- starting
13 on that entry on 517, and if you go to the top of
14 519.
15    A. Uh-huh.
16    Q. When I went through it, it looked to me
17 that every charge, other than one, were charges that
18 were made when you were in Eastern Europe. And the
19 one that -- it looked like, I don't know, maybe you
20 made it when you were in Eastern Europe. There's a
21 charge on the 3rd of April on page 518 to -- made to
22 some company located in Charlotte, News 2U.
23    A. Yeah, that was whenever I was flying back.
24 Some of these are, of course, posting -- it says --
25 so 4/3 must've been the date I flew back.

Robert Sharpe        July 19, 2022

---

18 (Pages 66 to 69)

70

1    Q.  So some of -- like the one on the next
2  page that showed that you were -- it was made in
3  Poland, it -- it was probably charged maybe either
4  on the 3rd or the 2nd and then it didn't post till
5  after you got back.
6    A.  Yeah.  So they -- they probably ran some
7  of these charges after I got back.  I -- I believe
8  -- and again, I could be wrong.  The -- that last
9  one for -- would've been potentially either for a
10  hotel or rental car.  I can't remember which one
11  that would be.
12    Q.  What -- who's Andy Layton?
13    A.  That's one of our employees.
14    Q.  Okay.  What -- does he have a title?  If
15  you don't know --
16    A.  He's -- he's heading up the DBA Stone Bay
17  for PCCS.
18    Q.  Okay.  What -- do you know when he was
19  hired?
20    A.  He had been part-time and assisting for a
21  while.  When David Danel was fired, he took over for
22  David Danel.
23    Q.  Going to David Danel, was -- what his --
24  so we talked a little bit about Stone Bay Tactical,
25  LLC and the DBA, Stone Bay Tactical.  Was one of his
Robert Sharpe          July 19, 2022

71

1  roles to open a bank account in the name of Stone
2  Bay Tactical, LLC, so a fire -- a federal firearms
3  license could be gotten in the name of Stone Bay
4  Tactical, LLC?
5    A.  That account was already opened up.
6    Q.  Okay.  But -- all right.  A different
7  question then.  Was one of his roles to get a
8  federal firearms license for Stone Bay Tactical,
9  LLC?
10    A.  Yes.
11    Q.  Okay.  Do you know why Stone Bay Tactical,
12  LLC never got a federal firearms license?
13    A.  Yeah, because of this lawsuit.
14    Q.  What did this lawsuit have to do with it?
15    A.  It scared away our investors and so we
16  didn't have the money to move forward.
17    Q.  All right.
18    (DEPOSITION EXHIBIT NO. 8 MARKED FOR THE
19  RECORD.)
20    Q.  Take a look at Exhibit 8.  And this was a
21  document that was produced by your counsel.
22    A.  Uh-huh.
23    Q.  It -- why don't you tell me what I'm
24  looking at here.
25    A.  Various types of weapons.
Robert Sharpe          July 19, 2022

72

1    Q.  Okay.  And if you go -- so what was
2  explained to me is, if you go through sort of the
3  list here, there's some locations.
4    A.  Uh-huh.
5    Q.  And then I go to the bottom and it tells
6  me the address of the location.  Like if I see PCC
7  -- PCCS, I go down and it shows that that particular
8  weapon, or the first one was suppressors, is located
9  at the Corporate Drive address for PCCS.
10    A.  So the only thing we've changed here is we
11  did go ahead and move everything to the 2017
12  Corporate Drive location, just because of all the
13  litigation and everything.  Just to make it simple,
14  we put everything at one location.
15    Q.  Okay.  So all of the weapons, and I'm
16  going to use the word "accessories" that are on this
17  list are currently -- excuse me -- located at 217
18  [sic] Corporate Drive?
19    A.  Correct.
20    Q.  And these items that are listed on Exhibit
21  8, were any of these intended to be transferred to
22  Stone Bay Tactical, LLC?
23    A.  Not transferred.  What we were going to do
24  is -- well, no, not transferred.
25    Q.  Okay.  Well -- well, what were you going
Robert Sharpe          July 19, 2022

73

1  to do?
2    A.  If -- if Stone Bay, LLC had the
3  opportunity to sell them on their retail side, there
4  was going to be a revenue split.  So -- so Stone
5  Bay, LLC would conduct the sale, paperwork and all
6  of that, PCCS would supply the inventory, then there
7  would be a revenue split between the two.
8    Q.  All right.
9    A.  So the LLC was going to help PCCS sell
10  inventory.
11    Q.  Okay.  All right.
12    (DEPOSITION EXHIBIT NO. 9 MARKED FOR THE
13  RECORD.)
14    Q.  I'm going to show you what we've marked as
15  Exhibit 9.
16    MR. REISS:  Can we take a five-minute
17  break?
18    MR. BABEL:  Sure.
19    (Recess, 11:17 a.m. - 11:27 a.m.)
20    Q.  (Mr. Babel)  All right.  Mr. Sharpe, let's
21  go back to Exhibit 3.
22    A.  Exhibit 3.
23    Q.  It's the affidavit of Mr. Rust.
24    A.  Oh, okay.  Hold on one second.
25    Q.  There you go.
Robert Sharpe          July 19, 2022

**Cape Fear Court Reporting, Inc.**

Robert P. Sharpe (vol 1) ~ 7/19/2022

74

```
 1     A.  Uh-huh.
 2     Q.  Okay.  So we were looking at this.  And if
 3 you go to -- I think it was Exhibit B to Mr. Rust's
 4 affidavit.
 5     A.  Uh-huh.
 6     Q.  And this is that form you filled out.
 7 Under the -- forgot to ask you this.  I think it's
 8 Section 2, which says, "A description of any and all
 9 notes, accounts, contract payments due or payments
10 of indebtedness to the defendant including."  And
11 then you filled in one.  I don't know what page it's
12 on.  But it says, "US Federal Government," it says,
13 "$172,608."  See what I'm looking at?
14     A.  Yeah.
15     Q.  What -- what is that?
16     A.  That is a sell of test strips to the US
17 Government.  It already received the items but had
18 not yet sent payment.
19     Q.  Okay.  Has the company received payment
20 from the government?
21     A.  Yes.
22     Q.  And what bank account did that amount go
23 into?
24     A.  I'm not sure.  I'd have to ask.
25     Q.  Do you know whether it went in the First
```
Robert Sharpe          July 19, 2022

75

```
 1 Citizens bank account?
 2     A.  I'm not sure.  I'd have to ask.
 3     Q.  Okay.  Do you know when it was -- when it
 4 was paid by the government?
 5     A.  Sometime in the last 30 days.
 6     Q.  All right.  Okay.  Let's go back to
 7 Exhibit 9.  And this is the document that was
 8 produced by your counsel.  Can you tell me what
 9 Exhibit 9 is?
10     A.  It's a chart of accounts.
11     Q.  Okay.  What is a chart of accounts?
12     A.  I'm assuming, and again this is just an
13 assumption, that this was a list of assets put
14 together for either you or DaVinci.
15     Q.  Okay.  And do you know who -- let me ask
16 you this.  Was this something that came out of like
17 QuickBooks or is this something that was created by
18 one of the employees at PCCS?
19     A.  I do not know.
20     Q.  Do you know why the weapons that we looked
21 at that were on Exhibit 8 aren't listed on Exhibit
22 9?
23     A.  I do not know.
24     Q.  Okay.
25     A.  I don't understand the scope or context of
```
Robert Sharpe          July 19, 2022

76

```
 1 this document.
 2     Q.  And you don't know who potentially created
 3 this document?
 4     A.  Correct.
 5        (DEPOSITION EXHIBIT NO. 10 MARKED FOR THE
 6 RECORD.)
 7     Q.  All right.  Mr. Sharpe, I'm showing you
 8 what I've marked as Exhibit 10.  Again, this is what
 9 was produced by your counsel.  Do you -- can you
10 tell me what Exhibit 10 is?
11     A.  Looks like a pay stub.
12     Q.  All right.  A pay stub from who to who?
13     A.  PCCS to me.
14     Q.  All right.  And it looks like it was from
15 a period of December 1st to December 31st.  Is that
16 correct?
17     A.  Yep.
18     Q.  Gross pay a hundred and fifteen thousand
19 dollars.  Is that correct?
20     A.  Yep.
21     Q.  Okay.  So other than this pay stub, has
22 PCCS paid you any other amounts?
23     A.  Just normal salary and -- and there for a
24 while, partial salary, because I took a pay cut.
25     Q.  Okay.  So -- so this period got you up to
```
Robert Sharpe          July 19, 2022

77

```
 1 the end of 2021.  So has PCCS paid you some type of
 2 compensation from January all the way through as
 3 you're sitting here today?
 4     A.  I haven't received a -- a paycheck in over
 5 a month or two.  But yeah, I mean, I got normal -- I
 6 believe I got normal pay scale through March, and
 7 then in April and part of May, it was a partial
 8 amount instead of a full amount.
 9     Q.  Okay.  Do you know how much you were
10 getting per month?
11     A.  My pay was set at 15,000 a month, but
12 then, after I got back from Ukraine, it went down to
13 half.
14     Q.  Okay.  So 7500?
15     A.  Uh-huh.
16        MR. REISS:  Is that a yes?
17        THE WITNESS:  Yes.
18     Q.  (Mr. Babel)  Are there -- does the --
19 would the company have payroll records and showing
20 or evidencing those amounts that were paid to you
21 from January of 2022 --
22     A.  Yes.
23     Q.  -- to today?
24     A.  Yeah.
25        (DEPOSITION EXHIBIT NO. 11 MARKED FOR THE
```
Robert Sharpe          July 19, 2022

20  (Pages 74 to 77)

Cape Fear Court Reporting, Inc.

Robert P. Sharpe (vol 1) ~ 7/19/2022

78

1  RECORD.)
2    Q.  I'm showing what's marked as Exhibit 11.
3    A.  Uh-huh.
4    Q.  Can you tell me what Exhibit 11 is?
5    A.  Yeah.  It's an agreement with Mark setting
6  the terms to purchase back shares.
7    Q.  Okay.  And this agreement was entered on
8  June 7, 2021, correct?
9    A.  That's what it says.
10   Q.  Okay.  And if you'll look under the
11 recitals, is it your understanding that this was an
12 agreement where PCCS was going to purchase 1,916
13 shares of -- B shares of the company from Mr.
14 Eastham?
15   A.  Correct.
16   Q.  And if you look under No. 2, the company
17 --
18   A.  Well, no.  He owned 3,194 shares.  We are
19 going to purchase 1,916.
20   Q.  Correct.
21   A.  Is that what you -- okay.  My hearing's a
22 little bit off, so --
23   Q.  That's all right.
24   A.  -- I apologize.
25   Q.  And the company was going to pay Mr.
   Robert Sharpe          July 19, 2022

79

1  Eastham $60,000 for those shares.
2    A.  Correct.
3    Q.  And is it true that the company, sitting
4  here today, has not paid Mr. Eastham --
5        MR. REISS: I'm going to object.
6    A.  -- any amount under this agreement?
7        MR. REISS: Objection.  Don't answer that.
8  It's beyond the scope of the 30(b)(6).
9        MR. BABEL: No, it's a liability.  It's a
10 liability of the company.  It's clearly within the
11 TRO.
12       MR. REISS: Okay.  I'll let you have that
13 one.
14       THE WITNESS: Well, what was the question
15 again?
16   Q.  (Mr. Babel) Yes.  Isn't it true that the
17 company, sitting here today, has not paid Mr.
18 Eastham any amount under this agreement?
19   A.  Oh.  Yes.
20   Q.  Okay.
21       (DEPOSITION EXHIBIT NO. 12 MARKED FOR THE
22 RECORD.)
23   Q.  I'm going to show you what we've marked as
24 Exhibit 12.
25   A.  Okay.
   Robert Sharpe          July 19, 2022

80

1        MR. BABEL: Oh.  Here, I wrote it for you.
2        MR. REISS: Thanks.
3    Q.  (Mr. Babel) All right.  Can you tell me
4  what Exhibit 12 is?
5    A.  Compensation Committee meeting notes,
6  records, whatever you want to -- minutes.
7    Q.  Okay.  So this would be minutes from the
8  Compensation Committee for PCCS?
9    A.  Correct.
10   Q.  Okay.  And who was on the Compensation
11 Committee?
12   A.  Myself, Mark, and Peter.
13   Q.  Okay.  And then would -- am I correct that
14 the date of these notes is August 27, 2020?
15   A.  It's what it says.
16   Q.  All right.  And if you go to the second
17 page.
18   A.  Uh-huh.
19   Q.  Am I correct that, based on the minutes of
20 the Compensation Committee, it is indicating that
21 Mr. Sparks and Mr. Eastham are both owed deferred or
22 back pay?
23   A.  At this time, yes.
24   Q.  Okay.  And Mr. Albert, as well, is owed
25 back pay, correct?
   Robert Sharpe          July 19, 2022

81

1        MR. REISS: Okay.  I'm going to object to
2  this.  Liabilities are not part of a TRO.
3        MR. BABEL: Well, it's accounting and
4  financial record.
5        MR. REISS: No.
6        MR. BABEL: All right.  We might need to
7  call the judge because we're wasting our time here.
8        MR. REISS: Okay.  Let's do it.
9        MR. BABEL: All right.
10       COURT REPORTER: Off the record?
11       MR. BABEL: Yeah.
12       (Recess, 11:36 a.m. - 11:54 a.m.)
13       MR. BABEL: All right.  We have conferred
14 with Judge Jones about the scope of the -- of the
15 deposition.  He has ordered us to return, I think on
16 the 26th, right --
17       MR. REISS: Yeah.
18       MR. BABEL: -- at 10 a.m. to finish the
19 deposition.  I believe his words, to some certain
20 extent, is the plaintiffs have a right to ask
21 whatever questions they would like to Mr. Sharpe as
22 an individual or the 30(b)(6).  We've agreed that we
23 will draft up some type of order, get it to Mr. --
24 to Judge Jones for his signature --
25       MR. REISS: -- today, yeah.
   Robert Sharpe          July 19, 2022

21 (Pages 78 to 81)

Robert P. Sharpe (vol 1) ~ 7/19/2022

|  | 82 |
|--|----|
| 1 | MR. BABEL:  Does that sound right? |
| 2 | MR. REISS:  It sounds about right, yeah. |
| 3 | MR. BABEL:  Okay. |
| 4 | (WHEREUPON, THE DEPOSITION TESTIMONY OF |
| 5 | ROBERT P. SHARPE CONCLUDED AT 11:55 A.M.) |

Robert Sharpe        July 19, 2022

83

STATE OF NORTH CAROLINA
COUNTY OF ONSLOW

C E R T I F I C A T E

I, PATRICIA B. KINLAW, COURT REPORTER-
NOTARY PUBLIC, DO HEREBY CERTIFY THAT ROBERT P.
SHARPE PRESENTED A SATISFACTORY FORM OF
IDENTIFICATION, WAS DULY SWORN OR AFFIRMED BY ME
PRIOR TO THE TAKING OF THE FOREGOING DEPOSITION; AND
THAT SAID DEPOSITION WAS TAKEN BY ME AND TRANSCRIBED
UNDER MY DIRECTION; AND THAT THE FOREGOING 82 PAGES
CONSTITUTE A TRUE AND CORRECT TRANSCRIPT OF THE
TESTIMONY OF THE WITNESS.

I DO FURTHER CERTIFY THAT I AM NOT COUNSEL
FOR, OR IN THE EMPLOYMENT OF EITHER OF THE PARTIES
TO THIS ACTION, NOR AM I INTERESTED IN THE RESULTS
OF THIS ACTION.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY
HAND THIS 22ND DAY OF JULY, 2022.


PATRICIA B. KINLAW
NOTARY # 19982650110

Robert Sharpe        July 19, 2022

Cape Fear Court Reporting, Inc.

# Deposition of **Robert Sharpe**

**Date:** July 26, 2022
**Volume:** II

**Case:** Eastham, et al. v. PCCS, Inc., et al.

Aurelia Ruffin _ Associates, Inc.
Phone: (910)343-1035
Email: pbruffiniii@att.net
Internet: www.peterruffin.com

NORTH CAROLINA                IN THE GENERAL COURT OF JUSTICE
                                   SUPERIOR COURT DIVISION
COUNTY OF NEW HANOVER         FILE NO. 22-CVS-001507

MARK EASTHAM and PETER SPARK,       )
                                    :
          Plaintiffs,               )
                                    :
          vs.                       )
                                    :
PORT CITY CONTRACTING SERVICES,     )
INC.; ROBERT P. SHARPE; STONE BAY   :
TACTICAL, LLC; and SRS SUPPLY, LLC, )
                                    :
          Defendants.               )

_____

          DEPOSITION OF ROBERT P. SHARPE
Individually and as 30(b)(6) Designee of Port City
          Contracting Services, Inc.

_____

REPORTED BY:

CHERIE J. ANDERSON, RMR, CRR, Notary Public

AURELIA RUFFIN & ASSOCIATES, INC.

215 S. Water Street, Suite 104 (28401)

Post Office Box 2025

Wilmington, North Carolina  28402-2025

pbruffiniii@att.net

www.peterruffin.com

TELEPHONE:  910 343-1035

               DATE REPORTED:    July 26, 2022

               LOCATION:         Wilmington, NC

               VOLUME:           2

                                              Page 84

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1                        APPEARANCES

 2    For the Plaintiffs: THOMAS S. BABEL

 3                        DAVIS HARTMAN WRIGHT, PLLC

 4                        3819 Park Avenue, Suite B

 5                        Wilmington, North Carolina  28403

 6    For Defendants:     J. CORY REISS

 7                        REISS & NUTT, PLLC

 8                        1221 Floral Parkway, Suite 104

 9                        Wilmington, North Carolina  28403

10

11

12

13

14

15

16

17

18

19

20

21

22

23

      Page 85
```

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
1                        STIPULATIONS

2              It is hereby stipulated and agreed by and

3    between the parties to this action, through their

4    respective counsel of record, as follows:

5    1.        Pursuant to Notice by Counsel for the

6    Plaintiffs, the deposition of Robert P. Sharpe and

7    Port City Contracting Services, Inc. may be taken on

8    the 26th day of July, 2022, beginning at 10:10 a.m.,

9    before Cherie J. Anderson, RMR, CRR, Notary Public and

10   Court Reporter for the firm AURELIA RUFFIN &

11   ASSOCIATES, INC.

12   2.        Said deposition shall be taken pursuant to

13   the North Carolina Rules of Civil Procedure.

14   3.        Any objections of any party hereto as to

15   notice of the taking of said deposition or as to the

16   time and place thereof or as to the competency of the

17   person before whom the same shall be taken are hereby

18   waived.

19   4.        That the reading and signing of the

20   transcript of the testimony by the witness is waived.

21

22

23

                                               Page 86
```

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1                          TABLE OF CONTENTS

2      TITLE PAGE                                  84

3      APPEARANCES                                 85

4      STIPULATIONS                                86

5      TABLE OF CONTENTS                           87

6      EXHIBIT LISTING                             88, 89

7      LAWYER'S NOTES                              90

8      DIRECT EXAMINATION BY MR. BABEL             91

9      CERTIFICATIONS                              180

10

11

12

13

14

15

16

17

18

19

20

21

22

23

       Page 87

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1                    EXHIBIT LISTING

 2    DESCRIPTION                      MARKED & ENTERED

 3    EXHIBIT NUMBER 13                             91

 4    Plaintiffs' Third Amended Notice/30(b)(6)

 5    EXHIBIT NUMBER 14                            120

 6    12/2021 through 5/2022 PCCS Checking Statement

 7    EXHIBIT NUMBER 15                            133

 8    Articles of Organization, G2G Federal Solutions

 9    EXHIBIT NUMBER 16                            134

10    Articles of Organization, Stone Bay Tactical

11    EXHIBIT NUMBER 17                            136

12    Articles of Organization, SRS Supply

13    EXHIBIT NUMBER 18                            137

14    6/30/20 PCCS Consent to Action

15    EXHIBIT NUMBER 19                            140

16    6/30/20 Statement to Shareholder - Sharpe

17    EXHIBIT NUMBER 20                            141

18    6/30/20 Statement to Shareholder - Eastham

19    EXHIBIT NUMBER 21                            142

20    Valuation of Shares

21    EXHIBIT NUMBER 22                            146

22    Port City Contracting Services Bylaws

23
```

Page 88

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1                    EXHIBIT LISTING (CONT.)

 2     DESCRIPTION                        MARKED & ENTERED

 3     EXHIBIT NUMBER 23                           149

 4     5/4/22 Letter from Thomas Babel to Addison Palanza

 5     EXHIBIT NUMBER 24                           151

 6     2/28/22 Letter to Sharpe and George from Potter

 7     EXHIBIT NUMBER 25                           157

 8     Screenshot of Text Messages (unknown date)

 9     EXHIBIT NUMBER 26                           158

10     Screenshot of Text Messages (unknown date)

11     EXHIBIT NUMBER 27                           160

12     Screenshot of Text Message (unknown date)

13     EXHIBIT NUMBER 28                           161

14     Screenshot of Msg 4/3, 2:56 p.m.; 6/16, 10:45 a.m.

15     EXHIBIT NUMBER 29                           163

16     3/20/22 Email from Sharpe to David

17     EXHIBIT NUMBER 30                           169

18     Subpoena and Response from G2G Federal Solutions

19     EXHIBIT NUMBER 31                           170

20     Accounting of Deposit to Southern Bank Account

21     EXHIBIT NUMBER 32                           177

22     12/10/21 Emails between Sharpe and Eastham

23

       Page 89
```

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

LAWYER'S NOTES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 90

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1              ROBERT P. SHARPE,

 2   was called for examination by Counsel and, having been

 3   first duly sworn, was examined and testified as

 4   follows:

 5                    - - -

 6                  EXAMINATION

 7                    - - -

 8   BY MR. BABEL:

 9      Q    All right.  Mr. Sharpe, good morning.  How are

10   you?

11      A    Good.

12      Q    All right.  I'm going to show you what I've

13   marked Exhibit 13.

14           (Exhibit 13 was marked for identification.)

15      A    Okay.

16      Q    Have you seen this exhibit before?

17      A    I mean, not that I can specifically remember.

18   I've seen -- I remember the Exhibit A.

19      Q    Okay.  So looking at Exhibit A, are you

20   prepared to testify as to the topics that are in

21   Exhibit A?

22      A    I mean, individually, something can come up I

23   don't know.  But yes.
```

Page 91

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1        Q    Okay.

 2        A    I'll do my best.

 3        Q    All right.  I am going to do my best, also,

 4   not to plow over what we did the last time we were

 5   together, but if I do, I apologize.

 6             Why don't you take out, from that exhibit

 7   stack, Exhibits 5, 2, and 3.  So 2, 3, and 5.

 8             Yeah.  One was a bank statement for First

 9   National Bank, May --

10        A    2, 3 -- gotcha.

11             THE COURT REPORTER:  I'm sorry.

12        Q    You've got it?

13        A    Yep.

14        Q    Okay.  All right.  So last time we were

15   together, we went through some of the bank

16   statements.  We talked about the different accounts

17   that were at First National Bank, the account that

18   was also at First Citizens.

19             And you had testified that you believed there

20   was a bank account in the D/B/A of Stone Bay

21   Tactical.  Is that correct?

22        A    I know -- no.  We opened up a bank account at

23   one point for Stone Bay, LLC.  There wasn't a
```

Page 92

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    separate account for Stone Bay D/B/A because it would

2    have just been PCCS.

3        Q    Okay.  Because I thought your testimony when

4    we -- if you recall, we were going through some of

5    the bank accounts.  We were looking at the transfers,

6    and the transfer said "Stone Bay," and I thought your

7    testimony was --

8        A    No.  That was --

9             THE COURT REPORTER:  I'm sorry.

10       Q    Let me finish.

11       A    Okay.

12       Q    I thought your testimony and what I read was,

13   you believe those transfers went to the Stone Bay

14   bank account for the D/B/A.

15       A    No.  What -- the reason why words like

16   "Stone Bay" are put on there is for internal

17   accounting so we can know exactly what we're spending

18   on that program so that, when we do split things

19   apart, anything that needs to be properly

20   cross-charged and paid for by the new entity can be

21   done so in the future.

22       Q    Okay.  So when we looked at those -- and we

23   can go back and look at them -- there's entries of

Page 93

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    money leaving the PCCS account, going to something

2    that says "Stone Bay."

3       A    Yeah.   But it's not going to Stone Bay; it's

4    going to either, like, Sig Sauer, Danel Defense.

5    It's going to a manufacturer to buy inventory for

6    PCCS under the Stone Bay program, because all the

7    invoices are issued through QuickBooks.

8           So whenever we put Stone Bay, you know, so

9    that -- and I don't do the accounting, but you know,

10   this is something that was started with Peter.

11          But when you put Stone Bay in QuickBooks and

12   they -- we understand, you know, where to

13   cross-charge it.   Because it was the intent by

14   everyone early on to separate the retail segment of

15   Stone Bay into its own LLC.

16          And we needed a way to account for any

17   expenditures that PCCS would need to be compensated

18   for.

19      Q    All right.   So you're telling me that when we

20   looked at the bank accounts -- here.   Why don't we

21   look at them.   Why don't you pull -- I think it's --

22   I think it would be 4.   Exhibit 4.

23      A    Yeah.   That's the operating account for PCCS.

Page 94

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    Q   Okay.  Right.  So we went to -- I think it's

2    the third page.  There's a statement ending

3    2/28/2022.

4    A   Uh-huh.

5    Q   And we looked at -- there's an entry on 2/4

6    and an entry on 2/8, and it says "Stone Bay."

7    A   Uh-huh.

8    Q   You're telling me that those entries are

9    payments to third-party invoices on behalf of

10   Stone Bay?

11   A   On behalf of PCCS under the Stone Bay program.

12   Q   Okay.  And that would be the same for --

13   there's another entry on 2/28.  There's another entry

14   that's going to Stone Bay?

15   A   Correct.

16   Q   So I would be able to go through the

17   QuickBooks, which you-all produced to us yesterday,

18   and I would be able to find payments to, let's say,

19   like Sig Sauer --

20   A   Uh-huh.

21   Q   -- on a similar date on 2/4?

22   A   Just to make it even easier for you, in the

23   QuickBooks side, it will be broken down by individual

Page 95

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    invoice, and then the aggregate amount -- so let's

2    say I had five invoices from Sig Sauer for $1,000.

3    Most likely you're going to see $5,000 paid out.  And

4    here, it will say $5,000, and it will have

5    "Stone Bay" on it so we know that that expenditure is

6    for the Stone Bay program.

7        Q    Okay.  All right.  Let's go back to Exhibit 5

8    and 2 and 3.

9        A    All right.

10       Q    Okay.  Take a look at Exhibit 5.

11       A    Yep.

12       Q    What I believe I'm looking at -- you tell me

13   if I'm wrong -- this looks to be sort of a

14   consolidated statement from First National Bank for,

15   it looks like, four different bank accounts in the

16   name of PCCS.  Is that correct?

17       A    I don't know if they're all in the name of

18   PCCS, but they could -- one of them might be the -- I

19   don't -- if this was pulled up under my Social and me

20   logging on, I could always see everything, every

21   account, that I had access to.

22           And so I can't testify to that specifically,

23   no.

                                              Page 96

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    Q   Okay.  Well, if one or more of these accounts

2    is not in the name of PCCS, what name would it be in?

3    A   There was one -- it might be the one at $370.

4    There was an entity that we all created called Sage,

5    and it never did anything.  We formed it, we opened a

6    bank account, we put a little bit of money in that

7    account, and then it did nothing.

8    Q   Okay.  And you think it might have been the

9    account with the last four numbers 0474?

10    A   Possibly.  I know Peter opened up extra

11    accounts, you know, for whatever accounting reason,

12    where he'd want to set money aside for something.

13    But all the PCCS accounts and the reasons why they

14    were opened, that's all Peter.

15        I was extremely hands-off when it came to

16    finances with the company.

17    Q   Okay.  All right.  Well, sticking to Exhibit 5

18    here, if we look at that first page, am I reading

19    that correct:  As of the end of May, there was

20    actually a negative balance -- there's a negative

21    balance in two of these accounts in -- well,

22    actually, there's a negative balance in one

23    account -- excuse me -- and zero balance in three of

Page 97

1    the accounts.

2       A    Okay.

3       Q    Am I reading that correct?

4       A    I --

5            MR. REISS:    Objection.

6       A    I assume so.   I can't testify to how you read.

7    I don't mean that to be snarky, like, but --

8       Q    Well, you tell me.   Do you know whether at the

9    end of May if there was any dollars in any of the

10   PCCS S accounts at First National Bank?

11      A    All money in the PCCS's name at First National

12   Bank was taken when DaVinci levied our accounts.

13   Everything.

14      Q    That wasn't my question.   My question was, do

15   you know, as of the end of May 2022, if all of the

16   bank accounts at First National Bank -- there were no

17   funds in them?

18      A    Not all of them, because some of them were not

19   PCCS accounts.   Like the Sage account was never

20   levied, but it only had a few hundred dollars in it.

21   And I believe at that time, the Stone Bay, LLC

22   account had a little bit of money in it as well.

23      Q    Okay.   Let's put aside the Stone Bay Tactical.

Page 98

1    I'm asking you about PCCS.

2        A    Yep.

3        Q    Is it true that as of the end of May, there

4    were zero dollars in the accounts in the name of PCCS

5    at First National Bank?

6        A    As far as I know.

7        Q    Okay.  Let's go back through the Stone Bay

8    Tactical, LLC account that you referenced.  Where is

9    that account?  What banking institution?

10       A    It's with First National Bank as well.

11       Q    Okay.  Do you believe it's one of these

12   accounts in Exhibit 5?

13       A    I have no idea just looking at the account

14   number.  I remembered 7282.  If I had -- I'm not

15   going to guess.  I have no idea.

16       Q    Yeah.  Don't guess.

17            All right.  Take a look at Exhibit 2.  This is

18   the First Citizens Bank.

19       A    Yep.

20       Q    All right.  So I believe your previous

21   testimony is, there is zero dollars in this account.

22   Is that correct?

23       A    Correct.

Page 99

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    Q   All right.  So as of today, which is I think

2    the 26th -- July 26th, there's zero dollars in

3    the First Citizens Bank account?

4    A   I can't testify -- I don't have access to this

5    account.  I can just testify that -- and I have no

6    reason to believe there's any.  I'm not trying to

7    mislead you.  I just -- I can't testify to

8    something -- I'm not on that account; I don't have

9    access to that account; I did not open that account;

10   I don't manage that account.

11   Q   Okay.  Who opened the account?

12   A   Holly.

13   Q   Holly Grange?

14   A   Yes.

15   Q   And I believe you testified you believe it was

16   opened in June --

17   A   Yeah.

18   Q   -- of this year?

19   A   Yeah.

20   Q   Okay.  All right.  Do you know, sitting here

21   today, if there's any dollars in any of the PCCS bank

22   accounts at First National Bank?

23   A   It's my understanding there is.  I do not have

Page 100

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    access to those bank accounts.

2       Q   Do you know how much is in those accounts?

3       A   No.  I do not have access to those bank

4    accounts.  I do know that we no longer have a levy

5    against that bank account.

6       Q   Why do you understand that to be true?

7       A   Because DaVinci lost their case, and the

8    punitive damages were removed.

9       Q   You previously testified that PCCS is in the

10   business of government contracting.

11      A   Correct.

12      Q   Is that correct?

13      A   Yes, sir.

14      Q   All right.  So would you agree with me, if we

15   use the year of 2021, the majority of the revenue

16   that was generated at PCCS was in the sale of

17   diabetic testing strips?

18      A   Yes.

19      Q   Would you -- could you put a percentage on

20   that, in 2021, what percentage of the revenue of PCC

21   was the sale --

22      A   Are you talking about gross --

23

Page 101

```
 1              THE COURT REPORTER:  I'm sorry.

 2     Q    Let me just finish so she can get it down.

 3          Can you give me a percentage of the gross

 4     revenue for 2021 for PCCS that was attributable to

 5     the sale of diabetic test strips?

 6     A    I'd say about 90 percent.

 7     Q    What about 2022?

 8     A    Hmm.  Because the year had just started.  We

 9     haven't gotten to do any arms sales of significance

10     yet.  So at least that much in 2022.

11     Q    Okay.  Is PCCS, sitting here today, still in

12     the business of selling diabetic test strips?

13     A    Uh-huh.

14              THE COURT REPORTER:  I'm sorry.  Is that yes?

15     A    Yes.

16              THE COURT REPORTER:  Thank you.

17     Q    Could you tell me, let's say, for the month

18     of -- say the month of June, how many sales did PCCS

19     have for the sale of diabetic test strips?

20     A    So it sounds like a simple question.  The

21     problem you run into is -- you can have a bid that

22     you put in in June; you could get notified that

23     you're being awarded that sale in June; but you don't
```

Page 102

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1      get the signed copy, potentially, for another month,

 2      just because of all of the procedural hurdles.

 3              So I do believe that, in June, there was a

 4      pending award.

 5      Q    Okay.  So you believe PCCS -- I'm going to use

 6      the one "won" -- won an award?

 7      A    Uh-huh.

 8      Q    In the month of June?

 9      A    Uh-huh.  At least one, maybe two.

10      Q    Okay.  And who was the customer?

11      A    Always the VA for diabetic test strips.

12      Q    Do you know if PCCS was awarded any bids in

13      the month of July?

14      A    And again, it comes down to what do you mean

15      by "awarded."  We were notified in July that we had

16      won a bid that was submitted in May, awarded in June,

17      but then it got held up for some issues on their end,

18      statutory -- a new EO came down, and they weren't --

19      you know, things just kind of got thrown up in the

20      air.

21              But we were notified that we did win an award.

22      Q    Okay.  And how does that work?  So you get the

23      notification that you won the award in July.  When
```

Page 103

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    would you actually supply the test strips?

2    A    After we get what's called a signed 1449 from

3    the signed contracting officer.  Until we have that

4    document physically in hand, regardless of it saying

5    that it's awarded, you know, in a government system

6    like sam.gov or anything like that -- until we

7    physically have that signed 1449, we have nothing.

8    Q    Okay.  Do you have that 1449 in your

9    possession in regards to the bid that --

10   A    I would have to check with Michael Rudner on

11   that.

12   Q    Let me just finish.

13   A    I'm sorry.  I apologize.

14   Q    Yeah.  Let me finish, and then you answer.  If

15   not, she's going to probably --

16   A    Welcome to my ADHD.  I apologize.

17   Q    So what was the number again?  14- --

18   A    1449.

19   Q    All right.  Do you know whether PCCS has in

20   its possession the 1449 related to the bid that you

21   said you just got notification in July --

22   A    I would have --

23          THE COURT REPORTER:  I'm sorry.  I just have

                                              Page 104

```
 1        to take the words down, and then you answer.

 2        A    I would have to double-check, but I would be

 3   happy to do that for you.  And I could have an answer

 4   for you rather quickly.

 5        Q    So sitting here, you don't know?

 6        A    No.  I don't physically get the bids.  And

 7   typically we'll have a phone call, and I'll ask.

 8   But -- I believe so, but I can't testify

 9   definitively.

10        Q    And I think you testified last time, the only

11   current officers of PCCS is Ms. Grange as the CEO and

12   Mr. Rudner as the president?

13        A    Uh-huh.

14             THE COURT REPORTER:  I'm sorry.  Is that yes?

15        A    Yes.

16             THE COURT REPORTER:  Thank you.

17        Q    All right.  Who is Jay Graves?

18        A    He was a partner.

19        Q    And when you say "partner," what do you mean

20   by that?

21        A    He owns 11 percent of the company.

22        Q    All right.  Was he an employee of PCCS?

23        A    Uh-huh.
```

Page 105

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1        Q    Okay.  What was his position?

 2        A    I mean, they kept using different titles.  His

 3   job was to help keep the diabetic test strip program

 4   on track.

 5        Q    Is he a pharmacist?

 6        A    No.

 7        Q    Is he still employed?

 8        A    No.

 9        Q    When did he leave the employ of PCCS?

10        A    45 days ago.

11        Q    Was he terminated?

12        A    No.

13        Q    Do you know where he went?

14        A    He has his own SDVOSB.

15             THE COURT REPORTER:  I'm sorry?

16             THE WITNESS:  He has his own company.

17             THE COURT REPORTER:  You said something else.

18             THE WITNESS:  SDVOSB.

19             THE COURT REPORTER:  Thank you.

20        A    Are you familiar with that term?

21        Q    Yes, sir.

22        A    And he's just running 100 miles an hour, you

23   know.  And really, there just wasn't a whole lot for
```

                                                    Page 106

1    him to do, considering the circumstances.

2        Q    Okay.  We talked about David Danel.

3             And then Adrianne George was the president of

4    PCCS at some point?

5        A    Uh-huh.

6        Q    And when did she leave the employ of PCCS?

7        A    In March.  I can't remember the exact date.

8    Around the 20th.  It was while I was in Ukraine.

9    Yeah.

10       Q    Was she terminated?

11       A    That's open for debate.  We were at a serious

12   impasse, and my response to her was, well, then, I'll

13   accept your resignation.

14       Q    What was the impasse over?

15       A    The stress of Mark and Peter trying to attack

16   the company through proxies, including Ryan and David

17   Danel.  They informed everyone that Mark and Peter

18   were out for blood and that they were looking to

19   destroy me personally and that I needed to consider

20   giving away all of my shares.  Otherwise Mark and

21   Peter were going to destroy me.

22            And I said, no.

23       Q    Okay.  So she wanted you to give up your

Page 107

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1   shares in the company?

 2       A    To David Danel.

 3       Q    To David Danel?

 4       A    Uh-huh.

 5       Q    Okay.  Do you know where she went?

 6       A    She has her own company.

 7       Q    What is the name of that company?

 8       A    My Cyber Executive.

 9       Q    And who is Ryan Albert?

10       A    He's a neighbor and was the pharmacist that

11   was one of our partners.  He's still a shareholder.

12       Q    And when did he leave the employ of PCCS?

13       A    I mean, it's not even so much that he left

14   employment.  When Mark and Peter left and Peter stole

15   all of the equipment, we didn't have a pharma program

16   anymore, and so I had nothing for Ryan to do.

17            And so Ryan was just like, you know, I'm out.

18   And I told him -- I says, you know, your shares are

19   your shares.  And we're still friends.  And there

20   just wasn't any work for him.

21            So it wasn't a termination in that -- there

22   was no work for him to do, and, you know, Mark was

23   pressuring him to testify and join this lawsuit, and
```

                                                  Page 108

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1    he didn't want to be a part of it.

 2        Q    All right.  What equipment did -- you said

 3    "Peter."  That's Mr. Spark, right?

 4        A    Uh-huh.

 5        Q    What equipment do you believe he took?

 6        A    Oh, I know he stole it.  An hour before he was

 7    fired, he knew it was coming because I was removing

 8    his administrative access to company accounts.  He

 9    went to Verizon Wireless and removed two iPhone Pros,

10    two iPad Pros, and a Surface Pro computer from the

11    company account and had it transferred into his own

12    name.

13        Q    Okay.  And I believe you went to the police

14    with those allegations, correct?

15        A    Absolutely.

16        Q    And they didn't press charges against

17    Mr. Spark, correct?

18        A    Yeah.  They felt like with the -- with the

19    overarching civil issues that my best route at that

20    time was to pursue it as a civil claim.

21        Q    All right.  Let's take a look at Exhibit 12.

22    It's probably at the bottom of that stack.

23            THE COURT REPORTER:  Yes.
```

Page 109

1      A     Okay.

2      Q     Okay.  I believe this is the last thing we

3   were going over when we got a little off-kilter last

4   time.

5      A     Sure.

6      Q     And these were the compensation committee

7   meeting notes of PCCS.  Correct?

8      A     These aren't the notes.

9      Q     Okay.  What would you call them?

10     A     Well, Peter took notes.  This was the document

11  that Peter put together after taking notes.

12     Q     Okay.  So would you call these the minutes?

13     A     I guess so.  Again, this is something that I

14  don't -- to be honest, when it comes to these types

15  of deals, when it comes to finance and some of these

16  corporate procedures, I'm ignorant.  And so this was

17  the job of -- Mark and Peter were going to make

18  things like this happen.

19     Q     Okay.  Were you provided a copy of these

20  minutes after --

21     A     Yes.

22     Q     Let me finish.

23           -- after the meeting concluded?

Page 110

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

 1      A    Yes, sir.

 2      Q    Okay.  And am I correct when I read this, the

 3  members of the compensation committee are yourself as

 4  CEO and chairman of the board, Mr. Eastham as the

 5  president and COO, and Mr. Spark as the CFO and

 6  secretary?

 7      A    Yes.

 8      Q    Okay.  Were there any other members in the

 9  compensation committee?

10      A    Not to my knowledge.

11      Q    And we were looking at the second page.

12      A    Uh-huh.

13      Q    And there are some entries here on the minutes

14  about deferred compensation or back pay.

15           Do you remember that?

16           MR. REISS:  Object to the form.

17      A    Where are we looking?

18      Q    If you look under Agenda Item, monthly

19  compensation?

20      A    Oh, yeah.  Yeah.

21      Q    And it says, "Discussion."  Do you see that?

22      A    Uh-huh.

23      Q    If you look at the second paragraph, it says,

Page 111

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1     "Individuals of Port City Contracting Services, LLC

 2    and now Port City Contracting Services, Inc. have

 3    been working for less than full compensation.

 4    Historically, payments were made adjusted based on

 5    availability of cash flow and requirements to reserve

 6    cash for working capital with SDVOSB set-aside

 7    issues.  In COVID-19, this has continued for longer

 8    than had been anticipated."

 9          "It is noted that the PPC loan calculations

10    were not impacted by the reduced payments being made,

11    as this was capped at under 100,000 annual salary,

12    and the VP of pharmaceuticals wasn't at full FTE

13    level."

14          And then it goes on to say, "Individuals with

15    past unpaid compensation are" -- there's a list.

16          Did I read that right?

17    A    You did read that right.

18    Q    Okay.  And it says that you're owed

19    compensation starting March 1st of 2019 at $15,000

20    a month?

21    A    Correct.

22    Q    Is that correct?

23    A    That's what it says.
```

Page 112

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    Q    Well, I'm going to ask you -- I'm asking you a

2    little different question, and probably a poor

3    question at that.

4    A    Yeah.

5    Q    Do you agree with these minutes, that you were

6    owed $15,000 a month since March 1st, 2019?

7    A    No.

8    Q    Okay.  How much were you owed?

9    A    I never intended to collect any of that money.

10   Anything that they're using this as the term of back

11   pay was a placeholder for equity.  So there was never

12   any back pay owed to me or anyone in the company.

13   Q    Okay.  Let's go down that list.  Keep going.

14   A    All right.

15   Q    What about -- it says here that Mr. Albert

16   started April 1st, 2019 at .25 FTE of $10,000?

17   A    Yeah.

18   Q    FTE and less paid in that month.

19        So I believe it's -- he's getting $10,000 a

20   month -- I'm going to ask you this:  Do you agree

21   that his compensation was supposed to be $10,000 a

22   month, and he got paid some portion of that?

23   A    Yep.

Page 113

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1      Q    So one-fourth of that?

2      A    It depended on the month.  So there could be a

3   month where Ryan had more work to do and, you know,

4   basically just asked him, and he would say, well, you

5   know, Ryan had to do a whole lot more stuff this

6   month.  So this month, we're going to pay him at .5,

7   .75, full-time.

8          So because his work changed, he didn't have a

9   consistent workload, that number was kind of decided

10   on a month-to-month basis.

11      Q    Do you agree that PCCS owes Mr. Albert back

12   pay?

13      A    No.

14      Q    Okay.  Let's go back -- now let's look at

15   Mr. Spark and Mr. Eastham.

16      A    Uh-huh.

17      Q    Sitting here, do you agree that PCCS owes

18   Mr. Spark back pay?

19      A    No.

20      Q    Why not?

21      A    Because he was never given back pay.

22      Q    Okay.  I don't -- what do you mean by that?

23      A    We agreed, whenever we were selling the

Page 114

1   company through our attorney, Kim Swintosky, that

2   part of the benefit and the reason why people came in

3   early was because they were promised future equity in

4   the company.

5         When we restructured from an LLC to a C corp,

6   we were in the middle of a dispute with our original

7   shareholder because originally he was supposed to

8   give up shares.  And he didn't.

9         And so we, you know, tried to go through --

10  basically bought him out.  And so that was a long

11  process.

12        And we had to do a valuation on the company.

13  And so our attorney told us we have to find a

14  reasonable way to put a value on the equity that was

15  promised to Jay, Ryan, Peter, and Mark.

16        And so this was the method that we used to put

17  a placeholder on the value of the equity that they

18  were due.

19  Q   All right.  So I'm going to tell you what I

20  think you just told me.  You tell me if I've got this

21  correct:  So for instance, I think Mr. Eastham

22  contends he's owed 72,500, I think it is.

23        Your testimony is, that's not owed in back

Page 115

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    pay.  That equals an amount of equity he would get in

2    the company at some future date?

3       A    You know, I don't know about "equal."  All I

4    know is that this was told to me that we were putting

5    a value on the books as a placeholder that would be

6    exchanged for equity in the future.  And that's what

7    we did.

8       Q    Okay.  Is there some written document that

9    outlines this equity plan?

10      A    Yes.

11      Q    Where is that?

12      A    You would have to talk to my attorney.

13      Q    Okay.  So there's a written document saying

14   that Mr. Eastham is going to be conveyed, at some

15   later date, some number of shares equal to this value

16   of 72,500?

17      A    I'm not sure of the specific details of the

18   document, but I know it's there.

19      Q    Okay.  Was it signed by Mr. Eastham and

20   Mr. Spark?

21      A    It was an email between Mr. Eastham,

22   Mr. Spark, and the attorney.

23      Q    And the attorney is who?

                                                    Page 116

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1        A    Kim Swintosky.

 2        Q    And --

 3        A    Because it was an ongoing chain of emails.

 4   It's not just one document.

 5        Q    So it's an email.  It's not like a written

 6   agreement that was signed by all the parties?

 7        A    Right.

 8        Q    Okay.  Do you recall when this email chain was

 9   going on?

10        A    Yeah.  It was the whole purpose.  It's what

11   started -- you know, this money was not put on the

12   books -- this debt was not added to the books until

13   after we restructured as a C corp.

14             And that was done around the time of these

15   minutes.  That was the whole reason this was written.

16   In fact, there's notes to these minutes that

17   specifically discusses some of these issues.  Peter

18   would have those notes.

19        Q    Are they anywhere in these minutes?

20        A    No.  They're notes that the minutes were

21   created from, to my understanding.

22        Q    All right.  Why don't you pull Exhibit 10.

23        A    Sure.
```

Page 117

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1        Q    All right.  I think last time we were
 2   together, you told me this was a pay stub showing
 3   that you were paid $115,000.  Correct?
 4        A    Paid how much?
 5        Q    Gross $115,000.
 6        A    Oh, for the month of December.  Absolutely.
 7        Q    Yeah.
 8        A    Yeah.
 9        Q    So based on what you just told me, this
10   $115,000 doesn't cover any back pay that you were
11   owed by the company?
12        A    Well, I'm not owed any back pay.
13        Q    Correct.  So for the month of December, your
14   gross salary was $115,000?
15        A    No.  My gross salary was 15,000.  The $100,000
16   was a performance bonus for me making the company
17   over $1 million.
18        Q    Okay.  So this payment had nothing to do with
19   any deferred compensation?
20        A    Correct.
21        Q    Okay.
22        A    I didn't even know -- I'll even clarify even
23   further:  I wasn't even informed that back pay, as
```

Page 118

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    they claim, even existed until after I announced my

2    bonus.

3         Q    And when did you announce this bonus?

4         A    On a phone call on approximately

5    December 10th.

6         Q    Was there a meeting in December of 2021 of the

7    compensation committee --

8         A    No.

9         Q    -- for PCCS.

10         So there wasn't a -- well, let me put it this

11   way:  Was there a discussion with Mr. Eastham and

12   Mr. Spark about deferred compensation in December of

13   2021?

14        A    After I had announced my intention to pay

15   myself an earned bonus.

16        Q    Okay.  Well, what was discussed during this

17   meeting?

18        A    They said that they agreed with my

19   compensation plan, and they thought that it was

20   reasonable.  However, they felt that before I paid

21   myself a bonus that they should receive back pay.

22   And I disagree.

23        Q    Did Mr. Eastham follow up this meeting with an

Page 119

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    email to you outlining why he thought back pay should

2    be paid?

3    A    I can't remember if there's a specific email.

4    I know there's emails and, you know, recorded

5    conversations, things like that.

6            (Exhibit 14 was marked for identification.)

7    Q    All right.  I'm going to show you what I

8    marked Exhibit 14.

9    A    Okay.

10    Q    Can you tell me what Exhibit 14 is?

11    A    It says Business Checking.  I'm assuming it's

12    7282.  It's double-printed, so I can't completely

13    read.  But -- or is this QuickBooks?

14            To be honest, I'm not 100 percent sure what

15    I'm looking at.

16    Q    I don't know, either.  It was sent to me

17    yesterday from your lawyer to me about -- it was

18    supposed to be --

19    A    I believe -- because I did review QuickBooks

20    to make sure that I, you know, had accurate

21    information.  I believe this is QuickBooks.

22    Q    Okay.  All right.  So let's go through a

23    couple entries here.

                                        Page 120

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1        And again, we're going to reference that top

2    number.  Do you see the 585 on the first page up on

3    the top there?

4        A    Okay.

5        Q    Okay.  Why don't you turn to 587.

6        A    Okay.

7        Q    There's an entry on December 6, 2021 to

8    Saltwater Real Estate.  What is that?

9        A    You would have to ask Peter.  He was in charge

10   of the books at that time.

11       Q    Okay.  Go to page 589.

12       A    Oh, you know what, I do remember what that

13   was.  And I apologize.  That was getting a place for

14   David Danel to stay because he was relocating at that

15   time to the area to help run the warehouse.

16       Q    Okay.  So temporary housing?

17       A    Yep.

18       Q    Okay.  Go to page 589.

19       A    All right.

20       Q    There is a payment on 12/8 to Mr. Danel and a

21   payment on 12/9, it looks like, to Mr. Danel.

22            What was that for?

23       A    Either -- pay, possibly an expense.  Again,

Page 121

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    that's still while Peter was in charge of the books,

2    so Peter would be your best source for that.

3         Q    Go to page 595, please.

4         A    Okay.

5         Q    There's an entry on January 12, 2022 to

6    Mr. Danel.  What is that for?

7         A    So there is a few expenses that he had.

8    Again, I do not handle the books for the company, and

9    I never have.  Actually, 8,459.31 -- I wouldn't be

10   surprised if that was his -- his pay for the month.

11        It could have been -- I know we had a kiosk to

12   run sales at the PCCS office through a company called

13   Silencer Shop.  That potentially could have been

14   that.

15        Something is either pay or reimbursement for

16   an expense.

17        THE COURT REPORTER:  And I'm sorry.  If you

18    say numbers without punctuating them, I won't know

19    what the numbers are or how to punctuate.

20        THE WITNESS:  $8,459.31.

21        THE COURT REPORTER:  Thank you.

22        A    It says Bill Payment, so I'm assuming that

23    it's something that David Danel purchased for the

Page 122

1    shop and then was reimbursed for it.

2       Q   Okay.  Go to page 602.  What is Forte --

3    F-O-R-T-E -- Consulting Group?

4       A   So we had a Salesforce program that was to

5    back up our contract with ORS Nasco, which is a

6    wholesale distribution company.  They don't sell to

7    end users.  They're a distributor for distributors.

8    So we started a Salesforce program to be able to

9    get -- we came up with an agreement with ORS Nasco to

10   represent them to the federal government.

11       And so we needed the B2B software program, and

12   then we had to populate that software with the

13   products, skews, pricing, descriptions.  And there

14   was about 300,000 skews in the ORS Nasco system from

15   600 manufacturers.

16       So it was my understanding that Forte was

17   helping with that whole data issue in the Salesforce.

18       Q   Okay.  Do you know why it was entered as

19   payroll?

20       A   I'm seeing it as expense.

21       Q   Well, if you look in the left, it says Forte

22   Consulting Group.  The next column says, Port City

23   Contracting, and then it says Payroll.

Page 123

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    A    You're on 602, right?

2    Q    Yes, sir.

3    A    I see Forte Consulting Group.  Oh.  Over here,

4    it says "Expense."  So I don't know why it says that.

5    Again, I did not run this.

6         I'll even be more clear:  I'm fairly upset at

7    the cost of that with David Danel because I did not

8    approve that amount.

9    Q    So you also don't know, if you look to the

10   right of expense, why it's entered as salaries and

11   wages?

12   A    I think that that's just some weird thing with

13   the system.  Kind of like how, you know, you see

14   Stone Bay.  But that was not payroll.  I mean,

15   because over here -- I can't even tell you what this

16   category is, because those words doesn't run

17   anywhere, but over here, it says, "Expense."

18        So that's a very specific area of QuickBooks

19   that I never dealt with.

20   Q    Well, in February of 2022, who would be doing

21   the entries in QuickBooks that we have from PCCS?

22   A    Adrianne George and Sheryl Mihalik.

23   Q    All right.  Go to --

                                              Page 124

1      A    And David Danel would probably have some

2  clarity on that as well, because he was running the

3  program with Salesforce and Forte.

4      Q    All right.  Go to page 603, please.

5      A    Yep.

6      Q    What is GO2 Weapons, Inc.  There's an entry on

7  February 17th, 2022 on the bottom of the page.

8      A    Yeah.  That was for short-barreled rifles that

9  were ordered by David Danel.

10     Q    Okay.  Ordered for which entity?

11     A    PCCS.

12     Q    And that would be the D/B/A, the Stone Bay

13  Tactical D/B/A?

14     A    Uh-huh.

15     Q    Go to page 604.

16     A    Uh-huh.

17     Q    There's an entry at the bottom of the page,

18  February 22nd, to Danel Defense, Inc.?

19     A    Yep.

20     Q    What is that?

21     A    More products for PCCS inventory.

22     Q    So that would be some type of weapon or -- I

23  don't know if you use the word "accessory"?

Page 125

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1        A    Either/or.  Yeah.  I believe that this was M4

 2   rifles.

 3        Q    Okay.  Go to the next page, 605.  There's

 4   another entry on the top there to Danel Defense?

 5        A    Uh-huh.

 6        Q    Do you recall what that was for?

 7        A    M4 rifles, but a different type.

 8        Q    Can you pull out Exhibit 8?

 9             Just keep that open, too.

10        A    What's that?

11        Q    Pull Exhibit 8.

12        A    8?

13        Q    Yes, sir.

14        A    My hearing is not the best.  I apologize.

15        Q    Are the M4 rifles on this list?

16        A    No.  This was a prepayment.  That -- that is a

17   new rifle that there's a waiting list for.  So we had

18   to prepay to get on the list.  They haven't even been

19   released.

20        Q    Okay.  So PCCS hasn't received those weapons?

21        A    No.

22        Q    All right.  Same page, 605, there's an entry

23   kind of in the middle to Ryker USA.  R-Y-K-E-R.
```

Page 126

1     A     Yeah.  Those are for grips, rifle grips.

2     Q     Okay.  Then the bottom, there's another entry

3   on February 24th to Forte Consulting Group for

4   $3,000-and-change.  Do you see that?

5     A     Same answer.  That was them populating data

6   sets from one program into another.

7     Q     Okay.  Go to page 606, please.

8     A     Uh-huh.

9     Q     There's an entry on the 25th of February,

10   and it says, "Amazon Sales," and it looks like it's a

11   deposit.  So it looks like something was sold on

12   Amazon.

13     A     Correct.  Yep.

14     Q     Was PCCS selling its products on Amazon?

15     A     They were.

16     Q     Under the name of PCCS?

17     A     I can't remember -- we used a different name,

18   I believe, because we didn't want -- we wanted some

19   separation between -- we didn't want people, like,

20   contacting our manufacturers and trying to enter

21   around us.  So I believe we changed the shown name,

22   you know, to the customer names on it, but it was a

23   PCCS account.

Page 127

1    Q   Okay.  So it's the end user, the customer.  Do
2  you know whether it was SRS Supply?

3    A   That was not SRS Supply.  SRS Supply was
4  specifically limited to eBay.

5    Q   All right.  Sitting here today, though, you
6  can't remember the name that the end user would have
7  seen on Amazon when they were buying products?

8    A   Not off the top of my head.  But I mean, it
9  wouldn't take long to find out for you.

10    Q   Is PCCS still currently selling products on
11  Amazon?

12    A   We've pulled out of Amazon just because it's
13  slowed down so much that it just -- the monthly costs
14  did not make sense any longer.

15    Q   All right.  Same page, there's an entry on
16  February 28th to Spartan Blades.

17    A   Yep.

18    Q   What's that?

19    A   That's inventory for PCCS.

20    Q   Go to page 607.

21    A   Uh-huh.

22    Q   And we're not going to go through every one of
23  these, but going through this entire exhibit, there's

Page 128

```
 1     a lot of entries to Sig Sauer.

 2        A    Yes.

 3        Q    Those would be for purchases of weapons?

 4        A    Yes -- and not just weapons.  Optics,

 5     accessories, a lot of -- the money is in accessories.

 6     So --

 7        Q    Okay.  Go to page 610.

 8             There's an entry on March 8th to Brandy

 9     Danel.  Was that Mr. Danel's wife?

10        A    Yes.

11        Q    And why was PCCS paying her $700?

12        A    For -- to make clear, I didn't operate the

13     books.  She was helping David with something.  I do

14     remember him saying, are you okay with her helping

15     me?  And I do know my response was, only if we

16     properly compensate her.

17             And I did the same thing with Peter and his

18     wife when his wife helped him.  I don't believe

19     people should work without pay.

20        Q    Okay.  Let's go to page 612.  There's an entry

21     on March 18th, a payment to Julie Naylor.

22        A    Uh-huh.

23        Q    Who is that?
```

Page 129

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    A    She runs all of the social media and helps --

2    if we need, you know, like a slide deck or something,

3    she just does media stuff for us.

4    Q    Is she an independent contractor?

5    A    Yes.

6    Q    And then there's another payment on the same

7    day to Mr. Rudner?

8    A    Uh-huh.

9    Q    What's that?

10   A    It says "Bill Payment" so I'm going to assume

11   that that was an expense charge.  I was in Ukraine at

12   this time, and so I was very cut off from day-to-day

13   information at that time.

14   Q    All right.  Go to page 615, please.

15   A    Okay.

16   Q    There's an entry on April 8th to Forte

17   Consulting Group again.  That's for the -- I'm going

18   to call it "software" or "updating your site" with

19   all of the products that you're being offered to sell

20   to the government?

21   A    Uh-huh.

22   Q    Is that a yes?

23   A    Yes.

Page 130

1    Q    Is it fair for me to assume every time I see

2    that Forte Consulting Group, that's what the payment

3    was for?

4    A    Yeah.  That's the only thing they did.

5    Q    All right.  Go to page 621.  I think it's the

6    last page.

7    A    All right.

8    Q    If you go to the bottom, on May 31st, it

9    says, "Return deposit item of $175,000."

10        Do you know what that is?

11   A    So you know, we were unaware that our accounts

12   were about to be levied because of malpractice by

13   counsel in that specific case.  We had ACH'ed a

14   payment of $175,000 -- we did a wire transfer, I

15   believe, to Ascencia.  And it was in process when all

16   this stuff happened, and so we thought they were

17   clawing it back, but then I guess, for whatever

18   reason, it had gone too far through the system.

19        So it ended up going through to Ascencia, but

20   not because we took any additional action.  I just

21   think that the clawback was unable to occur because

22   it must have already deposited into their account.

23        But on 5/31, that was the day -- I remember

Page 131

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1    very specifically -- that I was given notice that the
 2    account had been levied --
 3         Q    Okay.
 4         A    -- because our payroll bounced that day.
 5         Q    So you're telling me that the 175 is actually
 6    money leaving the PCCS account?
 7         A    It was supposed to.  And then it showed it as
 8    coming back, but then it never came back.  It
 9    actually ended up -- so my understanding is, their
10    legal department -- and again, this is just my
11    understanding.  Their legal department for the bank
12    got involved on 5/31.  They shut the account down.
13    They clawed back everything they could.
14              It was my understanding that they believed
15    they were going to be able to claw this money back,
16    but ultimately were unable to, so this money did, in
17    fact, end up being deposited with Ascencia.
18         Q    Okay.  So it didn't end up back in the PCCS
19    account?
20         A    No.
21         Q    What is G2G Federal Solutions, LLC?
22         A    That's a new company that I'm starting up with
23    three other partners.
```

Page 132

1    Q    All right.  And what's the intended business

2    of G2G Federal Solutions?

3    A    It's undefined at this time.

4         (Exhibit 15 was marked for identification.)

5    Q    I'm going to show you what I've marked as

6    Exhibit 15.

7    A    Uh-huh.

8    Q    All right.  I'll just represent to you, this

9    is what I pulled off from the North Carolina

10   Secretary of State's site.

11   A    Okay.

12   Q    Does this look like the Articles of

13   Organization for G2G Federal Solutions, LLC?

14   A    Yes.

15   Q    All right.  Now, if we look at that first

16   page, it's got the business address of

17   2017 Corporate Drive, Unit 4, Wilmington,

18   North Carolina.  Is that correct?

19   A    Yes.

20   Q    And that would be the same address for PCCS,

21   correct?

22   A    Yes.

23   Q    And it looks like, if you go to the second

Page 133

1    page -- actually, you know what, go to the last page.

2        A    Uh-huh.

3        Q    It states that yourself, Mr. Rudner, and David

4    Swintosky --

5        A    Uh-huh.

6        Q    -- are the managing members.  Is that correct?

7        A    Along with Holly.

8        Q    Okay.  And David Swintosky is the husband of

9    the lawyer that you referenced previously?

10       A    Yes.

11       Q    Does G2G have any bank accounts?

12       A    I don't believe so.  Not yet.  Because we

13   haven't even finished all of our organizational

14   paperwork.

15       Q    Does it have an operating agreement?

16       A    That's what we're still working on.

17            (Exhibit 16 was marked for identification.)

18       Q    I'm showing you what I've marked Exhibit 16.

19       A    Okay.

20       Q    Are these the Articles of Organization for

21   Stone Bay Tactical, LLC?

22       A    I believe so.

23       Q    All right.  And it looks like they were

Page 134

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    filed -- if you look on the top, that's

2    November 5th, 2021.  Is that correct?

3        A   Correct.

4        Q   All right.  If you look at number 6, it says,

5    the principal office for Stone Bay Tactical, LLC is

6    2017 Corporate Drive, Unit 4, Wilmington,

7    North Carolina.

8            That is the same address as PCCS, correct?

9        A   Correct.

10       Q   Who are the members of Stone Bay Tactical,

11   LLC?

12       A   I am not a member anymore, so to the best of

13   my understanding, Holly Grange is the sole member.

14       Q   And you testified, I think, previous, you

15   believe there's a bank account in the name of

16   Stone Bay Tactical, LLC?

17       A   Yeah, I know there's a bank account; I'm just

18   not sure what that number is.

19       Q   Did Mr. Danel open the bank account for

20   Stone Bay Tactical, LLC?

21       A   I can't testify to what Mr. Danel -- I don't

22   know.  I know that Mark and Kim worked together to

23   create Stone Bay, LLC, along with me, but Mark was in

Page 135

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1     charge of that process.

 2              (Exhibit 17 was marked for identification.)

 3        Q    I'm going to show you what I marked as

 4     Exhibit 17.

 5        A    Okay.

 6        Q    Are these the Articles of Organization for

 7     SRS Supply?

 8        A    I believe so.

 9        Q    Is SRS Supply, LLC still in business today?

10        A    I conveyed my interest to a third party.  It

11     was doing nothing, and I just said, you can have it.

12        Q    Who is that?

13        A    A gentleman named Patrick Sherrill.  But it's

14     my understanding that there's just -- there's really

15     no -- the PPE market is dead, and that's really all

16     Stone -- or SRS did was sell PPE on eBay

17     specifically.

18        Q    So the inventory for SRS Supply, was it stored

19     at the warehouse at PCCS's location?

20        A    It varied.  Some of it was kept at my house

21     or -- this is where it gets a little bit confusing.

22     There was more than one supply chain.  So SRS had its

23     own supply chain, its own direct contracts, but then
```

                                                    Page 136

Case 23-00089-5-DMW   Doc 1-2   Filed 09/22/23   Entered 09/22/23 15:01:42   Page 278 of 377

1    it would also purchase items through PCCS.

2         And then PCCS would also do the same for SRS.

3    So it was -- it was a team.

4         Q    Okay.  Was SRS Supply's principal place of

5    business the same address as PCCS?

6         A    At that time, it was.  Now it's operating out

7    of Texas.

8         Q    Okay.  Because, as you said, you conveyed your

9    interest to Mr. Sherrill?

10        A    Yeah.  You know, it was selling 200 bucks a

11   month or something like that, and it would cost me

12   more than that to --

13        Q    Do you recall when you gave your membership

14   interest to Mr. Sherrill?

15        A    December 31st of 2021.

16             (Exhibit 18 was marked for identification.)

17        Q    All right.  I'm going to show you what I've

18   marked as Exhibit 18.

19        A    Uh-huh.

20        Q    Have you seen this document before?

21        A    Most likely.  Don't remember it specifically.

22        Q    All right.  So this document says that PCCS

23   was converted from an LLC to a C corp approximately

Page 137

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    on June 30th, 2020.

2        A    Uh-huh.

3        Q    Does that sound correct to you?

4        A    Yes.

5        Q    And if you go down on that first page, under

6    the title Election of Officers, it has Mr. Sharpe as

7    the CEO -- and that's you -- Mr. Eastham as

8    president, Mr. Becton as the vice president, and

9    Mr. Spark as the secretary and treasurer?

10       A    Okay.

11       Q    Was that correct?

12       A    That's what it says.

13       Q    Do you agree that they were the officers of

14   PCCS as of June 30th, 2020?

15       A    I mean, relying on this, I'll say yes.  I

16   don't have an individual memory of the exact times

17   and dates of -- because that stuff kept changing,

18   but --

19       Q    Who is Mr. Becton?

20       A    That was the initial partner that we had

21   bought out his shares.  That was the whole issue.

22   You know, we had to value the company to buy him out,

23   and we had to be able to show the value for the

Page 138

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1    equity owed to Mark, Peter.

 2          So that -- he was the person that at that time

 3    owned 29 percent of the company.

 4    Q    So at some point, though, he was bought out?

 5    A    Yeah.  Not long after this.

 6    Q    Okay.  Was Mr. Becton an employee of PCCS?

 7    A    Huh-uh.

 8          THE COURT REPORTER:  Is that no?  I'm sorry.

 9    A    No.  To my understanding, he was -- he was --

10    you know, we were an LLC, so he was a shareholder,

11    member, whatever you want to call it.

12    Q    Okay.  But he was never a paid employee of

13    PCCS?

14    A    I don't believe so, the best of my knowledge.

15    But Peter would be the best source for that because

16    this was what he dealt with.

17    Q    Did Mr. Becton provide any services to PCCS?

18    A    Not really, no.  And that was, you know, a lot

19    of the concerns.  That's why we bought him out.

20    Q    Is there a shareholder agreement for PCCS?

21    A    I don't even know what a shareholder agreement

22    is.

23    Q    Well, is there any kind of written
```

Page 139

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    documentation signed by the shareholders or agreed to

2    by the shareholders talking about sort of how the

3    entity would be governed, maybe a buy/sell provision

4    in it, anything like that?

5         A    I don't know.

6              (Exhibit 19 was marked for identification.)

7              THE WITNESS:  Can I take a restroom break?

8              MR. BABEL:  Yeah.  Yeah.

9              (A recess transpired.)

10        Q    Mr. Sharpe, I'm going to show you what we

11   marked as Exhibit 19.

12        A    All right.

13        Q    Have you seen this document before?

14        A    I don't know if I've seen the document, but I

15   do understand what the document represents.

16        Q    Okay.  Would you agree with me this is dated

17   the same date as Exhibit 18 that we just looked at?

18        A    Yes.

19        Q    All right.  And if you go down, it says,

20   Description of Common Stock.  It says that you were

21   granted 10 shares of class A common stock?

22        A    Correct.

23        Q    And class A shares have unlimited voting

Page 140

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    rights, with one vote per share; is that correct?

2        A    Correct.

3        Q    And you were conveyed 9,990 shares of class B

4    common stock.  Is that correct?

5        A    No.  That's what the corporation is authorized

6    to issue.

7        Q    Okay.  Well, if you go back up to the top, it

8    says, "The corporation is authorized to issue 10,000

9    shares of common stock as follows."

10       A    Yeah.  10,000 -- or 9,000 -- because if you

11   look at our stock totals, I don't have 9,990 shares;

12   I have, you know, whatever 40 percent of that is.  So

13   that's the amount of shares the company is allowed to

14   issue out of a total of 10,000 shares.

15       Q    Well, but you are issued 10 shares of class A?

16       A    Correct.

17       Q    All right.  From June 30th, 2020 until

18   today, has there been any other individual that owns

19   class A common stock other than yourself?

20       A    No.

21       Q    Do you still only own 10 shares of class A

22   common stock?

23       A    Uh-huh.  Yes.

Page 141

1          (Exhibit 20 was marked for identification.)

2     Q    All right.  I'm going to show you what we've

3    marked as Exhibit 20.

4     A    Okay.

5     Q    Have you seen this before?

6     A    I can't say I've seen it, but I understand

7    what it represents.

8     Q    Okay.  And this is dated June 30th, 2020,

9    correct, if you look at the top?

10    A    Yes.  Yep.

11    Q    And this is saying that Mr. Eastham was given

12   1,990 shares of class B common stock.  Is that

13   correct?

14    A    Yes.

15         (Exhibit 21 was marked for identification.)

16    Q    All right.  I'm going to show you what I

17   marked as Exhibit 21.

18         Before we get to that, do you know whether

19   PCCS has a shareholder list?

20    A    I believe so.  I know there is something that

21   Pete created.  I don't -- I don't know what a

22   shareholder list is, so --

23    Q    Okay.

                                        Page 142

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1        A    Yeah.

 2        Q    All right.  Exhibit 21, have you seen this

 3   before?

 4        A    Yes.

 5        Q    Okay.  Can you tell me what it is?

 6        A    This was where we attempted to put a book

 7   value for tax purposes, because we knew we had to

 8   report the shares that were issued out to the IRS.

 9        Q    Okay.  All right.  And I think it's easier,

10   but you can look wherever you want to look, but if

11   you look there --

12        A    Uh-huh.

13        Q    -- this, I believe -- well, you tell me.  I

14   believe this is telling us the percentage of class B

15   shares in PCCS.  Would that be correct?

16        A    I think this is a total of all shares, because

17   I only had 5100 class A shares, and I had 10 class B.

18        Q    Are you sure it's not the reverse?  You had

19   10 class A and 51- --

20        A    Yeah.  I had 10 class A.  So I believe this is

21   a combination of all shares.

22        Q    Okay.  Well, if you look in that chart, in the

23   middle of it, it says that you have 5,110 shares.
```

Page 143

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1      A    Correct.

2      Q    You believe that's a combination of your B

3   shares and your A shares?

4      A    Yes.

5      Q    And it shows 40 percent of the company?

6      A    Yes.

7      Q    And then Mark E., that would be Mark Eastham,

8   correct?

9      A    Yes.

10     Q    He has 25 percent of the class B shares,

11  correct?

12     A    Correct.

13          MR. REISS:  Object to the form.

14     A    Approximately.  These -- if you do the math,

15  there's decimal points and something like that.

16     Q    And then Pete would be Pete Spark, correct?

17     A    Yes.

18     Q    And this document shows that he holds

19  15 percent of the class B shares, correct?

20          MR. REISS:  Object to the form.

21          THE WITNESS:  What was that?

22          MR. REISS:  I'm just objecting to the form.

23          If you understand it, you can answer the

Page 144

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1      question.

 2             THE WITNESS:  Oh.  Do you want me to answer

 3      the question?

 4             MR. REISS:  What's that?

 5             THE WITNESS:  Do you want me to answer?

 6             MR. REISS:  Yeah.

 7      A    I believe so, yeah.

 8      Q    Okay.  And then the next line says "Jay."  Is

 9      that Jay Graves?

10      A    Yes.

11      Q    And it shows that he owns 11 percent of the

12      class B shares.  Is that correct?

13      A    Yes.

14             MR. REISS:  Object to the form.

15      Q    And the last one is Ryan.  Ryan Albert?

16      A    Yes.

17      Q    And it shows that he owns 9 percent of the

18      shares?

19             MR. REISS:  Object to the form.

20      Q    Is that correct?

21      A    That's what it says.

22      Q    Okay.  Do you know, sitting here today, if

23      these percentages are still correct as to the
```

Page 145

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    shareholders and their interest in PCCS?

2        A    Approximately.  Again, you know, my share

3    isn't 40 percent; it's actually 40-point.  But to my

4    knowledge, none of these shares have changed.

5        Q    Okay.  This list that we were just looking at,

6    yourself, Mr. Eastham, Mr. Spark, Mr. Graves, and

7    Mr. Albert -- are those, sitting here today, the only

8    shareholders of PCCS?

9        A    Yes.

10       Q    Okay.

11           (Exhibit 22 was marked for identification.)

12       Q    All right.  I've shown you Exhibit 22.  Have

13   you seen this document before?

14       A    Maybe.  Unsure if I've ever seen it before.

15       Q    All right.  If you'll look at the first page,

16   and you go to Section 2, it says "Annual Meeting."

17   Do you see that?

18       A    Uh-huh.

19       Q    It says, "The annual meeting of the

20   shareholders shall be held each year in the month of

21   March on any day."

22           Did I read that correctly?

23       A    Yes.

                                              Page 146

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1        Q    Was there an annual meeting of the

 2   shareholders in 2022?

 3        A    I do not know.  I was gone.

 4             And looking back through this, I don't

 5   remember this document.  This is something that Peter

 6   put together.

 7        Q    This wasn't put together by your lawyers?

 8        A    I didn't sign it, so it could have been.

 9   Again, I do not know.

10        Q    Who are the current directors of PCCS?

11        A    On the board?

12        Q    Yes, sir.

13        A    Myself and Holly Grange.

14        Q    Do you know whether there was a board of

15   directors meeting in 2022?

16        A    I do not.

17        Q    Do you know if the --

18        A    You know what, we changed -- we did our annual

19   meeting in October, the previous October.  When we

20   first started doing everything -- and this is my

21   understanding, because this stuff, you know, was not

22   in my area of operations.

23             Originally we were going to be on a
```

Page 147

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1   January-to-December tax schedule.  We had expected

2   the conversion to happen differently.  So it was my

3   understanding we elected the midyear tax cycle.

4          At some point, it was decided to do --

5   especially with COVID and everything, we kind of

6   changed some things around.  But I do know that we

7   did the annual meeting in October, like

8   October 12th.

9      Q   The annual meeting of what?

10     A   PCCS.

11     Q   Shareholders?  Directors?

12     A   Everybody.  We've -- people flew -- you know,

13  Jay was there; I was there; Adrianne was there; I

14  even believe Mark flew in.  If he didn't fly in, he

15  was there by video.  It was -- the big annual meeting

16  was in October of 2021.

17     Q   Okay.  So you had one in 2021, but you don't

18  know if you had one in 2022?

19     A   Well, it hadn't been a year yet, so right.

20     Q   So the one in 2021, that was for 2021,

21  correct?

22     A   Correct.

23     Q   All right.  Do you know if PCCS has a stock

Page 148

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    transfer book?

2        A    No, I do not know.   I don't know what a stock

3    transfer book is.

4        Q    Does PCCS have directors and officers

5    insurance?

6        A    Not that I know of.

7             (Exhibit 23 was marked for identification.)

8        Q    I'll show you what I've marked as Exhibit 23.

9        A    Okay.

10       Q    Have you seen this document before?

11       A    I'm sure I have.   I've seen a bunch of legal

12   documents.   I just don't remember this one

13   specifically.

14       Q    All right.   Take the time, if you want to read

15   it.   I'll tell you what it is because I wrote it:

16   It's a demand on PCCS to investigate certain claims

17   against you.

18            Do you know what PCCS has done in response to

19   this letter in order to investigate the allegations

20   that are set out in this letter?

21       A    I know it was discussed with Addison, James

22   Gillespie, and Holly Grange, the issues and

23   concerns -- and myself.   Of course, I was a part of

Page 149

1    this discussion.

2        Q    Okay.  So Ms. Grange -- you discussed this

3    with Ms. Grange; Mr. Gillespie, who's a lawyer;

4    Addison, who's a lawyer.  Anyone else?

5        A    Conner.

6        Q    Who's Conner?

7        A    One of the partners for Addison.  It's another

8    attorney at his firm.

9        Q    Do you know whether any of those lawyers did

10   anything else to investigate the allegations?

11       A    I know they asked me a bunch of --

12            MR. REISS:  Objection.

13       Q    Before you answer it, I don't want to know if

14   you had any conversations with those lawyers.

15       A    Okay.

16       Q    If they told you something, I don't want to

17   get into that.

18       A    All issues were thoroughly considered and

19   discussed.

20       Q    Okay.  So do you know whether they did

21   anything else other than having a conversation with

22   yourself and Mrs. Grange?

23       A    What do you mean by "anything else"?

Page 150

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    Q    Anything else.  Did they investigate?  Did

2    they interview any other witnesses?  Did they look at

3    any documents?

4    A    I have no way of testifying to the actions of

5    other people.  I know that I was asked very specific

6    questions, not just about these specific questions,

7    but everything that was sent to us.

8          So I had a lot of papers and information that

9    I had to bring forth.

10         (Exhibit 24 was marked for identification.)

11   Q    All right.  I'm going to show you what has

12   been marked Exhibit 24.

13   A    Okay.

14   Q    Have you seen this document before?

15   A    Yes.

16   Q    All right.  Now, I know your current counsel

17   has sent some information to us, I think in the last

18   week or so, in response to this letter.

19         Do you know whether the information that was

20   provided by your current counsel was the first time

21   there was a response provided to this letter?

22   A    So our response consisted of turning this over

23   to our counsel at the time, which was Addison.  How

Page 151

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1    he responded after that, we do not know.  I do know
 2    that he failed to respond in many areas on many
 3    things, which is why he is no longer counsel.
 4        Q    Okay.  So I believe your testimony is, you
 5    don't know whether there was a response before the
 6    response that was made by your current counsel?
 7        A    Right.  I can tell you we expected one.
 8        Q    Okay.  Did you travel to Las Vegas on behalf
 9    of Stone Bay?
10        A    Well, PCCS.
11        Q    Okay.
12        A    But under the D/B/A of Stone Bay.
13        Q    All right.  And why did you go to Las Vegas?
14        A    That's where you meet the people to be able to
15    get the types of items that we need for government
16    contracting.  I mean, that was the who's who of
17    suppliers.
18        Q    Was it a trade show?
19        A    Yes.
20        Q    What was it called?
21        A    Shot Show.
22        Q    Shot Show?
23        A    Yeah.  It's the largest industry event.  It's
```

                                              Page 152

1    hard to get into.

2        Q    Is it --

3        A    In fact, Peter is the one that advocated for

4    us going to that.  He wanted to go very badly.

5        Q    Well, who went?

6        A    Me, David Danel, Michael Rudner.

7        Q    Okay.  And was Shot Show focused more on

8    weapons, sort of the military aspect of government

9    contracting?

10       A    Everything.  You had everything from clothing

11   to accessories.  It wasn't just government.  It was

12   every segment of retail that you can think of.  So

13   for instance, like with Sig Sauer, they had multiple

14   silos.  So we were their mil-fed distributor, but

15   they also have, you know, people from traditional

16   retail outlets as well.

17          The point of Shot Show was to network and

18   build as large of a supply chain as possible for

19   government contracting.

20       Q    Okay.  Was Shot Show -- is the Shot Show trade

21   show focused more on the military -- I'm going to use

22   the word "military" aspect in the sense I don't --

23       A    It's not focused --

Page 153

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    Q    Let me finish.

2    A    Go ahead.

3    Q    The type of products:  so weapons, sights,

4    other accessories for handguns, body armor, uniforms.

5         Is it focused on that sort of area?

6    A    That's a component of it.

7    Q    Okay.

8    A    The major component.

9    Q    A major component.  What percentage would that

10   be at the trade show?

11   A    No idea.  The first time I went.  It is so

12   large and so spread out, you can't even visit it all

13   during the time.  So before you go, you know, you

14   kind of start making appointments to meet with, you

15   know, various entities or you -- like, I was trying

16   to -- one of my goals was to be able to get

17   contracting for ammunition, because as an SDVO state,

18   it just made sense, especially with the Grange name

19   and everything.

20        With his military credentials, it was an easy

21   close.  So my focus there was -- was military.  I

22   mean, because that's what we do.

23   Q    Okay.  So you weren't going there trying to

Page 154

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    find vendors for, for instance, diabetic test strips?

2        A    No.

3        Q    This was for the Stone Bay part of the

4    business?

5        A    Not just Stone Bay.  Stone Bay is specifically

6    geared towards the military online exchange.  That's

7    it.

8        Q    That's Stone Bay Tactical, LLC?

9        A    Right.  But PCCS was interested in the big

10   government contracts.  For instance, Sig Sauer just

11   got the award to replace the M4, M16, where their

12   SDVO is to be a mil-fed distributor.  I went there to

13   lock up -- Shot Show's typically where you lock up

14   your -- that's why it's in January for 2022.

15           So that was how PCCS got its finalized supply

16   contract with Sig Sauer.  Every -- Shot Show is the

17   Super Bowl of defense, guns, tactical, all of that.

18       Q    And you mentioned -- was it Mr. Grange?

19       A    Well, his name is very popular.  David.  Yeah.

20       Q    Right.  So you had testified that you used his

21   name to help you get some appointments with some of

22   these suppliers.  Is that correct?

23       A    Uh-huh.

Page 155

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    Q    And was Mr. Grange a member of Stone Bay

2   Tactical, LLC?

3    A    No.  His association is -- well, one, Grange

4   Council is, you know -- I mean, Holly runs it, but

5   that is a family entity.

6         David has a very large training facility, but

7   he didn't have any type of retail establishment, and

8   so the plan was to establish a pro shop there at the

9   training facility.

10        And because the vast majority of the people

11  that were run through that facility are military or

12  law enforcement, the plan was for us to have a

13  presence at the facility so that we could advocate

14  for and gain access to those government supply

15  contracts, because it's a lot easier when we can

16  train you on a system and say, if you want these,

17  we're also the federal supplier.

18        And so then PCCS was going to attempt to

19  outfit those government teams as they came through.

20   Q    Okay.  So PCCS, the D/B/A Stone Bay Tactical,

21  was going to have a pro shop at the Grange Council's

22  training facility?

23   A    Uh-huh.

                                            Page 156

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1              THE COURT REPORTER:  Is that yes?

 2              MR. REISS:  Is that a yes?

 3     A    Yes.  That was my intent.

 4              (Exhibit 25 was marked for identification.)

 5     Q    I'll show you what I marked as Exhibit 25.

 6          Have you seen his text chain before?

 7     A    I have.

 8     Q    Okay.  What am I looking at here?  Who are the

 9     people in this text chain?

10     A    You are looking at a text between me and the

11     CEO of DaVinci.

12     Q    Okay.  And if I'm reading this right, it looks

13     like, because this is black and white, the CEO of

14     DaVinci would be -- I'm going to call him the white

15     bubbles, and you're going -- call them the gray

16     bubbles.  Is that correct?

17     A    I believe so.

18     Q    Okay.  So going in this text chain, it looks

19     like one of the texts on 4:15 p.m. is a text from

20     you.  And it says, "I met yesterday.  I'm in a

21     meeting in Vegas.  As soon as I get confirmation,

22     I'll let you know.  The VA does ARO by business days,

23     so we have time to deliver" [unintelligible].
```

Page 157

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1              Did I read that correctly?

 2      A    You read that correctly.

 3      Q    Okay.  So the reference here to Vegas, is that

 4  that same trip we were just talking about that you

 5  went to the --

 6      A    Yeah.

 7      Q    -- Shot Show?

 8      A    This is while I was in Vegas.  Yep.

 9              (Exhibit 26 was marked for identification.)

10      Q    All right.  I'm going to show you what I

11  marked as Exhibit 26.

12      A    Yep.

13      Q    Have you seen this text chain before?

14      A    Yes.

15      Q    All right.  And who are the people on this

16  text chain?

17      A    There was more than one person from DaVinci,

18  so I can't testify definitively who was on the other

19  end, but this was somebody in the DaVinci

20  organization.

21      Q    Okay.  And again, black and white.  Am I

22  correct when I look at this, I'll call them the gray

23  bubbles this time, is someone or some other people
```

Page 158

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    from DaVinci?

2    A    Yeah, I'm the black and white.

3    Q    Okay.  And you wrote, looks like the middle,

4    "Okay.  If you think you can scare me with

5    litigation, you likely don't realize who sits on my

6    board.  I dare you to file."

7         Did I read that right?

8    A    Yep.

9    Q    All right.  That's your text, correct?

10   A    It is.

11   Q    Who's the person on your board that you're

12   referencing?

13   A    James Gillespie was getting ready to move to

14   our board.  He went to Harvard, Princeton.

15   Q    And which company board are you referring to?

16   A    PCCS.  We hadn't yet put him on the board,

17   but -- and also, Holly Grange.  I mean, we have a

18   strong board, strong people.  So you know, this

19   person thought they were going to push me around, and

20   I said, no.

21   Q    Before -- and I'm switching gears here on

22   you -- you referenced -- was it ORS Nasco when we

23   were talking about the Forte Consulting?

Page 159

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1     A    Yes.

2     Q    At some point did you offer to sell the ORS

3   Nasco business to David Danel?

4     A    There was a discussion about it.  And so the

5   discussion was a few ideas.  One was to first offer

6   it to Mark and Peter and say, would you be willing to

7   purchase this?  And give them a first crack at it.

8          And of course, I expected them to say no or to

9   give a very low value.

10          And then the intent was to work through our

11   attorneys to sell that off for sure.

12          (Exhibit 27 was marked for identification.)

13     Q    I'm showing you what I've marked as

14   Exhibit 27.  Have you seen this text before?

15     A    I have.

16     Q    Is this a text from you?

17     A    Yeah.  This was from me to David Danel.

18     Q    Okay.

19     A    He had just finished trying to steal multiple

20   assets from PCCS.  I had found out that he was

21   conspiring with Mark and Peter and sharing private

22   information.  I was specifically upset because I have

23   a restraining order against Peter, and he was

Page 160

1    communicating with company employees to harass me,

2    violating that restraining order.  And I was angry,

3    and I was angry that somebody that was supposed to be

4    helping me was secretly working for your clients.

5        Q    All right.  And are the petrels [phonetic] you

6    reference in this text the items that you said he

7    stole from the company?

8        A    Uh-huh.

9        Q    You say, "James will be in contact."  Is that

10   James Gillespie?

11       A    Yes.

12            (Exhibit 28 was marked for identification.)

13       Q    All right.  Mr. Sharpe, I'm going to show you

14   what I've marked and ripped as Exhibit 28.

15            MR. REISS:  28?

16            MR. BABEL:  Yeah.  I believe that's correct.

17       Q    Have you seen this text before?

18       A    Yes.

19       Q    Is this a text you sent to Mr. Eastham?

20       A    Yes.

21       Q    All right.  In it, you say, "I'm sorry for

22   anything I did to hurt you.  I'm broke, and I lost

23   everything."

Page 161

1      What are you referring to when you say, "I've

2  lost everything"?

3      A   At that point, my wife was ready to divorce

4  me.  My two partners that I treated like family lied

5  to me, stole from my company, made their intent clear

6  to file as many lawsuits as it takes to break me,

7  used members of my company to spread discontent, to

8  inform people that they needed to leave PCCS because

9  all this impending doom of litigation was coming from

10  Mark and Peter.

11      Mark and Peter were very aware of my problems

12  with PTSD and depression, because previously I had

13  asked them to please stop with their games and their

14  attempts to rile me up and harm me.

15      And this was me flying back from Ukraine after

16  getting an average of three hours of sleep a night,

17  coming back to not even knowing if I was going to

18  have a home, a wife; and the people that I trusted to

19  build my future had stabbed me in the back.

20      Q   All right.  And looking at that text, it says

21  you've been serving in the Ukraine.  "I'm going to

22  enlist and try to find some peace through service."

23      Is that enlist in the Ukrainian Army?

Page 162

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1       A    That was my intent.

2       Q    And I don't recall if we got into this last

3    time, but did Mr. Danel fly back to Ukraine and help

4    you in your return to the United States?

5       A    No.   That's what he told other people.

6    Mr. Danel flew back to Ukraine, hid his

7    communications with Mark and Peter, simultaneously

8    was telling members of the company and members of my

9    family different stories.   He tried to convince me

10   when he first came back that all was lost due to Mark

11   and Peter's pending litigation and that it was in my

12   best interest to give him all my shares immediately

13   and he would protect me.

14           And it was a follow-on to that plan of David

15   Danel.   And my disagreement with him is -- was the

16   conversation I had with Adrianne that they -- she

17   left the company because I was not willing to give

18   away my shares because of the Mark and Peter

19   situation.

20           (Exhibit 29 was marked for identification.)

21      Q    All right.   I'm going to show you what I

22   marked Exhibit 29.

23      A    Yep.

Page 163

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    Q   All right.  This is an email chain.  Have you

2    seen this before?

3    A   I have.

4    Q   All right.  And if you look at the first page,

5    it looks like an email from you to David at

6    Broadsword Defense.  Is that David Danel?

7    A   Yeah.  He was working for me at the time.

8    Q   Was this sent to anyone else other than David

9    Danel?

10   A   I don't remember.  I may have sent it to

11   Adrianne.  This was right after a particularly

12   traumatic set of events while I was in Ukraine, and

13   it was also immediately after David came and this --

14   you know, he was telling me that my company was lost

15   and that Mark and Peter were going to destroy me and

16   that I've lost everything and that my only way to

17   salvage any future for myself was to give up all of

18   my shares to him.

19        And I hit a very low point emotionally because

20   PCCS was the work that I did that allowed me to heal

21   and come out of my shell as a disabled veteran, and

22   your clients were trying to take that away from me.

23   Q   Okay.  Well, let's look at the second page of

Page 164

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    the exhibit, but it says page 3 of 5.  Am I reading

2    this correct that on March 20th -- and I'm looking

3    sort of -- I guess it would be the -- maybe the third

4    paragraph?

5        A    Yeah.

6        Q    It starts, "As a veteran."

7             Am I reading this right:  As of March 20th,

8    you did resign as the CEO of PCCS?

9        A    That was my intent.

10       Q    Okay.  And then you go down -- the next

11   paragraph.  You say that Peter Spark and Mark Eastham

12   subsequently defrauded the company.

13            What did they do to defraud the company?

14       A    Well --

15            THE WITNESS:  Is it okay for me to answer

16     this in full?

17            MR. REISS:  Do you need to talk to me about a

18     potential privilege issue?

19            THE WITNESS:  No.

20            MR. REISS:  Then go ahead.

21       A    So, first, they lied about the back-pay issue.

22   That was -- always had been presented to me that that

23   was a placeholder put on the books to properly

Page 165

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    valuate the company in anticipation for shares.

2         I gave them those shares.  They never

3    mentioned to me again that the back pay was -- or you

4    know, that those monies were still put on there.

5         And then when we had our -- they hid it from

6    me.  They never discussed it in the financial

7    meeting.

8         In October, we had our largest annual meeting

9    that was specifically focused on finances, and you

10    know, I remember asking Mark and Peter, why wasn't

11    this even discussed, the largest debt you claim we

12    have by far; and when you gave me a financial

13    briefing, you didn't include it.  Why?

14    Q    Are you done?  Because I have a question.

15    A    No.  I mean, that's -- so that's how they

16    defrauded me.  They were able to get shares under

17    false pretenses.  They were able to hide money on the

18    books and not discuss it with me and then try to use

19    that as leverage when I discovered that their conduct

20    and their behavior was horrendous.

21    Q    Do you know whether, as of October 2021, the

22    shareholder meeting that you were referring to,

23    whether on the books and records for PCCS, it showed

Page 166

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    that there was back pay owed to Mr. Eastham and

2    Mr. Sparks?

3        A    Yeah.   That's what --

4             MR. REISS:   Objection to form.

5             THE WITNESS:   What's that?

6             MR. REISS:   I'm objecting to the form.

7             Go ahead and answer.

8        A    Okay.   So looking back now, I don't know how

9    to read financial statements.   You know, I'm -- I'm

10   good at what I'm good at.   And that's why I paid Mark

11   and Peter hundreds of thousands of dollars to guide

12   me and to help me.   So it may have been on the books

13   at that time.   It most likely was.

14           I didn't possess the books.   I didn't look at

15   the books.   I didn't -- I don't write checks.   I

16   don't deal with the finances or the accounting.   I

17   relied on Mark and Peter to give me accurate and

18   solid information in the best interest of myself and

19   the company, and they didn't do that.

20           They admitted to me that they excluded this

21   debt from the financial report.

22       Q    Okay.   So if you recall, we looked at

23   Exhibit 12, which was those compensation committee

Page 167

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    meeting minutes.

2       A    Uh-huh.

3       Q    And they were dated August 27th of 2020.

4            Do you know whether the books and records of

5    PCCS from the period of August 27th, 2020 up to

6    October 2021 of this shareholder meeting, whether it

7    would show that there was back pay owed to

8    Mr. Eastham and Mr. Spark?

9            MR. REISS:   Object to the form.

10      A    I don't know -- I don't know how it was

11   quantified.   I did find out later in my

12   investigations, after Mark and Peter brought up this

13   issue, that it had been put -- a debt of, I think,

14   $366,000 had been put on the books.

15           I knew that it initially was going to be put

16   on the books as a placeholder for equity shares and

17   that it was my understanding when that equity was

18   issued, it would zero out all of that, and we were

19   going to go forward as a brand-new team and everybody

20   take care of everybody.

21           And they got exactly what they were promised

22   from me.   I kept up my end of the deal.

23      Q    When was this -- did you say it was zeroed out

                                              Page 168

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    or it was going to be zeroed out?

2        A    It was supposed to.   That was the agreement.

3        Q    When was this agreement entered?

4        A    It was discussed over a range of time, but the

5    whole reason why a debt was placed on the books was

6    as a placeholder for future equity compensation.

7            (Exhibit 30 was marked for identification.)

8        Q    All right.   Mr. Sharpe, I'm going to show you

9    Exhibit 30.

10       A    Yep.

11       Q    And I'll just represent to you what I'm

12   showing you.   This is a copy of a subpoena that we

13   issued to G2G Federal Solutions, LLC, and this is the

14   response.

15       A    Okay.

16       Q    And I think we went over this before, but I

17   just want to cross my Ts, dot my Is here.

18           But if you look on the third page of this

19   exhibit.   Okay.   In response to the subpoena, we got

20   this page, and then we got the adjoining pages, which

21   are documents that were printed off from the

22   Secretary of State's office.

23           And I believe you testified -- are there any

Page 169

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1    other government documents for G2G, meaning like an

 2    operating agreement?

 3      A    I've never seen one government document for

 4    G- -- this is a new program amongst new partners that

 5    we are at the very early stages.  So I know of

 6    nothing further.

 7      Q    So you would agree that it looks like -- one,

 8    two, three, four -- I think it's six pages that were

 9    from the Secretary of State.  That's basically it?

10      A    I would agree that you know more about this

11    company than I do.  And if Holly says that these are

12    all the documents, then I have complete faith in

13    Holly that these are all the documents.

14           (Exhibit 31 was marked for identification.)

15      A    I do know that G2G doesn't even have a bank

16    account.

17      Q    All right.  I'm showing you what I marked

18    Exhibit 31.

19      A    Okay.

20      Q    Okay.  So these were some of the documents

21    that were produced by your counsel to us, and I

22    believe this relates to the last time we were

23    together, we were talking about this amount that was
```

Page 170

1    owed by the federal government to PCCS for the sale

2    of diabetic test strips.  And you had testified it

3    had gotten paid to PCCS.

4            Do you recall that?

5        A   What's your question?

6        Q   My question is, do you recall your testimony

7    related to that?

8        A   Honestly, no.  But what's the question?  And

9    I'll answer it.

10       Q   Okay:  Well, it looks to me, from this

11   document, that the $172,608 that was paid from the

12   government --

13       A   Yep.

14       Q   -- for sales that were made by PCCS was

15   actually deposited into an account of Grange Council,

16   LLC.  Is that correct?

17       A   To the best of my understanding.

18       Q   Okay.  Who notified the government to deposit

19   that amount into Grange Council, LLC's bank account?

20       A   I gave the government permission to have

21   Michael Rudner and Holly Grange be able to take that

22   over.  My problem at the time was, I was supposed to

23   be hands-off on all accounts.

Page 171

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1          And this was the solution to that problem

2     because I am not a signator on that account.

3          Q    Okay.  And so what relationship does Grange

4     Council, LLC have with PCCS?

5          A    Right now, just working together to -- you

6     know, to try to conduct smart business.  PCCS is done

7     as an SDVOSB.  So right now, I'm looking to rely on

8     Grange Council to grow future business however we can

9     find it.

10         Q    And if you look at the second page of that

11    exhibit, am I reading this right that $172,608 was

12    deposited in the Grange Council, LLC's account on

13    June 23rd, 2022?

14         A    I have no way of verifying that.  I can just

15    read to you what this page says.  I don't -- like I

16    said, I'm not a signator; I don't know the bank; I --

17    if I wanted to, I couldn't get any further

18    information without going to Holly.

19         Q    Was there any written agreements between the

20    Grange Council, LLC, and PCCS related to the

21    $172,608?

22         A    I'm no longer an executive with the company

23    actively, so there could be between Michael and

Page 172

1    Holly, but I have no knowledge.  I have to, right

2    now, stay as hands-off on finances as possible.

3        Q   Do you know who created this first page that's

4    Exhibit 31?

5        A   No.  I have a guess.

6             THE WITNESS:  Am I allowed to guess?

7             MR. REISS:  No.

8             THE WITNESS:  Okay.

9        Q   Do you know whether Ms. Grange created this

10   first page?

11       A   Same answer:  I don't know.

12       Q   And it's your testimony the reason the funds

13   were deposited in Grange Council, LLC's bank account

14   was because you didn't have signatory authority on

15   that bank account?

16       A   Yeah.  We were concerned that we needed to

17   have a clear and provable line showing that these

18   expenses and checks and authorizations were not done

19   by me.

20            MR. BABEL:  Why don't we take a short break,

21     please.

22            THE WITNESS:  Sure.

23            MR. REISS:  Okay.

Page 173

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1          (A recess transpired.)

 2    BY MR. BABEL:

 3       Q   All right.  Mr. Sharpe, when you were in the

 4    Ukraine, who was running PCCS?

 5       A   Adrianne George, David Danel.

 6       Q   All right.  Well, then you had testified that

 7    Ms. George left at some point.  So after Ms. George

 8    leaves, who's running the company?

 9       A   David Danel.

10       Q   All right.  And then at some point, he left.

11    Then who would be running the company?

12       A   I appointed Holly -- and Michael Rudner was

13    always in a leadership -- so after I got back and I

14    learned that David was trying to steal company

15    resources, I fired him, and Holly agreed to help me

16    out.

17       Q   Okay.  So Ms. Grange's involvement came about

18    after you returned from the Ukraine?

19       A   She was involved in the company early on.  I

20    had asked her to be a part of the board early on and

21    just to advise me and to -- you know, just like with

22    anybody else that I bring around the company, you

23    know -- use her knowledge and expertise.  But it was
```

Page 174

```
 1    on a very limited basis at first.

 2         But then after I got back, I said, Holly, I

 3    need you to run things.

 4         Q    Was Ms. Grange a member of the board of

 5    directors for PCCS?

 6         A    Yes.

 7         Q    All right.  When did she first become a

 8    director?

 9         A    I don't know if the paperwork was ever even

10    officially done because, again, I don't -- I asked

11    her to join the board after I fired Mark and Peter.

12         Q    Okay.

13         A    So effective -- I believe the effective date

14    was January 1st.

15         Q    Have you had conversations with Ryan Albert

16    where you conveyed to Mr. Albert that he was to

17    convey a message to Mr. Spark to stop this

18    litigation?

19         A    No.  What I told Ryan was, we needed to -- and

20    if I'm thinking about the right conversation, I

21    remember telling Ryan, we're being sued by another

22    company; our attorneys have screwed everything up;

23    and that --
```

Page 175

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1              MR. REISS:  Different attorneys, by the way.

 2              THE WITNESS:  Yeah.

 3     A    And I have a -- I texted the same to Mark.

 4          I went through Ryan, because I do not need to

 5     contact Peter directly because of the restraining

 6     order.  And I said, but you need to make sure they

 7     know -- they need to have their attorney contact my

 8     attorney because, if he's genuinely concerned about

 9     the minority share value, there is an issue going

10     down right now that could affect the value of PCCS.

11          And that it is my duty, as controlling

12     shareholder, to let everybody know and ensure that we

13     do what we need to do to protect our value in our

14     company.

15     Q    Have you had any conversations with Mr. Albert

16     in the prior week where you told Mr. Albert to convey

17     a message to Mr. Spark?

18     A    Yeah.  That's what I just explained to you.

19     Q    Okay.  So that happened --

20     A    That message.  Yeah.

21     Q    So if Mr. Albert testifies that the message

22     that you had told him to relay to Mr. Spark was that

23     he needed to stop this litigation or it was going to
```

Page 176

```
 1   go bad for him, that would not be a correct

 2   statement?

 3       A   I did tell Ryan, person-to-person -- I said, I

 4   really wish Peter could see that his lies and the

 5   things that he are doing -- that he's doing, there's

 6   about to be an accountability, and he really needs to

 7   consider, does he want to follow Mark down that path.

 8   Because I'm really concerned about Peter's future,

 9   and I believe that Peter is heavily influenced by

10   Mark.

11           (Exhibit 32 was marked for identification.)

12       Q   I'm going to show you what I've marked as

13   Exhibit 32.

14       A   Yep.

15       Q   And this is an email chain.  Do you recall

16   seeing this email chain?

17       A   I do.

18       Q   Okay.  So if you look at the second page --

19       A   Sure.

20       Q   -- there is a list of employees with amounts

21   set out there.

22           Based on your previous testimony, do you

23   disagree that these amounts are owed as back pay to
```

Page 177

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    these various employees?

2        A    I do.

3        Q    Okay.  So just so the record is clear, going

4    down that list, Jay would be Jay Graves, correct?

5        A    Uh-huh.

6        Q    Mark would be Mark Eastham?

7        A    Correct.

8        Q    Peter would be Peter Spark?

9        A    Correct.

10       Q    Robert Rudner?

11       A    No.  That's me.

12       Q    You.  Sorry.

13            And then Ryan would be Ryan Albert?

14       A    Correct.

15       Q    So you disagree that all of these amounts are

16   owed to these various employees?

17       A    I disagree that any of that money is owed.

18            MR. BABEL:  I think those are all my

19   questions.  Thanks.

20            MR. REISS:  Okay.  Sounds good.  I don't have

21   any questions.

22            THE COURT REPORTER:  And would you like a

23   copy of the transcript?

                                              Page 178

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
1              MR. REISS:  Yes.

2              THE COURT REPORTER:  Do you need that by

3      Friday as well?

4              MR. REISS:  I don't.

5              THE COURT REPORTER:  Thank you.  Everyone

6      have a great day -- oh, I should ask, is just an

7      etrans okay or do you need a hard copy?

8              MR. BABEL:  PDF.

9              MR. REISS:  PDF as well.

10             THE COURT REPORTER:  Thank you.

11    (Witness excused.)

12    (Deposition was concluded at 12:21 p.m.)

13

14

15

16

17

18

19

20

21

22

23

      Page 179
```

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
1    STATE OF NORTH CAROLINA  )

2    COUNTY OF NEW HANOVER     )

3               CERTIFICATION OF REPORTER

4          I, Cherie J. Anderson, Registered Merit

5    Reporter, Registered Professional Reporter, Certified

6    Realtime Reporter, and Notary Public and Court

7    Reporter for the firm of AURELIA RUFFIN & ASSOCIATES,

8    INC., have read the foregoing transcript, which was

9    taken down and transcribed by me, and I find the

10   contents of the same to be true and correct to the

11   best of my knowledge and belief.

12          I further certify that the above-named

13   witness was duly sworn by me prior to the taking of

14   the foregoing deposition.

15                    This the 26th day of July 2022.

16

17

18                    _____/S/_____

19                    Cherie J. Anderson, RMR, CRR

20                    Notary Public #201932500176

21

22

23
                                               Page 180
```

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

```
 1   STATE OF NORTH CAROLINA  )

 2   COUNTY OF NEW HANOVER     )

 3                    CERTIFICATION

 4          I, PETER BROWNE RUFFIN, III, Notary Public,

 5   Court Reporter, and President of AURELIA RUFFIN &

 6   ASSOCIATES, INC., do hereby certify that the foregoing

 7   transcript constitutes a true and correct record of

 8   the testimony of ROBERT P. SHARPE, the same having

 9   been taken down by Cherie J. Anderson, RMR, CRR, on

10   the date and at the place set forth in the record and

11   before those persons named therein;

12          FURTHER, that prior to the taking of her

13   testimony, the above-named witness was duly sworn by

14   Cherie J. Anderson, RMR, CRR;

15          FURTHER, that Peter Browne Ruffin, III and

16   Cherie J. Anderson are not related to any of counsel;

17   we are not employed by any of counsel or parties to

18   this action, save and except for the explicit purpose

19   of taking down the testimony herein and transcribing

20   same; and that we, in no way, are interested in the

21   outcome of said litigation;

22          FURTHER, that the original of this

23   transcript will be bound for filing with the Clerk of

     Page 181
```

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

1    District Court of New Hanover County and will be

2    forwarded to THOMAS S. BABEL, ESQ., DAVIS HARTMAN

3    WRIGHT, PLLC, 3819 Park Avenue, Suite B, Wilmington,

4    North Carolina, 28403, for hand-delivery to the Court

5    at the time of trial.

6                    This the 26th day of July 2022.

7

8                    _____

9

10                   Notary Public #19971470080

11

12

13

14

15

16

17

18

19

20

21

22

23

                                                    Page 182

| A | | | |
|---|---|---|---|
| **a.m (2)** 86:8 89:14 | **accounts (23)** 92:16 93:5 94:20 96:15 97:1,11,13,21 98:1,10,12,16 98:19 99:4,12 100:22 101:1,2 101:4 109:8 131:11 134:11 171:23 | 156:13 | **amount (6)** 96:1 116:1 124:8 141:13 170:23 171:19 |
| **able (10)** 95:16 95:18 123:8 132:15 138:23 152:14 154:16 166:16,17 171:21 | | **advocated (1)** 153:3 | **amounts (3)** 177:20,23 178:15 |
| | | **affect (1)** 176:10 | **Anderson (7)** 84:13 86:9 180:4,19 181:9 181:14,16 |
| | | **Agenda (1)** 111:18 | |
| | | **aggregate (1)** 96:1 | |
| **above-named ...** 180:12 181:13 | | **ago (1)** 106:10 | **angry (2)** 161:2 161:3 |
| **Absolutely (2)** 109:15 118:6 | **accurate (2)** 120:20 167:17 | **agree (9)** 101:14 113:5,20 114:11,17 138:13 140:16 170:7,10 | **announce (1)** 119:3 |
| **accept (1)** 107:13 | **ACH'ed (1)** 131:13 | | **announced (2)** 119:1,14 |
| | **action (4)** 86:3 88:14 131:20 181:18 | **agreed (5)** 86:2 114:23 119:18 140:1 174:15 | **annual (9)** 112:11 146:16 146:19 147:1 147:18 148:7,9 148:15 166:8 |
| **access (7)** 96:21 100:4,9 101:1 101:3 109:8 156:14 | | | |
| | **actions (1)** 151:4 | **agreement (8)** 117:6 123:9 134:15 139:20 139:21 169:2,3 170:2 | |
| **accessories (4)** 129:5,5 153:11 154:4 | **actively (1)** 172:23 | | **answer (12)** 104:14 105:1,3 127:5 144:23 145:2,5 150:13 165:15 167:7 171:9 173:11 |
| | **added (1)** 117:12 | | |
| **accessory (1)** 125:23 | **Addison (5)** 89:4 149:21 150:4,7 151:23 | **agreements (1)** 172:19 | |
| **account (45)** 89:20 92:17,20 92:22 93:1,14 94:1,16,23 96:21 97:6,7,9 97:23 98:19,22 99:8,9,13,21 100:3,5,8,9,9 100:10,11 101:5 109:11 127:23 131:22 132:2,6,12,19 135:15,17,19 170:16 171:15 171:19 172:2 172:12 173:13 173:15 | | **ahead (3)** 154:2 165:20 167:7 | **anticipated (1)** 112:8 |
| | **additional (1)** 131:20 | **air (1)** 103:20 | |
| | **address (4)** 133:16,20 135:8 137:5 | **Albert (11)** 108:9 113:15 114:11 145:15 146:7 175:15 175:16 176:15 176:16,21 178:13 | **anticipation (1)** 166:1 |
| | **ADHD (1)** 104:16 | | **anybody (1)** 174:22 |
| | **adjoining (1)** 169:20 | | **anymore (2)** 108:16 135:12 |
| | **adjusted (1)** 112:4 | | **apart (1)** 93:19 |
| | **administrativ...** 109:8 | **allegations (3)** 109:14 149:19 150:10 | **apologize (5)** 92:5 104:13,16 121:13 126:14 |
| | **admitted (1)** 167:20 | **allowed (3)** 141:13 164:20 173:6 | **APPEARAN...** 85:1 87:3 |
| **accountability...** 177:6 | **Adrianne (6)** 107:3 124:22 148:13 163:16 164:11 174:5 | **Amazon (6)** 127:10,12,14 128:7,11,12 | **appointed (1)** 174:12 |
| **accounting (5)** 89:20 93:17 94:9 97:11 167:16 | | **Amended (1)** 88:4 | **appointments ...** 154:14 155:21 |
| | **advise (1)** 174:21 | **ammunition (1)** 154:17 | **approve (1)** |
| | **advocate (1)** | | |

Extra right column:

124:8
**approximatel...** 119:4 137:23 144:14 146:2
**April (2)** 113:16 130:16
**area (4)** 121:15 124:18 147:22 154:5
**areas (1)** 152:2
**armor (1)** 154:4
**arms (1)** 102:9
**Army (1)** 162:23
**ARO (1)** 157:22
**Articles (6)** 88:8 88:10,12 133:12 134:20 136:6
**Ascencia (3)** 131:15,19 132:17
**aside (2)** 97:12 98:23
**asked (6)** 114:4 150:11 151:5 162:13 174:20 175:10
**asking (3)** 99:1 113:1 166:10
**aspect (2)** 153:8 153:22
**assets (1)** 160:20
**ASSOCIATE...** 84:14 86:11 180:7 181:6
**association (1)** 156:3
**assume (3)** 98:6 130:10 131:1
**assuming (2)** 120:11 122:22
**attack (1)** 107:15
**attempt (1)** 156:18
**attempted (1)** 143:6

attempts (1) 162:14
attorney (8) 115:1,13 116:12,22,23 150:8 176:7,8
attorneys (3) 160:11 175:22 176:1
attributable (1) 102:4
August (2) 168:3,5
AURELIA (4) 84:14 86:10 180:7 181:5
authority (1) 173:14
authorizations... 173:18
authorized (2) 141:5,8
availability (1) 112:5
Avenue (2) 85:4 182:3
average (1) 162:16
award (5) 103:4 103:6,21,23 155:11
awarded (5) 102:23 103:12 103:15,16 104:5
aware (1) 162:11

——————
B

B (10) 85:4 141:3 142:12 143:14,17 144:2,10,19 145:12 182:3
B2B (1) 123:11
Babel (11) 85:2 87:8 89:4 91:8

140:8 161:16 173:20 174:2 178:18 179:8 182:2
back (38) 93:23 96:7 99:7 111:14 113:10 113:12 114:11 114:14,18,21 115:23 118:10 118:12,23 119:21 120:1 123:5 131:17 132:8,8,13,15 132:18 141:7 147:4 162:15 162:17,19 163:3,6,10 166:3 167:1,8 168:7 174:13 175:2 177:23
back-pay (1) 165:21
bad (1) 177:1
badly (1) 153:4
balance (4) 97:20,21,22,23
bank (36) 89:20 92:8,9,15,17 92:20,22 93:5 93:14 94:20 96:14,15 97:6 98:10,12,16,16 99:5,10,18 100:3,21,22 101:1,3,5 132:11 134:11 135:15,17,19 170:15 171:19 172:16 173:13 173:15
banking (1) 99:9
based (3) 112:4 118:9 177:22
basically (3) 114:4 115:10 170:9

basis (2) 114:10 175:1
Bay (39) 84:6 88:10 92:20,23 93:1,6,13,16 94:2,3,6,8,11 94:15 95:6,10 95:11,14 96:5 96:6 98:21,23 99:7 124:14 125:12 134:21 135:5,10,16,20 135:23 152:9 152:12 155:3,5 155:5,8 156:1 156:20
Becton (4) 138:8 138:19 139:6 139:17
beginning (1) 86:8
behalf (3) 95:9 95:11 152:8
behavior (1) 166:20
belief (1) 180:11
believe (41) 93:13 96:12 98:21 99:11,20 100:6,15,15 103:3,5 105:8 109:5,13 110:2 113:19 120:19 120:21 126:1 127:18,21 129:18 131:15 134:12,22 135:15 136:8 139:14 142:20 143:13,14,20 144:2 145:7 148:14 152:4 157:17 161:16 169:23 170:22 175:13 177:9
believed (2) 92:19 132:14

benefit (1) 115:2
best (12) 92:2,3 109:19 122:2 126:14 135:12 139:14,15 163:12 167:18 171:17 180:11
bid (4) 102:21 103:16 104:9 104:20
bids (2) 103:12 105:6
big (2) 148:15 155:9
Bill (2) 122:22 130:10
bit (3) 97:6 98:22 136:21
black (3) 157:13 158:21 159:2
Blades (1) 128:16
blood (1) 107:18
board (12) 111:4 147:11 147:14 159:6 159:11,14,15 159:16,18 174:20 175:4 175:11
body (1) 154:4
bonus (5) 118:16 119:2,3 119:15,21
book (3) 143:6 149:1,3
books (17) 116:5 117:12,12 121:10 122:1,8 129:13 165:23 166:18,23 167:12,14,15 168:4,14,16 169:5
bottom (5) 109:22 125:7 125:17 127:2

131:8
bought (4) 115:10 138:21 139:4,19
bounced (1) 132:4
bound (1) 181:23
Bowl (1) 155:17
Box (1) 84:16
brand-new (1) 168:19
Brandy (1) 129:8
break (3) 140:7 162:6 173:20
briefing (1) 166:13
bring (2) 151:9 174:22
Broadsword (1) 164:6
broke (1) 161:22
broken (1) 95:23
brought (1) 168:12
Browne (2) 181:4,15
bubbles (3) 157:15,16 158:23
bucks (1) 137:10
build (2) 153:18 162:19
bunch (2) 149:11 150:11
business (12) 101:10 102:12 120:11 133:1 133:16 136:9 137:5 155:4 157:22 160:3 172:6,8
buy (2) 94:5 138:22
buy/sell (1) 140:3

buying (1) 128:7
Bylaws (1)
  88:22

**C**

C (3) 115:5
  117:13 137:23
calculations (1)
  112:9
call (9) 105:7
  110:9,12 119:4
  130:18 139:11
  157:14,15
  158:22
called (5) 91:2
  97:4 104:2
  122:12 152:20
capital (1) 112:6
capped (1)
  112:11
care (1) 168:20
Carolina (11)
  84:1,17 85:5,9
  86:13 133:9,18
  135:7 180:1
  181:1 182:4
case (2) 101:7
  131:13
cash (2) 112:5,6
category (1)
  124:16
CEO (6) 105:11
  111:4 138:7
  157:11,13
  165:8
certain (1)
  149:16
CERTIFICA...
  180:3 181:3
CERTIFICA...
  87:9
Certified (1)
  180:5
certify (2)
  180:12 181:6
CFO (1) 111:5
chain (13) 117:3

117:8 136:22
136:23 153:18
157:6,9,18
158:13,16
164:1 177:15
177:16
chairman (1)
  111:4
changed (5)
  114:8 127:21
  146:4 147:18
  148:6
changing (1)
  138:17
charge (4) 121:9
  122:1 130:11
  136:1
charges (1)
  109:16
chart (1) 143:22
check (1) 104:10
Checking (2)
  88:6 120:11
checks (2)
  167:15 173:18
Cherie (7) 84:13
  86:9 180:4,19
  181:9,14,16
circumstances...
  107:1
Citizens (3)
  92:18 99:18
  100:3
City (7) 84:6,10
  86:7 88:22
  112:1,2 123:22
civil (3) 86:13
  109:19,20
claim (3) 109:20
  119:1 166:11
claims (1)
  149:16
clarify (1)
  118:22
clarity (1) 125:2
class (15) 140:21
  140:23 141:3

141:15,19,21
142:12 143:14
143:17,17,19
143:20 144:10
144:19 145:12
claw (1) 132:15
clawback (1)
  131:21
clawed (1)
  132:13
clawing (1)
  131:17
clear (5) 124:6
  129:12 162:5
  173:17 178:3
Clerk (1) 181:23
clients (2) 161:4
  164:22
close (1) 154:21
clothing (1)
  153:10
collect (1) 113:9
column (1)
  123:22
combination (2)
  143:21 144:2
come (2) 91:22
  164:21
comes (3)
  103:14 110:14
  110:15
coming (4)
  109:7 132:8
  162:9,17
committee (5)
  110:6 111:3,9
  119:7 167:23
common (7)
  140:20,21
  141:4,9,19,22
  142:12
communicatin...
  161:1
communicatio...
  163:7
company (45)
  97:16 105:21

106:16 107:16
108:1,6,7
109:8,11
113:12 115:1,4
115:12 116:2
118:11,16
122:8,12 123:6
123:22 138:22
139:3 141:13
144:5 159:15
161:1,7 162:5
162:7 163:8,17
164:14 165:12
165:13 166:1
167:19 170:11
172:22 174:8
174:11,14,19
174:22 175:22
176:14
compensate (1)
  129:16
compensated (...
  94:17
compensation ...
  110:6 111:3,9
  111:14,19
  112:3,15,19
  113:21 118:19
  119:7,12,19
  167:23 169:6
competency (1)
  86:16
complete (1)
  170:12
completely (1)
  120:12
component (3)
  154:6,8,9
computer (1)
  109:10
concerned (3)
  173:16 176:8
  177:8
concerns (2)
  139:19 149:23
concluded (2)
  110:23 179:12

conduct (2)
  166:19 172:6
confirmation (...
  157:21
confusing (1)
  136:21
Conner (2)
  150:5,6
Consent (1)
  88:14
consider (2)
  107:19 177:7
considered (1)
  150:18
considering (1)
  107:1
consisted (1)
  151:22
consistent (1)
  114:9
consolidated (1)
  96:14
conspiring (1)
  160:21
constitutes (1)
  181:7
Consulting (7)
  123:3,22 124:3
  127:3 130:17
  131:2 159:23
CONT (1) 89:1
contact (3)
  161:9 176:5,7
contacting (1)
  127:20
contends (1)
  115:22
contents (3)
  87:1,5 180:10
continued (1)
  112:7
contract (2)
  123:5 155:16
contracting (13)
  84:6,11 86:7
  88:22 101:10
  104:3 112:1,2

123:23 152:16
153:9,19
154:17
**contractor (1)**
130:4
**contracts (3)**
136:23 155:10
156:15
**controlling (1)**
176:11
**conversation (3)**
150:21 163:16
175:20
**conversations ...**
120:5 150:14
175:15 176:15
**conversion (1)**
148:2
**converted (1)**
137:23
**convey (2)**
175:17 176:16
**conveyed (5)**
116:14 136:10
137:8 141:3
175:16
**convince (1)**
163:9
**COO (1)** 111:5
**copy (5)** 103:1
110:19 169:12
178:23 179:7
**corp (3)** 115:5
117:13 137:23
**corporate (3)**
110:16 133:17
135:6
**corporation (2)**
141:5,8
**correct (62)**
92:21 95:15
96:16 97:19
98:3 99:22,23
101:11,12
109:14,17
110:7 111:2
112:21,22

115:21 118:3
118:13,20
127:13 133:18
133:21 134:6
135:2,3,8,9
138:3,11
140:22 141:1,2
141:4,16 142:9
142:13 143:15
144:1,8,11,12
144:16,19
145:12,20,23
148:21,22
155:22 157:16
158:22 159:9
161:16 165:2
171:16 177:1
178:4,7,9,14
180:10 181:7
**correctly (3)**
146:22 158:1,2
**CORY (1)** 85:6
**cost (2)** 124:7
137:11
**costs (1)** 128:13
**Council (8)**
156:4 171:15
171:19 172:4,8
172:12,20
173:13
**Council's (1)**
156:21
**counsel (12)**
86:4,5 91:2
131:13 151:16
151:20,23
152:3,6 170:21
181:16,17
**County (4)** 84:2
180:2 181:2
182:1
**couple (1)**
120:23
**course (2)**
149:23 160:8
**Court (27)** 84:1
84:1 86:10

92:11 93:9
102:1,14,16
104:23 105:14
105:16 106:15
106:17,19
109:23 122:17
122:21 139:8
157:1 178:22
179:2,5,10
180:6 181:5
182:1,4
**cover (1)** 118:10
**COVID (1)**
148:5
**COVID-19 (1)**
112:7
**crack (1)** 160:7
**create (1)**
135:23
**created (5)** 97:4
117:21 142:21
173:3,9
**credentials (1)**
154:20
**cross (1)** 169:17
**cross-charge (1)**
94:13
**cross-charged ...**
93:20
**CRR (5)** 84:13
86:9 180:19
181:9,14
**current (5)**
105:11 147:10
151:16,20
152:6
**currently (1)**
128:10
**customer (3)**
103:10 127:22
128:1
**cut (1)** 130:12
**Cyber (1)** 108:8
**cycle (1)** 148:3

**D**

**D/B/A (7)** 92:20

93:1,14 125:12
125:13 152:12
156:20
**damages (1)**
101:8
**Danel (28)** 94:4
107:2,17 108:2
108:3 121:14
121:20,21
122:6,23 124:7
125:1,9,18
126:4 129:9
135:19,21
153:6 160:3,17
163:3,6,15
164:6,9 174:5
174:9
**Danel's (1)**
129:9
**dare (1)** 159:6
**data (2)** 123:17
127:5
**date (11)** 84:21
89:8,10,12
95:21 107:7
116:2,15
140:17 175:13
181:10
**dated (3)** 140:16
142:8 168:3
**dates (1)** 138:17
**David (26)**
89:16 107:2,16
108:2,3 111:24
122:23 124:7
125:1,9 129:13
134:3,8 153:6
155:19 156:6
160:3,17
163:14 164:5,6
164:8,13 174:5
174:9,14
**DaVinci (7)**
98:12 101:7
157:11,14
158:17,19
159:1

**DAVIS (2)** 85:3
182:2
**day (8)** 86:8
130:7 131:23
132:4 146:21
179:6 180:15
182:6
**day-to-day (1)**
130:12
**days (2)** 106:10
157:22
**dead (1)** 136:15
**deal (2)** 167:16
168:22
**deals (1)** 110:15
**dealt (2)** 124:19
139:16
**debate (1)**
107:11
**debt (5)** 117:12
166:11 167:21
168:13 169:5
**December (7)**
118:6,13 119:5
119:6,12 121:7
137:15
**decided (2)**
114:9 148:4
**decimal (1)**
144:15
**deck (1)** 130:2
**Defendants (2)**
84:8 85:6
**defense (5)** 94:4
125:18 126:4
155:17 164:6
**deferred (3)**
111:14 118:19
119:12
**definitively (2)**
105:9 158:18
**defraud (1)**
165:13
**defrauded (2)**
165:12 166:16
**deliver (1)**
157:23

demand (1)
149:16
department (2)
132:10,11
depended (1)
114:2
deposit (4)
89:20 127:11
131:9 171:18
deposited (5)
131:22 132:17
171:15 172:12
173:13
deposition (6)
84:10 86:6,12
86:15 179:12
180:14
depression (1)
162:12
Description (3)
88:2 89:2
140:20
descriptions (1)
123:13
Designee (1)
84:10
destroy (3)
107:19,21
164:15
details (1)
116:17
diabetic (8)
101:17 102:5
102:12,19
103:11 106:3
155:1 171:2
different (8)
92:16 96:15
106:2 113:2
126:7 127:17
163:9 176:1
differently (1)
148:2
direct (2) 87:8
136:23
directly (1)
176:5

director (1)
175:8
directors (5)
147:10,15
148:11 149:4
175:5
disabled (1)
164:21
disagree (4)
119:22 177:23
178:15,17
disagreement ...
163:15
discontent (1)
162:7
discovered (1)
166:19
discuss (1)
166:18
discussed (7)
119:16 149:21
150:2,19 166:6
166:11 169:4
discusses (1)
117:17
discussion (5)
111:21 119:11
150:1 160:4,5
dispute (1)
115:6
distribution (1)
123:6
distributor (3)
123:7 153:14
155:12
distributors (1)
123:7
District (1)
182:1
DIVISION (1)
84:1
divorce (1)
162:3
document (18)
104:4 110:10
116:8,13,18
117:4 137:20

137:22 140:13
140:14,15
144:18 146:13
147:5 149:10
151:14 170:3
171:11
documentatio...
140:1
documents (7)
149:12 151:3
169:21 170:1
170:12,13,20
doing (5) 124:20
136:11 147:20
177:5,5
dollars (7) 98:9
98:20 99:4,21
100:2,21
167:11
doom (1) 162:9
dot (1) 169:17
double-check ...
105:2
double-printe...
120:12
Drive (2) 133:17
135:6
due (2) 115:18
163:10
duly (3) 91:3
180:13 181:13
duty (1) 176:11

---
E
---
E (1) 144:7
early (5) 94:14
115:3 170:5
174:19,20
earned (1)
119:15
easier (3) 95:22
143:9 156:15
Eastham (20)
84:3 88:18
89:22 111:4
114:15 115:21
116:14,19,21

119:11,23
138:7 142:11
144:7 146:6
161:19 165:11
167:1 168:8
178:6
easy (1) 154:20
eBay (2) 128:4
136:16
effective (2)
175:13,13
either (4) 94:4
120:16 121:23
122:15
Either/or (1)
126:1
elected (1) 148:3
Election (1)
138:6
email (10) 89:16
116:21 117:5,8
120:1,3 164:1
164:5 177:15
177:16
emails (3) 89:22
117:3 120:4
emotionally (1)
164:19
employ (3)
106:9 107:6
108:12
employed (2)
106:7 181:17
employee (3)
105:22 139:6
139:12
employees (4)
161:1 177:20
178:1,16
employment (1)
108:14
ended (2)
131:19 132:9
enforcement (1)
156:12
enlist (2) 162:22
162:23

ensure (1)
176:12
enter (1) 127:20
entered (5) 88:2
89:2 123:18
124:10 169:3
entire (1) 128:23
entities (1)
154:15
entity (5) 93:20
97:4 125:10
140:3 156:5
entries (6) 93:23
95:8 111:13
120:23 124:21
129:1
entry (16) 95:5,6
95:13,13 121:7
122:5 125:6,17
126:4,22 127:2
127:9 128:15
129:8,20
130:16
EO (1) 103:18
equal (2) 116:3
116:15
equals (1) 116:1
equipment (3)
108:15 109:2,5
equity (11)
113:11 115:3
115:14,17
116:1,6,9
139:1 168:16
168:17 169:6
especially (2)
148:5 154:18
ESQ (1) 182:2
establish (1)
156:8
establishment ...
156:7
Estate (1) 121:8
etrans (1) 179:7
event (1) 152:23
events (1)
164:12

**everybody (4)** 148:12 168:19 168:20 176:12
**exact (2)** 107:7 138:16
**exactly (2)** 93:17 168:21
**examination (3)** 87:8 91:2,6
**examined (1)** 91:3
**exchange (1)** 155:6
**exchanged (1)** 116:6
**excluded (1)** 167:20
**excuse (1)** 97:23
**excused (1)** 179:11
**executive (2)** 108:8 172:22
**exhibit (87)** 87:6 88:1,3,5,7,9,11 88:13,15,17,19 88:21 89:1,3,5 89:7,9,11,13 89:15,17,19,21 91:3,14,16,18 91:19,21 92:6 94:22 96:7,10 97:17 99:12,17 109:21 117:22 120:6,8,10 126:8,11 128:23 133:4,6 134:17,18 136:2,4 137:16 137:18 140:6 140:11,17 142:1,3,15,17 143:2 146:11 146:12 149:7,8 151:10,12 157:4,5 158:9 158:11 160:12 160:14 161:12

161:14 163:20 163:22 165:1 167:23 169:7,9 169:19 170:14 170:18 172:11 173:4 177:11 177:13
**Exhibits (1)** 92:7
**existed (1)** 119:1
**expected (3)** 148:1 152:7 160:8
**expenditure (1)** 96:5
**expenditures (1)** 94:17
**expense (7)** 121:23 122:16 123:20 124:4 124:10,17 130:11
**expenses (2)** 122:7 173:18
**expertise (1)** 174:23
**explained (1)** 176:18
**explicit (1)** 181:18
**extra (1)** 97:10
**extremely (1)** 97:15

**F**

**F-O-R-T-E (1)** 123:3
**facility (5)** 156:6 156:9,11,13,22
**fact (3)** 117:16 132:17 153:3
**failed (1)** 152:2
**fair (1)** 131:1
**fairly (1)** 124:6
**faith (1)** 170:12
**false (1)** 166:17
**familiar (1)**

106:20
**family (3)** 156:5 162:4 163:9
**far (3)** 99:6 131:18 166:12
**February (6)** 124:20 125:7 125:18 127:3,9 128:16
**federal (9)** 88:8 89:18 123:10 132:21 133:2 133:13 156:17 169:13 171:1
**felt (2)** 109:18 119:20
**file (3)** 84:2 159:6 162:6
**filed (1)** 135:1
**filing (1)** 181:23
**finalized (1)** 155:15
**finance (1)** 110:15
**finances (4)** 97:16 166:9 167:16 173:2
**financial (4)** 166:6,12 167:9 167:21
**find (8)** 95:18 115:13 128:9 155:1 162:22 168:11 172:9 180:9
**finish (6)** 93:10 102:2 104:12 104:14 110:22 154:1
**finished (2)** 134:13 160:19
**fired (3)** 109:7 174:15 175:11
**firm (3)** 86:10 150:8 180:7
**first (30)** 91:3 92:8,17,18

96:14 97:18 98:10,11,16 99:5,10,18 100:3,22 121:2 133:15 138:5 146:15 147:20 151:20 154:11 160:5,7 163:10 164:4 165:21 173:3,10 175:1 175:7
**five (1)** 96:2
**flew (3)** 148:12 148:14 163:6
**Floral (1)** 85:8
**flow (1)** 112:5
**fly (2)** 148:14 163:3
**flying (1)** 162:15
**focus (1)** 154:21
**focused (5)** 153:7,21,23 154:5 166:9
**follow (2)** 119:23 177:7
**follow-on (1)** 163:14
**follows (3)** 86:4 91:4 141:9
**foregoing (3)** 180:8,14 181:6
**form (9)** 111:16 144:13,20,22 145:14,19 167:4,6 168:9
**formed (1)** 97:5
**Forte (9)** 123:2 123:16,21 124:3 125:3 127:3 130:16 131:2 159:23
**forth (2)** 151:9 181:10
**forward (1)** 168:19
**forwarded (1)** 182:2

**found (1)** 160:20
**four (3)** 96:15 97:9 170:8
**Friday (1)** 179:3
**friends (1)** 108:19
**FTE (3)** 112:12 113:16,18
**full (3)** 112:3,12 165:16
**full-time (1)** 114:7
**funds (2)** 98:17 173:12
**further (7)** 118:23 170:6 172:17 180:12 181:12,15,22
**future (9)** 93:21 115:3 116:2,6 162:19 164:17 169:6 172:8 177:8

**G**

**G- (1)** 170:4
**G2G (9)** 88:8 89:18 132:21 133:2,13 134:11 169:13 170:1,15
**gain (1)** 156:14
**games (1)** 162:13
**geared (1)** 155:6
**gears (1)** 159:21
**GENERAL (1)** 84:1
**generated (1)** 101:16
**gentleman (1)** 136:13
**genuinely (1)** 176:8
**George (6)** 89:6 107:3 124:22 174:5,7,7

Page 189

getting (4) 113:19 121:13 159:13 162:16
Gillespie (4) 149:22 150:3 159:13 161:10
give (9) 102:3 107:23 115:8 160:7,9 163:12 163:17 164:17 167:17
given (3) 114:21 132:1 142:11
giving (1) 107:20
go (39) 93:23 95:16 96:7 99:7 113:13 114:14 115:9 120:22 121:11 121:18 122:3 123:2 124:23 125:4,15 126:3 127:7 128:20 128:22 129:7 129:20 130:14 131:5,8 133:23 134:1 138:5 140:19 141:7 146:16 152:13 153:4 154:2,13 165:10,20 167:7 168:19 177:1
GO2 (1) 125:6
goals (1) 154:16
goes (1) 112:14
going (62) 91:12 92:3 93:4 94:1 94:3,4,5 95:14 96:3 99:15 103:5 104:15 107:21 110:3 110:17 113:1 113:13,20 114:6 115:19 116:14 117:9

120:7 121:1 128:22,23 130:10,17 131:19 132:15 133:5 136:3 137:17 140:10 142:2,16 147:23 151:11 153:4,21 154:23 156:18 156:21 157:14 157:15,18 158:10 159:19 161:13 162:17 162:21 163:21 164:15 168:15 168:19 169:1,8 172:18 176:9 176:23 177:12 178:3
good (5) 91:9,11 167:10,10 178:20
gotcha (1) 92:10
gotten (2) 102:9 171:3
governed (1) 140:3
government (... 101:10 104:5 123:10 130:20 152:15 153:8 153:11,19 155:10 156:14 156:19 170:1,3 171:1,12,18,20
Grange (24) 100:13 105:11 135:13 147:13 149:22 150:2,3 150:22 154:18 155:18 156:1,3 156:21 159:17 171:15,19,21 172:3,8,12,20 173:9,13 175:4
Grange's (1)

174:17
granted (1) 140:21
Graves (4) 105:17 145:9 146:6 178:4
gray (2) 157:15 158:22
great (1) 179:6
grips (2) 127:1,1
gross (5) 101:22 102:3 118:5,14 118:15
Group (6) 123:3 123:22 124:3 127:3 130:17 131:2
grow (1) 172:8
guess (7) 99:15 99:16 110:13 131:17 165:3 173:5,6
guide (1) 167:11
guns (1) 155:17

H
hand (1) 104:4
hand-delivery... 182:4
handguns (1) 154:4
handle (1) 122:8
hands-off (3) 97:15 171:23 173:2
Hanover (4) 84:2 180:2 181:2 182:1
happen (2) 110:18 148:2
happened (2) 131:16 176:19
happy (1) 105:3
harass (1) 161:1
hard (2) 153:1 179:7
harm (1) 162:14

HARTMAN (2) 85:3 182:2
Harvard (1) 159:14
head (1) 128:8
heal (1) 164:20
hearing (1) 126:14
heavily (1) 177:9
held (2) 103:17 146:20
help (6) 106:3 121:15 155:21 163:3 167:12 174:15
helped (1) 129:18
helping (4) 123:17 129:13 129:14 161:4
helps (1) 130:1
hereto (1) 86:14
hid (2) 163:6 166:5
hide (1) 166:17
Historically (1) 112:4
hit (1) 164:19
Hmm (1) 102:8
holds (1) 144:18
Holly (16) 100:12,13 134:7 135:13 147:13 149:22 156:4 159:17 170:11,13 171:21 172:18 173:1 174:12 174:15 175:2
home (1) 162:18
honest (2) 110:14 120:14
Honestly (1) 171:8
horrendous (1) 166:20

hour (2) 106:22 109:6
hours (1) 162:16
house (1) 136:20
housing (1) 121:16
Huh-uh (1) 139:7
hundred (1) 98:20
hundreds (1) 167:11
hurdles (1) 103:2
hurt (1) 161:22
husband (1) 134:8

I
idea (3) 99:13 99:15 154:11
ideas (1) 160:5
identification ... 91:14 120:6 133:4 134:17 136:2 137:16 140:6 142:1,15 146:11 149:7 151:10 157:4 158:9 160:12 161:12 163:20 169:7 170:14 177:11
ignorant (1) 110:16
III (2) 181:4,15
immediately (2) 163:12 164:13
impacted (1) 112:10
impasse (2) 107:12,14
impending (1) 162:9
include (1) 166:13
including (1)

107:16
**independent (1)**
130:4
**individual (3)**
95:23 138:16
141:18
**individually (2)**
84:10 91:22
**Individuals (2)**
112:1,14
**industry (1)**
152:23
**influenced (1)**
177:9
**inform (1)** 162:8
**information (8)**
120:21 130:13
151:8,17,19
160:22 167:18
172:18
**informed (2)**
107:17 118:23
**initial (1)** 138:20
**initially (1)**
168:15
**instance (4)**
115:21 153:13
155:1,10
**institution (1)**
99:9
**insurance (1)**
149:5
**intended (2)**
113:9 133:1
**intent (6)** 94:13
157:3 160:10
162:5 163:1
165:9
**intention (1)**
119:14
**interest (6)**
136:10 137:9
137:14 146:1
163:12 167:18
**interested (2)**
155:9 181:20
**internal (1)**

93:16
**interview (1)**
151:2
**inventory (4)**
94:5 125:21
128:19 136:18
**investigate (4)**
149:16,19
150:10 151:1
**investigations ...**
168:12
**invoice (1)** 96:1
**invoices (3)** 94:7
95:9 96:2
**involved (2)**
132:12 174:19
**involvement (1)**
174:17
**iPad (1)** 109:10
**iPhone (1)** 109:9
**IRS (1)** 143:8
**issue (9)** 123:17
138:21 141:6,8
141:14 165:18
165:21 168:13
176:9
**issued (5)** 94:7
141:15 143:8
168:18 169:13
**issues (6)** 103:17
109:19 112:7
117:17 149:22
150:18
**item (2)** 111:18
131:9
**items (3)** 137:1
152:15 161:6

**J**
**J (8)** 84:13 85:6
86:9 180:4,19
181:9,14,16
**James (4)**
149:21 159:13
161:9,10
**January (3)**
122:5 155:14

175:14
**January-to-D...**
148:1
**Jay (7)** 105:17
115:15 145:8,9
148:13 178:4,4
**job (2)** 106:3
110:17
**join (2)** 108:23
175:11
**Julie (1)** 129:21
**July (9)** 84:21
86:8 100:2
103:13,15,23
104:21 180:15
182:6
**June (12)**
100:16 102:18
102:22,23
103:3,8,16
138:1,14
141:17 142:8
172:13
**JUSTICE (1)**
84:1

**K**
**keep (3)** 106:3
113:13 126:9
**kept (4)** 106:2
136:20 138:17
168:22
**Kim (3)** 115:1
117:1 135:22
**kind (7)** 103:19
114:9 124:13
126:23 139:23
148:5 154:14
**kiosk (1)** 122:11
**knew (3)** 109:7
143:7 168:15
**know (125)**
91:23 92:22
93:17 94:8,9
94:12 96:5,17
97:10,11 98:8
98:15 99:6

100:20 101:2,4
103:12,19
104:5,19 105:5
106:13,23
108:5,17,18,22
109:6 114:3,5
115:9 116:3,3
116:4,18
117:11 118:22
120:4,4,16,20
121:12 122:11
122:18 123:18
124:4,9,13
125:23 127:22
128:2 129:15
130:2 131:10
131:11 134:1
135:17,22,22
137:10 138:22
139:10,18,21
140:5,14
141:12 142:18
142:20,21
145:22 146:2
147:3,9,14,17
147:18,21
148:6,12,18,23
149:2,2,6,18
149:21 150:9
150:11,13,20
151:5,16,19
152:1,1,5
153:15 154:13
154:15 156:4
157:22 159:18
164:14 166:4
166:10,21
167:8,9 168:4
168:10,10
170:5,10,15
172:6,16 173:3
173:9,11
174:21,23
175:9 176:7,12
**knowing (1)**
162:17
**knowledge (6)**

111:10 139:14
146:4 173:1
174:23 180:11

**L**
**large (3)** 153:18
154:12 156:6
**largest (3)**
152:23 166:8
166:11
**Las (2)** 152:8,13
**law (1)** 156:12
**lawsuit (1)**
108:23
**lawsuits (1)**
162:6
**lawyer (4)**
120:17 134:9
150:3,4
**LAWYER'S (2)**
87:7 90:1
**lawyers (3)**
147:7 150:9,14
**leadership (1)**
174:13
**learned (1)**
174:14
**leave (4)** 106:9
107:6 108:12
162:8
**leaves (1)** 174:8
**leaving (2)** 94:1
132:6
**left (6)** 108:13
108:14 123:21
163:17 174:7
174:10
**legal (3)** 132:10
132:11 149:11
**let's (13)** 95:18
96:1,7 98:23
99:7 102:17
109:21 113:13
114:14,14
120:22 129:20
164:23
**letter (6)** 89:4,6

151:18,21
**level (1)** 112:13
**leverage (1)** 166:19
**levied (4)** 98:12 98:20 131:12 132:2
**levy (1)** 101:4
**lied (2)** 162:4 165:21
**lies (1)** 177:4
**limited (2)** 128:4 175:1
**line (2)** 145:8 173:17
**list (10)** 112:15 113:13 126:15 126:17,18 142:19,22 146:5 177:20 178:4
**LISTING (3)** 87:6 88:1 89:1
**litigation (6)** 159:5 162:9 163:11 175:18 176:23 181:21
**little (5)** 97:6 98:22 110:3 113:2 136:21
**LLC (25)** 84:7,7 92:23 94:15 98:21 99:8 112:1 115:5 132:21 133:13 134:21 135:5 135:11,16,20 135:23 136:9 137:23 139:10 155:8 156:2 169:13 171:16 172:4,20
**LLC's (3)** 171:19 172:12 173:13
**loan (1)** 112:9
**location (2)**

84:22 136:19
**lock (2)** 155:13 155:13
**logging (1)** 96:20
**long (3)** 115:10 128:9 139:5
**longer (5)** 101:4 112:7 128:14 152:3 172:22
**look (30)** 93:23 94:21 96:10 97:18 99:17 109:21 111:18 111:23 114:14 123:21 124:9 133:12,15 135:1,4 141:11 142:9 143:10 143:10,11,22 146:15 151:2 158:22 164:4 164:23 167:14 169:18 172:10 177:18
**looked (5)** 93:22 94:20 95:5 140:17 167:22
**looking (16)** 91:19 93:5 96:12 99:13 107:18 111:11 111:17 120:15 146:5 147:4 157:8,10 162:20 165:2 167:8 172:7
**looks (13)** 96:13 96:15 121:21 127:10,11 133:23 134:23 157:12,18 159:3 164:5 170:7 171:10
**lost (6)** 101:7 161:22 162:2 163:10 164:14

164:16
**lot (7)** 106:23 114:5 129:1,5 139:18 151:8 156:15
**low (2)** 160:9 164:19

---

## M

**M16 (1)** 155:11
**M4 (4)** 126:1,7 126:15 155:11
**major (2)** 154:8 154:9
**majority (2)** 101:15 156:10
**making (2)** 118:16 154:14
**malpractice (1)** 131:12
**manage (1)** 100:10
**managing (1)** 134:6
**manufacturer ...** 94:5
**manufacturer...** 123:15 127:20
**March (8)** 107:7 112:19 113:6 129:8,21 146:21 165:2,7
**Mark (5)** 84:3 107:15,17,20 108:14,22 110:17 115:15 135:22,23 139:1 144:7,7 148:14 160:6 160:21 162:10 162:11 163:7 163:10,18 164:15 165:11 166:10 167:10 167:17 168:12 175:11 176:3 177:7,10 178:6

178:6
**marked (40)** 88:2 89:2 91:13,14 120:6 120:8 133:4,5 134:17,18 136:2,3 137:16 137:18 140:6 140:11 142:1,3 142:15,17 146:11 149:7,8 151:10,12 157:4,5 158:9 158:11 160:12 160:13 161:12 161:14 163:20 163:22 169:7 170:14,17 177:11,12
**market (1)** 136:15
**math (1)** 144:14
**mean (17)** 91:17 91:22 98:7 103:14 105:19 106:2 108:13 114:22 124:14 128:8 138:15 150:23 152:16 154:22 156:4 159:17 166:15
**meaning (1)** 170:1
**media (2)** 130:1 130:3
**meet (2)** 152:14 154:14
**meeting (19)** 110:7,23 119:6 119:17,23 146:16,19 147:1,15,19 148:7,9,15 157:21 166:7,8 166:22 168:1,6
**member (5)** 135:12,13

139:11 156:1 175:4
**members (7)** 111:3,8 134:6 135:10 162:7 163:8,8
**membership (1)** 137:13
**memory (1)** 138:16
**mentioned (2)** 155:18 166:3
**Merit (1)** 180:4
**message (5)** 89:12 175:17 176:17,20,21
**Messages (2)** 89:8,10
**met (1)** 157:20
**method (1)** 115:16
**Michael (5)** 104:10 153:6 171:21 172:23 174:12
**middle (4)** 115:6 126:23 143:23 159:3
**midyear (1)** 148:3
**Mihalik (1)** 124:22
**mil-fed (2)** 153:14 155:12
**miles (1)** 106:22
**military (7)** 153:8,21,22 154:20,21 155:6 156:11
**million (1)** 118:17
**minority (1)** 176:9
**minutes (9)** 110:12,20 111:13 113:5 117:15,16,19

117:20 168:1
**mislead (1)**
100:7
**money (13)** 94:1
97:6,12 98:11
98:22 113:9
117:11 129:5
132:6,15,16
166:17 178:17
**monies (1)** 166:4
**month (19)**
102:17,18
103:1,8,13
112:20 113:6
113:18,20,22
114:2,3,6,6
118:6,13
122:10 137:11
146:20
**month-to-mo...**
114:10
**monthly (2)**
111:18 128:13
**morning (1)**
91:9
**move (1)** 159:13
**Msg (1)** 89:14
**multiple (2)**
153:13 160:19

——————
**N**
——————
**name (16)** 96:16
96:17 97:2,2
98:11 99:4
108:7 109:12
127:16,17,21
128:6 135:15
154:18 155:19
155:21
**named (2)**
136:13 181:11
**names (1)**
127:22
**Nasco (5)** 123:5
123:9,14
159:22 160:3
**National (9)**

92:9,17 96:14
98:10,11,16
99:5,10 100:22
**Naylor (1)**
129:21
**NC (1)** 84:22
**need (11)** 94:17
130:2 152:15
165:17 175:3
176:4,6,7,13
179:2,7
**needed (7)** 94:16
107:19 123:11
162:8 173:16
175:19 176:23
**needs (2)** 93:19
177:6
**negative (3)**
97:20,20,22
**neighbor (1)**
108:10
**network (1)**
153:17
**never (12)** 97:5
98:19 113:9,11
114:21 122:9
124:19 132:8
139:12 166:2,6
170:3
**new (10)** 84:2
93:20 103:18
126:17 132:22
170:4,4 180:2
181:2 182:1
**night (1)** 162:16
**North (11)** 84:1
84:17 85:5,9
86:13 133:9,18
135:7 180:1
181:1 182:4
**Notary (6)** 84:13
86:9 180:6,20
181:4 182:10
**noted (1)** 112:9
**notes (9)** 87:7
90:1 110:7,8
110:10,11

117:16,18,20
**notice (3)** 86:5
86:15 132:1
**Notice/30(b)(6...**
88:4
**notification (2)**
103:23 104:21
**notified (4)**
102:22 103:15
103:21 171:18
**November (1)**
135:2
**number (27)**
88:3,5,7,9,11
88:13,15,17,19
88:21 89:3,5,7
89:9,11,13,15
89:17,19,21
99:14 104:17
114:9 116:15
121:2 135:4,18
**numbers (3)**
97:9 122:18,19
**NUTT (1)** 85:7

——————
**O**
——————
**Object (6)**
111:16 144:13
144:20 145:14
145:19 168:9
**objecting (2)**
144:22 167:6
**Objection (3)**
98:5 150:11
167:4
**objections (1)**
86:14
**occur (1)** 131:21
**October (8)**
147:19,19
148:7,8,16
166:8,21 168:6
**off-kilter (1)**
110:3
**offer (2)** 160:2,5
**offered (1)**
130:19

**office (4)** 84:16
122:12 135:5
169:22
**officer (1)** 104:3
**officers (4)**
105:11 138:6
138:13 149:4
**officially (1)**
175:10
**oh (7)** 109:6
111:20 118:6
121:12 124:3
145:2 179:6
**okay (136)**
91:15,19 92:1
92:14 93:3,11
93:22 95:1,12
96:7,10 97:1,8
97:17 98:2,23
99:7,11 100:11
100:20 102:11
103:5,10,22
104:8 106:1
107:2,23 108:5
109:13 110:1,2
110:9,12,19
111:2,8 112:18
113:8,13
114:14,22
116:8,13,19
117:8 118:18
118:21 119:16
120:9,22 121:4
121:5,6,11,16
121:18 122:4
123:2,18
125:10 126:3
126:20 127:2,7
128:1 129:7,14
129:20 130:15
132:3,18
133:11 134:8
134:19 136:5
137:4,8 138:10
139:6,12
140:16 141:7
142:4,8,23

143:5,9,22
145:8,22 146:5
146:10 148:17
149:9 150:2,15
150:20 151:13
152:4,8,11
153:7,20 154:7
154:23 156:20
157:8,12,18
158:3,21 159:3
159:4 160:18
164:23 165:10
165:15 167:8
167:22 169:15
169:19 170:19
170:20 171:10
171:18 172:3
173:8,23
174:17 175:12
176:19 177:18
178:3,20 179:7
**one-fourth (1)**
114:1
**ongoing (1)**
117:3
**online (1)** 155:6
**open (4)** 100:9
107:11 126:9
135:19
**opened (6)**
92:22 97:5,10
97:14 100:11
100:16
**operate (1)**
129:12
**operating (4)**
94:23 134:15
137:6 170:2
**operations (1)**
147:22
**Optics (1)** 129:4
**order (4)** 149:19
160:23 161:2
176:6
**ordered (2)**
125:9,10
**organization (7)**

88:8,10,12
133:13 134:20
136:6 158:20
organizational...
134:13
original (2)
115:6 181:22
originally (2)
115:7 147:23
ORS (5) 123:5,9
123:14 159:22
160:2
outcome (1)
181:21
outfit (1) 156:19
outlets (1)
153:16
outlines (1)
116:9
outlining (1)
120:1
overarching (1)
109:19
owed (15)
112:18 113:6,8
113:12 115:22
115:23 118:11
118:12 139:1
167:1 168:7
171:1 177:23
178:16,17
owes (2) 114:11
114:17
owned (1) 139:3
owns (4) 105:21
141:18 145:11
145:17

_____
P

P (5) 84:6,10
86:6 91:1
181:8
p.m (3) 89:14
157:19 179:12
page (38) 87:2
95:2 97:18
111:11 121:2

121:11,18
122:3 123:2
125:4,7,15,17
126:3,22 127:7
128:15,20
129:7,20
130:14 131:5,6
133:16 134:1,1
138:5 146:15
164:4,23 165:1
169:18,20
172:10,15
173:3,10
177:18
pages (2) 169:20
170:8
paid (12) 93:20
96:3 113:18,22
118:3,4 119:20
120:2 139:12
167:10 171:3
171:11
Palanza (1) 89:4
papers (1) 151:8
paperwork (2)
134:14 175:9
paragraph (3)
111:23 165:4
165:11
Park (2) 85:4
182:3
Parkway (1)
85:8
part (5) 109:1
115:2 149:23
155:3 174:20
particularly (1)
164:11
parties (3) 86:3
117:6 181:17
partner (3)
105:18,19
138:20
partners (5)
108:11 132:23
150:7 162:4
170:4

party (2) 86:14
136:10
path (1) 177:7
Patrick (1)
136:13
pay (23) 111:14
113:11,12
114:6,12,18,21
116:1 118:2,10
118:12,23
119:14,21
120:1 121:23
122:10,15
129:19 166:3
167:1 168:7
177:23
paying (1)
129:11
payment (9)
118:18 121:20
121:21 122:22
129:21 130:6
130:10 131:2
131:14
payments (4)
95:9,18 112:4
112:10
payroll (4)
123:19,23
124:14 132:4
pbruffiniii@a...
84:18
PCC (1) 101:20
PCCS (90) 88:6
88:14 93:2
94:1,6,17,23
95:11 96:16,18
97:2,13 98:10
98:19 99:1,4
100:21 101:9
101:16 102:4
102:11,18
103:5,12
104:19 105:11
105:22 106:9
107:4,6 108:12
110:7 114:11

114:17 119:9
122:12 124:21
125:11,21
126:20 127:14
127:16,23
128:10,19
129:11 132:6
132:18 133:20
135:8 137:1,2
137:5,22
138:14 139:6
139:13,17,20
142:19 143:15
146:1,8 147:10
148:10,23
149:4,16,18
152:10 155:9
155:15 156:18
156:20 159:16
160:20 162:8
164:20 165:8
166:23 168:5
171:1,3,14
172:4,6,20
174:4 175:5
176:10
PCCS's (2)
98:11 136:19
PDF (2) 179:8,9
peace (1) 162:22
pending (2)
103:4 163:11
people (15)
115:2 127:19
129:19 148:12
151:5 152:14
153:15 156:10
157:9 158:15
158:23 159:18
162:8,18 163:5
percent (11)
102:6 105:21
120:14 139:3
141:12 144:5
144:10,19
145:11,17
146:3

percentage (5)
101:19,20
102:3 143:14
154:9
percentages (1)
145:23
performance (1)
118:16
period (1) 168:5
permission (1)
171:20
person (5) 86:17
139:2 158:17
159:11,19
person-to-per...
177:3
personally (1)
107:19
persons (1)
181:11
Pete (3) 142:21
144:16,16
Peter (44) 84:3
94:10 97:10,14
107:15,17,21
108:14,14
109:3 110:10
110:11,17
115:15 117:17
121:9 122:1,2
129:17 139:1
139:15 147:5
153:3 160:6,21
160:23 162:10
162:11 163:7
163:18 164:15
165:11 166:10
167:11,17
168:12 175:11
176:5 177:4,9
178:8,8 181:4
181:15
Peter's (2)
163:11 177:8
petrels (1) 161:5
pharma (1)
108:15

112:12
**pharmacist (2)**
106:5 108:10
**phone (2)** 105:7
119:4
**phonetic (1)**
161:5
**physically (3)**
104:4,7 105:6
**place (4)** 86:16
121:13 137:4
181:10
**placed (1)** 169:5
**placeholder (6)**
113:11 115:17
116:5 165:23
168:16 169:6
**Plaintiffs (3)**
84:4 85:2 86:6
**Plaintiffs' (1)**
88:4
**plan (5)** 116:9
119:19 156:8
156:12 163:14
**please (6)** 122:3
125:4 127:7
130:14 162:13
173:21
**PLLC (3)** 85:3,7
182:3
**plow (1)** 92:4
**point (10)** 92:23
107:4 139:4
148:4 153:17
160:2 162:3
164:19 174:7
174:10
**points (1)**
144:15
**police (1)** 109:13
**poor (1)** 113:2
**popular (1)**
155:19
**populate (1)**
123:12
**populating (1)**
127:5

**Port (7)** 84:6,10
86:7 88:22
112:1,2 123:22
**portion (1)**
113:22
**position (1)**
106:1
**possess (1)**
167:14
**possession (2)**
104:9,20
**possible (2)**
153:18 173:2
**possibly (2)**
97:10 121:23
**Post (1)** 84:16
**potential (1)**
165:18
**potentially (2)**
103:1 122:13
**Potter (1)** 89:6
**PPC (1)** 112:9
**PPE (2)** 136:15
136:16
**prepared (1)**
91:20
**prepay (1)**
126:18
**prepayment (1)**
126:16
**presence (1)**
156:13
**presented (1)**
165:22
**president (6)**
105:12 107:3
111:5 138:8,8
181:5
**press (1)** 109:16
**pressuring (1)**
108:23
**pretenses (1)**
166:17
**previous (4)**
99:20 135:14
147:19 177:22
**previously (3)**

101:9 134:9
162:12
**pricing (1)**
123:13
**Princeton (1)**
159:14
**principal (2)**
135:5 137:4
**printed (1)**
169:21
**prior (3)** 176:16
180:13 181:12
**private (1)**
160:21
**privilege (1)**
165:18
**pro (3)** 109:10
156:8,21
**probably (4)**
104:15 109:22
113:2 125:1
**problem (3)**
102:21 171:22
172:1
**problems (1)**
162:11
**procedural (1)**
103:2
**Procedure (1)**
86:13
**procedures (1)**
110:16
**process (3)**
115:11 131:15
136:1
**produced (2)**
95:17 170:21
**products (7)**
123:13 125:21
127:14 128:7
128:10 130:19
154:3
**Professional (1)**
180:5
**program (12)**
93:18 94:6
95:11 96:6

106:3 108:15
123:4,8,11
125:3 127:6
170:4
**promised (3)**
115:3,15
168:21
**properly (3)**
93:19 129:16
165:23
**Pros (2)** 109:9
109:10
**protect (2)**
163:13 176:13
**provable (1)**
173:17
**provide (1)**
139:17
**provided (3)**
110:19 151:20
151:21
**provision (1)**
140:3
**proxies (1)**
107:16
**PTSD (1)**
162:12
**Public (6)** 84:13
86:9 180:6,20
181:4 182:10
**pull (4)** 94:21
117:22 126:8
126:11
**pulled (3)** 96:19
128:12 133:9
**punctuate (1)**
122:19
**punctuating (1)**
122:18
**punitive (1)**
101:8
**purchase (2)**
137:1 160:7
**purchased (1)**
122:23
**purchases (1)**
129:3

**purpose (2)**
117:10 181:18
**purposes (1)**
143:7
**pursuant (2)**
86:5,12
**pursue (1)**
109:20
**push (1)** 159:19
**put (21)** 93:16
94:8,11 97:6
98:23 101:19
102:22 110:11
115:14,16
117:11 119:10
143:6 147:6,7
159:16 165:23
166:4 168:13
168:14,15
**putting (1)**
116:4

___
**Q**
**quantified (1)**
168:11
**question (11)**
98:14,14
102:20 113:2,3
145:1,3 166:14
171:5,6,8
**questions (4)**
151:6,6 178:19
178:21
**QuickBooks (9)**
94:7,11 95:17
95:23 120:13
120:19,21
124:18,21
**quickly (1)**
105:4

___
**R**
**R-Y-K-E-R (1)**
126:23
**range (1)** 169:4
**read (14)** 93:12
98:6 111:2
112:16,17

149:14 158:1,2
159:7 167:9
172:15 180:8
**reading (7)**
86:19 97:18
98:3 157:12
165:1,7 172:11
**ready (2)** 159:13
162:3
**Real (1)** 121:8
**realize (1)** 159:5
**really (7)** 106:23
136:14,15
139:18 177:4,6
177:8
**Realtime (1)**
180:6
**reason (8)** 93:15
97:11 100:6
115:2 117:15
131:18 169:5
173:12
**reasonable (2)**
115:14 119:20
**reasons (1)**
97:13
**recall (9)** 93:4
117:8 126:6
137:13 163:2
167:22 171:4,6
177:15
**receive (1)**
119:21
**received (1)**
126:20
**recess (2)** 140:9
174:1
**record (4)** 86:4
178:3 181:7,10
**recorded (1)**
120:4
**records (2)**
166:23 168:4
**reduced (1)**
112:10
**reference (3)**
121:1 158:3

161:6
**referenced (3)**
99:8 134:9
159:22
**referencing (1)**
159:12
**referring (3)**
159:15 162:1
166:22
**regardless (1)**
104:4
**regards (1)**
104:9
**Registered (2)**
180:4,5
**reimbursed (1)**
123:1
**reimbursemen...**
122:15
**REISS (26)** 85:6
85:7 98:5
111:16 144:13
144:20,22
145:4,6,14,19
150:12 157:2
161:15 165:17
165:20 167:4,6
168:9 173:7,23
176:1 178:20
179:1,4,9
**related (4)**
104:20 171:7
172:20 181:16
**relates (1)**
170:22
**relationship (1)**
172:3
**relay (1)** 176:22
**released (1)**
126:19
**relied (1)** 167:17
**relocating (1)**
121:14
**rely (1)** 172:7
**relying (1)**
138:15
**remember (16)**

91:17,18 107:7
111:15 120:3
121:12 127:17
128:6 129:14
131:23 137:21
147:5 149:12
164:10 166:10
175:21
**remembered (1)**
99:14
**removed (2)**
101:8 109:9
**removing (1)**
109:7
**replace (1)**
155:11
**report (2)** 143:8
167:21
**REPORTED (...**
84:12,21
**Reporter (27)**
86:10 92:11
93:9 102:1,14
102:16 104:23
105:14,16
106:15,17,19
109:23 122:17
122:21 139:8
157:1 178:22
179:2,5,10
180:3,5,5,6,7
181:5
**represent (3)**
123:10 133:8
169:11
**represents (2)**
140:15 142:7
**requirements ...**
112:5
**reserve (1)**
112:5
**resign (1)** 165:8
**resignation (1)**
107:13
**resources (1)**
174:15
**respective (1)**

86:4
**respond (1)**
152:2
**responded (1)**
152:1
**response (11)**
89:18 107:12
129:15 149:18
151:18,21,22
152:5,6 169:14
169:19
**restraining (3)**
160:23 161:2
176:5
**restroom (1)**
140:7
**restructured (2)**
115:5 117:13
**retail (4)** 94:14
153:12,16
156:7
**return (2)** 131:9
163:4
**returned (1)**
174:18
**revenue (3)**
101:15,20
102:4
**reverse (1)**
143:18
**review (1)**
120:19
**rifle (2)** 126:17
127:1
**rifles (4)** 125:8
126:2,7,15
**right (91)** 91:9
91:12 92:3,14
94:19 95:1
96:7,9 97:17
99:17,20 100:1
100:20 101:14
104:19 105:17
105:22 109:2,3
109:21 112:16
112:17 113:14
115:19 117:7

117:22 118:1
120:7,22
121:19 124:1
124:10,23
125:4 126:22
128:5,15
130:14 131:5,7
133:1,8,15
134:23 135:4
137:17,22
140:12,19
141:17 142:2
142:16 143:2,9
146:12,15
148:19,23
149:14 151:11
151:16 152:7
152:13 155:9
155:20 157:12
158:10,15
159:7,9 161:5
161:13,21
162:20 163:21
164:1,4,11
165:7 169:8
170:17 172:5,7
172:11 173:1
174:3,6,10
175:7,20
176:10
**rights (1)** 141:1
**rile (1)** 162:14
**ripped (1)**
161:14
**RMR (5)** 84:13
86:9 180:19
181:9,14
**Robert (6)** 84:6
84:10 86:6
91:1 178:10
181:8
**route (1)** 109:19
**Rudner (8)**
104:10 105:12
130:7 134:3
153:6 171:21
174:12 178:10

Page 196

**Ruffin (6)** 84:14
    86:10 180:7
    181:4,5,15
**Rules (1)** 86:13
**run (7)** 102:21
    121:15 122:12
    124:5,16
    156:11 175:3
**running (5)**
    106:22 125:2
    174:4,8,11
**runs (2)** 130:1
    156:4
**Ryan (16)**
    107:16 108:9
    108:16,17
    114:3,5 115:15
    145:15,15
    175:15,19,21
    176:4 177:3
    178:13,13
**Ryker (1)**
    126:23

—— S ——
**S (4)** 84:15 85:2
    98:10 182:2
**S/ (1)** 180:18
**Sage (2)** 97:4
    98:19
**salaries (1)**
    124:10
**salary (3)**
    112:11 118:14
    118:15
**sale (6)** 101:16
    101:21 102:5
    102:19,23
    171:1
**sales (5)** 102:9
    102:18 122:12
    127:10 171:14
**Salesforce (4)**
    123:4,8,17
    125:3
**Saltwater (1)**
    121:8

**salvage (1)**
    164:17
**sam.gov (1)**
    104:6
**Sauer (7)** 94:4
    95:19 96:2
    129:1 153:13
    155:10,16
**save (1)** 181:18
**saying (4)** 104:4
    116:13 129:14
    142:11
**says (35)** 94:2
    95:6 108:18
    111:21,23
    112:18,23
    113:15 120:11
    122:22 123:21
    123:22,23
    124:4,4,17
    127:10 130:10
    131:9 135:4
    137:22 138:12
    140:19,20
    141:8 143:23
    145:8,21
    146:16,19
    157:20 162:20
    165:1 170:11
    172:15
**scare (1)** 159:4
**schedule (1)**
    148:1
**Screenshot (4)**
    89:8,10,12,14
**screwed (1)**
    175:22
**SDVO (2)**
    154:17 155:12
**SDVOSB (4)**
    106:14,18
    112:6 172:7
**second (6)**
    111:11,23
    133:23 164:23
    172:10 177:18
**secretary (5)**

111:6 133:10
    138:9 169:22
    170:9
**secretly (1)**
    161:4
**Section (1)**
    146:16
**see (10)** 96:3,20
    111:21 121:2
    124:3,13 127:4
    131:1 146:17
    177:4
**seeing (2)**
    123:20 177:16
**seen (20)** 91:16
    91:18 128:7
    137:20 140:13
    140:14 142:5,6
    143:2 146:13
    146:14 149:10
    149:11 151:14
    157:6 158:13
    160:14 161:17
    164:2 170:3
**segment (2)**
    94:14 153:12
**sell (5)** 123:6
    130:19 136:16
    160:2,11
**selling (5)**
    102:12 114:23
    127:14 128:10
    137:10
**sense (3)** 128:14
    153:22 154:18
**sent (6)** 120:16
    151:7,17
    161:19 164:8
    164:10
**separate (2)**
    93:1 94:14
**separation (1)**
    127:19
**serious (1)**
    107:11
**service (1)**
    162:22

**services (7)** 84:6
    84:11 86:7
    88:22 112:1,2
    139:17
**serving (1)**
    162:21
**set (5)** 97:12
    149:20 164:12
    177:21 181:10
**set-aside (1)**
    112:6
**sets (1)** 127:6
**share (3)** 141:1
    146:2 176:9
**shareholder (1...**
    88:16,18
    108:11 115:7
    139:10,20,21
    142:19,22
    166:22 168:6
    176:12
**shareholders (7)**
    140:1,2 146:1
    146:8,20 147:2
    148:11
**shares (38)**
    88:20 107:20
    108:1,18,19
    115:8 116:15
    138:21 140:21
    140:23 141:3,9
    141:11,13,14
    141:15,21
    142:12 143:8
    143:15,16,17
    143:21,23
    144:3,3,10,19
    145:12,18
    146:4 163:12
    163:18 164:18
    166:1,2,16
    168:16
**sharing (1)**
    160:21
**Sharpe (15)**
    84:6,10 86:6
    88:16 89:6,16

89:22 91:1,9
    138:6 140:10
    161:13 169:8
    174:3 181:8
**shell (1)** 164:21
**Sherrill (3)**
    136:13 137:9
    137:14
**Sheryl (1)**
    124:22
**shop (4)** 122:13
    123:1 156:8,21
**short (1)** 173:20
**short-barreled...**
    125:8
**Shot (9)** 152:21
    152:22 153:7
    153:17,20,20
    155:13,16
    158:7
**show (29)** 91:12
    120:7 133:5
    136:3 137:17
    138:23 140:10
    142:2,16 149:8
    151:11 152:18
    152:21,22
    153:7,17,20,20
    153:21 154:10
    155:16 157:5
    158:7,10
    161:13 163:21
    168:7 169:8
    177:12
**Show's (1)**
    155:13
**showed (2)**
    132:7 156:23
**showing (6)**
    118:2 134:18
    160:13 169:12
    170:17 173:17
**shown (2)**
    127:21 146:12
**shows (4)** 144:5
    144:18 145:11
    145:17

shut (1) 132:12
side (1) 95:23
Sig (7) 94:4
  95:19 96:2
  129:1 153:13
  155:10,16
sights (1) 154:3
sign (1) 147:8
signator (2)
  172:2,16
signatory (1)
  173:14
signed (7) 103:1
  104:2,3,7
  116:19 117:6
  140:1
significance (1)
  102:9
signing (1)
  86:19
Silencer (1)
  122:13
silos (1) 153:14
similar (1) 95:21
simple (1)
  102:20
simultaneousl...
  163:7
sir (6) 101:13
  106:21 111:1
  124:2 126:13
  147:12
site (2) 130:18
  133:10
sits (1) 159:5
sitting (7)
  100:20 102:11
  105:5 114:17
  128:5 145:22
  146:7
situation (1)
  163:19
six (1) 170:8
skews (2) 123:13
  123:14
sleep (1) 162:16
slide (1) 130:2

slowed (1)
  128:13
smart (1) 172:6
snarky (1) 98:7
social (2) 96:19
  130:1
software (3)
  123:11,12
  130:18
sold (1) 127:11
sole (1) 135:13
solid (1) 167:18
solution (1)
  172:1
Solutions (6)
  88:8 89:18
  132:21 133:2
  133:13 169:13
somebody (2)
  158:19 161:3
soon (1) 157:21
sorry (12) 92:11
  93:9 102:1,14
  104:13,23
  105:14 106:15
  122:17 139:8
  161:21 178:12
sort (5) 96:13
  140:2 153:8
  154:5 165:3
sound (1) 138:3
sounds (2)
  102:20 178:20
source (2) 122:2
  139:15
Southern (1)
  89:20
Spark (18) 84:3
  109:3,17 111:5
  114:15,18
  116:20,22
  119:12 138:9
  144:16 146:6
  165:11 168:8
  175:17 176:17
  176:22 178:8
Sparks (1) 167:2

Spartan (1)
  128:16
specific (6)
  116:17 120:3
  124:18 131:13
  151:5,6
specifically (11)
  91:17 96:22
  117:17 128:4
  132:1 136:17
  137:21 149:13
  155:5 160:22
  166:9
spending (1)
  93:17
split (1) 93:18
spread (2)
  154:12 162:7
SRS (12) 84:7
  88:12 128:2,3
  128:3 136:7,9
  136:16,18,22
  137:2,4
stabbed (1)
  162:19
stack (2) 92:7
  109:22
stages (1) 170:5
start (1) 154:14
started (6) 94:10
  102:8 113:16
  117:11 123:8
  147:20
starting (2)
  112:19 132:22
starts (1) 165:6
state (4) 154:17
  170:9 180:1
  181:1
State's (2)
  133:10 169:22
statement (7)
  88:6,16,18
  92:8 95:2
  96:14 177:2
statements (2)
  92:16 167:9

states (2) 134:3
  163:4
statutory (1)
  103:18
stay (2) 121:14
  173:2
steal (2) 160:19
  174:14
sticking (1)
  97:17
stipulated (1)
  86:2
STIPULATIO...
  86:1 87:4
stock (10)
  140:20,21
  141:4,9,11,19
  141:22 142:12
  148:23 149:2
stole (4) 108:14
  109:6 161:7
  162:5
Stone (40) 84:6
  88:10 92:20,23
  93:1,6,13,16
  94:2,3,6,8,11
  94:15 95:6,10
  95:11,14 96:5
  96:6 98:21,23
  99:7 124:14
  125:12 134:21
  135:5,10,16,20
  135:23 136:16
  152:9,12 155:3
  155:5,5,8
  156:1,20
stop (3) 162:13
  175:17 176:23
stored (1)
  136:18
stories (1) 163:9
Street (1) 84:15
stress (1) 107:15
strip (1) 106:3
strips (8) 101:17
  102:5,12,19
  103:11 104:1

155:1 171:2
strong (2)
  159:18,18
stub (1) 118:2
stuff (5) 114:5
  130:3 131:16
  138:17 147:21
submitted (1)
  103:16
subpoena (3)
  89:18 169:12
  169:19
subsequently (...
  165:12
sued (1) 175:21
Suite (4) 84:15
  85:4,8 182:3
Super (1)
  155:17
SUPERIOR (1)
  84:1
supplier (1)
  156:17
suppliers (2)
  152:17 155:22
supply (14) 84:7
  88:12 104:1
  128:2,3,3
  136:7,9,18,22
  136:23 153:18
  155:15 156:14
Supply's (1)
  137:4
supposed (7)
  113:21 115:7
  120:18 132:7
  161:3 169:2
  171:22
sure (12) 110:5
  116:17 117:23
  120:14,20
  135:18 143:18
  149:11 160:11
  173:22 176:6
  177:19
Surface (1)
  109:10

Page 198

surprised (1)
122:10
Swintosky (4)
115:1 117:1
134:4,8
switching (1)
159:21
sworn (3) 91:3
180:13 181:13
system (5) 104:5
123:14 124:13
131:18 156:16

———————————
T
TABLE (2) 87:1
87:5
tactical (15)
84:7 88:10
92:21 98:23
99:8 125:13
134:21 135:5
135:10,16,20
155:8,17 156:2
156:20
take (12) 92:6
96:10 99:17
105:1 109:21
128:9 140:7
149:14 164:22
168:20 171:21
173:20
taken (6) 86:7
86:12,17 98:12
180:9 181:9
takes (1) 162:6
talk (2) 116:12
165:17
talked (2) 92:16
107:2
talking (5)
101:22 140:2
158:4 159:23
170:23
tax (3) 143:7
148:1,3
team (2) 137:3
168:19

teams (1) 156:19
TELEPHON...
84:20
tell (12) 96:12
98:8 102:17
115:19,20
120:10 124:15
143:5,13
149:15 152:7
177:3
telling (7) 94:19
95:8 132:5
143:14 163:8
164:14 175:21
temporary (1)
121:16
term (2) 106:20
113:10
terminated (2)
106:11 107:10
termination (1)
108:21
test (8) 102:5,12
102:19 103:11
104:1 106:3
155:1 171:2
testified (10)
91:3 92:19
100:15 101:9
105:10 135:14
155:20 169:23
171:2 174:6
testifies (1)
176:21
testify (10)
91:20 96:22
98:6 100:4,5,7
105:8 108:23
135:21 158:18
testifying (1)
151:4
testimony (13)
86:20 93:3,7
93:12 99:21
115:23 152:4
171:6 173:12
177:22 181:8

181:13,19
testing (1)
101:17
Texas (1) 137:7
text (17) 89:8,10
89:12 157:6,9
157:10,18,19
158:13,16
159:9 160:14
160:16 161:6
161:17,19
162:20
texted (1) 176:3
texts (1) 157:19
Thank (6)
102:16 105:16
106:19 122:21
179:5,10
Thanks (1)
178:19
thereof (1) 86:16
thing (4) 110:2
124:12 129:17
131:4
things (8) 93:18
103:19 110:18
120:5 148:6
152:3 175:3
177:5
think (23) 94:21
94:22 95:1
97:8 100:1
105:10 115:20
115:21,22
118:1 124:12
131:5,21
135:14 143:9
143:16 151:17
153:12 159:4
168:13 169:16
170:8 178:18
thinking (1)
175:20
third (5) 88:4
95:2 136:10
165:3 169:18
third-party (1)

95:9
Thomas (3) 85:2
89:4 182:2
thoroughly (1)
150:18
thought (7) 93:3
93:6,12 119:19
120:1 131:16
159:19
thousands (1)
167:11
three (4) 97:23
132:23 162:16
170:8
thrown (1)
103:19
time (31) 86:16
92:4,14 98:21
105:10 109:20
110:4 117:14
118:1 121:10
121:15 130:12
130:13 131:1
133:3 137:6
139:2 149:14
151:20,23
154:11,13
157:23 158:23
163:3 164:7
167:13 169:4
170:22 171:22
182:5
times (1) 138:16
title (2) 87:2
138:6
titles (1) 106:2
today (8) 100:1
100:21 102:11
128:5 136:9
141:18 145:22
146:7
told (11) 108:18
115:13,20
116:4 118:2,9
150:16 163:5
175:19 176:16
176:22

top (7) 121:1,3
126:4 128:8
135:1 141:7
142:9
topics (1) 91:20
total (2) 141:14
143:16
totals (1) 141:11
track (1) 106:4
trade (3) 152:18
153:20 154:10
traditional (1)
153:15
train (1) 156:16
training (3)
156:6,9,22
transcribed (1)
180:9
transcribing (1)
181:19
transcript (5)
86:20 178:23
180:8 181:7,23
transfer (4) 93:6
131:14 149:1,3
transferred (1)
109:11
transfers (2)
93:5,13
transpired (2)
140:9 174:1
traumatic (1)
164:12
travel (1) 152:8
treasurer (1)
138:9
treated (1)
162:4
trial (1) 182:5
tried (2) 115:9
163:9
trip (1) 158:4
true (4) 99:3
101:6 180:10
181:7
trusted (1)
162:18

Page 199

try (3) 162:22
  166:18 172:6
trying (8) 100:6
  107:15 127:20
  154:15,23
  160:19 164:22
  174:14
Ts (1) 169:17
turn (1) 121:5
turning (1)
  151:22
two (6) 97:21
  103:9 109:9,10
  162:4 170:8
type (4) 125:22
  126:7 154:3
  156:7
types (2) 110:14
  152:15
typically (2)
  105:7 155:13

**U**

Uh-huh (35)
  95:4,7,20
  102:13 103:7,9
  105:13,23
  107:5 108:4
  109:4 111:12
  111:22 114:16
  125:14,16
  126:5 127:8
  128:21 129:22
  130:8,21 133:7
  134:2,5 137:19
  138:2 141:23
  143:12 146:18
  155:23 156:23
  161:8 168:2
  178:5
Ukraine (9)
  107:8 130:11
  162:15,21
  163:3,6 164:12
  174:4,18
Ukrainian (1)
  162:23

ultimately (1)
  132:16
unable (2)
  131:21 132:16
unaware (1)
  131:11
undefined (1)
  133:3
understand (5)
  94:12 101:6
  140:15 142:6
  144:23
understandin...
  100:23 117:21
  123:16 132:9
  132:11,14
  135:13 136:14
  139:9 147:21
  148:3 168:17
  171:17
uniforms (1)
  154:4
unintelligible ...
  157:23
Unit (2) 133:17
  135:6
United (1) 163:4
unknown (3)
  89:8,10,12
unlimited (1)
  140:23
unpaid (1)
  112:15
Unsure (1)
  146:14
updating (1)
  130:18
upset (2) 124:6
  160:22
USA (1) 126:23
use (6) 101:15
  103:5 125:23
  153:21 166:18
  174:23
user (2) 128:1,6
users (1) 123:7

**V**

VA (2) 103:11
  157:22
valuate (1)
  166:1
valuation (2)
  88:20 115:12
value (11)
  115:14,17
  116:5,15
  138:22,23
  143:7 160:9
  176:9,10,13
varied (1)
  136:20
various (3)
  154:15 178:1
  178:16
vast (1) 156:10
Vegas (5) 152:8
  152:13 157:21
  158:3,8
vendors (1)
  155:1
verifying (1)
  172:14
Verizon (1)
  109:9
veteran (2)
  164:21 165:6
vice (1) 138:8
video (1) 148:15
violating (1)
  161:2
visit (1) 154:12
VOLUME (1)
  84:23
vote (1) 141:1
voting (1)
  140:23
VP (1) 112:12
vs (1) 84:5

**W**

wages (1)
  124:11
waiting (1)

126:17
waived (2) 86:18
  86:20
want (14) 97:12
  109:1 127:18
  127:19 139:11
  143:10 145:2,5
  149:14 150:13
  150:16 156:16
  169:17 177:7
wanted (4)
  107:23 127:18
  153:4 172:17
warehouse (2)
  121:15 136:19
wasn't (11)
  92:23 98:14
  106:23 108:20
  108:21 112:12
  118:23 119:10
  147:7 153:11
  166:10
Water (1) 84:15
way (8) 94:16
  115:14 119:11
  151:4 164:16
  172:14 176:1
  181:20
we'll (1) 105:7
we're (8) 93:17
  108:19 114:6
  121:1 128:22
  134:16 156:17
  175:21
we've (3) 128:12
  142:2 148:12
weapon (1)
  125:22
weapons (6)
  125:6 126:20
  129:3,4 153:8
  154:3
week (2) 151:18
  176:16
weird (1) 124:12
Welcome (1)
  104:16

went (14) 92:15
  93:13 95:1
  106:13 108:5
  109:9,13 153:5
  154:11 155:12
  158:5 159:14
  169:16 176:4
weren't (2)
  103:18 154:23
white (4) 157:13
  157:14 158:21
  159:2
wholesale (1)
  123:6
wife (5) 129:9,18
  129:18 162:3
  162:18
willing (2) 160:6
  163:17
Wilmington (7)
  84:17,22 85:5
  85:9 133:17
  135:6 182:3
win (1) 103:21
wire (1) 131:14
Wireless (1)
  109:9
wish (1) 177:4
witness (18)
  86:20 106:16
  106:18 122:20
  140:7 144:21
  145:2,5 165:15
  165:19 167:5
  173:6,8,22
  176:2 179:11
  180:13 181:13
witnesses (1)
  151:2
won (4) 103:6,6
  103:16,23
word (2) 125:23
  153:22
words (3) 93:15
  105:1 124:16
work (8) 103:22
  108:20,22

Page 200

114:3,8 129:19
160:10 164:20
**worked (1)**
135:22
**working (6)**
112:3,6 134:16
161:4 164:7
172:5
**workload (1)**
114:9
**wouldn't (2)**
122:9 128:9
**WRIGHT (2)**
85:3 182:3
**write (1)** 167:15
**written (6)**
116:8,13 117:5
117:15 139:23
172:19
**wrong (1)** 96:13
**wrote (2)** 149:15
159:3
**www.peterruf...**
84:19

___
**X**
___

___
**Y**
___
**yeah (43)** 92:8
94:3,23 99:16
100:17,19
104:14 107:9
109:18 111:20
111:20 113:4
113:17 117:10
118:7,8 125:8
126:1 127:1
131:4 135:17
137:10 139:5
140:8,8 141:10
143:1,20 145:6
145:7 152:23
155:19 158:6
159:2 160:17
161:16 164:7
165:5 167:3
173:16 176:2
176:18,20

**year (5)** 100:18
101:15 102:8
146:20 148:19
**Yep (18)** 92:13
96:11 99:2,19
113:23 121:17
125:5,19
127:13 128:17
142:10 158:8
158:12 159:8
163:23 169:10
171:13 177:14
**yesterday (3)**
95:17 120:17
157:20
**you-all (1)** 95:17

___
**Z**
___
**zero (5)** 97:23
99:4,21 100:2
168:18
**zeroed (2)**
168:23 169:1

___
**0**
___
**0474 (1)** 97:9

___
**1**
___
**1 (2)** 86:5
118:17
**1,000 (1)** 96:2
**1,990 (1)** 142:12
**10 (7)** 117:22
140:21 141:15
141:21 143:17
143:19,20
**10,000 (6)**
113:16,19,21
141:8,10,14
**10:10 (1)** 86:8
**10:45 (1)** 89:14
**100 (2)** 106:22
120:14
**100,000 (2)**
112:11 118:15
**104 (2)** 84:15
85:8
**10th (1)** 119:5

**11 (2)** 105:21
145:11
**115,000 (4)**
118:3,5,10,14
**12 (3)** 109:21
122:5 167:23
**12/10/21 (1)**
89:22
**12/2021 (1)** 88:6
**12/8 (1)** 121:20
**12/9 (1)** 121:21
**12:21 (1)** 179:12
**120 (1)** 88:5
**1221 (1)** 85:8
**12th (1)** 148:8
**13 (3)** 88:3
91:13,14
**133 (1)** 88:7
**134 (1)** 88:9
**136 (1)** 88:11
**137 (1)** 88:13
**14 (4)** 88:5
120:6,8,10
**14- (1)** 104:17
**140 (1)** 88:15
**141 (1)** 88:17
**142 (1)** 88:19
**1449 (5)** 104:2,7
104:8,18,20
**146 (1)** 88:21
**149 (1)** 89:3
**15 (4)** 88:7
133:4,6 144:19
**15,000 (3)**
112:19 113:6
118:15
**151 (1)** 89:5
**157 (1)** 89:7
**158 (1)** 89:9
**16 (3)** 88:9
134:17,18
**160 (1)** 89:11
**161 (1)** 89:13
**163 (1)** 89:15
**169 (1)** 89:17
**17 (3)** 88:11
136:2,4

**170 (1)** 89:19
**172,608 (3)**
171:11 172:11
172:21
**175 (1)** 132:5
**175,000 (2)**
131:9,14
**177 (1)** 89:21
**17th (1)** 125:7
**18 (4)** 88:13
137:16,18
140:17
**180 (1)** 87:9
**18th (1)** 129:21
**19 (3)** 88:15
140:6,11
**19971470080 (...**
182:10
**1st (4)** 112:19
113:6,16
175:14

___
**2**
___
**2 (8)** 84:23
86:12 92:7,7
92:10 96:8
99:17 146:16
**2/28 (1)** 95:13
**2/28/2022 (1)**
95:3
**2/28/22 (1)** 89:6
**2/4 (2)** 95:5,21
**2/8 (1)** 95:6
**2:56 (1)** 89:14
**20 (3)** 88:17
142:1,3
**200 (1)** 137:10
**2017 (2)** 133:17
135:6
**2019 (3)** 112:19
113:6,16
**201932500176...**
180:20
**2020 (6)** 138:1
138:14 141:17
142:8 168:3,5
**2021 (14)** 101:15

101:20 102:4
119:6,13 121:7
135:2 137:15
148:16,17,20
148:20 166:21
168:6
**2022 (15)** 84:21
86:8 98:15
102:7,10 122:5
124:20 125:7
147:2,15
148:18 155:14
172:13 180:15
182:6
**2025 (1)** 84:16
**20th (3)** 107:8
165:2,7
**21 (4)** 88:19
142:15,17
143:2
**215 (1)** 84:15
**22 (3)** 88:21
146:11,12
**22-CVS-0015...**
84:2
**22nd (1)** 125:18
**23 (3)** 89:3
149:7,8
**23rd (1)** 172:13
**24 (3)** 89:5
151:10,12
**24th (1)** 127:3
**25 (5)** 89:7
113:16 144:10
157:4,5
**25th (1)** 127:9
**26 (4)** 84:21
89:9 158:9,11
**26th (5)** 86:8
100:2,2 180:15
182:6
**27 (3)** 89:11
160:12,14
**27th (2)** 168:3,5
**28 (4)** 89:13
161:12,14,15
**28401 (1)** 84:15

Eastham, et al. v. PCCS, Inc., et al.
Robert Sharpe

**28402-2025 (1)** 84:17
**28403 (3)** 85:5,9 182:4
**28th (1)** 128:16
**29 (4)** 89:15 139:3 163:20 163:22

**3**

**3 (6)** 86:14 92:7 92:7,10 96:8 165:1
**3,000-and-cha...** 127:4
**3/20/22 (1)** 89:16
**30 (3)** 89:17 169:7,9
**30(b)(6) (1)** 84:10
**300,000 (1)** 123:14
**30th (4)** 138:1 138:14 141:17 142:8
**31 (4)** 89:19 170:14,18 173:4
**31st (2)** 131:8 137:15
**32 (3)** 89:21 177:11,13
**343-1035 (1)** 84:20
**366,000 (1)** 168:14
**370 (1)** 97:3
**3819 (2)** 85:4 182:3

**4**

**4 (5)** 86:19 94:22,22 133:17 135:6
**4/3 (1)** 89:14
**4:15 (1)** 157:19
**40 (3)** 141:12 144:5 146:3
**40-point (1)** 146:3
**45 (1)** 106:10

**5**

**5 (8)** 92:7,7 96:7 96:10 97:17 99:12 114:6 165:1
**5,000 (2)** 96:3,4
**5,110 (1)** 143:23
**5/2022 (1)** 88:6
**5/31 (2)** 131:23 132:12
**5/4/22 (1)** 89:4
**51- (1)** 143:19
**5100 (1)** 143:17
**585 (1)** 121:2
**587 (1)** 121:5
**589 (2)** 121:11 121:18
**595 (1)** 122:3
**5th (1)** 135:2

**6**

**6 (2)** 121:7 135:4
**6/16 (1)** 89:14
**6/30/20 (3)** 88:14,16,18
**600 (1)** 123:15
**602 (2)** 123:2 124:1
**603 (1)** 125:4
**604 (1)** 125:15
**605 (2)** 126:3,22
**606 (1)** 127:7
**607 (1)** 128:20
**610 (1)** 129:7
**612 (1)** 129:20
**615 (1)** 130:14
**621 (1)** 131:5

**7**

**700 (1)** 129:11
**72,500 (2)** 115:22 116:16
**7282 (2)** 99:14 120:12
**75 (1)** 114:7

**8**

**8 (3)** 126:8,11,12
**8,459.31 (2)** 122:9,20
**84 (1)** 87:2
**85 (1)** 87:3
**86 (1)** 87:4
**87 (1)** 87:5
**88 (1)** 87:6
**89 (1)** 87:6
**8th (2)** 129:8 130:16

**9**

**9 (1)** 145:17
**9,000 (1)** 141:10
**9,990 (2)** 141:3 141:11
**90 (2)** 87:7 102:6
**91 (2)** 87:8 88:3
**910 (1)** 84:20

STATE OF NORTH CAROLINA ᶠᴵᴸᴱᴰ

COUNTY OF NEW HANOVER ᴬᵁᴳ -2 ᴾ ᴵ: 5ᴵ

NEW HANOVER CO., C.S.C.

BY_____

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 22-CVS-001507

MARK EASTHAM
And PETER SPARK,

      Plaintiffs,

vs.

PORT CITY CONTRACTING
SERVICES, INC., ROBERT P. SHARPE,
STONE BAY TACTICAL, LLC, and SRS
SUPPLY, LLC,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF
ROBERT P. SHARPE**

I, Robert P. Sharpe, under oath, hereby state and affirm as follows:

1.    I am over the age of eighteen years, suffer from no legal disabilities, have personal knowledge of all matters herein asserted unless asserted upon information and belief, in which case I have a factual basis to believe them to be true, and am otherwise competent to testify to the contents of this Affidavit. I commonly go by the nickname "Trey."

2.    I served in the United States Marine Corps from 1993 – 1997, when I was honorably discharged at the rank of Corporal. I have served overseas as both a Marine and private contractor.

3.    As a result of my service, I suffer from and have been diagnosed with Post-Traumatic Stress Disorder ("PTSD").

4.      In 2019, I formed a company called Port City Contracting Services, LLC for the purpose of doing business under the Service-Disabled Veteran-Owned Business ("SDVOB") Program established by the United States Government. The Department of Veterans Affairs qualifies businesses to compete for government contracts as SDVOBs, which receive preferential consideration consistent with U.S. policy to support service-disabled veterans after discharge from their service.

5.      I was the 51% interest holder and controlling member of Port City Contracting Services, LLC ("PCCS LLC"), which are both requirements to qualify as a SDVOB.

6.      PCCS LLC had 2 minority members: Nicholas Becton (29%) and Mark Eastham (20%). True and accurate copies of our 2019 Schedule K-1s are attached as Exhibit A.

7.      As a competent businessperson, I recognized that a successful government contractor should have persons with expertise in all aspects of the company's affairs, including management, accounting, customer service, business development and the like. As a startup company seeking to obtain large, often million-dollar supply contracts for government agencies such as the VA, however, PCCS LLC lacked the ability to immediately pay qualified persons to fill those roles during its formative period and initial operations.

8.      Accordingly, I recruited individuals whom I believed possessed the qualifications and skills that would get the company on track and provide me, as the manager and majority owner, sound business advice.

-3-

9.      Each of those persons, including but not limited to Peter Spark, agreed from the beginning of their relationship with PCCS LLC, to forego payment for their work during that time until the company was profitable and they could be issued ownership interests in the company as compensation for their initial work.

10.      PCCS LLC did not set the schedules for their work or direct how they performed tasks they agreed to do.

11.      As a 20% member of the company, Eastham was compensated through distributions.

12.      Each of those persons, including but not limited to Eastham and Spark, agreed from the beginning that once the company was able to pay salaries, they would be hired employees compensated for their labor.

13.      Spark provided bookkeeping services.

14.      Importantly, however, neither Eastham nor Spark were expected to, nor did they, devote all their professional efforts to PCCS LLC; they had other business interests and sources of income as well.

15.      Each of the persons who agreed to provide services to PCCS LLC in exchange for future shares of the successful business, including but not limited to Spark, knew and expressly agreed that such interests in the company would be their compensation until such time that salaries could be paid and that their initial labor constituted an investment in PCCS LLC.

-4-

16.     Eastham understood that his compensation was from distributions and additional future equity until the company could pay salaries to him, me, and others who wished to be employed.

17.     The company's primary line of business initially was distributing diabetes test strips to the Department of Veterans Affairs.  I personally generated the relationships with qualifying manufacturers to obtain our supplies and as the service-disabled veteran qualified the company for contracts under the SDVOB Program.

18.     Beginning in June of 2020, the company was able to employ on salary basis persons who had thus far foregone compensation in expectation of equity. Additionally, the owners of PCCS LLC converted the partnership to a corporation, Port City Contracting Services, Inc. ("PCCS Inc.").  The corporation issued 10,000 shares of common stock, consisting of 10 shares of Class A common stock that carried voting rights, and 9,990 shares of Class B common stock that carried no voting rights. A true and accurate copy of the Articles of Conversion is attached as Exhibit B.

19.     The 10 shares of Class A voting stock were issued to me.  The Class B stock was issued as follows: 5,100 shares to me; 2,900 shares to Becton; and 1,990 shares to Eastham.  That division of Class B stock closely tracked our interests in the LLC at the time of conversion.

20.     I was issued the only voting stock due to the United States Government's requirement that a service-disabled veteran retain not only majority economic interest in a SDVOB but also have control over that business.

-5-

21.     The Corporation also adopted bylaws and elected the following officers and directors:  Robert P. Sharpe, CEO; Eastham, President; Becton, Vice President; Spark, Secretary and Treasurer.

22.     Becton was removed as vice president by the other officers and directors on July 7, 2020.

23.     On August 17, 2020, the Board of Directors met and acknowledged that persons had "gone un- or under paid for a portion of their work so far.  Those doing so, were willing to do so based upon a promise of future payment or ownership in the Company."  The Board also acknowledged that equity issuances would require additional issuances to Sharpe to ensure his continued economic interest of at least 51% in compliance with SDVOB regulations.  A true and accurate copy of minutes from that meeting, executed by Spark as secretary, is attached as Exhibit C.

24.     During that summer, I wished to issue stock to Spark and others, and to increase Eastham's share; however, Becton would not accept dilution of his interest to do so.  Combined with the requirement that service-disabled veterans remain majority shareholders, the situation limited the ability of PCCS Inc. to compensate Eastham, Spark, and others with equity as contemplated.

25.     I eventually negotiated a stock buyback with Becton in which he sold his shares back to PCCS Inc. effective December 17, 2020.

26.     To do that, I worked with Spark and Eastham on the best and fairest method to value the company, and thus shares Becton was to sell back to PCCS Inc., but we had to account for the labor that they and others had invested but which had

not yet been converted to equity as expected. To do that, we used salaries established in June of 2020 and retroactively accounted for them in each month since each person began his association with PCCS LLC. We understood this to be nothing more than an accounting mechanism to develop a valuation of the company.

27.    Spark, whose financial experience qualified him as the company's bookkeeper and treasurer, initially accounted for those figures as "owner investment" in the company. However, that was not adequate under the circumstances and the figures were identified as "payable" liabilities, which could be converted to equity after the transaction with Becton. Kimberly Swintosky, my attorney in that transaction, has provided an affidavit and exhibit explaining the valuation process and the expectation that past unpaid work was to be converted to equity in the company.

28.    Importantly, no one was promised or expected to receive both new equity and dollar-for-dollar retrospective payment based on salaries established for the first time in June of 2020.

29.    On December 10, 2020, as the sole voting member, I approved an Amendment to the Articles of Incorporation raising the number of shares to 1,000,000, consisting of 10 shares of Class A voting stock and 9,999,990 shares of Class B non-voting stock. As the Board of Directors, Eastham, Sharp, and I consented to that increase as well. True and accurate copies of the shareholder consent, board consent, and Amendment are attached as Exhibits D, E, and F.

-7-

30.     On December 28, 2020, Eastham's shares were increased by 1,204 to 3,194. Spark was issued 1,916 shares of Class B stock; Ryan Albert was issued 1,150 shares of Class B stock; and Jay Graves was issued 1,405 shares of Class B stock. My economic interest remained at 5,100 shares of Class B stock and all 10 shares of Class A voting stock. In other words, despite my own unpaid labor contributions, I did not demand additional equity as compensation.

31.     On June 7, 2021, at Eastham's request, PCCS entered into a Stock Redemption and Release Agreement with Eastham, which is attached as Exhibit G.

32.     The agreement provided for PCCS Inc. to purchase 1,916 of Eastham's shares in increments as diabetic test strips were sold, equal to $1 per box until the redemption price of $60,000 was paid in full. The agreement term was for one year after June 7, 2021, at which time Eastham would retain any shares not purchased by then.

33.     On September 16, 2021, Spark emailed me and Eastham to report receipt of payment, invoicing, and award of contracts for enough boxes of diabetic test strips to finance redemption of 761 of Eastham's shares, and he suggested the amounts be rounded up to pay half of the buyout that month. I replied: "Sounds good to me." A true and accurate copy of that email exchange is attached as Exhibit H.

34.     Based on the allegations in the Amended Complaint, it appears that for reasons Spark and Eastham do not explain, Spark failed to complete and Eastham did not demand that transaction be completed — not due to resistance from me, the company's voting member, because I approved the only payment proposed to me.

Nevertheless, the remedy provided in the Redemption Agreement for PCCS Inc.'s failure for any reason to buy back Eastham's shares by June 8, 2022, which has passed, is that Eastham "will retain the difference of shares not purchased and redeemed by" PCCS Inc.

35.    PCCS Inc. enjoyed substantial growth in 2021. I was responsible for sales of more than $5.4 million worth of diabetic supplies.

36.    Throughout the company's existence, I sought additional opportunities to leverage our SDVOB status in other lines of business, including pharmaceuticals, personal protective equipment ("PPE"), and firearms to be sold to federal agencies. Some of these lines of business utilized online retail portals such as Amazon.

37.    On October 5, 2021, PCCS Inc., doing business as "Stone Bay Tactical," obtained federal firearms manufacturer and import/export licenses. I had developed contracts between PCCS Inc. d/b/a Stone Bay Tactical and two major firearms manufacturers, Sig Sauer and Daniel Defense, which would supply weapons and related goods to be sold to federal agencies by our SDVOB. True and accurate copies of PCCS Inc.'s licenses are attached as Exhibit I.

38.    I identified another business opportunity selling firearms retail through the government's exchange system, which is an online retail mall for veterans. Through a separate LLC to be owned by me and other members of PCCS Inc., which was expected to include Eastham and Spark as members, Stone Bay Tactical, LLC ("SBT LLC") would capitalize on PCCS Inc.'s supply line from Sig Sauer and Daniel

-9-

Defense to procure inventory that could be sold retail to veterans through the military exchange.

39.    Meanwhile, Eastham and Spark were developing PCCS Inc.'s pharmaceutical sales division. Their work was kept on a laptop and iPads owned by PCCS Inc. and in Spark's possession.

40.    Eastham decided he wished to work on the pharmaceutical side as an independent contractor. He negotiated a contract that included a 25% commission on all pharmaceutical sales. A copy of the draft showing his participation is attached as Exhibit J.

41.    I thought that was a good model to incentivize business development, which so far had been limited to my efforts.

42.    Throughout my business development efforts, however, Eastham and Spark were sources of constant derision and skepticism. They opposed my e-commerce plans, selling on platforms such as Amazon and eBay, believing it would not be profitable. Additionally, they took a narrow view of what it means to be a government "contractor." While they preferred to draw the lines of business tightly around diabetic supplies and pharmaceuticals, I believed our SDVOB designation should be used to conduct "contracting" for any goods the government might need that would prove lucrative for the company.

43.    In October of 2021, all members met to discuss the company's finances.

44.    PCCS Inc. having realized more than $1.5 million in gross profit that year from my diabetic supply sales, I would have been due a bonus of more than

$250,000 under the commission plan. I informed Eastham and Spark in December that I only wanted a bonus of $100,000. They expressed reservations.

45.     Later, by email on December 10, 2021, Eastham admitted that my proposed commission was fair. However, he then demanded that he, Spark, and other employees receive "back pay" for their work under PCCS LLC. A true and accurate copy of that email is attached as Exhibit K.

46.     The source of the "back pay" numbers was the retrospective income calculations placed in the books in 2020 for valuation and taxation purposes during negotiations with Becton. As previously stated, those figures were meant as mere placeholders that would be converted to equity; apparently, however, Spark had not adjusted the books to reflect their elimination upon issuance of shares to each of those persons and never mentioned that to me.

47.     Accordingly, Eastham and Spark were demanding a second round of compensation for the same work, which was both contrary to the company's interest and unwarranted given their knowledge that their prior work was an investment for equity.

48.     On December 13, 2021, I met with Eastham, Spark, and CEO Adrianne George to discuss the existence of $366,000 in liabilities that were supposed to have been converted to equity when the new shares were issued. Amazingly, neither Eastham nor Spark had raised the existence of such a huge liability during our financial meeting in October.

49.     Whatever his belief about the propriety of maintaining those liabilities on the books, Spark admitted in a telephone conference on December 13, 2021, that they were to be addressed upon the sale of the company, not as "back pay" from operational income. Again, that reflects his understanding that work for PCCS LLC was an investment to be realized as a return upon a future event. The transcript of that recorded conversion is attached as Exhibit L (*See* p 6).

50.     This dispute was only the latest controversy caused by Eastham and Spark. We were in a state of regular conflict by December of 2021. Eastham had resisted expansion of PCCS Inc.'s business to lines other than diabetic supplies and pharmaceuticals. He expressed discomfort to me about the Stone Bay Tactical division; both he and Spark also protested PPE sales via Amazon and eBay, believing they would not be worth the company's time and attention.

51.     Because of their constant rejection of the e-commerce line of business, I formed SRS Supply, LLC to sell those products.

52.     Allegations in this action that PCCS Inc.'s warehouse has been used by SBT LLC and SRS LLC without compensation are completely false. First, SBT LLC has no assets to store; the firearms in PCCS Inc.'s warehouse, and related goods, are property of PCCS Inc. d/b/a Stone Bay Tactical, which holds the federal firearms licenses ("FFLs") required to possess and store them. Second, SRS paid PCCS Inc. fees from sales shipped out of that facility. In other words, despite Eastham's and Spark's rejection of the business SRS conducts, that company does compensate PCCS Inc.

53.     The sworn statement that weapons purchased with PCCS Inc.'s funds "have no relationship to the business of Defendant PCCS" is clearly false (Am. Compl. ¶ 75), as Eastham and Spark well knew when they verified the Complaint and Amended Complaint.  Spark executed the FFLS on behalf of PCCS Inc. d/b/a Stone Bay Tactical.  Spark and Eastham knew that Stone Bay Tactical was a d/b/a of PCCS Inc. and that PCCS Inc. would profit from its sales, as chat exchanges attached hereto as Exhibits M, N, and O show.

54.     Despite their supposed concerns about Stone Bay Tactical, Eastham and Spark assisted in forming the retail entity Stone Bay Tactical, LLC, in which they were offered ownership interests.  True and accurate copies of emails evidencing their participation in the formation of Stone Bay Tactical, LLC are attached as Exhibit P.

55.     In December of 2021, I discovered through examination of corporate chat records that Eastham and Spark had been badmouthing my efforts and resisting them behind my back to the company's detriment, and to other employees.  It became clear they could not remain employed and in charge of important company functions because they would not be faithful to the company.

56.     I also discovered that Spark had made a payment to Eastham in 2020 that resulted in Eastham receiving more income than me on his W-2 for 2020.  This put PCCS Inc. in violation of the SDVOB regulations requiring a service-disabled veteran to receive more compensation than any non-veteran director, officer, or employee. Eastham and Spark knew that regulation and yet did not warn me or anyone else that I needed to receive additional compensation to avoid a potential

catastrophe for PCCS Inc. A true and accurate copy of the Department of Veterans Affairs Verification Assistance Brief explaining the compensation regulations is attached as Exhibit Q.

57.     On December 14, 2021, I terminated Eastham and Spark. That day, Spark contacted PCCS Inc.'s service provider, Verizon, and transferred company cellular phones, iPads, and a computer into his own name. True and accurate copies of screen shots I took of Verizon records documenting Spark's actions are attached as Exhibit R.

58.     All business plans, data, and other information upon which PCCS Inc.'s pharmaceutical division was to be based were contained in the equipment Spark kept. Spark did not return any of it to PCCS Inc, which is consistent with his and Eastham's plans to take that business for themselves.

59.     On November 30, 2021, Eastham and Spark discussed plans via email to induce me to shut down the pharmaceutical side of PCCS Inc. so they could "have a better shot at just picking it up with Pathfinder," an SDVOB owned by Jay Graves, or buy me out of PCCS because "we have spend [sic] considerable time building the brand to an extent." A true and accurate copy of that exchange is attached as Exhibit S. I believe this lawsuit is part of that plan to take over PCCS Inc.

60.     In December of 2021, PCCS Inc. leased a vehicle for my business use. I had donated the use of my personal vehicle for business purposes since the business was formed, but PCCS Inc. d/b/a Stone Bay Tactical was going to require far more road travel than I should have been expected to impose on my own vehicle. That is

because I would have to travel to meet with military and other government officials to demonstrate various firearms and related equipment that PCCS Inc. d/b/a Stone Bay Tactical was trying to sell to federal agencies. I used personal funds for the down-payment and track all personal use on an application for taxation purposes. The allegation that an officer and/or the head of business development traveling for such purposes may not use a company-leased vehicle for business travel is absurd.

61.     In early 2022, I also discovered that Spark had made physical threats against me. I took them seriously as did a judge in New Hanover County. Contrary to the false sworn assertion in the original Complaint, which the Court used as grounds to enter a secret TRO against me (TRO ¶ 25), a no-contact order was in fact entered against Spark. A true and accurate copy of that order is attached as Exhibit T.

62.     The Amended Complaint also faults me for seeking the return of PCCS Inc.'s property from Spark and attempting to enlist help from the authorities. Despite law enforcement's disinterest in this as a "civil matter," attempting to recover misappropriated company property containing valuable data is a proper application of my fiduciary duties to the company. To suggest otherwise demonstrates a lack of understanding about the best interests of PCCS Inc.

63.     In March of 2022, as Stone Bay Tactical, LLC was being established, PCCS Inc., by and through PCCS Inc.'s CEO, Adrianne George, loaned SBT LLC $10,000 to cover incidental expenses. The two companies determined that accounting for repayment to PCCS Inc. would be easier in a lump sum than making minor loans

and their incremental repayment. SBT LLC currently has no funds in its account, which will be repaid to PCCS Inc. when SBT LLC is able to do business according to the business plan in place when this litigation was filed. Unfortunately, the conduct of Eastham and Spark has prevented SBT LLC from progressing by, among other things, fouling PCCS Inc.'s contractual relationships with Sig Sauer and Daniel Defense. SBT LLC's planned business would benefit PCCS Inc. by paying it a share of profits from inventory sold in the retail veterans exchange marketplace. Accordingly, this loan had a perfectly legitimate business purpose for PCCS Inc.

64.     In 2022, I took two trips to further business interests of PCCS Inc. d/b/a Stone Bay Tactical, which Eastham and Rust erroneously fault me for taking.

65.     In January 2022, I traveled to Las Vegas for a trade show called Shot Show. This is a large trade show involving firearms manufacturers and distributors. I made valuable contacts for PCCS Inc. d/b/a Stone Bay Tactical. Attending this event was for legitimate business purposes. Eastham and Spark's allegation that I spent $20,000 of company funds on personal expenses is preposterous and completely unsupported by the totality of the company's books, bank statements, and credit card statements.

66.     In March, I traveled to Ukraine, which Russia had invaded, with the goal of securing business supplying tactical equipment, firearms, and medical supplies using PCCS Inc.'s existing suppliers and contacts. This trip was expressly for the purpose of expanding PCCS Inc.'s business opportunities while also providing needed supplies to a government friendly to the United States.

67.    During that trip, Lt. Col. O. Adamovych of the Armed Forces of Ukraine certified me as a representative of the military supply unit of the A7062 Armed Forces of Ukraine.  This meant that PCCS Inc., by and through me, became authorized to supply the Ukrainian military.  I also received a certification as a military instructor. True and accurate letters attesting to these certifications are attached as Exhibit U.

68.    The accusation that I spent PCCS Inc. funds on a personal, rather than a corporate mission is false.  In addition to PCCS Inc. funds for business travel and related expenses, which amounted to less than $10,000. The trip was also partially financed by potential business partners, in joint ventures, that might arise in Ukraine for PCCS Inc. and aligned entities.   One such business partner routed $10,000 to me through PCCS Inc., due to communication limitations in the region.  A true and accurate copy of the March 31, 2022, PCCS bank statement showing those transactions is attached as Exhibit V. PCCS also received a commission payment from sales resulting from that trip.

69.    Shortly before I left for Ukraine, I received correspondence and demands from attorneys for Eastham and Spark falsely accusing me of wrongdoing and threatening legal action against me.  I also received communications from them through a PCCS employee while in Ukraine that were very threatening.  Those false allegations, which are repeated in the present lawsuit, triggered episodes of depression and PTSD-like symptoms due to the stress.

70.    Under the circumstances, it was more preferable to me to lend my military experience to Ukraine for a time, and not focus on the trouble stirred up by

my business partners. My time in bomb shelters, military barracks and eating military rations while volunteering to fight Russian forces cost PCCS Inc. nothing.

71.    When I returned after four weeks, I used my authority to appoint Holly Grange, a former member of the North Carolina House of Representatives, as CEO of PCCS Inc., along with other officers. I became head of strategy and business development. True and accurate copies of those appointments are attached as Exhibit W.

72.    Accordingly, while I do not run daily operations of PCCS Inc., I retain my necessary control over the company through voting shares.

73.    In May of 2022, and again in June through counsel, I asked Eastham and Spark to execute a form required by the VA for recertification of PCCS Inc. as a SDVOB. The form accurately reflected the existing ownership interests of shareholders, as required by the VA to apply for recertification. Eastham and Spark refused to execute the document. Without the form fully executed, I was unable to submit the application and PCCS Inc. lost its certification under the program on July 7, 2022, effectively ending its business as a government contractor.

74.    Had they signed the form, I believe I could have obtained recertification despite the federal violation Eastham and Spark committed in 2020 by paying Eastham additional funds without counterbalancing that amount in my compensation. However, I could not invoke the exception available to PCCS Inc. until after submitting the application, which I could not submit incomplete due to the electronic procedures used by the VA.

75.   Eastham and Spark have since joined forces with other persons in efforts to take over PCCS Inc., consistent with plans they discussed by email in November last year.  They have proposed replacing me or diluting my Class A stock with another disabled veteran.  This litigation is merely a pretext to leverage such a concession from me based on false allegations and demands for payments PCCS Inc. does not owe.

76.   The strategy included obtaining a Temporary Restraining Order by deliberately avoiding giving me any notice of that application and then obtaining an order crippling PCCS Inc.'s capability to do what business it could.  Additionally, the order provided Eastham and Spark the means to obtain early discovery I believe they provided to a creditor of PCCS Inc., DaVinci Company, which had launched a separate lawsuit against the company and obtained a default judgment due to the failure of previous counsel to answer that Complaint.

77.   Upon information and belief, Eastham and Spark have been working with DaVinci, the plaintiff in that other action, against the interests of PCCS Inc. with the further goal of removing me or diluting my Class A stock so they could gain control over PCCS Inc.   On June 28, 2022, attorneys in the other litigation representing DaVinci Co. demanded, upon pain of many threats, that I relinquish my Class A voting stock to another service-disabled veteran and as part of the resulting arrangement they would resolve this action with Eastham and Spark.  A true and accurate copy of the demand is attached as Exhibit X.  Officers of DaVinci also have

stated in my presence that they have consulted with Eastham and Spark, and their attorneys have exchanged documents to assist each other against PCCS Inc.

78.    On July 8, 2022, Eastham contacted a business partner of mine, Mary Puncochar, former senior executive at Ascensia Diabetes Care, the primary client of PCCS and the foundation of our business with the VA. Eastham wanted to do business with Ascensia, not knowing Puncochar had left that company. He texted her that, among other things, I had been found "guilty of fraud" and had "lied to the court." Those are false statements published with the malicious intent to injure my business relations. Eastham said he "wanted to make sure you have facts when working with Trey." I have never been found guilty of fraud or lied to a court. A true and accurate copy of this text message, which Puncochar provided to me, is attached as Exhibit Y.

79.    Since entry of the Temporary Restraining Order, PCCS has been unable to sell its inventory or conduct business in its usual course. I am informed and believe the notice of the Order to banking institutions and others has disrupted access to systems, such as payroll, tied to PCCS accounts. Additionally, because I am a signatory to PCCS's operating account, Holly Grange, the company's CEO, thought it best to route funds from the government through her own company and pay bills outside of PCCS to avoid even the appearance of non-compliance with the Order, burdening her and her company with funds held in trust for PCCS. She has fully accounted for all of those funds while holding them in trust for PCCS. Additionally,

the Order prevents me from exercising control over the company, further exacerbating its inability to meet SDVBO regulations.

80.    The only reasons PCCS was unable to pay bills for a short period of time was because of the TRO in this case and a default judgment for $250,000.00 that was entered in the DaVinci matter, prompting execution on PCCS's accounts, and which has since been set aside.  Reversing the punitive damages default means that but for this TRO, PCCS could use its accounts in the regular course of business to receive funds and pay bills.

81.    Throughout these efforts by DaVinci and the Plaintiffs in this case to force me to relinquish shares in PCCS, Holly Grange and I have continued to keep PCCS a going concern by paying its bills as they come due since the receipt of $172,608 from the Department of Veterans Affairs for an existing contract on June 23.  Based on bids to the VA prior to its decertification as a SDVBO, I have been notified that PCCS has been awarded contracts worth more than $500,000, which PCCS will satisfy under Grange's leadership.

82.    Eastham and Spark seem to believe that I was not fully forthcoming with the New Hanover County Sheriff's Office when a deputy asked me to fill out a form identifying assets of PCCS Inc. for execution on the DaVinci judgment.  The firearms inventory did not fit the descriptions of property requested to be identified and I did not believe they qualified as "equipment."  Nevertheless, I informed the deputy that there was a warehouse containing medical supplies and firearms and it

was my understanding from her response that such items were not of a type that could be liquidated to satisfy a judgment and therefore did not need to be listed.

83.    As a veteran, I am offended that Eastham and Spark allege that my PTSD makes me unfit to be the controlling owner of a business.  It is only because of my service-related disability that they were able to reap hundreds of thousands of dollars in salaries and much more in the value of their equity interest in a company that was lucrative until their misconduct destroyed its ability to conduct business.

84.    To summarize, every substantive factual allegation in the Complaint and Amended Complaint used to support the secret entry of a TRO is false.

85.    Contrary to the sworn statements of Eastham and Spark, firearms were in fact a line of business for PCCS d/b/a Stone Bay Tactical, and they knew it.  A true and accurate copy of the d/b/a filing is attached as Exhibit Z.

86.    Contrary to the sworn statements of Eastham and Spark, I asked for a commission in the amount of $100,000 based on my sales volume, and they agreed that was reasonable — not a breach of any duty on my part.

87.    Contrary to the sworn statements of Eastham and Spark, I authorized payment to Eastham pursuant to the Stock Redemption Agreement when requested but Spark, the CFO, failed to enact it and Eastham never demanded it.  Additionally, the agreement itself provides that upon expiration of its term, Eastham merely retains any shares not purchased by then, rendering his claim completely frivolous.

88.    Contrary to the sworn statements of Eastham and Spark, there was no agreement for "back pay" and they knew it.  Eastham and Spark both received equity

interest in PCCS Inc. as compensation for any unpaid work they performed for PCCS LLC, which they understood to be the intent of all parties.  Importantly, the books showed me as due the single largest amount of "back pay," at $170,000, but I have never expected it to be paid.  Ryan Albert's affidavit stating that I admitted I was "owed $170,000 in deferred compensation" and that because of that I was going to pay myself the bonus is simply incorrect.

89.    The baseless allegations that I spent tens of thousands of dollars belonging to PCCS for personal trips to Las Vegas and Ukraine are frivolous; those were documented business trips and any spending on non-PCCS matters was my own.

90.    The vehicle they contend was bought for me as an unauthorized personal perk was leased to provide for travel that I had previously performed in my personal vehicle, often without compensation from PCCS, and is completely justified by the company's business plans, particularly the d/b/a Stone Bay Tactical line, which Eastham and Spark have scuttled through their misconduct, disloyalty, and misrepresentations to the Court.

91.    All my actions have been for the benefit of PCCS Inc.

-23-

This the 2ⁿᵈ day of August 2022.

_____

ROBERT P. SHARPE

Sworn to and subscribed before me this
the 2ⁿᵈ day of August 2022.

_____
NOTARY PUBLIC

My commission expires: _8-17-2025_

VICTOR S. ALEXANDER, III
NOTARY PUBLIC
New Hanover County
North Carolina
My Commission Expires August 17, 2025

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

FILED IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 22-CVS-001507

2022 AUG -2  P 1: 52

NEW HANOVER CO., C.S.C.

BY _____

MARK EASTHAM
And PETER SPARK,

        Plaintiffs,

vs.

PORT CITY CONTRACTING
SERVICES, INC., ROBERT P. SHARPE,
STONE BAY TACTICAL, LLC, and SRS
SUPPLY, LLC,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF KIMBERLY Q.
SWINTOSKY**

I, Kimberly Quarles Swintosky, under oath, hereby state and affirm as follows:

1.     I am over the age of eighteen years, suffer from no legal disabilities, have personal knowledge of all matters herein asserted, and am otherwise competent to testify to the contents of this Affidavit.

2.     I am a licensed attorney practicing in North Carolina since 1998.

3.     I am a partner at Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP. I practice tax, corporate and business law with an emphasis on private equity transactions and general representation of closely-held businesses and their owners. I do not practice litigation.

4.     I began representing Robert "Trey" Sharpe beginning in July 2020 concerning a buyout of a then-business partner, Nicholas Becton, in Port City Contracting Services, Inc. ("PCCS Inc.").

5.     PCCS Inc. began as a limited liability company, Port City Contracting Services, LLC ("PCCS LLC") taxed as a partnership, which was converted to a corporation in June of 2020.

6.     Sharpe wanted purchase or have PCCS Inc. purchase the shares held by Becton in part to fulfill commitments to make equity grants to persons who had helped PCCS LLC become a going concern.

7.     PCCS Inc. is, and was then, a Service-Disabled Veteran-Owned Business ("SDVOB"), which receives preferential consideration for certain contracting practices by the United States Government.  Regulations governing SDVOBs restrict the ownership and control of such a business to ensure that a service-disabled veteran or veterans hold the majority equity interest and maintain control of the business.

8.     Becton's ownership in PCCS Inc. limited PCCS Inc.'s ability to issue stock to non-service-disabled veterans and non-veterans such as Mark Eastham ("Eastham") and Peter Spark ("Spark").

9.     The following was relayed to me by Sharpe, Eastham, and Spark during our discussions about how best to craft an exit for Becton and to restructure ownership of PCCS Inc.:

   a. Eastham, Spark, and other persons involved in PCCS LLC had agreed
      to forego compensation for their work during the business's formative
      period in exchange for equity stakes in PCCS LLC;

-3-

b.  Sharpe was majority owner and an officer of PCCS Inc. and likewise forewent compensation for his work in PCCS LLC during its formative period;

c.  The books and records of PCCS Inc. did not reflect a liability for any foregone compensation;

d.  Eastham had been promised a twenty-five percent (25%) equity stake in PCCS Inc., and Spark had been promised a fifteen percent (15%) equity stake in PCCS, Inc..

e.  Eastham and Spark acknowledged awareness of the restrictions imposed on non-service-disabled veteran owners by the federal SDVBO program as it impacted their ability to obtain equity while Becton remained a shareholder and the amount of equity they could have in relation to Sharpe's equity;

f.  In July 2020 (when Smith Anderson was engaged) Eastham and Spark were officers of PCCS Inc. and were, by that time, receiving compensation for their work.

10.    During negotiations to buy out Becton, a central issue was the value of PCCS Inc.  For purposes negotiating with Becton and issuing stock to Eastham, Spark and others, I encouraged PCCS Inc. to obtain a third party valuation of its stock. Given that a number of employees had foregone compensation for some period in exchange for the promise to receive equity that had not yet been issued, I believed

-4-

it was necessary and appropriate to have PCCS Inc.'s accounting records reflect an amount on its balance sheet for the compensation that was foregone.

11.    I explained to Sharpe, Eastham, and Spark that the amount of unpaid compensation should be quantified and put on the company's balance sheet because if PCCS Inc. were to have dissolved without ever having issued stock to the employees that agreed to forego compensation in exchange for equity, they would have a claim for the foregone compensation.  PCCS Inc.'s financial statements would not have accurately reflected its financial position without the inclusion of an amount for the foregone compensation.

12.    I advised Sharpe, Eastham and Spark that once shares were issued to those who had foregone compensation in the formative period of PCCS LLC, the recorded liability for such compensation could be converted to equity in the company, thereby eliminating the liability.

13.    Spark and I discussed the foregoing in an email exchange after I learned that the expectant shareholders' unpaid earnings were initially booked as "owner investment" in the books and records of PCCS Inc.  I explained that because the expectant shareholders had not yet been issued stock, showing their interest as "owner investment" would be inappropriate and that the amount should be shown as a "payable, which can then be converted to equity once the shares are granted."  A true and accurate copy of this communication is attached as Exhibit A.

14.    By June of 2020, PCCS Inc. was generating sufficient income to pay salaries to Sharpe, Eastham, Spark, and the other employees.

REISS & NUTT, PLLC
1221 Floral Parkway, Suite 104 – Wilmington, North Carolina 28403

15.     Consistent with my discussions with Sharpe, Eastham and Spark an amount of foregone compensation was determined based on the then current salaries of Sharpe, Eastham, Spark, and other employees for the months they had previously worked for PCCS LLC without payment and added to the balance sheet as compensation payable to reflect the amount of compensation foregone by employees that started working for PCCS LLC before it had cash flow to pay them in exchange for the promise of equity ownership.

16.     The third party hired to produce a valuation of PCCS Inc. to be used during negotiations with Becton and for tax purposes connected with the issuance of stock to employees was aware of the liability for foregone compensation. Ultimately, Becton and Sharpe reached an agreement that resulted in PCCS Inc. purchasing Becton's shares.

17.     PCCS Inc. issued new Class B shares in December of 2020, including enough shares to give Eastham twenty-five percent (25%) of all of PCCS Inc.'s issued and outstanding stock and Spark fifteen percent (15%) of all of PCCS Inc.'s issued and outstanding stock.

18.     In fall of 2021, Sharpe communicated with me about creating Stone Bay Tactical, LLC ("SBT LLC") which was to conduct business selling firearms.

19.     Soon thereafter, Eastham corresponded with me about drafting an agreement between SBT LLC and PCCS Inc. to document the amount of expenses PCCS Inc. incurred in furtherance of the firearms business on behalf of SBT LLC and provide terms of repayment of such expenses as well as any other expenses incurred

-6-

on behalf of SBT LLC going forward. Although we traded drafts and suggested edits of that agreement, it was never finalized.

20.    No one expressed any concern to me about SBT LLC diverting any corporate opportunities from PCCS Inc.

21.    It was my impression in communicating with Eastham that he preferred the firearm business to be separate and apart from the medical supply business of PCCS Inc.

22.    In December 2020, Sharpe communicated with me about creating SRS Supply, LLC, for purposes of selling medical supplies via the internet.

This the 21st day of ___July___ 2022.

_____
**KIMBERLY Q. SWINTOSKY**


STATE OF NORTH CAROLINA
COUNTY OF WAKE

Sworn to and subscribed before me this
the 21st day of July 2022.

_____
NOTARY PUBLIC

KATHY L. BARDEN
NOTARY PUBLIC
WAKE COUNTY, NC

My commission expires:  _April 4, 2026_


**REISS & NUTT, PLLC**
1221 Floral Parkway, Suite 104 – Wilmington, North Carolina 28403

Exhibit
A

**From:** **Kim Swintosky** kswintosky@smithlaw.com  🖉
**Subject:** RE: PCCS [SMITHLAW-RDU.016866.00001]
**Date:** November 7, 2020 at 12:24 AM
**To:** Peter Spark peter@pccsmedical.com, Mark Eastham mark.eastham@pccsmedical.com, Trey Sharpe trey@pccsmedical.com
**Cc:** Mark Eastham mark.eastham@pccsmedical.com

Yes, I think it needs to be shown as a payable, which can then be converted to equity once the shares are granted. Is Nick's $490 included somewhere?

**From:** Peter Spark [mailto:peter@pccsmedical.com]
**Sent:** Friday, November 6, 2020 8:56 PM
**To:** Kim Swintosky <kswintosky@smithlaw.com>; Mark Eastham <mark.eastham@pccsmedical.com>; Trey Sharpe <trey@pccsmedical.com>
**Cc:** Mark Eastham <mark.eastham@pccsmedical.com>
**Subject:** Re: PCCS [SMITHLAW-RDU.016866.00001]

Hi Kim,

The book keepers put the unpaid earnings as owner investment. I got the impression you wanted it classed as such so my mistake. Would you prefer this to be treated as salaries payable? I can adjust (they take too long each time I ask them).

For the $50.20 Yes that should be there for INC. I'll have to look at what they did there.

Pete

Get Outlook for iOS

**From:** Kim Swintosky <kswintosky@smithlaw.com>
**Sent:** Friday, November 6, 2020 6:50 PM
**To:** Peter Spark; Mark Eastham; Trey Sharpe
**Cc:** Mark Eastham
**Subject:** RE: PCCS [SMITHLAW-RDU.016866.00001]

A put option is purchase option in reverse, i.e., someone holding an option has the right to purchase stock (imposes the purchaser's decision on the seller), whereas the holder of a put has the right to require a seller to purchase the stock from the holder.  There may or may not be a stated purchase price, rather the purchase price could be determined per a stated formula or by appraisal.  Ofter in closely-held businesses, there is an Operating Agreement or Shareholder Agreement that includes buy-sell provisions that are triggered by certain events, e.g., death of a shareholder could result in Corporation or other Shareholders having a purchase right (option) or obligation to buy the deceased shareholder's shares or it could trigger a right of the deceased shareholder's estate to require the Company to purchase the stock (a put) – either way at a price determined by the agreement.

Doing a Shareholder Agreement to address dilution (and I recommend considering buy-

sell provisions) is on the to-do list once stock has been issued to Pete, Mark, Jay and Ryan, but I understand that currently there is no Shareholder Agreement.

Re: the Sept 2020 Balance Sheet, since Company has not yet issued stock to Pete, Jay or Ryan, why are they included in Owners' Investment? And where does the $366,000 come from? We cannot send a Balance Sheet that looks like we've already written off Nick and already added Pete, Jay and Ryan, when we've told them no issuances have yet occurred.

I assume that all of the assets and liabilities shown on the July/Aug LLC Balance Sheet are also included on the Inc. Balance Sheet, correct? Shouldn't the $50.20 in checking 5978 be on July Balance Sheet for Inc.?

Thanks,

Kim

**KIMBERLY Q. SWINTOSKY | PARTNER**
kswintosky@smithlaw.com | bio
919.821.6736 | vcard | smithlaw.com | map

Sign up to receive legal updates

**From:** Peter Spark [mailto:peter@pccsmedical.com]
**Sent:** Friday, November 6, 2020 5:55 PM
**To:** Kim Swintosky <kswintosky@smithlaw.com>; Mark Eastham <mark.eastham@pccsmedical.com>; Trey Sharpe <trey@pccsmedical.com>
**Cc:** Mark Eastham <mark.eastham@pccsmedical.com>
**Subject:** RE: PCCS [SMITHLAW-RDU.016866.00001]

Hi Kim,

Assuming my memories from education days of 20+ years ago serve me right a PUT is an offering with a set buy back price at a future determined point in time the absolutely aren't PUT options

What we want to do is issue a true and fair value to Mr. Becton (and at the same time for him to have no legal recourse).

That fair value in the mind of PCCS really has been exceeded already based on what he received for the reasons previously stated (lack of effort / non-performance / prior verbal agreement to reduce his holding) however we still want to do the right thing. Sure it was an expensive lesson but we have learned from this. I can say verbal agreements will not

stand and we will not allow them to drag on based on just trust. The cost of getting it in writing is far less than the consequences of not having it written and executed

I would say we offer based on the discount amount at $56,260 knowing we will absolutely cap at the $73k. I don't want long a protracted discussions or negotiations, this has distracted all of us for far too long. Based on past experience my assumptions is that Mr. Becton is not going to accept that first offer, despite the report. I would say that any counter offer he makes will immediately be rejected if in excess of the $73k. I don't know if this is possible but would also suggest that given there is the report, any costs we incur for subsequent negotiations need to come out of that $73k cap

Over to Mark and Trey

Pete

**From:** Kim Swintosky <kswintosky@smithlaw.com>
**Sent:** Friday, November 6, 2020 4:27 PM
**To:** Peter Spark <peter@pccsmedical.com>; Mark Eastham <mark.eastham@pccsmedical.com>; Trey Sharpe <trey@pccsmedical.com>
**Cc:** Mark Eastham <mark.eastham@pccsmedical.com>
**Subject:** RE: PCCS [SMITHLAW-RDU.016866.00001]

Pete,

I just sent an email to Dane, but I think we have what we need from him.

I am not aware of any put option that the grantees of any of the shares issued will have, which means that you CAN use the discounted value - $1940 per 1% rather than $2520 per 1% for purposes of the compensatory stock issuances.

That being the case, do you still want to offer to buy Nick out at $73k - which would mean also using the 252k valuation for the grants? Would you prefer to offer $56,260 ($1940 x 29)?

Thanks,

Kim

KIMBERLY Q. SWINTOSKY | PARTNER
kswintosky@smithlaw.com | bio
919.821.6736 | vcard | smithlaw.com | map

Sign up to receive legal updates

**From:** Peter Spark [mailto:peter@pccsmedical.com]
**Sent:** Friday, November 6, 2020 3:09 PM
**To:** Kim Swintosky <kswintosky@smithlaw.com>; Mark Eastham
<mark.eastham@pccsmedical.com>; Trey Sharpe <trey@pccsmedical.com>
**Cc:** Mark Eastham <mark.eastham@pccsmedical.com>
**Subject:** RE: PCCS [SMITHLAW-RDU.016866.00001]

Hi Kim,

I believe you have the valuation report and additional calculation.
Did we need both in the report from Dane or just the original and then the additional
calculation?

I am also attaching the financials from the book-keepers

As mentioned, the LLC goes past June as a result of the banking transaction dates.
Adjustments can be made with accruals so it is all reflected in June if anyone feels that
strongly about it but it wont really change anything

Please let me know if you have any questions

Thanks

Pete

**From:** Kim Swintosky <kswintosky@smithlaw.com>
**Sent:** Monday, November 2, 2020 12:38 PM
**To:** Peter Spark <peter@pccsmedical.com>; Mark Eastham
<mark.eastham@pccsmedical.com>; Trey Sharpe <trey@pccsmedical.com>
**Cc:** Mark Eastham <mark.eastham@pccsmedical.com>
**Subject:** RE: PCCS [SMITHLAW-RDU.016866.00001]

Is everyone okay with my forwarding a copy of the valuation report to Joe?

I don't plan to send the LLC financials – but I glanced at them.  The bookkeepers
understand that the entity was converted, right?  The LLC did not exist after June 30.  I
was surprised to see columns for July and August 2020 for the LLC.

**From:** Peter Spark [mailto:peter@pccsmedical.com]
**Sent:** Monday, November 2, 2020 12:26 PM
**To:** Kim Swintosky <kswintosky@smithlaw.com>; Mark Eastham

To: Kim Swintosky <kswintosky@smithlaw.com>; Mark Eastham
<mark.eastham@pccsmedical.com>; Trey Sharpe <trey@pccsmedical.com>
**Subject:** RE: PCCS [SMITHLAW-RDU.016866.00001]

Hi Kim,

Document from Dane is attached.

LLC books are completed and attached as well.

The corporation books were expected to be reviewed by the manager last Friday. I have
chased again. I suspect they will come today but will let you know.
I am hoping that the calculation will at least start the discussions as we really want to get
this resolved and behind us. Would be great to have an agreement on settlement this
week.

Thank you

Pete

**From:** Kim Swintosky <kswintosky@smithlaw.com>
**Sent:** Monday, November 2, 2020 10:54 AM
**To:** Peter Spark <peter@pccsmedical.com>
**Subject:** RE: PCCS [SMITHLAW-RDU.016866.00001]

Actually no – we exchanged vms on Friday afternoon, but didn't connect.  I plan to call
him today.  I saw Dane's response and understand.  What's the latest re: the financial
statements?

**From:** Peter Spark [mailto:peter@pccsmedical.com]
**Sent:** Monday, November 2, 2020 9:34 AM
**To:** Kim Swintosky <kswintosky@smithlaw.com>
**Subject:** RE: PCCS [SMITHLAW-RDU.016866.00001]

Hi Kim,

I am chasing up Dane as he didn't deliver the report over the weekend like he said he
would.
Out of interest, did you connect with Joe?
Thanks

Pete

**From:** Kim Swintosky <kswintosky@smithlaw.com>
**Sent:** Friday, October 30, 2020 1:24 PM
**To:** C. Joseph DelPapa <CJDelPapa@wardandsmith.com>
**Subject:** PCCS [SMITHLAW-RDU.016866.00001]

Joe,

Apologies on the delay in getting back to you.  This week is getting away from me.

I'm going to be tied up in meetings tomorrow morning, but around tomorrow afternoon if you have a few minutes to connect.

Kim


**KIMBERLY Q. SWINTOSKY | PARTNER**
kswintosky@smithlaw.com | bio
919.821.6736 | vcard | smithlaw.com | map



Sign up to receive legal updates


IMPORTANT: This e-mail message is intended solely for the individual or individuals to whom it is addressed. It may contain confidential attorney-client privileged information and attorney work product. If the reader of this message is not the intended recipient, you are requested not to read, copy or distribute it or any of the information it contains. Please delete it immediately and notify us by return e-mail or by telephone (919) 821-1220.